**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

 APR 2 2 2024 

MITCHELL R. ELFERS
CLERK

| | | |
|---|---|---|
| **WILLIAM FULKERSON,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | Case No. ___24cv382-SCY___ |
| | ] | |
| **New Mexico Department of Justice; and** | ] | |
| **the following individuals in their personal** | ] | |
| **capacity: Raul Torrez, Hector Balderas,** | ] | |
| **Andrew Deakyne and Rodney Gabaldon;** | ] | **Fair Hearing Demanded** |
| | ] | **Jury Trial Demanded** |
| **Defendants.** | | |

## <u>VIOLATION OF CONSTITUTIONAL RIGHTS AND DAMAGES COMPLAINT</u>

**COMES NOW,** Plaintiff, a Pro Se litigant, who states, under penalty of perjury, the following:

1. Plaintiff William Fulkerson is a resident of Bernalillo County, New Mexico. He is totally disabled and he receives Disability Benefits from the Social Security Administration (SSA) and Office of Personnel Management (OPM) due to Post Traumatic Stress Disorder (PTSD) related medical issues. This happened because he was subjected to a **Senior MANAGEMENT** maintained hostile work environment for over a decade at the SSA's Albuquerque Teleservice Center in Albuquerque, New Mexico. Medical records can confirm that the Plaintiff did not have PTSD before his arrival at the TSC. Medical Expert testimony has been supplied in the Plaintiff's Exhibit number **2020** concerning the proven disability of the Plaintiff - which the Plaintiff alleges was caused by the defendant employing Agency.

2. As a result of that toxic illegal environment, the Plaintiff suffered irreparable damages to his career; it led to the end of his fourteen year relationship/marriage - and his familial relationships for the most part; and most devastating - his mental health forever. The Plaintiff calls attention to Plaintiff's Exhibits - **FAM 1 AND FAM 2** from two of his siblings on the state of their relationship with the Plaintiff and his mental health issues. It should also be noted that the Plaintiff's good name, reputation and standing in the community have been annihilated in public view as reflected in the judges decisions issued previously. The Plaintiff also suffered a Traumatic Brain Injury in 2012 that has led to an ongoing impairment in the Plaintiff cognitive

abilities – which can be noted and easily observable in his writings. This does not need to be pointed out to the Plaintiff- but it is demonstrated in the various rulings issued by federal Judges.

3. The Plaintiff has ATTEMPTED to get a fair hearing on the numerous legal issues presented in the numerous legal documents filed in each of the various cases by the Plaintiff that are now housed in the various legal libraries of the EEOC; in the M.S.P.B; the U.S.D.C. and the Tenth Circuit Court of Appeals. The instant case is the Plaintiff's tenth attempt to get a fair hearing that the Plaintiff remains legally entitled since he filed his first formal complaint in 2013 with the EEOC!

4. That legal entitlement is based upon an <u>indisputable fact</u>- the Plaintiff has a Property Interest Right in his federal career - which was prematurely ended by the illegal actions of his former employer, the Social Security Administration. The Plaintiff has been credited with thirty-one years of federal service with the Agency and he would still be working today if he was not disabled. The property interest right should have allowed the Plaintiff the "OPPORTUNITY TO BE HEARD at a meaningful time in a meaningful manner, " as discussed in the Supreme Court case of *Mathews v. Eldridge*, 424 U.S. 319,333(1976)(quoting Armstrong v. Manzo, 380 U.S. 545, 552(1965)), on his various legal issues in each filed complaint in a hearing. This right means more than the opportunity to just file written Response documents that can hide deception that in-person cross-examination could overcome in a fair hearing where the Plaintiff has the opportunity to challenge testimony and evidence. The Plaintiff was not given that fundamental opportunity on his legal issues repeatedly. This is an <u>indisputable fact</u>.

In *Snipes v. Scott*, No. 4:18-CV-580 MW/CAS (January, 2019), Judge Walker discusses the property interest rights of a state government employee that filed that due process case. Even though the legal issues were moot before the actual ruling was issued by the judge, Judge Walker allowed the case to move forward to a formal hearing because of the employee's property interest right. For the record - the Plaintiff has never waived his legal property interest right in any way, shape or form in the past or presently.

5. The federal Judges have not spoken to those two indisputable facts (there are more indisputable facts discussed throughout this document) in any of their decision documents on the Plaintiff's complaints that were before them. In fact, their legal decisions <u>ignore</u> that reality altogether. Their summary judgements, dismissals, and denials deprive the Plaintiff of his Constitutional right to due process. The Plaintiff was deprived of the opportunity to present his entire case; to the cross-examination and challenges the favorable and unfavorable witnesses statements contained in their Affidavits/Depositions; or to challenge the evidence submitted by the Agency regarding the allegations presented by the Plaintiff. So far, a fair hearing has not been given to the Plaintiff; Justice has not been served nor has it prevailed. It is apparent that the judges are okay with the violations of the Plaintiff's Constitutional rights - their decisions reflect it.This is an <u>indisputable fact</u>!

6.  The deprivation of the Plaintiff's Constitutional right to due process starts with Judge Bobby Baldock in 2018. He presided over the Plaintiff's EEO complaints in the U.S.D.C. case number 16-CV-889-BRB-KBM. A copy of that decision document is Plaintiff's Exhibit ZERO. Judge Baldock ignored the Tenth Circuit Court of Appeals decision in *Romero v. Union Pacific Railroad*, 615 F. 3d 1303 (10th Cir.1980) concerning the prohibition of issuing summary judgement decisions on cases involving RETALIATION. The rationale behind that 1980 decision is based upon witness creditability issues. There are more Tenth Circuit decisions on this issue within the *Romero* case that speak directly to the issue in *Madison v. Desert Livestock Co.*, 574 F. 2d (10th Cir. 1978); *National Aviation Underwriters, Inc. v. Altus Flying Service, Inc.*, 555 F. 2d 778(10th Cir. 1977); and *Little Redhouse v. Quality Ford Sales, Inc.*, 511 F. 2d 230 (10th Cir. 1975). There are too many cases to say that Judge Baldock did his job correctly. Judge Baldock overlooked the vast amount of case law that stated that he should not issue a summary judgement decision. He looked willfully past the Rule of Law on the matters before him! The Supreme Court case of *Adickes v. S.H. Kress Co.*, 398 U.S. 144 (1970) stated that the issuance of a summary judgement decision cannot be issued in a case where there is a genuine issue at hand.

The end result to be put forth - he failed to consider that Agency witnesses could or would lie about the issues presented to him in the Plaintiff's complaint. He intentionally failed to give the Plaintiff due process. Thirty-four years on the bench.

Judge Baldock <u>literally</u> slanted witnesses' statements presented in their Affidavits to fit the judge's bias narrative concerning the Plaintiff. Judge Baldock failed to consider favorable supporting evidence from other witness Affidavits, Agency Investigation Conclusions and other evidence that were in the case files at the time. Specifically, the judge ignored the somewhat faulty EEO and SSA Regional Office Internal investigation Conclusions that supported the numerous allegations put forth by the Plaintiff on the EEO complaint issues. Judge Baldock's attempt to satisfy the three prong analysis set forth in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 is a - LET THE PLAINTIFF BE CLEAR - A JOKE!!! His bias is demonstrated there within many times over! Judge Johnson could not come to any other conclusion - except by choice.

Judge Baldock intentionally and deliberately attempted to circumvent Rule 56 (c), U.S.C.A., which states that the issuance of a summary judgement cannot be issued on a case where there is a GENUINE issue to a material fact. Judge Baldock, by his actions - <u>in twenty-nine pages</u>, resorts to illegal means in his attempt to try and show that there was no GENUINE issue. Ignoring evidence in file that shows there was a genuine issue to a material fact — many of them!!! Intentionally, Deliberately and Willfully actions taken by the judge. <u>Indisputable fact</u>.

7.  It should be noted that the Agency Internal Investigation was conducted by another career Agency employee who watered down his findings on the legal issues he investigated and reported on. He could not completely dispose of the EEO issues investigated as discussed in that document. The EEO Investigator, who was <u>paid for by the Agency</u>, likewise failed to conduct a

legitimate investigation and her report was watered down as well. The answers given by the witnesses to the questions asked by both investigators should have REQUIRED FURTHER QUESTIONS TO BE ASKED - but those new questions were never asked because the Agency did not want to address the true answers to those other illuminating questions and to them becoming public in a hearing. The Plaintiff conducted numerous formal federal investigations throughout his career with the Agency. These two Agency driven investigations are sub-standard to put it mildly. A fair hearing would have exposed SSA's efforts to RETALIATE AGAINST the Plaintiff for his whistle-blowing activities.

8.   The Exhibits submitted with the Constructive Discharge, Retaliation and Civil Rights Violation case filed in November 2020 are actually from the original case files of the 2018 U.S.D.C. Case which are now the Plaintiff's Exhibit Zero in the instant case. The 2020 Due Process case file exhibits are now the Plaintiff's Exhibit 2020 in the instant case. Judge Baldock intentionally, deliberately and willfully ignored written evidence contained within the 2018 case files; ignored case law concerning the prohibition of "summary judgement decisions" on cases where retaliation issues at issue as discussed in the *Romero v. Union Pacific Railroad* case; failed to allow the Plaintiff to present his case and evidence; and the judge also made false statements about the Plaintiff's creditability to hide his bias (on page seven - for example) in his 2018 decision document.

The Plaintiff was not given the opportunity to be heard in many ways. Judge Baldock intentionally, deliberately and willfully failed to consider available AND OVERWHELMING evidence in file (exhibit 2020 AND MORE) in the light most favorable to the party opposing the summary judgement motion - the Plaintiff. The Plaintiff cannot explain why the judge is biased against him, but there can be no denying the judge's actions are over the line and cumulatively speaking, those actions demonstrate bias.

 "To succeed on a claim of judicial bias, the Petitioner must demonstrate either that the trial judge was actually bias against him or that 'circumstances were such that an appearance of bias created a conclusive presumption of actual bias.'" Tafoya v. Tansy, 9 F. App'x 862, at 873 (10th Cir. 2001)(quoting Fero v. Kerby 39 F 3d. 1462, 1478 (10th Cir. 1994). Again, there was no discussion or consideration given to the supporting favorable evidence in the form of the witness Affidavits, depositions, defective investigations or the other documents contained in the Agency's Internal Investigation or its conclusions that were in the2018 case files LITERALLY in front of Judge Baldock. In fact, Judge Baldock stated that there was a lack of evidence to support the Plaintiffs' claims in his decision document. It was there if he would have looked for it - in file. He needs to be held accountable for his illegal actions that violate the law, as well as those others who also violate the law by their own actions against the Plaintiff's Constitutional rights.

All the while, Judge Baldock ignored what is contained within the case files that showed the existence and ongoing continuation of the Hostile Work Environment that the Plaintiff complained of in that specific lawsuit. Each piece of that evidence speaks for itself! The Agency's

Internal Investigation and the EEO Investigation evidence and the conclusions contained in those reports fully supported the Plaintiff' EEO allegations against his employer - which was also, ignored Judge Baldock in his decision. The Judge violated 18 U.S.C. subsection 242 – **Deprivation of Rights under the color of Law by his bias actions.**

The Plaintiff believes that Judge Johnson became aware of these facts when he examined the evidence submitted in the 2020 Due Process Case that was before him. The Plaintiff discussed that 2018 case file evidence on page two of his filed 2020 Initial Complaint document. Judge Johnson ignores that evidence completely in making a decision on the due process violation issue. He intentionally, deliberately and willfully in turn, ignores that evidence and facts discussed in those documents. Judge Johnson wrote the following sentence in the last paragraph of his decision - "While he may not have been afforded a hearing in person, Plaintiff has not shown that he did not have a "full and fair opportunity to litigate his claims in *Fulkerson1*." A reading of the Complaint document that was before the Judge Johnson does not support his expressed statement. The Judge ignored the *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 case that states that there are two exceptions (the Continuing Violation Doctrine issues, and a new Claim - the due process violation issue) to issuing a "Res judicata decision." The Plaintiff did put forth both of those exceptions in his filed documents: the Plaintiff's Response to the Show Cause Order document and the Amended Complaint document that Judge Johnson ignored Intentionally. These exceptions are also discussed in the filed Opening Statement document in the Tenth Circuit Appeal case filed by the Plaintiff.

FOR THE RECORD - The Plaintiff has not ever been given the opportunity to cross-examine or challenge : 1) the writers of the submitted Agency evidentiary documents; 2) the Agency's witnesses who submitted Affidavits that are contained in the case files; 3) the statements contained in the depositions of senior Agency Management;  4) the Plaintiff had not been allowed to present the SSA Regional Office Internal Investigation favorable evidentiary documents and Conclusions; or 5) the Affidavits of employees who witnessed the Plaintiff being subjected to the Hostile Work Environment contained in the case files that the Judge had in the case files. Without being able to cross-examine or to challenge the witnesses and evidence, the Plaintiff did not have the opportunity to be heard that is required under legal due process procedures.

The Tenth Circuit Court of Appeals panel of Judges, in turn, looked the other way on the whole matter as well. This is why the Plaintiff filed the Judicial Misconduct complaint – THIS IS A CONSPIRACY TO DEPRIVE THE PLAINTIFF OF HIS CONSTITUTIONAL RIGHTS by the judges involved!!! And, as discussed below, the NMDOJ has become a willing participant in this conspiracy. All of these Actors violated 18 U.S.C. subsection 241 – **Conspiracy Against Rights by their own individual actions.**

It is crystal clear that the Plaintiff has alleged the violation of federal and state Felony criminal statutes have been committed by federal, and now, state Actors in his previous complaints. The

Plaintiff uses the term "Actor" for a reason. When a person holds a position of authority and they commit a crime, they lose all immunity and benefits under law associated with the position they hold. They become an actor. ALL federal employees have a legal duty to act upon allegations of wrongdoing by other government Actors presented to them under various federal regulations that apply to all federal employees regardless of the Agency or entity involved. The Judges have failed to take appropriate actions on the reported multitude of criminal violations of Law. Indisputable fact !!!

9. Judge Baldock's bias against the Plaintiff is demonstrated in his words and phrasing of statements contained in that decision document and his outright ignorance (thirty-four years on the bench) of the Retaliation prohibition ruling in Summary Judgement determinations made by the Tenth Circuit Court of Appeals in the *Romero v. Union Pacific Railroad* Case cited in this document above. The Judge used some form of the word "retaliate" well over thirty times in his decision document. The Plaintiff also believes that the *Romero* case may discuss the other forms of legal technicalities that are prohibited regarding the various complaints filed by the Plaintiff.

10. There is way too much evidence that Judge Baldock intentionally ignored which can be summed up as a demonstration of bias on his part. The Plaintiff has "highlighted" numerous aspects of that case page by page that deserve complete understanding on the legal issues discussed in the document. All the Trier of Facts has to do is to scratch the surface and it all comes gushing out.

11. Exhibit One of the evidence submitted in the November 2020 due process case goes against Judge Baldock's statements contained in the footnotes on page seven of the 2018 document. That document shows that the Plaintiff was formally diagnosed with Post Traumatic Stress Disorder (PTSD) in January 2012 – not 2013 as Judge Baldock had accused the Plaintiff of lying about. Judge Baldock ASSASINATED the Plaintiff's creditability in that 2018 decision document to overshadow his bias and to justify his violation of the Plaintiff's Constitutional rights. Judge Baldock's failures denied the Plaintiff's right to a jury trial under the Seventh amendment of the United States (U.S.) Constitution. Judge Baldock had been an appeals judge for over thirty one years in 2016.

12. At best, Judge Baldock has only taken on new cases from the District Court when there was an overload of cases in the District Courts. The Judge's failure to recognize and address the Plaintiff's property interest right; his failure to recognize evidence in file; ignoring case law; and thus, the plaintiff's legal entitlement to a fair hearing where he had the "opportunity to be heard" has never happened.  The Judge slanted the statements of the witnesses' Affidavits to fit his narrative concerning the Plaintiff and the Plaintiff's creditability. This fact can only be proven by cross-examination of witnesses and scrutinizing the evidence IN A FAIR HEARING. That decision document defamed the plaintiff in many different ways.

13. It is also worth noting that the Plaintiff continues to seek attorney representation but no one is willing to step up to the task. The Plaintiff has MANY non-acceptance letters from various attorneys that he contacted previously - he can produce them if needed. The Plaintiff knows that it is not a lack of available resources to fund that representation. The Plaintiff also understands that he has been and continues to be legally entitled to a fair hearing - which he has not gotten. If he ever gets a hearing - the Agency will be toast for its PROVABLE ongoing hostile work environment that caused the Plaintiff to become mentally disabled as well as intentionally violating the Plaintiff's Constitutional rights and preventing the Plaintiff from getting Justice.

14. When a federal Actor states that the Plaintiff's arguments are not "WELL TAKEN" - the Plaintiff would like to point out to any Actor that the violation of his Constitutional rights are not "WELL TAKEN" and that is why he CONTINUES TO FILE NEW lawsuits. And furthermore, he is resolved in filing as many other lawsuits as it takes until his rights are respected and adhered to as required by the law. A second issue that same federal Actor stated in her decision concerns her observation that she could not see any JUDICIAL BIAS based upon her review of the case documents. The Plaintiff believes that she did not look very hard to make that conclusion.

15. A reading of Exhibit **Zero** (contained in this lawsuit with highlights) makes that assessment inaccurate and troubling to the Plaintiff. It should be noted that ALL of the previous Triers of Fact did not address this reality in their own decisions either — especially Judge William Johnson.

16. Judge Johnson also violated the Plaintiff's federal Appeal rights regarding the M.S.P.B. decision that was the catalyst for bringing the filing of the November 2020 Case In District Court. Judge Johnson's own many failures — some of which have been addressed in this document are criminal. He recognized that Judge Baldock had violated the Plaintiff's Constitutional rights and he tried to protect Judge Baldock himself. He joined in the conspiracy at this point.

17. The Plaintiff also intends to retain and provide testimony from a Language Expert witness on this very issue at hearing. The Plaintiff alleges that the decision documents themselves show bias and the expert will speak to that allegation in their testimony.

18. The Plaintiff understands and alleges that the Social Security Administration would **bribe** whoever it needed to so that it could keep the Plaintiff's case out of Court. He was a member of management for over half of his federal career. He use to know where all the bodies were buried -that is the knowledge of illegal activities and violations of law that the Agency covered up. Now he only remembers one — her name was *Serena Lee*, a transgender woman who committed suicide due to the hostile work environment she was subjected to at the TSC. The Plaintiff cried when he learned of her death!!! *It would not have happened if the Plaintiff had gotten a TIMELY fair hearing that he was legally entitled to.*

19. The blood of that innocent woman is on the hands of Judge Baldock and those who continue to choose to ignore their own duty whether they accept it or not!!! May the Lord have mercy on their souls!!! There were/are many employees that have been damaged and harmed by that environment and SSA Executive management have been well aware of it for decades now. A legitimate investigation would be able to prove this fact.

20. The Agency has been very successful thus far – the court case records reflect that overriding conclusion – no fair hearing to date!!! This is the Plaintiff's tenth attempt to get a fair hearing on the legal issues he presents below. The Plaintiff can and will prove his case to a jury. A reading of his various lawsuit documents reveal that he did not put forth a "WORD SALAD" in any of the documents he has filed in court that the Decision-makers could miss the theme of. Yet, here we are today.

21. The 2018 U.S.D.C. decision is suspect because that Federal Actor issued a Summary Judgement decision on a case where "RETATIATION" claims were put forth by the Plaintiff. This goes against the Ten Circuit Court of Appeals own PRECEDENT setting decision in *Romero v. Union Pacific Railroad* case. In this decision, the Court held that Witness creditability issues preclude the issuance of a Summary Judgement decision. Yet, Judge Baldock spouts out a ton of case law as if he was the Defendant's Counsel – AND all the while, he is totally ignorant and silent on the issues addressed in the *Romero* case. The Plaintiff does not believe that this happened by circumstances outside the control of Judge Baldock and the Judge's legal reasoning should be scrutinized for an understanding of his own legal position taken in past rulings. There is no other legitimate legal way of seeing this fact in objectively.

22. Yes, Judge Baldock intentionally and deliberately chose to ignore the Retaliation issues outright and case Law that was right in front of his face. MAKE NO MISTAKE ON THAT ISSUE!!! Again, in his decision document, Judge Baldock reiterates an iteration of the word "RETALIATE or RETALIATION' over thirty times in that document. This is an indisputable fact. Judge Baldock is NOT omnipotent and his "TAKE" on the Affidavit statements put forth by the witnesses is slanted, inaccurate and untrue. Yet, without a fair hearing where the Plaintiff is given a REAL opportunity to be heard, Judge Baldock's intentional failures float, numerous federal and state Laws and Felony statutes broken, Constitutional rights violated, and the Rule of Law is stomped on and intentionally broken! UNACCEPTABLE! No person, be he a judge or not, should be allowed to get away with these crimes.

23. He and the Tenth circuit Court have ignored a number of its own "precedent" cases (as discussed above) regarding various legal issues raised in the Plaintiff's previous cases in their rulings on the Plaintiffs' case. These issues were discussed in the Judicial Misconduct complaint filed by the Plaintiff in December 2021. A copy of the acceptance letter from the Tenth Circuit's Director's Office with highlighted notes is contained Plaintiff's Exhibit 2. The Plaintiff highlighted most of the entire Misconduct document. The Plaintiff is monitoring how this legal matter resolves closely. The Plaintiff has expectations the issue should be be dealt with to conclusion in

this mix. Over two years and no decision to date - the Plaintiff thinks that SHOULD invite scrutiny to say the least. We are talking about the violation of Constitutional rights over an extended period of time. The Plaintiff raises a concern that the Chief Judge of the Tenth Circuit Court of Appeals is delaying the findings of the misconduct complaint based upon what has been discussed above.

24. Judge Baldock had no personal knowledge of the Plaintiff to make a creditability determination on his own. He relied upon the WRITTEN AFFIDAVITS/EVIDENCE of the Agency's witnesses and documents WITHOUT the Plaintiff having the opportunity to cross examine the Agency witnesses' statements made in their Affidavits; or to challenge their testimony; or to challenge any other evidence submitted by the Agency in a fair hearing to which the Plaintiff remains LEGALLY ENTITLED TO. This was intentional!!! Repeating - the first Exhibit in the November 2020 Constructive Discharge, Retaliation and Civil Rights Violation case files shows that the federal Actor fatally assassinated the Plaintiff's creditability unjustly back in that 2018 decision. A fair hearing would have prevented this complete failure perpetrated by the Actor involved.

25. *The Agency was well aware of the Plaintiff's property interest right* because this case is not the first time the Agency has attempted to deprive its workforce as well as the American Public they serve in other cases of their Constitutional rights and they have been busted for it by the Courts routinely. The Supreme Court rebuked the Agency in its decision in the *Goldberg V. Kelley 397 U.S. 254* (1970) case for its violation of the SSI populations' due process rights concerning the receipt of government funds to which they were legally entitled to. Another aspect the Goldberg-Kelly decision is the Supreme Court's stated stance on the issue of cross-examination of witnesses and Agency's actions which has been ignored by the Actors involved in the overall conspiracy case where the Plaintiff is concerned.  A copy of that decision can be supplied to this Court if needed. Yet, Judge Johnson stated in his decision that the Plaintiff had the opportunity to be heard without an actual hearing – knowing that a Retaliation claim had been raised and ignored by Judge Baldock in Baldock's decision.

26. ON POINT – SSA got beat in the Goldberg-Kelly case in what year? 1970, PEOPLE!!! So, in 2013, when the Plaintiff requested a hearing (for the first time) that he WAS LEGALLY ENTITED TO BECAUSE OF HIS PROPERTY INTEREST RIGHT, it is an indisputable fact that he has not gotten one to date. WHO IS RESPONSIBLE FOR THIS HAPPENING? The answer leads to another indisputable fact – it is NOT the Plaintiff who has or is violating his own Constitutional rights!!!

The reality of the Goldberg-Kelly case on SSA was that the Agency has to give SSI recipients' formal hearings before taking away the money they are entitled to. Now, looking at the Plaintiff's case on that very issue - the SAME Agency has orchestrated a conspiracy so that it does not have to give an employee of the SAME Agency the SAME legal rights as ALL SSI Recipients have – that is a formal fair hearing. This "NEW" claim was put forth in the Plaintiff's Amended Complaint in the 2020 Due Process Violation case that Judge Johnson ignored. The

judge stated as much in his decision -that the Plaintiff had "had the opportunity to present his case in writing" and that was enough. **This is unacceptable!!!** .

**NOTE: The "new" claim is one of the two exceptions that should have prevented the issuance of a "RES JUDICATA" decision by Judge Johnson. A review the Supreme Court decision in the Lawlor v. National Screen Service Corp. case discusses the two exceptions as preventative measures to ensure the ends of Justice are not thwarted.**

27. The Plaintiff is expecting the Trier of Facts assigned to the instant case to understand that the Plaintiff understands his legal rights enough to bring this case to life in front of a jury - and that it is provable in a Court of Law. The Plaintiff asserts that judges sitting on the bench in the decades since the 1950s'and the 1970s' should know their stuff – RIGHT?  This case illustrates a breakdown in the Judiciary process that has previously set our legal system above others around the world. This case also stains the American Public's perception of what our legal system accepts as appropriate way of dealing with legal issues – THE RULE OF LAW!

In the Conspiracy case (which includes the NMDOJ),  past Judges have exceeded and  abused their official authority; and they are bias by their actions in making their ruling against the Plaintiff's multitude of legitimate legal complaints without giving him a fair hearing. **They ignore legal precedents, federal and state felony criminal statutes - left and right. They ignore case Law! And most sadly, they ignore - or maybe even reject the Supreme Court and its Supremacy - and that they are actually thumbing their noses at the Court itself! Their actions and decisions do not reflect the Rule of law.** There is no sugar coating this reality can be presented if the Plaintiff gets the fair hearing that he is entitled to. If the NMDOJ had investigated the criminal allegations it received from the Plaintiff, the conspiracy discussed above would have surfaced then.

28. The Plaintiff has requested that Opposing Counsel agree to the admission of the ALL Case files into the record that will be established hereafter based upon this lawsuit. They are well over fifty pages each, but they are necessary and essential pieces of evidence central to the Conspiracy claims being presented in this document. Opposing Counsel continues to be uncooperative with the Plaintiff and fails to addressing issues that require legal cooperation. The Plaintiff, therefore, makes a motion that the 2018 case files, the U.S.D.C. November 2020 case files and the entire collection of the Tenth Circuit case files is admitted into evidence in the instant case by this Court.

## THE INSTANT CASE

29.  Federal and State Civil and Criminal law violations concerning the Plaintiff Constitutional rights occurred within the state of New Mexico by multiple federal Actors, and now, state Actors. These federal and state Actors violated provisions of Title VII of the Civils Rights Act of 1964, 42

U.S.C. subsection 2000 et seq. The instant case concerns the violations of law by the New Mexico Department of Justice (NMDOJ), which was formerly known as the New Mexico Office of the Attorney General (NMOAG.) The NMDOJ violated the Plaintiff's Constitutional rights under Article Two, Subsection 18 of the New Mexico Constitution regarding the due process clause and the Equal protection under the law clause - as well as the violation of the Fifth Amendments' Due Process, Equal Protection, and the Eminent Domain Clauses, and the violation of the Seventh Amendment of the United States (U.S.) Constitution by other conspiracy participants. These are <u>multiple indisputable facts</u>.

The NMDOJ is an active conspiracy participant that continues to violate the Constitutional rights of the Plaintiff flagrantly, deliberately, intentionally and willfully. Much of the discussion below is an interweaving of all the conspiracy actors actions involved in the Conspiracy. The Plaintiff believes this is the best way to show it going down.

30. The Plaintiff takes **ISSUE** with the language, wording and tone of the federal Actors who issued the previous decisions on his legal matters. THIS HAS COLORED THE PERCEPTION OF THE PLAINTIFF IN MANY NEGATIVE WAYS. The Plaintiff can demonstrate his character, honesty and integrity – in other words – HIS CREDITABILITY when he is given the chance to do so in a FAIR Hearing! **He is insulted and defamed** in many ways by what they put forth in their documents that assassinates his good name, his reputation and standing in the community.

**THIS VIOLATES THE PLAINTIFF'S LIBERTY INTEREST.** The Plaintiff raises a new claim at this point for that violation of this Liberty interest right to this Court today. The 2018 U.S.D.C. Decision letter, the 2020 M.S.P.B. decision letter and the 2021Tenth Circuit Decision letters are pointed to in support of the allegation. These Actors all relied upon written statements and written evidence – nothing else. **UNACCEPTABLE!** Someone is responsible for making the false statements put forth by the judges about the Plaintiff.

31. The documents previously submitted by the Plaintiff *are not word salads* – nor is this one! A jury will agree with that in time when they are able to read the various documents discussed and presented to them in this lawsuit. The Actors have been intentionally chopped up the Plaintiff's documents' statements in order to cast doubts and vilify the Plaintiff, his creditability and the legal issues he has presents in those documents.

32. The Plaintiff states that he is a federal Crime Victim as discussed in 18 U.S.C. Subsection 3771. This is an <u>indisputable fact</u>. The Plaintiff filed a complaint against the NMDOJ on this issue in April 2023. The complaint Number is NMOAG-ECS-202304428-a9da. A copy of that complaint is Plaintiff's Exhibit Number 1. This is an <u>indisputable fact</u>. The NMDOJ has intentionally ignored its legal responsibilities and duties under that statute and it continues to disrespect the Plaintiffs rights specified in the statute. He also reported the crimes to the FBI on July 19, 2022. To date, there has been no action taken on this matter by the FBI to the best of the Plaintiff's knowledge. He also filed two complaints with the DOJ. They turned him down both times.

33. For the record- the Plaintiff contacted the following federal Agencies or Entities trying to get help on these legal issues: the O.S.C.; the M.S.P.B.; the DOJ; the OIG; the FBI; and now a state Agency - the NMDOJ. Not one of them was willing to help! PATHETIC! This is <u>indisputable fact</u>.

34. Both federal and state Constitutional rights and felony criminal statutes have been violated by the NMDOJ that will be explained below. The starting date of the NMDOJ violations began when it issued a "Denial of Service" letter in September 2022 and is continuing to date. This is an <u>indisputable fact</u>. By its actions and conduct, the NMDOJ has participated in an illegal conspiracy with other conspiracy participants to deprive the Plaintiff of his Constitutional rights. This is a violation of 18 U.S.C. Subsection 241 - **Conspiracy against Rights**. They are part of the ongoing conspiracy.

35. To qualify and be named a participant in a conspiracy, the party has to *commit an act that FURTHERS the actual conspiracy -* even though that particular party may not have directly committed the actual crimes. This is the case for the NMDOJ in the instant case. **The NMDOJ can be best described as "the patsy"** who is willing to take the fall for the bad guys including the main perpetrators that have masterminded the conspiracy - The Social Security Administration, his former employer. The NMDOJ is attempting to shield federal Actors from accountability for the crimes they committed under the color of Law and <u>the NMDOJ makes itself a criminal</u> by doing so. This is an <u>indisputable fact</u>.

36. Jurisdiction and Venue are proper for this Court. This Complaint is filed timely. The instant case is based upon the three complaints filed against the NMDOJ itself. The first complaint filed by the Plaintiff was in November 2022 concerning the violation Of 18 U.S.C. Subsection 4 – Misprision of a Felony by the NMDOJ. The complaint number is NMOAG-ECS-20221112-2d4c. A copy of this document is Plaintiff's Exhibit Number 3. This is <u>indisputable fact</u>.   This is a multiple count indictment complaint as there has been the violation of multiple federal and state felonies committed over the course of the overall conspiracy that have gone on unreported to <u>appropriate</u> LEGAL AUTHORITES. To date the Plaintiff has not received any communications on the actions taken or the results of these complaints against the NMDOJ from the NMDOJ.

37. The Second complaint occurred in April 2023 and it has been addressed above. The third complaint was filed against the NMDOJ in September 2023. The Plaintiff attempted to file this complaint on-line, but the NMDOJ computer system would not accept the submission of this complaint. Therefore, on September 25, 2023, the Plaintiff called the NMOAG and spoke to a representative named Maria. The Plaintiff and the representative reviewed the on-line complaint and she could not see why it was not accepted and that she would make the matter known to others. Phone records can confirm the call occurred and the duration of the call as well. This is an <u>indisputable fact</u>.

38. As stated previously, the Plaintiff has a legal "Property interest right "in his federal career and the rights, privileges and immunities of that property interest right were violated and/or deprived by the federal actors previously, and by the state actors involved in the instant case. The federal actors issued "final decisions" in the various legal complaints filed by the Plaintiff without first addressing the Plaintiff's property interest right. This violates the Rule of Law! This is an <u>indisputable fact</u>. Technical Dismissals, Denials and Summary Judgements are, in fact, final decisions in themselves and these decisions were being requested by previous Opposing Counsels. Even though they know that they were doing and it must be emphasized that they were okay with it - violating the Plaintiff's Constitutional rights each and every time.

39. The Plaintiff challenges the use of judicial process procedures that ultimately result in the violations of Constitutional rights of American citizens including himself, and thusly, **violating the Rule of Law**. When do Constitutional rights take a back seat to legal technicalities that usurp the rights in question? Perhaps the Trier of Facts in the instant case can shed light on this issue to the Plaintiff.

40. The Plaintiff raises the legal question concerning which is more necessary in a Democracy - a Constitutional right being adhered to or Prosecutorial discretion when crimes against those rights are violated and ignored. The Plaintiff looks forward to finding out that answer from this Court. **Again, the Plaintiff makes the point that the NMDOJ could have advocated with federal law enforcement entities about the violation of the Plaintiffs' Constitutional rights, but did not do so. This is an** <u>indisputable fact</u>. By not taking any official legal action whatsoever, the NMDOJ demonstrates its active participation in the overall conspiracy.

41. The Supreme Court stated in its decision in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) (words to the effect) that if a person has a "property " interest , a hearing concerning that specific "property" interest right is <u>a legal prerequisite</u>. The actions and conduct of the NMDOJ ignores the commission of federal and state felony crimes and its duty – its obligations under law to uphold and defend the Plaintiff's Constitutional rights. It is a fact that the Plaintiff's FEDERAL Constitutional rights have been stomped on and violated repeatedly for over a decade! Now the Plaintiff's Constitutional rights under state law are being stomped on and violated as well!!! And, we are headed towards two years on the instant case. This is <u>indisputable fact</u>.

42. Repeating again, in the decision on the Snipes V. Scott case, Chief Judge Walker pointedly addressed the due process rights of a government employee – even though the legal issue was likely to be moot by the time the decision was issued - which it was. That did not matter to the judge, Judge Walker respected all aspects of Ms. Snipes' right to due process and addressed them correctly and legally. The Plaintiff loved Judge Walker's "Initial decision" document for its strongly worded language. The Plaintiff feels that it "fit like a glove" to his own legal situation.

43. That REQUIRED hearing did not happen previously for the Plaintiff and it has never occurred to date - which makes it a continuing violation of the Plaintiff's Constitutional rights to this very

day. This is an <u>indisputable fact</u>. And therefore, all violations are subject to the Continuing Violation Doctrine. Since April 2018, the Plaintiff has raised his Constitutional Due Process/property interest right violation issue in <u>all</u> of his initial Court filed documents on each of his complaints. The libraries that house the EEOC, the MSPB and the U.S.D.C. Decisions maintain the filed documents that any Judge has the ability to view the filed documents they may choose to question.

44. In the Plaintiff's Opening Statement to the Tenth Circuit Court of Appeals case Number 21-2001, Fulkerson v. Andrew Saul, Commissioner, and SSA. The Plaintiff addressed the "ENDS OF JUSTICE" issue that has been ignored by the many Actors involved in these legal matters. This is indisputable fact number  .A copy of that document is Plaintiff's Exhibit number 4. Judge Johnson's decision and the Tenth Circuit panel of Judges that wrote the decision and ultimately the entire pool of Tenth Circuit Judges don't care what the Supreme Court has ruled repeatedly where federal employees are concerned. They have stated as much in their written decisions.

45. A copy of the Initial Complaint documents, the decision letters issued on those complaints from the Merit System Protection Board – Plaintiff's Exhibits number 15A and Exhibit number 15A1; the U.S.D.C. case number 20cv1145-JFR – Plaintiff's Exhibit number 15B and Exhibit number Exhibit Number 15B1; and the Tenth Circuit Court of Appeals are Plaintiff's Exhibits number 4 and Exhibit number 4B. All of these documents are necessary to establish and demonstrate the Conspiracy claim issues alleged in this lawsuit does exist. The ability to see these documents in the moment are necessary evidence to be included as evidence in the instant case. The Plaintiff makes a motion to this Court to admit all of the documents discussed in this document into the record as evidence in the instant case.

46. The Plaintiff presented his Constitutional legal rights issue to the Tenth Circuit court of Appeals Judges in his Petition for Rehearing document filed with that Court in November 2021. A copy of that document is presented as Plaintiff's Exhibit 4B that the Court chose not to correct its material harmful error. This is Plaintiff's Exhibit number 4C and the Tenth Circuit's Decision letter as Exhibit number 4D. The Tenth Circuits' complete and illegal failures led to the filing of the Plaintiff's Judicial Misconduct complaint against Judge William Johnson and the Tenth Circuit panel of judges in December 2021. There has been no decision rendered on that complaint to the best of the Plaintiff's knowledge to date. TWO YEARS PLUS AND NO DECISION!!! Had the Plaintiff been aware that he was a crime victim, the language and statements presented in the Misconduct complaint document would have been very much different! The Plaintiff is concerned the Judicial Misconduct procedures are being corrupted presently by the Tenth Circuit.

47. The Plaintiff believes that the Cumulative Error Doctrine should be utilized to understand what has transpired with the Courts involved. Actors in multiple jurisdictions have violated the Plaintiff's Constitutional rights. This is an <u>Indisputable fact!</u> The Plaintiff did not violate his own rights in any way- THE PLAINTIFF REMAINS A VICTIM IN ALL OF THIS MESS!

48. The Plaintiff is submitting a copy of the Judicial Misconduct complaint form and Statement of Facts as Plaintiff's Exhibit number 2A; Plaintiff's Response to Order to Show Cause as Plaintiff's Exhibit number 2B; Plaintiff's Amended Complaint as Plaintiff's Exhibit number 2C; and the letter from the Tenth Circuit Court of Appeals Executive Director showing the acceptance of the misconduct complaint against Judge William Johnson – but denied the complaint against the Tenth Circuit Panel of Judges. That document is Plaintiff's Exhibit number 2D. It is worth repeating – the words and issues presented in the misconduct complaint would have been different had the Plaintiff known better.

49. Minimally, these overt bias based actions and conduct are demonstrate by the outright procedural due process and Substantive due process violations that are the result of the judges perpetrated crimes. Those crimes (in their totality) are an INDISPUTABLE FACT which cannot be denied. Journeymen federal actors knowingly, intentionally, deliberately and willfully choose to take actions that violated the Constitutional rights of the Plaintiff. These illegal actions demonstrated the "SPECIFIC/STRICT INTENT" to violate the Plaintiff's civil rights, and as such, the Plaintiff alleges that makes them criminals! The Plaintiff contends that specific/strict intent is equivalent to criminal intent regarding the conspiracy aspects/elements involved in the instant case. This is a violation of 18 U.S.C. subsections 242 – Deprivation of Rights under color of Law. As a participant in the conspiracy, the NMDOJ is just as guilty as the others involved in that conspiracy.

50. The Plaintiff makes a motion for this Court to appoint a Special Prosecutor to conduct a legitimate investigation of the alleged violations of federal and state felony statutes that have been committed on these legal matters by the conspiracy's participants. This includes not yet mentioned violations that have been committed by Opposing Counsel in the last lawsuit against the NMDOJ. As Officers of the Courts; and by their own illegal actions and conduct, Opposing Counsel has violated its legal obligations to the Courts as well as violating the Plaintiff's Constitutional rights described here within.

51. Opposing Counsel was well aware that the Defendants continue to violate the law with ONGOING criminal inaction continuing to being taken by the Defendants. The Plaintiff has sent numerous emails to Opposing Counsel outlining the ongoing violations of Law by the Defendants. This is an indisputable fact. They have intentionally, deliberately and willfully ignored each and every one of the emails sent to them. They have violated 18 U.S.C. subsection 4 themselves. The Plaintiff can produce those emails to this Court if needed.

52. The Investigation would determine which of the Actors have violated the Plaintiff's Constitutional rights and the crimes they committed in doing so. It would also aid in determining those who should face a Section 1983 claim that the Plaintiff is presenting to this Court in this lawsuit. Currently, the Plaintiff identifies the current Attorney General, Raul Torrez; the former Attorney General Hector Balderas; and both members of current Opposing Counsel team as

having violated the Plaintiff's Constitutional rights in the instant case. They are listed as Defendants in the instant case.

53. It should be noted that many of the federal actors involved in the overall conspiracy have been in their various positions for decades, and they knowingly violated the Plaintiff's Constitutional rights. It should also be noted that the Plaintiff was not compensated for the violation and damage to his person by his former employer – a total disability due to PTSD caused by the federal employer nor for the violation of his property interest right by the actors involved. Evidence of the damages caused by the Hostile Work Environment was included in the exhibits filed with the November 2020 case. The (unpaid) damages were caused by government employees who violated the Eminent Domain clause of the Fifth Amendment of the U.S. Constitution.

54. The Plaintiff has exhausted his ability to get a fair hearing on any of the previous **NINE** legitimate legal complaints filed in three different federal jurisdictions. This has deprived the Plaintiff of the" opportunity to be heard" that is legally required under the due process clause of the Fifth Amendment of the US Constitution and Article2, subsection 18 of the New Mexico state Constitution. The Supreme Court Decision in *Cleveland Board of Education v. Loudermill*, 470 U.S. 53, 546 (1985) stated (words to the effect) that a plaintiff is legally entitled to an "opportunity to be heard" if they have a property interest right. That has not happened to date. This is an underline indisputable fact.

55. In its September 2021 decision letter, the Tenth Circuit Court of Appeals stated that the Court determined that the Plaintiff had received "the appropriate level of process " concerning all of the previously legitimately, legally filed complaints. The Plaintiff did not have the opportunity to cross examine any of the numerous federal actors involved in these legal issues –**THEREFORE, the Plaintiff did not have the opportunity to be heard that due process procedures demand and require**. The written statements of witnesses remain unchallenged due to the violation of the Plaintiff's Constitutional right to due process by means of technical dismissals, denials or Summary Judgements issued by federal conspiracy participants.

56. While some of the Conspiracy participants have absolute immunity from civil liability, other conspiracy participants only have qualified immunity. And it worth repeating - the violation of criminal felony statutes removes ALL immunity held by a person thereafter because the illegal actions taken are outside the official legal duties of the actors involved. These Individuals are violating the law and they are attempting to cover-up their crimes by stating that they are acting under the color of Law. ***They are not***. The violations made by these individuals violated the Plaintiff's Constitutional rights and they are subject to the provisions of 42 U.S.C. Subsection 1983; Subsection 1985 and Subsection 1986.

57. The Supreme Court has issued many favorable decisions concerning federal employee's property interest rights to which the Plaintiff spoke to in the Petition for Rehearing document

(Exhibit 4) concerning his own property interest right. The Actors have willfully deprived the Plaintiff of equal protection he is entitled to under the Equal protection clause of the Fifth Amendment of the US Constitution and the same Equal protection clause stated in Article2, subsection 18 of the New Mexico state Constitution. The Plaintiff is being deprived of equal justice based upon the favorable legal decisions made previously concerning other federal employees and their individual property interest rights.

58. In April 2022, the Plaintiff first learned that violating someone's civil rights is a federal felony under 18 U.S.C. subsection 242 – **Deprivation of Rights Under Color of Law**; and another federal felony concerning 18 U.S.C. subsection 241(linked to 18 U.S.C. Subsection 371) – **Conspiracy against Rights** which is applicable based upon the facts of the Plaintiff's case; and 18 U.S.C. subsection 1503 – **Obstruction of Justice** which is also applicable based upon those same facts concerning the actions of all Actors involved. The Plaintiff informed the Tenth Circuit's Executive Director's Office and reported the crimes committed by the judges to the office staff representative.

59. NMDOJ's own failure to act appropriately and legally responsible connects them into active participation in the overall conspiracy that has deprived the Plaintiff of his legal rights secured and protected by the U.S. Constitution, the N.M. Constitution, and the laws of both the United States and the state of New Mexico. They do so by the intentional DIRELECTION OF DUTY AND OBSTRUCTION OF JUSTICE on the part of the NMDOJ employees.

60. In November 2022, the Plaintiff filed a complaint with the U.S. Department of Justice to which they responded they would not help the Plaintiff on his legal matters. The Plaintiff filed a second complaint in February 2023 and received a similar decision. A copy of letters is submitted as Plaintiff's Exhibit **30A** and Exhibit **30B**. They refused to help!

61. On September 12, 2023, N.M. Attorney General Raul Torrez issued a letter to Governor Lujan-Grisham stating that **he has an overriding duty to "uphold and defend the Constitutional rights of every citizen."** This is an <u>indisputable fact</u>. By his own personal actions and conduct under the color of law – which are not part of his official duties as the Attorney General, Defendant Torrez has violated 18 U.S.C. Subsections 241, 242 and 1503. He is also subject to the provisions of 18 U.S.C. Subsection 1983; Subsection 1985; and Subsection 1986 as well as the New Mexico Civil Rights Act. A copy of that document is Plaintiff's Exhibit **31**. He and Balderas did not uphold or defend the Constitutional rights of the Plaintiff in any way, at any time.

62. The failure to uphold and defend the Plaintiff's Constitutional right to due process and ignoring his property interest right allows the various Actors to escape accountability for their criminal actions. This is an action taken by the NMDOJ that furthers the overall Conspiracy initiated by the other conspiracy participants. The claim that "prosecutorial immunity" saves the NMDOJ actually falls short of the necessary legally required actions that should have been taken by the NMDOJ.

63. In April 2022, the Plaintiff contacted the Executive Director's Office for the Tenth Circuit Court of Appeals and reported the criminal violations to a staff member in that office because he had previously filed a Judicial Misconduct complaint against these same federal actors with that office. He followed up with that office three months later and he has not received a response from the Director's office to date. The violation of 18 U.S.C. Subsection 4 – Misprision of a Felony is applicable to the staff of the Tenth Circuit Court of Appeals Executive Director's office.

64. For the record, no decision has been received concerning the Judicial Misconduct complaint from one of the federal actors directly involved in the case – the FORMER Chief Judge of the Tenth Circuit Court of Appeals. The Plaintiff left a voice message on March 15, 2024 with the Director's office requesting the status of that complaint and the Plaintiff has received a response from a representative in that office named "Katelyn?" and she stated that after the Plaintiff reported the crimes to that office in 2022, the Directors' Office forwarded those allegations to the Chief Judge of the Tenth Circuit to be dealt with.

65. This alleged referral action taken means that no action was taken by that Chief Judge to date on the criminality issue concerning the federal actors involved in the conspiracy. If he had, it would have been publically known at this late date. This is a breakdown and failure of Judicial Counsel oversight mandated by Law concerning the criminal allegations made against the Judges identified in that Misconduct complaint. The former Chief Judge should be held accountable for his personal violations of his former duties concerning the Misconduct complaint.

66. The former Chief Judge himself was implicated in the Misconduct complaint document – and he was left in charge of deciding the outcome of the complaint itself. This person should have timely recused himself due to conflict of interest issues. The Chief Judge should have transferred the jurisdiction of that complaint to the Court of Appeals for the FEDERAL SECTOR. He did not do so. The Plaintiff also believes that Judge Johnson should have given the Plaintiff the option of a transfer (instead of issuing the Res Judicata decision) based upon jurisdictional issues related to the M.S.P.B. issue - or he should have be willing to deal with the Plaintiff's property interest right correctly and legally.

67. On July 19, 2022, in the instant case, the Plaintiff filed a criminal online complaint against the federal actors with the NMDOJ. After thirty days, the Plaintiff left a voice message with the NMDOJ requesting the status of that complaint. He received a call from a representative with the NMDOJ. She stated that they did not receive any complaint from the Plaintiff on their online computer system. The Plaintiff told her that he had received a confirmation email from the system showing it was received.

68. Thereafter, the Plaintiff sent a copy of the <u>DELETED</u> online complaint form and a copy of the documents submitted to the Tenth Circuit Court of Appeals concerning the Judicial Misconduct Complaint he filed previously with that particular Court. These Documents are titled: the Judicial

Misconduct Complaint form and Statement of Facts; Plaintiff's Response to Show Cause Order, Plaintiff's Amended Complaint, and Petitioner's Request for Rehearing. It should be noted that the deletion of the online Complaint form document violates 18 U.S.C. Subsection 1519 – Destruction of evidence. A copy of the cover letter and the deleted complaint form are Plaintiff's Exhibit Number 37.

69. The Plaintiff alleges that the evidence provided in the complaint form and the other documents submitted to the NMDOJ should have surpassed the "probable cause" threshold necessary for the criminal complaint issues to be investigated at the least by the NMDOJ *or by another more appropriate law enforcement agency - the Plaintiff reiterated this point several times in his complaint documents to the NMDOJ*. This is an <u>indisputable fact</u>. The NMDOJ ignored the evidence presented to it and their inaction "furthers" the violation of the Plaintiffs' Constitutional rights. The NMDOJ could have ADVOCATED concerning the violation of the Plaintiff's Constitutional rights with multiple federal law enforcement Agencies like the FBI, the DOJ or the OIG concerning the violations discussed in the documents that they had in their immediate possession.

70. In Late September 2022, the NMDOJ issued a "denial of service" letter stating that their office would not be taking any legal action whatsoever on the matters presented to them. A copy of the Decision letter is Plaintiff's Exhibit Number 39. This is an <u>indisputable fact</u>. This is NONFEASANCE on the part of the NMDOJ. The NMDOJ wants to give criminal federal Actors a "pass" on accountability for their felony crimes that have violated and continue to violate the Plaintiff's Constitutional rights – PURE AND SIMPLE. They have no problem with that reality – they are not the one whose rights are being violated. It is the Plaintiff's hope that this Court has major objections to the CONTINUING VIOLATION of the Plaintiff's Constitutional rights.

71. In November 2022, the Plaintiff filed a criminal complaint based upon 18 U.S.C. subsections 4 – Misprision of Felony against the NMDOJ for its failure to take action on the federal and state felonies committed by the federal actors which was discussed in the evidence presented to the NMDOJ previously. This is an <u>indisputable fact</u>. Thereafter, the Plaintiff made two voice mail requests for status on this complaint and he has not received any response from the NMDOJ. A copy of that complaint document is Plaintiff Exhibit Number 3. To date, the Plaintiff has not heard anything on this complaint from the NMDOJ. This is an <u>indisputable fact</u>. Based upon their conduct and actions, they apparently think at they are above scrutiny or accountability for their wrongdoings.

72. Based upon the stated duty of "upholding and defending" the Constitutional rights of the citizens put forth by Attorney General Torrez in his September 12, 2023 letter to N.M. Governor Lujan-Grisham, the Plaintiff alleges that the State has an ONGOING duty to protect its citizens' civil rights from federal intrusion and the NMDOJ's inaction to take appropriate legal action has continued to deprive the Plaintiff of his Constitutional rights under federal and state

Constitutional law. A copy of the A.G.'s letter to the Governor of New Mexico dated September 12, 2023 is Plaintiff's Exhibit number 31.

73. For the record – the NMDOJ filed its two motions to kill the Plaintiff's Complaint for Damages lawsuit on September 29, 2023. Less than three weeks after the Attorney General's letter to the Governor! This is an indisputable fact. It should be noted that the Plaintiff had filed his third complaint against the NMDOJ on September 25, 2023 for its failure to file a timely Response to the Complaint for Damages lawsuit as required by law that had become due as of September 16, 2023. The facts concerning the Attorney General's conduct and actions speak for themselves. This is an indisputable fact.

74. The Plaintiff alleges that the federal actors violated both Procedural due process and Substantive due process issues by taking the actions they did – for example, In all of the final decisions issued after April 2018, the federal actors knowingly, deliberately, intentionally, and willfully ignored the Plaintiff's property interest right even though the Plaintiff made specific arguments on that issue in all of his initial complaint filings since April 2018. A reading of those written decisions thereafter shows that the property interest right issue is not spoken to by the Judges; and in some instances, the issue is actually "blown off" by the some of the federal actors involved – the 2020 Due Process case decision by Judge Johnson and the Tenth Circuit's Panel decision issued in September 2021 are pointed to as evidence of this occurring. This is an indisputable fact.

75. The failure to address legally raised issues by any federal Actor is unacceptable to any law-abiding citizen in our nation – or it should be. These perverted decisions are arbitrary and capricious! These procedurally and substantively defective decisions should have been overturned upon appeal - but were not.

76. In fact, Judge William Johnson willfully ignored the Supreme Court decision issued in *Lawlor v. National Screen Service Corp.*, 352 U.S. 992 (1957) which discusses two exceptions to the issuance of a "Res Judicata" decision *because such decisions may defeat the end purpose of Justice*. By reading the Plaintiff's Response to the Show Cause Order document; the Plaintiff's Amended Complaint document filed in the U.S.D.C. Due Process case; the Tenth Circuit Court case Opening Statement document; and the Plaintiff's Petition for Rehearing document - both of the exceptions were properly addressed by the Plaintiff within those documents, and yet, Judge Johnson flatly ignored that legal precedent intentionally. The Judge demonstrates his bias by his conduct and actions on the case before him that deprived the Plaintiff of his Constitutional rights to due process on his legal issues. The Tenth Circuit then followed suit!

77. LET the Plaintiff be clear – a Judge who issues a "Res Judicata" decision should know its exceptions beforehand - and to act accordingly when those exceptions are presented to the Court. The Plaintiff believes Judge Johnson knew all too well. The Plaintiff directly confronts the issue about Judge Johnson's failure to recognize this in the Amended Complaint the Plaintiff

filed in January 2021 in the Due Process case. In fact, the Plaintiff lodged a "formal objection" in that document which was ignored by Judge Johnson. Judge Johnson failed to address that objection all-together. This is an <u>indisputable fact</u>.

78. All of the Actors have willfully ignored the Rule of Law in many illegal ways - issue after issue – the Constitutions, Supreme Court decisions, Judicial Issue Doctrines, Federal and State civil and Criminal Statutes, and the <u>massive</u> case law on the legal issues. Yet, the NMDOJ is fine with taking no action on the violation of the Plaintiff's constitutional rights – which is contrary to its STATED view on upholding and defending the Constitutional rights of its citizens. This is an <u>indisputable fact</u>. They breached their legal duties and responsibilities as the entity that is legally charged and responsible for taking care the State's legal matters and protecting the rights of the citizens residing in the state. This nothing short of a dereliction of duty by unknown employees of the NMDOJ. To think that these employees did not have knowledge of the wrongdoings is naive thinking or intentional and willful disregard.

79. The cumulative effect is that these Actors committed federal and state level felonies to which the NMDOJ has chosen to ignore its legal obligation and duty to investigate; and it has failed to take appropriate and proper legal action to uphold and defend the Plaintiff's Constitutional rights. The failures by the federal Actors <u>goes well beyond "the appearance of impropriety "</u>and it can be strongly argued that the NMDOJ continues to play an active part in the conspiracy to deprive the Plaintiff of his Constitutional rights.

80. The NMDOJ has violated a number of New Mexico Criminal Statutes, Chapter 30, Article 28, subsection 1 – **Attempt to commit felony**; and subsection 2 – **Conspiracy**. The NMDOJ, by its actions and conduct violated New Mexico criminal statute 30-1-13 and 18 U.S.C. subsection 3 (federally) – **Accessory after the Fact**. These are felony violations committed by the NMDOJ - the state's top law enforcement entity, who is charged with ensuring that all citizens, all businesses, corporations and governmental entities (and, hopefully all politicians) to uphold ALL laws whether they are federal, state or both. **The NMDOJ fails miserably and they operate illegally.**

81. The Plaintiff believes that the NMDOJ has provably violated the Fifth Amendment, the Seventh Amendment and the Fourteenth Amendment of the U.S. Constitution by its failure to protect its citizens' Constitutional rights from federal intrusion. The Plaintiff contends that the NMDOJ has violated a number of statutes in 42 U.S.C. Chapter 21 – Civil Rights, which are 1) subsection 1981 (c) – **Equal rights under the Law;** 2) subsection 1985 (2,3) –**Conspiracy to Interfere with Civil Rights;** and 3) subsection 1986 – **Action for Neglect to prevent** – which involves the harm caused by inaction. The NMDOJ is legally liable for the failure to act within the scope of its legal responsibilities and duties to the citizens who reside within the state.

82. Based upon the legislative intent of the New Mexico Civil Rights Act, the NMDOJ has violated the Constitutional rights of the Plaintiff under the U.S. constitution, the N.M. Constitution, and as

such, the NMDOJ is violating federal and state criminal law by its failure to act in a legally responsible manner regarding its duties and obligations to the citizens of the State. The Plaintiff seeks justice on these matters from this Court. A copy of the New Mexico Civil Rights Act is Plaintiff's Exhibit 40.

83. In summary, No one in our nation is above the Law – no matter who thinks differently! This includes <u>all</u> federal and state Actors, former Presidents and the NMDOJ itself! The Conspiracy can be traced through the following documents and by the actions of the participants involved:

84. Judge Baldock had thirty-four years of experience on the bench in 2016 when he took the Plaintiff's Equal Employment Opportunity (EEO) complaint case that year. Reading the *Romero* case Decision shows that Judge Baldock intentionally, deliberately and willfully ignored the prohibition and intentionally issued a "DEFECTIVE" Summary Judgement decision. The evidence submitted with the 2020 due process case that came from the 2018 case files PROVES this issue. Judge Baldock ignored evidence that was in file. This is <u>an indisputable fact easily proven</u>.

85. In the Amended Complaint document filed in the November 2020 U.S.D.C. Due Process case, the plaintiff speaks to SSA's legal responsibilities regarding the Plaintiff's property interest right to due process and the violation by the Agency of its duties and responsibilities by its discussed actions. The Plaintiff also lodges a "formal Objection" within that document that Judge Johnson ignored as well. It should be noted that the Plaintiff filed a formal grievance with SSA on the property interest right issue in April 2018. The Agency denied that grievance in June 2018.

86. Judge Johnson intentionally ignored the two exceptions discussed (in the *Lawlor* case) that were presented in the Plaintiff's filed documents and he intentionally issued a DEFFECTIVE decision. Judge Johnson recognized the Constitutional rights violation regarding the issuance of a prohibited "summary judgement" decision made by Judge Baldock and Judge Johnson intentionally, deliberately and willfully issued the prohibited "Res Judicata" decision on the case before him AND THEREBY, HE ENTERED INTO A CONSPIRACY to violate the Plaintiff's Constitutional rights and to keep the felony crimes committed by a peer from seeing the light of day.

87. The Tenth Circuits' full panel of Judges, likewise, recognizes the reality of what the previous judges have done and THEY ENTERED INTO THE CONSPIRACY - which continues to violate the Plaintiff's Constitutional rights. A reading of the Plaintiff's Petition for Rehearing Document discusses the Constitutional right violation issue that all of the Judges flat out deliberately ignored. This VIOLATES the Continuing Violation Doctrine which can be summed up as - that until the violation is corrected - the Plaintiff's Constitutional rights remain violated.

88. Next, in the instant case, Attorney Generals' Balderas and Torrez joined in this illegal Conspiracy to protect all the Judges who have gone out of their LEGAL way TO VIOLATE THE RULE OF LAW,

and they too, ultimately violated the Plaintiff's CONSTITUTIONAL RIGHTS. The NMDOJ have become criminals just like the Judges they have been protecting by their nonfeasance.

89. The Plaintiff filed three formal complaints against the NMDOJ itself to which it has not taken any legally identifiable action to the best of the Plaintiff's knowledge. Those complaints need to be investigated by a Special Prosecutor who can get to the bottom of who is involved in the conspiracy and to take appropriate legal action based upon the results of a formal investigation of the legal issues involved.

90. When the Plaintiff actually gets the "OPPORTUNITY TO BE HEARD" on the legal issues he has put forth, he believes this Court, the Jury – and ultimately, the American Public will be shocked and outraged by the illegal conduct and actions of the actors involved in the violation of the Plaintiff's Constitutional rights. Those violations are: 1) deprivation of rights, privileges, immunities of the Plaintiff's Property Interest right; 2) deprivation of a fair hearing; 3) deprivation of the opportunity to be heard; 4) deprivation of equal protection under the Law; and 5) deprivation of payment of compensation for damages to the plaintiff's person and property. These illegal actions are a deprivation of the Plaintiff's legal rights that are secured and protected by the Constitutions and the laws of both our nation and the state of New Mexico.

91. The Plaintiff request oral arguments and the opportunity to be heard on these legal issues.

## Damages

As a direct and proximate result of the actors wrongful and illegal conduct and actions taken; compounded by the NMDOJ's own intentional, deliberate and willful Nonfeasance, the Plaintiff has suffered injuries and damages including, but no limited to physical pain, suffering, and especially, mental anguish – knowing that his Constitutional rights are being stomped on for eleven years and everyone including the NMDOJ is okay with that. The ongoing task of filing litigation seeking Justice has triggered many bad recurring PTSD episodes that originated from the illegal and debilitating actions taken by a co-conspirator, the defendant employer - SSA. NMDOJ's own legal failures to take appropriate legal action not only increased the duration but also exacerbated the suffering each and every day. The Plaintiff struggles with Depression and anger issues for weeks – sometimes months after he submits his documents to the Courts. Having to relive the CRAP that made him totally disabled over and over again!!! It makes him physically SICK - thinking and having to rehashing it over and over in each and every document he has submitted to the Courts that have gone over the line that insults equal and fair justice - time and time again.

Additional injuries include a loss of life's enjoyment in significant and meaningful ways, a very troubling loss of trust in the judicial system. The harm and damage inflicted has caused and exacerbated the Plaintiff's emotional distress concerning him being treated fairly on these matters. The Plaintiff should

not have to go to such heroic measures to get justice by having to represent himself Pro Se on these legal issues. Having PTSD and a Traumatic Brain Injury (TBI) makes it difficult to think and to conduct legal research. It is draining on the Plaintiff physically and mentally daily.

This legal matter and the Plaintiff's disability caused the end of the Plaintiff's fourteen year relationship with a good woman in divorce; caused irreparable damage to most of the Plaintiff's family relationships; negatively impacted the mental health of the Plaintiff **FOREVER**; and it prematurely ended the Plaintiff's federal career – HE WOULD STILL BE WORKING TODAY IF HE HAD BEEN TREATED RIGHT!!! Unidentified federal and state Actors have defamed and injured the Plaintiff's good name, his reputation and his standing within the community. The Plaintiff has not been given the opportunity to clear his name to date. He requests this Court hear this new case with the one being discussed and presented here.

Punitive damages are requested for the knowingly, intentional, deliberate and willful violation of the Plaintiff's Constitutional rights that has occurred over the past eleven years. What the Plaintiff has endured is heart-wrenching and it should never have happened to any citizen in our nation.

**THEREFORE**, Plaintiff requests this Court enters a Judgement against the Defendant, the NMDOJ in the amount of $ Forty Million Dollars for the NMDOJ's violation of the Plaintiff's Constitutional rights and for the violations committed by the other conspiracy participants. The Plaintiff also request this Court provide for any other (Injunctive) relief the Court may deem proper such as pre-judgement and post-judgement interest, all Court costs expenditures, and future attorney fees if warranted.

Respectfully Submitted,

4/22/24    *William Fulkerson*

William M. Fulkerson,
Pro-Se Litigant
3809 General Bradley St. NE
Albuquerque NM 87111
(505) 234-0254

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

## Case Number_____



• 1 page Document

# FULKERSON v. New Mexico DEPARTMENT OF JUSTICE

## Case Number_____

### AUTHORITIES

1. Romero v. Union Pacific Railroad, 615 F 3d. 1303 (1980) – on the issue of Summary Judgement Exclusions for Retaliation claims.

2. Board of Regents of State Colleges v. Roth, 408 U.S. 564 (1072) – on the issue of Property Interest rights requiring a hearing on that matter.

3. Snipes v. Scott, No. 4:18-CV-580 MW/CAS (January 2019) – on the issue of due process regarding property Interest rights of government employees.

4. Cleveland Board of Education v. Loudermill, 470 U.S. 53, 546 (1985) on the issue of requiring a fair hearing for those who have a property Interest right.

5. Lawlor v. National Screen Service Corp., 352 U.S. 992 (1955) on the issue of exceptions to a Res Judicata Decisions- the ends of Justice.

6. New Mexico Civil Rights Act which became effective in July 2021.

7. Goldberg v. Kelly, 397 U.S. 254 (1970) on the issues of due and cross-examination of Agency actions and witnesses.

8. *Desert Livestock Co.*, 574 F. 2d (10th Cir. 1978*) on the issue of witness creditability.*

9. *National Aviation Underwriters, Inc. v. Altus Flying Service, Inc.*, 555 F. 2d 778(10th Cir. 19770) on the issue of witness creditability.

10. *Little Redhouse v. Quality Ford Sales, Inc.,* 511 F. 2d 230 (10th Cir. 1975) on the issue of witness creditability.

11. Mathews v. Eldridge, 424 U.S. 319,333(1976) on the issue of meaningful time and manner for due process to occur.

12. Adickes v. S.H. Kress Co., 398 U.S. 144 (1970) on the issue of not granting summary judgement on cases where there is a genuine issue to a material fact.

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

### Case Number

# EXHIBITS ████████

• 2 page Document

# FULKERSON v. New Mexico DEPARTMENT OF JUSTICE

## Case Number _____

### EXHIBITS

1. Exhibit **FAM 1** – Statement of Phillip Fulkerson, brother of the Plaintiff, concerning damages.

2. Exhibit **FAM 2** – Statement of Cindy Faulkner, sister of the Plaintiff, concerning damages.

3. **Exhibit Zero** – Summary Judgment Decision on 16-CV-889-BRB-KBM, Fulkerson v. Carolyn Colvin, and Acting Commissioner of SSA.

4. **Exhibit 2020** – the 2018 case file Exhibits submitted in the 2020 Due Process case.

5. **Exhibit 1** – State of New Mexico Office of the Attorney General Complaint – 20230428-a9d9.

6. **Exhibit 2** consists of the Tenth Circuit Court of Appeals Judicial Misconduct complaint documents.

7. **Exhibit 3** is a copy of the NMOAG complaint 20221112-2d4c.

8. **Exhibit 4** consists of four Tenth Circuit Court of Appeals Documents associated with Case Number 21-2001.

9. **Exhibit 15A** consists of two documents associated with M.S.P.B. Case Number DE-0752-20-0323-I-1.

10. **Exhibit 15B** consists of two documents associated with the U.S.D.C. Case Number 20cv1145-JFR.

11. **Exhibit 30** consists of two document associated with the complaints filed with the Department of Justice.

12. **Exhibit 37** is a copy of the Plaintiff's Cover letter to the NMOAG and the deleted Complaint document NMOAG 020220719-f8a9.

13. **Exhibit 39** is a copy of the "denial of service" letter from A.G. Balderas.

**FULKERSON v. NMDOJ EXHIBITS PAGE 2**

14. **Exhibit 31** is a copy of Attorney General Torrez's letter to the Governor.

15. **Exhibit 40** is a copy of the New Mexico Civil Rights Act.

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

**Case Number** _____

# EXHIBIT NUMBER:

FAM 1

• 3 page Document

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

**Case Number** _____

# EXHIBIT NUMBER:

FAM 2


• 1 page Document

Cindy Faulkner
197 Bethel Ln
Bismarck, AR 71929

To Whom it May Concern,

This is a personal acknowledgement on Bill Fulkerson, my brother. The time frame I will covering is from about 2010 to present.

When Bill and Ashley were married, his life seemed to be going along real well. He was happy and he got along well with his wife. But when he got sick with hepatitis B, his work life started to change which affected his marriage as well.

Bill became agitated easily, more so than before. His work was treating him very unprofessionally. He had worked for SSA for many years and advanced to a leadership position. But the way they treated him was like the years of service was not appreciated. This, in turn gave over to depression and anger.

As for his marriage, he and Ashley fought more often. Both of them called my husband, Stuart Faulkner, many a night talking until midnight about their respective issues. Bill was put on many different prescriptions to combat depression which didn't seem to help for very long at all.

Bill became a totally different person. He was more hostile and would fly off the handle at the smallest comment in which he took as a personal insult to him or his intelligence.  I usually limited my family and my interaction with him for this reason.

How his superiors treated Bill during this time made him very paranoid and he became very defensive of his life and his knowledge of his job. He was promoted to his position by his hard work and his ability to lead and instruct others. And now the agency, or more to the point, the supervisors above him were trying to push him out. They gave him an office with no real responsibilities nor anyone to supervise. After years of leading and supervising, they were trying to stagnant his career. I believe this was the start of his PTSD issues as well as his anger and his withdrawal from the family.

Bill's state of mind as a result of all this abuse has led him to a very solitary lifestyle and has taken him away from his family, including his children.

Thank you for your time.

Cindy Faulkner

Cindy Faulkner
4-5-2024

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

**Case Number**_____

# EXHIBIT NUMBER:



ZERO

• 29 page Document

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

WILLIAM FULKERSON,

    Plaintiff,

v.

CAROLYN COLVIN, Acting
Commissioner of the SOCIAL
SECURITY ADMINISTRATION,

    Defendant.

No. 16-CV-889-BRB-KBM

## ORDER GRANTING DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

**BALDOCK**, Circuit Judge.[*]

    Plaintiff William Fulkerson complains that his former employer, Defendant Social Security Administration (SSA), engaged in employment discrimination on the basis of disability, in violation of the Americans with Disabilities Act of 1990 (ADA), and retaliation, in violation of Title VII of the Civil Rights Act of 1964. Before the Court is Defendant's motion for summary judgment on both claims. Doc. 52. Upon motion, a district court should enter summary judgment if the evidence "shows that there is no genuine dispute as to any material fact and the

---

[*]    Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation pursuant to 28 U.S.C. § 291(b).

*34 Years on the Bench.*

*Plaintiff's Exhibit Zero pages 5 to 33.*

*[Handwritten annotation: 2018 case file contains the following: Employee Affidavits favorable to the Plaintiffs allegations, An Agent Internal Investigation Conclusion document, confirming the Plaintiff's allegations all ignored by the judge]*

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when a reasonable jury could find in favor of the nonmovant. *Id.* To make this showing, the nonmovant must produce more than "a scintilla of evidence in support of [his] position." *Id.* at 252.

Defendant, as the moving party, has the initial burden to show "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once Defendant meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. *Id.* In so doing, the nonmoving party may not rest solely on the allegations in its pleadings, but must instead, by its "own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The factual record and reasonable inferences are viewed in the light most favorable to the party opposing summary judgment. *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017). At the summary judgment stage, the judge's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 249.

## I.

This lawsuit arises from Plaintiff's employment as a Staff Assistant in the SSA Mega Teleservice Center (TSC) located in Albuquerque, New Mexico. Plaintiff

2

*10/2013 not.*

began working for Defendant in 1989 and retired from the agency in February 2013.

During that time, Plaintiff filed multiple Equal Employment Opportunity (EEO)

complaints for disability discrimination and retaliation.  In 2004, Plaintiff was

diagnosed with Hepatitis C and depression.  That same year, Plaintiff filed an EEO

complaint for disability discrimination, naming Terry Clements (TSC Director) as

the alleged discriminating official.  Upon returning to work after eleven months of        *Retaliatory*

chemotherapy for Hepatitis C, Clements reassigned Plaintiff within the TSC from           *✳ action*

Section Manager to Staff Assistant.  In 2005, Plaintiff filed an EEO complaint for

retaliation, naming Clements as the alleged discriminating official.  Notably,            *Hostile*

Plaintiff did not administratively exhaust his 2004 and 2005 EEO claims.        *✗ work*
                                                                                *environ*
Plaintiff's disability discrimination and retaliation claims currently before this    *issues*

Court stem from a second round of EEO claims Plaintiff filed on January 5, 2012 and

April 18, 2012.[2]  The second round of EEO claims were based on two disabilities:

diverticulitis and posttraumatic stress disorder (PTSD).  In these new EEO

complaints, Plaintiff alleged Defendant discriminated against him and subjected him

to a hostile work environment in retaliation for his prior EEO activity.

---

[2] Doc. 58-1 at 1.  In his complaint, Plaintiff claims he "filed his EEO claims
beginning in September of 2011 and continuing until he left his employment."  Doc.
1 at 3.  Plaintiff did not point to any evidence to substantiate his claim.  In fact, the
evidence shows Plaintiff did not file an EEO claim until January 5, 2012.  Doc. 58-1
at 1.  Although the Court looks at the facts in the light most favorable to the
Plaintiff, allegations made in pleadings that are contradicted by the evidence before
the Court will not be considered.  Plaintiff must provide evidence to substantiate his
claims.  *See Celotex*, 477 U.S. at 324.

3

To establish his disability discrimination and retaliation claims, Plaintiff asserts a series of alleged adverse actions. In 2008, Defendant assigned Plaintiff a new supervisor, Kathryn Rhoads. Plaintiff claims Rhoads knew about his 2004 and 2005 EEO complaints and his medical conditions, and as a result, Rhoads created a hostile work environment that caused Plaintiff to suffer from PTSD. Plaintiff alleges Rhoads made critical comments during several performance evaluations that Plaintiff interpreted to be retaliatory. For example, in November 2009, despite working at the TSC for two decades, Plaintiff claims he felt threatened during his year-end evaluation when Rhoads allegedly said, "You know I am the only one here who knows you." Doc. 55-2 at 3. During Plaintiff's mid-year evaluation in April 2010, Plaintiff met with Rhoads to discuss Plaintiff's work performance. Plaintiff alleges Rhoads made critical comments during his review including, "You are really, really slow," and "You have a bad reputation." Doc. 1 at 3. Despite Rhoads' alleged critical comments, Plaintiff also acknowledged that Rhoads worked to promote his skills. For instance, in June 2010, Rhoads requested and received approval from management to give Plaintiff an assignment to attend management meetings in an effort to help develop his skills. By the time Rhoads completed Plaintiff's 2010 year-end performance review, Rhoads ranked Plaintiff "5" out of "5" for Interpersonal Skills, noted Plaintiff's improvement, and encouraged Plaintiff to continue to find opportunities to maintain good working relationships with his colleagues.

4

On June 22, 2011, Plaintiff claims Rhoads told Plaintiff he was not a "team player" because "he questioned why the regional work cadre did not attend job related training." Doc. 55 at 7. Two days later, Plaintiff met with the TSC Director, Mikel Rowley, and TSC Deputy Director, Cynthia Steinberg, to inform them about Rhoads' "team player" comment and to request a new supervisor. He also sought to use the meeting as a vehicle to obtain a promotion, submitting a job application to Rowley at the meeting. Doc 55-1 at 21. According to Plaintiff, after their meeting, Rowley and Steinberg did not help advance Plaintiff's career and downplayed Rhoads' actions. According to Rowley, he followed up on Plaintiff's complaints by talking to Rhoads and discussing ways to improve communication. Rowley did not take further action because "[he] did not see these concerns as being severe enough to change [Plaintiff's] supervisor" and he "didn't see any retaliation." Doc. 55-2 at 22; Doc. 55-1 at 23. Additionally, Rowley did not award Plaintiff the job he applied for because Rowley did not think he would be successful in the position due to his history of yelling at his colleagues, including Rowley, Rhoads, and Kloeppel. Doc. 55-1 at 23 (yelling at Kloeppel); Doc. 55-1 at 25 (yelling at Rowley); Doc. 55-2 at 14, 22 (yelling at Rhoads).

In early August 2011, Plaintiff spoke with Rhoads on the phone. During their conversation, Rhoads allegedly "berated" Plaintiff about his plans for an upcoming training session. Doc. 55 at 27. Unbeknownst to Rhoads, her voice was audible to another SSA employee who was with Plaintiff during the phone call. Plaintiff claims

*[handwritten annotations: "Cross Extra! Issue on X Agency Witness ⑥", "Pretextual Intimidate Issue", "X Patricia Brown 5 — Judge Baldok starts Brown's statements."]*

he felt embarrassed to be disciplined by his boss in front of the other SSA employee. *Retaliatory Issue*
A few days later, Plaintiff sent an email to Rowley to explain his issues with Rhoads
and to request a new supervisor, again. Shortly thereafter, ~~Rhoads told Plaintiff he
would have to leave the Claims Section if he wanted a new supervisor.~~ Plaintiff
interpreted Rhoads' statement as a threat, even though it was factually true because
Rhoads was the supervisor of the Claims Section at that time. On August 9, Rhoads
sent Plaintiff an email stating ~~she had communication and trust~~ issues with him. On
September 23, 2011, Rowley, Steinberg, and Rhoads met with Plaintiff again to
discuss his issues with Rhoads. During the meeting, management denied Plaintiff's
claims of alleged misconduct. Following the meeting, Plaintiff was dissatisfied with
management's response and felt they failed to take any appropriate action to resolve
the issue.

*Credibility issues raised — no chance to cross-examine witness.*

   In October 2011, Defendant made several changes related to Plaintiff's
employment that Plaintiff finds objectionable. For example, starting that month,
Defendant changed its Officer-In-Charge (OIC) policy. Because of the policy
change, Plaintiff was no longer eligible to serve as OIC. On October 19, 2011,
Rhoads gave Plaintiff a "3" out of "5" for "Interpersonal Skills" as part of Plaintiff's
employment performance rating. And upon completion of Plaintiff's temporary
management development assignment on October 28, ~~Defendant informed Plaintiff
that he no longer needed to attend management meetings as part of his assignment.~~

*Pretextual Retaliatory Issue*

   In an effort to respond to Plaintiff's request for a new supervisor, Defendant

6

assigned Sue Kloeppel as Plaintiff's new supervisor in the Claims Section in October 2011, but Plaintiff's complaints about his supervisors continued. On November 23, Kloeppel issued an oral warning to Plaintiff for allegedly yelling at her. According to Plaintiff, this was the first time he was disciplined at work. On February 7, 2012, Kloeppel sent Plaintiff an email about Plaintiff's interference with personnel issues. According to Plaintiff, Kloeppel intended to use the email to harass, threaten, and retaliate against him. And on March 12, 2012, Plaintiff alleges Rowley told Plaintiff his job duties would be determined by Plaintiff's upcoming mediation regarding his second-round EEO claims.

Notably, Plaintiff's EEO complaints at issue and all of the alleged instances of discrimination and retaliation mentioned pre-date Plaintiff's diagnosis with diverticulitis and PTSD. Defendant was diagnosed with diverticulitis in May 2012 and diagnosed with PTSD in January 2013.[3]  In November 2012, Plaintiff was "determined to be totally disabled." Doc.1 at 4. His last official day at the TSC was on February 8, 2013.  Plaintiff subsequently retired when his application for disability was approved.

*Plaintiff's Exhibit #1*
*11/2020*
*Case*
*file*

---

[3]  The record does not support Plaintiff's assertion that he was diagnosed with PTSD in January 2012 by Dr. Thomas Gross who "believed Plaintiff was suffering from PTSD as a result of Plaintiff's hostile work environment." Doc. 55 at 3.  Dr. Gross did not diagnose Plaintiff with PTSD and did not comment on what he thought about Plaintiff's work environment. Rather, Dr. Gross advised Plaintiff to see a psychiatrist or psychologist. Doc 52-3. Plaintiff's misrepresentation of the record has not gone unnoticed.

7

*The Judge's interpretation of evidence is biased for unknown reasons!*

## II.

In his complaint, Plaintiff alleges "Defendant discriminated against Plaintiff in the terms and conditions of his employment on the basis of his disabilities" in violation of the Americans with Disabilities Act of 1990 (ADA). Doc. 1 at 4. The ADA prohibits employers from discriminating in employment on the basis of a disability. 42 U.S.C. § 12112(a). The United States, however, is specifically excluded from the statutory definition of "employer" within the ADA. 42 U.S.C. § 12111(5)(B)(i) ("The term 'employer' does not include the United States."). SSA is an independent agency of the United States federal government. Neither party disputes that SSA is a federal agency or that Plaintiff was a federal employee. Accordingly, Plaintiff cannot maintain a claim against Defendant under the ADA. *See Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) ("As a federal employee, Rivera has no remedy for employment discrimination under the ADA. . . . His sole claim for discrimination on the basis of disability is under the Rehabilitation Act."); *Bolden v. Ashcroft*, 515 F. Supp. 2d 127, 137 (D.D.C. 2007) (dismissing an ADA claim against the U.S. Marshall Service because "[t]he ADA explicitly exempts the federal government from coverage.").

The Rehabilitation Act of 1973, instead, is the appropriate statute to bring Plaintiff's disability discrimination claim because it is the exclusive remedy for federal employees alleging disability discrimination against the United States or its agencies. 29 U.S.C. § 791; *Johnson v. United States Postal Serv.*, 861 F.2d 1475,

8

1477 (10th Cir. 1988). In his complaint, Plaintiff did not allege disability discrimination on the basis of the Rehabilitation Act.[4] In his response to Defendant's motion for summary judgment, Plaintiff omitted his ADA claim and changed his argument to rely on the Rehabilitation Act. "[A] party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P 15(a)(2). Given Plaintiff did not amend his complaint, this Court dismisses Plaintiff's claims against Defendant regarding disability discrimination under the ADA.[5]

III.

Plaintiff also claims Defendant retaliated against Plaintiff in the terms and conditions of his employment, in violation of Title VII. 42 U.S.C. § 2000e. Specifically, Plaintiff claims he was "retaliated against for engaging in protected activities by subjecting Plaintiff to a hostile work environment." Doc. 55 at 25.

---

[4] Inexplicably, Plaintiff brought this claim under the ADA even though Defendant previously provided the appropriate authority governing his claims. In its Notice of Consolidation of Plaintiff's two EEO claims, Defendant informed Plaintiff: "The authority to collect information relative to the investigation of this complaint derives from one or more of the following sources: Title VII . . . ; the Rehabilitation Act of 1973." Doc. 52-4 at 3. The Notice did not list the ADA as an appropriate authority for Plaintiff's claim.

[5] Plaintiff also raises two claims for the first time in his response to Defendant's motion for summary judgment: (1) Defendant regarded Plaintiff as disabled and (2) Plaintiff was subjected to a hostile work environment when Defendant failed to reasonably accommodate him by allowing him to use donated leave time to recover. This Court declines to construe Plaintiff's response as a request to amend his complaint. Accordingly, the Court will not consider Plaintiff's "regarded as" and "failure to accommodate" claims.

BIAS
example

9

## A.

The antiretaliation provision of Title VII forbids "discriminat[ion] against" an employee or job applicant who, *inter alia*, has "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e–3(a). To allege a prima facie case of retaliation, Plaintiff must allege "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). If Plaintiff has alleged a prima facie case of retaliation, the burden shifts to Defendant to show that the action was taken for a legitimate, non-discriminatory reason. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). This burden is one of production, not persuasion. *Carter v. Pathfinder Energy Services, Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). "The relevant inquiry is not whether [Defendant's] proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (citation and internal brackets omitted).

If Defendant satisfies its burden of producing evidence that the action was taken for legitimate, non-discriminatory reason, Plaintiff has the burden of establishing that Defendant's proffered explanation is pretextual. *Hansen v. SkyWest*

X 2018 case file contains enough evidence ignored by the Judge previously identified.

*Airlines*, 844 F.3d 914, 925 (10th Cir. 2016). Plaintiff may establish pretext by pointing out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [Defendant] did not act for the asserted non-discriminatory reasons." *Lobato*, 733 F.3d at 1289. The Tenth Circuit has opined that an employee generally may establish pretext in one of three ways. An employee may present evidence that (1) the employer's stated reasons for an adverse employment action are false; (2) the employer acted contrary to a written company policy prescribing the employer's action against the employee under the circumstances; or (3) he was treated differently from other similarly situated employees who violated protocols of comparable seriousness. *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004).

*Employed*
*X*
*Affidavits*
*in 1/2020*
*case.*
*Infile*
*of 2018*
*case*

**B.**

With the legal framework in place, the Court now turns to whether Plaintiff presented sufficient evidence on his retaliation claim. As for the first element of Plaintiff's prima facie case, the Tenth Circuit has noted, "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *Fye v. Oklahoma Corp. Com'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). In addition to voicing informal complaints, Plaintiff has established he engaged in the following protected employee actions: filing EEO claims in 2004, in 2005, on January 5, 2012,

11

and on April 18, 2012.

*Over 40 counts with EEOC*

He then alleges that, in response to these protected employee actions, Defendant engaged in the following ten adverse actions against him.  This Court will consider each instance in turn.  For the first and second adverse actions, the Court analyzes Plaintiff's case under the first step of the *McDonnell Douglas* test—whether Plaintiff established a prima facie case of retaliation.  For the remaining eight adverse actions, the Court proceeds to the second and third steps of the *McDonnell Douglas* test—whether Defendant provided a legitimate, non-retaliatory explanation for its action and whether Plaintiff refuted Defendant's explanations by showing they were pretextual.

Adverse Action 1.  Plaintiff alleges Rhoads and Plaintiff's management team began subjecting Plaintiff to a hostile work environment in retaliation for Plaintiff's 2004 and 2005 EEO complaints.  Plaintiff alleges Rhoads knew about Plaintiff's prior EEO activity.  As evidence of an alleged hostile work environment, Plaintiff alleges: (1) Rhoads told Plaintiff, "You are slow! I mean you are slow—really slow." during Plaintiff's 2010 mid-year performance review; (2) Rhoads threatened to tarnish Plaintiff's reputation in June 2011 by telling everyone that Plaintiff is not a "team player"; (3) Rhoads denied Plaintiff higher grade duties to promote his career growth; (4) Rhoads told Plaintiff he should be happy in his current position; and (5) Plaintiff's management did nothing in September 2011 when Plaintiff complained of Rhoads' alleged actions.  Doc. 55 at 26–27.

*EEOC case ju*
*refused to dismiss Hostile work environment case.*

*Agency was conducting internal investigation in (?) 2012.*

12

Plaintiff failed to establish the necessary elements of his prima facie case as to the first adverse action because he did not establish the desire to retaliate for the 2004 and 2005 EEO claims was the "but for" cause of Rhoads' alleged words and actions. To satisfy the causation element, a plaintiff must prove the desire to retaliate was the "but for" cause of the challenged employment action. *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). A causal connection may be shown by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006). Here, however, a five to six year time lag between Plaintiff's participation in protected activity and Rhoads' comments by itself would not be sufficient to justify an inference of causation. *Compare Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (a three-month period, standing alone, is insufficient to establish causation) *with Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 386 (10th Cir. 1984) (a two-hour gap between protected conduct and adverse employment action was sufficient to satisfy the causation prong of the prima facie case).

Without temporal proximity to support an inference of causation, Plaintiff must offer additional evidence to establish causation. *Antonio*, 458 F.3d at 1181 . ("[U]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."). To that end, Plaintiff does not provide evidence to establish causation.

The statement that is closest to asserting a causal connection is, "Ms. Rhoads admits she was aware that Plaintiff filed a prior EEO." Doc. 55 at 26. This however, does not establish evidentiary support that Rhoads acted in retaliation for Plaintiff's prior EEO activity. Given Rhoads was not involved with the prior EEO activity—in fact, she did not begin working as Plaintiff's supervisor until several years after the 2004 and 2005 complaints—nothing in the record indicates she had any motive to retaliate for actions in which she was wholly uninvolved. Under these circumstances, mere knowledge of prior EEO activity is insufficient to show causation because it does not justify an inference of retaliatory motive. *Meznick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) ("[K]nowledge on an employer's part, without more, cannot itself be sufficient to take a retaliation case to the jury."). Without establishing a causal connection, Plaintiff cannot prove his prima facie case for retaliation as to the first adverse action.

   **Adverse Action 2.** Plaintiff contends he was "ostracized and isolated by Defendant from his management team." Doc. 1 at 3. Plaintiff then expanded his claim in his response to Defendant's motion to suggest his supervisors' failure to reply to his email "at an appropriate time" interfered with his ability to perform his job. Doc. 55 at 9, 33. Plaintiff asserted he emailed "Mr. Rowley on August 9, 2011, August 19, 2011, and September 15, 2011, regarding continuing issues with Ms.

*[handwritten annotations: "(15)", "(16)", "Evidence X in file in 2018 case reported by the judge", "Judge is slanting witnesses' statements to justify the violation of the Plaintiff's rights. Cross-examination of the witnesses would show this!"]*

Rhoads, but did not get a response until September 20, 2011."[6]  Doc. 55 at 9. Plaintiff's allegation does not constitute actionable retaliation. Title VII does not protect individuals from all retaliation; instead, the alleged retaliation must produce an injury or harm. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  "Snubbing by supervisors and co-workers are not actionable under § 704(a)." *Id.* (internal citation and quotation omitted).  Accordingly, Plaintiff's claim of a second adverse action does not withstand summary judgment.

For the remaining eight adverse action claims, there are several ways in which Plaintiff failed to meet his burden to withstand summary judgment.  The Court, therefore, proceeds to the second and third steps of the *McDonnell Douglas* test to dispose of those claims.

Adverse Action 3.  Plaintiff alleges he received negative evaluations and was evaluated on areas outside his job description in October 2011 in retaliation for reporting Rhoads.  He argued the negative evaluations hurt his chances to advance his career because he earned a "3" for "Interpersonal Skills" in 2011, which was lower than the "5" he earned in 2010.  Defendant satisfied its burden under the second step of the *McDonnell Douglas* test by providing a legitimate, non-retaliatory explanation for the evaluation.  According to Defendant, Plaintiff's performance

---

[6] Plaintiff's own allegations to the EEOC contradict this assertion.  According to Plaintiff's Amended Issues Before the EEOC, Rowley responded to Plaintiff on August 15, 2011.  Doc. 52-6 at 2.  Plaintiff does not provide evidence the delay inhibited him from completing his job duties.

Internal Agency Investigation[15] in progress.

*[handwritten: pretextual]*

evaluation decreased because issues emerged from 2010 to 2011. "Ms. Rhoads state[d] that she felt that Plaintiff's interpersonal skills had slipped, that he was no longer functioning at the same level. Plaintiff had created conflicts with co-workers based on accusations and things that he had said." Doc. 52 at 25. As a result, Ms.

*[handwritten margin: ✗ no cross examination of witnesses to challenge testimony]*

Rhoads gave him a lower evaluation rating in 2011. Rhoads' explanation is supported by her contemporaneous evaluation of Plaintiff, in which she alluded to Plaintiff's conflicts with his coworkers, "I encourage you to continue to seek assistance when you are faced with difficult communications challenges." Doc. 52-11 at 6.

Proceeding to the third step of the *McDonnell Douglas* test, the Court concludes Plaintiff fails to satisfy his burden to demonstrate Defendant's non-retaliatory explanation was pretextual. To show pretext, Plaintiff must produce evidence of such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Lobato*, 733 F.3d at 1289. Plaintiff claims the 2011 evaluation occurred after

*[handwritten margin: evidence ✗ in file in 2018 case ignored by the Judge.]*

Plaintiff reported Rhoads for creating a hostile work environment. The timing of the evaluation is relevant to the causation element of Plaintiff's prima facie case, but it does not satisfy Plaintiff's burden to demonstrate that Rhoads' explanation is unworthy of belief and does not demonstrate that Rhoads did not act for the asserted

16

non-discriminatory reasons. *Id.* Plaintiff also argues Rhoads acted on an alleged threat "to frame [Plaintiff] as a non-team player." Doc. 55 at 32. Rhoads' alleged "team player" comment, however, occurred several months earlier on June 22, 2011, and was not a blanket threat, as Plaintiff's suggests. Instead, Rhoads allegedly told Plaintiff he was not a "team player" because "he questioned why the regional work cadre did not attend job related training." Doc. 55 at 7. Absent evidence to suggest Rhoads did not honestly believe Plaintiff's interpersonal skills slipped and acted upon those good faith beliefs, Plaintiff's pretext argument fails.

**Adverse Action 4.** Plaintiff argues Rhoads threatened to reassign Plaintiff from the Claims Section if he got a new supervisor. Plaintiff claims this threat was in retaliation for Plaintiff reporting Rhoads. Proceeding to the second step of the *McDonnell Douglas* test, Defendant provided a legitimate, non-retaliatory explanation for the comments. Rhoads admits she discussed the issue with Plaintiff, but denied that it was intended as a threat or motivated by retaliatory animus. Instead, she explained the comments were an expression of her thoughts on the logistics of Plaintiff's request. Given Rhoads was the supervisor of the Claims Section, it follows that if Plaintiff were assigned a new supervisor, he would no longer be in the Claims Section.

To meet his burden under the third step of *McDonnell Douglas*, Plaintiff argues Defendant's explanation was pretextual, citing Rhoads' alleged comments that she was going to make Plaintiff look like he was not a "team player." As in Adverse

17

*[handwritten: The inability to work with others would effectively prevent the Plaintiff from being promoted!]*

Action 3, Plaintiff does not explain how Rhoads' alleged "team player" comment is related to her alleged reassignment comment. According to the record, the "team player" comment occurred during a discussion about training, not about reassignment. Doc. 55-2 at 3. The Court finds nothing in the record to explain how *Evidence* being a "team player" would have any bearing on one's assigned supervisor. *was* Further, the comment certainly does not present evidence of any "weaknesses, *in file* implausibilities, inconsistencies, incoherencies, or contradictions in the employer's *in 2018* proffered legitimate reasons for its action that a reasonable factfinder could *(132 before* rationally find them unworthy of credence and hence infer that the employer did not *by the* act for the asserted non-discriminatory reasons." *Lobato*, 733 F.3d at 1289. In the *judge* absence of evidence that casts doubt on Defendant's proffered explanation, Plaintiff has not met his burden of showing that Defendant's reason was a pretext for retaliation. *(22)*

     **Adverse Action 5.** Next, Plaintiff contends Rhoads retaliated against Plaintiff *(23)* for his prior EEO activity when she "berated" Plaintiff on the phone on August 2, 2011 in front of another SSA employee. To explain Rhoads' legitimate, non-retaliatory motive for the interaction, Defendant recounted the context and substance of the phone call. According to Rhoads, she called Plaintiff to discuss an up-coming *X* training that Plaintiff would be coordinating. Since Plaintiff seemed uncomfortable with the subject of the training (a computer program), Rhoads felt it was necessary to ask Plaintiff to develop a plan for the training. Plaintiff responded to Rhoads'

*pretextual₁₈ → Plaintiff was a state certified Licensed teacher before he began working for the Agency. He received $500⁰⁰ award. This lesson was not the 1ˢᵗ one taught. He is a good trainer*

training plan request by asking, "Why don't you believe I can do this?" and "don't you trust me." Doc. 52 at 28. The two exchanged heated words, which were overheard by SSA employee, Patricia Brown, while she was sitting in Plaintiff's office. *her Affidavit was stricken and Plaintiff did not have abil/ty to cross-examine to clarf statements.*

In response to Defendant's explanation, Plaintiff proffers two theories to establish the explanation was pretextual. First, Plaintiff identified inconsistencies between the testimony of Rhoads and the testimony of Ms. Brown, the SSA employee in Plaintiff's office who overheard the conversation with Rhoads. Plaintiff disputes Defendant's statement that Plaintiff "became angry" and instead proffers Ms. Brown's testimony that, "When her [sic] got off, he was frustrated." Doc. 55 at 28. Plaintiff fails to articulate how being angry or being frustrated are sufficiently inconsistent to demonstrate pretext. Plaintiff's assertion that Plaintiff was "frustrated" but not "angry" is a distinction without a difference. A reasonable factfinder could not rationally find such a distinction was so inconsistent to infer Rhoads' explanation unworthy of credence. *Lobato*, 733 F.3d at 1289. Further, a reasonable factfinder could not find that such a distinction would create any inference that Rhoads did not act for the asserted non-discriminatory reasons. *Id.*

*The Judge is not Omnipotent*

Second, Plaintiff argues Defendant's explanation is inconsistent because prior to the phone call, "Rhoads had never previously requested a training plan from Plaintiff." Doc. 55 at 27. Defendant explained Rhoads asked for the training plan because Plaintiff "previously told [Rhoads] that he did not understand a computer

*Pretextual cross-exam Issue!"*

19

*[handwritten: X Baldock makes excuses for witness.]*

program that was relevant to this third round of training." Doc. 52 at 28. Although Rhoads' request was inconsistent, the inconsistency does not cast doubt on Defendant's proffered explanation. Because Plaintiff's lease allegations do not explain the pretextual connection between Rhoads' request and any retaliatory animus, we do not consider this issue further. "[M]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011). Plaintiff's claim regarding the phone call, therefore, cannot withstand summary judgment.

*[handwritten: Baldock started Pat Brow Affidavit statements. Cross-examination would show truth of phone call.]*

**Adverse Action 6.** Plaintiff also claims he "was denied training to advance his career." Doc. 1 at 3. In an effort to provide an explanation for Plaintiff's vague claim, Defendant provided a justification for Cynthia Steinberg's decision to deny Plaintiff's request to bring in SSA employees to help Plaintiff train other employees.[7] According to Steinberg, she did not think it was a good use of SSA resources to bring in other employees for the training. Steinberg stated she "did not base [her] decision to deny [Plaintiff] the use of [SSA employees] on his alleged disabilities or his prior EEO activity." Doc. 52-12 at 4. While this explanation is not very illuminating, it is a legitimate, non-retaliatory explanation for Steinberg's decision.

In an effort to show Defendant's explanation was pretextual, Plaintiff's

---

[7] Neither party's pleadings provided a clear explanation of the issue involved with this claim. One thing, however, is clear: Plaintiff failed to produce more than "a scintilla of evidence in support of [his] position." *Liberty Lobby*, 477 U.S. at 252.

20

response is even more dim. Citing no evidence, Plaintiff claims he "included Ms. Steinberg in an email one month prior alleging that he was being subjected to a hostile work environment." Doc. 55 at 17. Plaintiff may not rest solely on the allegations in his pleadings, but must instead, by his "own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). This Court finds no evidence to suggest Defendant's explanation is pretextual because Plaintiff did not—as he must—produce evidence of any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's explanation. *Lobato*, 733 F.3d at 1289. Even if Plaintiff provided evidence of the alleged email, the mere fact that Steinberg was aware of an alleged hostile work environment does not create a reasonable inference that Steinberg did not act for the asserted non-discriminatory reasons. *Id.* Accordingly, Plaintiff's claim regarding training cannot withstand summary judgment.

**Adverse Action 7.** Plaintiff claims on October 28, 2011, Defendant denied him permission to attend management meetings that he previously attended, which prevented Plaintiff from completing his job duties and from moving into a management role. As in Claims 3, 4, 5, and 6, the Court advances its analysis to step two of the *McDonnell Douglas* test. In response to Plaintiff's management meeting claim, Defendant explained Plaintiff no longer needed to attend management meetings because his attendance was part of a temporary developmental assignment,

*[handwritten margin notes: "Evidence was in file in 2018 case. Two Investigations conducted by the Agency support Plaintiff's Allegations." and "Pretextual Retaliatory action."]*

21

which ended in October 2011.

(24)

Plaintiff contends Defendant's explanation was pretext for retaliation, arguing exclusion from management meetings was part of a broader effort by management to prevent Plaintiff's career growth. As purported evidence of pretext, Plaintiff lists several allegations, none of which call into question Defendant's explanation that Plaintiff's attendance was temporary and ended as planned at the end of the developmental assignment.[8] Without arguing any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's non-retaliatory explanation, no reasonable factfinder could rationally find Defendant's explanation is pretextual. *Lobato*, 733 F.3d at 1289. Accordingly, this Court finds the evidence insufficient to raise a triable issue.

(25)

**Adverse Action 8.** Plaintiff claims Defendant retaliated against Plaintiff by changing his position description. Plaintiff also claims his job duties were taken away when he reported that his position description did not align with his job duties.

*Agency Internal Investiga conclusa ignored 2018 ease file.*

---

[8] Plaintiff listed the following: (1) Defendant assigned Plaintiff a new supervisor, Kloeppel, who was the same grade-level as Plaintiff; (2) Rowley admitted that in 2011, Plaintiff expressed an interest in working in a management role; (3) Rowley admitted that Plaintiff benefitted from and made good contributions to the meetings; (4) Rowley admitted the meetings helped develop Plaintiff's skills; (5) Plaintiff's job description stated he needed to attend the meetings to fulfill his job duties; (6) Rhoads and Kloeppel refused to provide Plaintiff with information discussed at Claims Executive meetings; (7) Plaintiff was never provided details to promote supervisory skills; and (8) Defendant excluded Plaintiff from discussing a lead project with the TSC Director even though Plaintiff was "better versed on the project than Mr. Rowley." Doc. 55 at 30.

*X Slanted view by the Judge*

leaving him with mostly clerical duties to perform.  Under the pretext analysis,

Defendant provided an explanation that dispels any notion that the description

change was retaliatory.  According to Defendant, SSA management mistakenly failed

to update Plaintiff's position description during the realignment of the TSC in 2006.

When Plaintiff complained of the discrepancy in October 2011, management

reviewed Plaintiff's position description and concluded Plaintiff's job description

"was not consistent with his job duties and had six elements under the rating factors

instead of four."  Doc. 52-10 at 2.  To rectify the discrepancy, Defendant assigned

Plaintiff to a new position with an updated position description, at the same pay and

grade level.

    After the update, Plaintiff complained "his supervisory role was taken away

and he was given job duties that was [sic] only paperwork and not assignments that

would provide him career growth."  Doc. 55 at 31.  His claim contradicts his own

testimony, which indicated Plaintiff lost his supervisory duties back in 2005 (not in

October 2011) and since then, he has been doing mostly paperwork: "I've been in a

dead-end position for eight years, sir.  I've been doing secretarial duties for eight

years, sir."  Doc. 52-2 at 3.  Further, Plaintiff claims he was not given assignments

that would provide career growth.  This, again, is patently contradicted by Plaintiff's

own statements.  Specifically, Plaintiff claims the temporary detail, which required

him to attend management meetings, helped get him back to a management role.

    In an additional effort to demonstrate pretext, Plaintiff described the

23

deposition of the Director of Human Resources, Vickie Matthews: "Ms. Matthews admits in her deposition that HR did not take any official action to Plaintiff's complaint, nor did she speak to a supervisor." Doc. 55 at 31. Plaintiff also highlighted Matthews' testimony that "Plaintiff's nonstandard position description was taken away and a standard position was substituted when he was reassigned." Doc. 55 at 31. Neither of these assertions demonstrate Defendant's explanation was false, contrary to a written policy, or Plaintiff was treated differently than other similarly situated employees. *Salguero*, 366 F.3d at 1176. "[M]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *C.R. England, Inc.*, 644 F.3d at 1044.

*Agency Internal Appeal info conclusion ignored.*

Plaintiff makes one claim related to his position description that, if true, would indicate Plaintiff's non-retaliatory explanation was pretextual and unworthy of belief: "Mr. Rowley told Plaintiff that his job duties would depend on the outcome of Plaintiff's EEO mediation." Doc. 55 at 31. To support this allegation, Plaintiff cited generally to SDAF #31, which is nothing more than a recitation of the claims he submitted for investigation as noted in Defendant's Notice of Consolidation. Doc. 55 at 6–11; Doc 55-2 at 1–6. He also cited Exhibit F, which is Rowley's deposition. Doc. 55-1 at 21–25. Rowley did not address the alleged comment in his deposition. Rowley did, however, discuss Plaintiff's mediation. Rowley stated Defendant planned to allow Plaintiff to report directly to him as part of the mediation: "That's what we were going to offer in mediation. And then people who did the mediation

24

presented it, and I came into the mediation as well, and kind of informed [Plaintiff]."
Doc. 55-1 at 24. In this context, Rowley's testimony indicates Plaintiff's changed
position description was potentially affected by the outcome of his mediation, but the
alleged statement was not a threat. Rowley's testimony, instead, provides a
legitimate, non-retaliatory explanation for Rowley's alleged statement—that
changing Plaintiff's position description to report directly to Rowley was meant to
satisfy Plaintiff's request for a new supervisor. Accordingly, Rowley's statement
cannot be used to support Plaintiff's burden of demonstrating Defendant's
explanation for changing Plaintiff's position description was pretext for retaliation
because it makes Defendant's explanation more believable, not less.

    **Adverse Action 9.** Plaintiff alleges he was denied the opportunity to serve
as the Officer-in-Charge (OIC) when the Claim Manager was not present and instead
appointed lower-level employees to act as the OIC. While the parties argue about
whether Plaintiff established a prima facie case, the Court, again, advances its
analysis to the parties' arguments regarding pretext. In response to Plaintiff's
allegation, Defendant explained Plaintiff was not permitted to serve as Kloeppel's
backup beginning in the fall of 2011 because SSA management changed its OIC
policy when management determined it had enough supervisors to provide back-up
when needed. Because Plaintiff was not a supervisor, after the policy change he
could not serve as OIC. To refute Defendant's explanation and to establish pretext,
Plaintiff advances three arguments.

25

First, he claims Defendant's explanation is contrary to an agreement he made with Kloeppel and Rhoads. While Plaintiff's alleged agreement with Kloeppel and Rhoads does contradict Defendant's updated OIC policy, such contradiction does not suggest Defendant's explanation about a decision made by superiors of Kloeppel and Rhoads in October 2011 is unworthy of belief because Kloeppel and Rhoads did not make the decision regarding the policy change. If anything, this assertion undercuts Plaintiff's retaliation claim because it indicates both Kloeppel and Rhoads were willing to allow Plaintiff to serve as OIC during the time that Plaintiff alleges he had a strained relationship with them. Accordingly, a reasonable factfinder could not rationally find the policy update explanation "unworthy of credence and hence infer that [Defendant] did not act for the asserted non-discriminatory reasons." *Lobato*, 733 F.3d at 1289.

Second, Plaintiff claims Rowley's testimony about his limited knowledge of the OIC system contradicts his later explanation about the OIC policy change. During his deposition, Rowley claimed he "[did not] know a lot of details on Officer in Charge. . . . [I]t wasn't in my unit." Doc. 55-1 at 23. Later, Rowley submitted an affidavit discussing the OIC policy change, which he explained, only allowed supervisors to act as an OIC. Doc. 52-10 at 3. To show pretext, Plaintiff asserts an inconsistency, but does not explain how Rowley's statement made his later explanation about the OIC policy change unworthy of belief. No reasonable factfinder could rationally find Rowley's statements would make Defendant's

26

explanation unworthy of credence. *Lobato*, 733 F.3d at 1289. Further, Rowley's statements do not create an inference that Defendant did not act for non-discriminatory reasons when it changed the OIC policy. *Id.*

Third, Plaintiff argues Defendant's claim that an OIC does not have supervisory duties contradicts "Ms. Rhoads [sic] statement that an OIC answers questions and handles things in the absence of the Section Manager." Doc. 55 at 32. This alleged contradiction does not advance Plaintiff's pretext argument. Whether an OIC is a supervisory position has no bearing on whether Defendant's policy change explanation is worthy of belief. The Court finds nothing in the record to indicate the policy change was implemented in retaliation for Plaintiff's EEO activities. Without more, Plaintiff's pretext arguments about the OIC position cannot withstand summary judgment. None of these alleged inconsistencies, alone or in combination, are sufficient to show pretext because a reasonable factfinder could not rationally find Defendant's explanations unworthy of credence and hence infer that Defendant did not act for the asserted non-discriminatory reasons. *Lobato*, 733 F.3d at 1289.

**Adverse Action 10.** Plaintiff asserts an email from his first-line supervisor, Sue Kloeppel, dated February 7, 2012 demonstrates Plaintiff was subjected to a hostile work environment in retaliation for his EEO filing. To meet step two of its *McDonnell Douglas* burden, Defendant provided a legitimate, non-retaliatory explanation. According to Kloeppel, she sent the email after Plaintiff discussed the

27

conduct of one bargaining unit employee with another bargaining unit employee. In the email, Kloeppel explained it was inappropriate for Plaintiff to engage in this kind of discussion, set forth her expectations, provided instructions, and asked if Plaintiff understood. Kloeppel denies the statement "While I hope this conduct situation does not result in disciplinary action, you are accountable for following my instructions" was a threat. Doc. 52-13 at 2.

First, Plaintiff contends Kloeppel's description is pretextual because it is inconsistent, but does not explain how or with what the statement is inconsistent. Second, Plaintiff claims Kloeppel's email "implied that Plaintiff was acting in an insubordinate manner." Doc. 55 at 34. After reviewing the email, the Court finds nothing to suggest such an implication. And even if there were, Plaintiff does not argue that such an implication would render Defendant's explanation unworthy of belief. *Lobato*, 733 F.3d at 1289. Third, Plaintiff contends Kloeppel's explanation was pretextual because "allegations that Plaintiff was acting outside the scope of his work is [sic] contradicted by Plaintiff's position description." Doc. 55 at 34. Kloeppel explained to Plaintiff, "It is not within the scope of your work assignments to give instructions to supervisors on how to deal with their employees." Doc. 52-13 at 6. Without evidence to refute Kloeppel's explanation, Plaintiff failed to show that Defendant's non-retaliatory reason for its actions were pretext for retaliation. Therefore, Plaintiff's claim cannot withstand summary judgment.

28

* * *

Defendant Social Security Administration's motion for summary judgment (Doc. 52) is GRANTED. Plaintiff counsel's motion to withdraw (Doc. 62) is GRANTED. Final judgment in favor of Defendant shall be entered.

Entered for the Court
this 6th day of April, 2018

Bobby R. Baldock
United States Circuit Judge
Sitting by Designation

*If I was grading the Judge's work, I would give him a Zero for this violation of the Rule of Law! William Fulkerson*

*(29 pages!)*

*Plaintiff's Exhibit Zero*

29

*Page 33 of 33*

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

**Case Number** _____

# EXHIBIT NUMBER:

# 2020

Medical Expert Report,
conry Document - 1 page;
Regional Office Investigate
Conclusions, - 4 pages;
Patrica Brown Affidavit;
Elizabeth Corey Affidavit;
Pattie Gravlee Affidavit;
Emails & Notification of
of Personnel Action Docm,
     37 pages total

PAMELA M. CONRY APRN,BC
4508 Carlisle Blvd, NE Ste. 210
Albuquerque, NM 87107
505/247-1921 Office   505/247-1020 Fax   505/514-8673 Cell

FEBRUARY 29, 2012

William M. Fulkerton
DOB: ████████

I hereby certify the above referenced individual has a debilitating medical condition, Posttraumatic Stress Disorder (309.81), which has been refractory to medications. The potential health benefits of the medical use of cannabis outweigh the health risks for this person.

Respectfully submitted,

Pamela Conry APRN, BC
Psychiatric-Mental Health NP/CNS

Plaintiff #1

David



**CONFIDENTIAL**
**REPORT OF ADMINISTRATIVE REVIEW**
**COMPLAINANT: BILL FULKERSON**

Plaintiff #2

Exhibit
Page 1 of 2

**Exhibit C**

## CONCLUSION

**Reassignment from Section Manager to Staff Assistant**

- ➤ Bill returned to full time status in November 2005, and then asked Terry to reassign him as Section Manager when vacancies occurred in 2006 and again in 2007. Bill said Terry responded that he would fill the positions through vacancy announcements and that Bill would have to use that process. Bill did not submit an application.

- ➤ The grades of the Section Manager and Staff Assistant position are the same and the promotion potential in both positions is the same. The Section Manager position involves supervision and the Staff Assistant does not.

- ➤ Bill deserved some consideration under these circumstances since Bill successfully competed for the Section Manager position previously.

- ➤ A reasonable person might accept reassignment from Section Manager to Staff Assistant while on a part-time basis because of a business need, but would understandably question the decisions in 2006 and 2007.

**Harassment and Hostile Work Environment**

- ➤ We cannot establish that Bill Fulkerson was subjected to unwelcome verbal or physical conduct related to his membership in a protected class. He defined as harassment, the decisions made independently or collectively by his superiors when he did not agree with those decisions. He ascribed no other purpose to those decisions, comments, and actions other than to harass him. He did not accept the purposes or objectives provided by management for their decisions, actions and comments.

- ➤ Both TSC management and Bill Fulkerson had communication difficulties that remain unresolved.

- ➤ Bill participated in section manager meetings while he was a section manager. After his reassignment to the staff assistant position, his change in duties and responsibilities did not require that he continue to participate in section manager meetings. However, he did attend the claims management meetings. Upon initiation of his management development program, Bill resumed participation in the section manager meetings until the development program concluded. Bill continued to participate in claims manager meetings until TSC management granted his request to change supervisors.

- ➤ Bill no longer attends any management meetings.

- ➤ These shifts corresponded to the position changes and organizational alignment.

17

Exhibit 21
Page 13 of 241

**Ancillary Observations**

We believe an aggravating factor in Bill's situation is his position.

1. **The responsibilities and scope of the Albuquerque TSC Staff Assistant position as currently performed by Bill Fulkerson are inconsistent with the Position Description #098L090. This, in part, is contributing to a misunderstanding of his position, for both him and his supervisor.**

   The official title associated with position description #098L090 is Management and Program Analyst. The organizational title corresponding to position description #098L090 is Staff Assistant to Mega-TSC Director. The organizational location of position description #098L090 is: SSA, DCO, Office of the Regional Commissioner, Mega-TSC Director's Office. The duties outlined in position description #098L090 state that the incumbent serves as staff assistant to the Mega-TSC Director and shares in the director's responsibilities for administrative and program management to include:
   - serving as advisor and consultant to the Mega-TSC Director in all areas of responsibility; and
   - acting as the personal representative of the Director in meetings with regional management and staff regarding issues that affect the Director's ability to meet Agency objectives.

   Kay Rhoads indicated that when Bill returned to work after his illness and became the Staff Assistant, he reported to Cleo Gonzales who was Branch Operations Chief. Kay further indicated that when Cleo retired, Helen Denero took her place. Kay took Helen's place when she retired in 4/08 and Bill was still Staff Assistant. Bill Fulkerson confirmed this history of reporting relationships. Therefore, as Staff Assistant, Bill never reported to the Mega-TSC Director. He reported to the Branch Operations Chief until October 2011 when Mike Rowley reassigned him to Claims Section Manager, Sue Kloeppel. The Claims Section Manager (GS-13) reports to the Branch Operations Chief (GS-14) who in turn reports to the Mega-TSC Director.   (See Exhibit 16)

   One aspect of Kay's developmental plan in April 2010 was to have Bill attend section manager meetings for a temporary period. It seems clear that prior to that time Bill had not attended section manager meetings. All parties agree that Bill Fulkerson currently does not participate in section manager meetings. If Bill's reporting relationship changed and he reported to the Mega-TSC Director based on the position description he currently occupies, it would seem appropriate for him to attend the section manager meetings.

   Currently, Bill does not act as the personal representative of the Mega-TSC Director. In the Exhibits, an analysis of the Staff Assistant position and the Claims Section may be helpful in reviewing his assigned duties.

18

Exhibit 21
Page 19 of 241

Based on the information obtained in the investigation, Bill's position has never been used as it was designed. If the TSC continues to use this position only in the claims unit, then it may not meet the requirements for the grade GS-13.

2. **The responsibilities and scope of the Albuquerque TSC Staff Assistant position as currently performed by Bill Fulkerson are inconsistent with the PACS Expectations Statements (X96L090).**

The PACS Expectations Statements associated with the Albuquerque TSC Staff Assistant position are inconsistent with the position responsibilities.

That is, the PACS Expectations Statements (X96L090) associated with the Albuquerque TSC Staff Assistant position contains six elements including "Demonstrates Leadership" and "Manages Performance."

One of the reasons Kay said she initiated Bill's developmental plan was to provide some basis for rating him in the elements: "Demonstrates Leadership" and "Manages Performance." Kay's explanation suggests that prior to initiating the development plan, Bill was not involved in activities associated with those elements, or only marginally so at best.

The Regional PACS Coordinator in the Center for Human Resources, develops the expectations for non-standard position descriptions. It is their opinion that the PACS rating criteria should be four elements rather than six for the Staff Assistant position. This is true regardless of whether this individual reports to the Claims Section Manager or the TSC-Mega Director.

3. **Rapport and Interpersonal Relationships**

The interview with Bill Fulkerson was emotionally charged and lasted over 5 ½ hours. It appears that the incidents continue to cause him anxiety and distress. A review of Bill's emails paints the picture of a distraught individual. (See Exhibit 17)

Bill had a recent verbal exchange with his supervisor regarding his lack of discretion concerning his conversation with a bargaining unit employee about another employee's conduct. Bill indicated that his First Amendment rights allowed him to act without regard to supervisory direction.

The communication issues, if not checked, could escalate to disciplinary levels. These issues are as critical as those cited above, and need immediate attention. We are concerned that the current environment poses unique challenges that must be addressed with expedience and sensitivity.

Exhibit __21__
Page __20__ of __241__



## WITNESS' AFFIDAVIT

I, <u>Patricia L. Brown</u>, am an __x__ employee of:

Agency                 <u>Social Security Administration</u>

County of Agency:   <u>Bernalillo</u>

Office:                 <u>Albuquerque Teleservice Center</u>

Division:              <u>Operations, Dallas Region</u>

Located in:            <u>Albuquerque, New Mexico</u>

In the capacity of (show both your organization title and the classification of your job, if different, <u>Operations Supervisor</u>, Grade <u>GS-12</u> between _____ and the present.

My telephone number during working hours is: <u>877-897-0605 x 18858</u>

### I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and the Social Security Administration policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Social Security Administration. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My responses to the following questions are provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and the Social Security Administration policy. In addition, the Complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear _____ affirm _____ my responses to the questions which follow are true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised in these questions by the investigator.

Q.     What is your full name?

A.     Patricia L. Brown.

Q.     Do you currently work for the Social Security Administration?

A.     Yes.

Plaintiff #3

Exhibit ___

Page 1 of 10

Page 1 of 6                          Initials:

**Exhibit D**

Q.    In what division, office, or section of Social Security Administration do you work?

A.    I am with the ICTU Claims Department.

Q.    In what office is that?

A.    The Albuquerque Teleservice Center.

Q.    What is your position title and the grade and series of your position?

A.    My grade is GS-12 and I am an Operations Supervisor for the Claims Department.

Q.    How long have you held that position in the Albuquerque Teleservice Center?

A.    In this particular department since March 2011. I was an Operations Supervisor in the Teleservice side since 2008.

Q.    This EEO Complaint was accepted on the basis of reprisal for prior EEO activity. Prior to participating in this interview for the investigation of this EEO Complaint, have you ever participated in any other EEO activity?

A.    Never.

Q.    Do you know Mr. William Fulkerson who is Complainant in this matter?

A.    Yes.

Q.    How did you come to know him?

A.    When I came to the TSC I was meeting everyone in the Field Support Unit in 2005. I used to be a Claims Representative on the disability side, so that is how I know him.

Q.    Do you currently work with Mr. Fulkerson?

A.    Not any more since he moved to another floor. I think that was back in March or April of 2012. I am not exactly sure of the date.

Q.    Before that did you work directly with Mr. Fulkerson?

Initials: _____

Exhibit 31

Page 2 of 10

Page 2 of 6

**A.**    Oh, yes.

**Q.**    Do you know whether Mr. Fulkerson has participated in EEO activity before this complaint we are discussing today, which was filed in January 2012?

**A.**    I am just aware of some EEO activity going on. I don't know if it was a different one than this one.

**Q.**    How did you become aware of that?

**A.**    Just everyone talking, just hearsay.

**Q.**    Did Mr. Fulkerson ever talk to you about it?

**A.**    He never said he had an EEO claim. I do remember him telling me once before that someone may be contacting me from our EEO but no one ever did. I think that was last year.

## CLAIMS

**Q.**    Complainant has alleged in this Complaint that he was discriminated against when he was subjected harassment and a hostile work environment based on reprisal for EEO activity involving incidents which have occurred over a period of time extending from June 2011 to the present. I am only going to discuss the allegations in Mr. Fulkerson's complaint about which you may have some knowledge or information.

Complainant alleges that on August 2, 2011, Ms. Rhoads called Complainant's office and berated him on an issue regarding the Field Office cross-component training. Complainant states that you were in his office when Ms. Rhoads called him. Do you recall this incident?

**A.**    I do.

**Q.**    Tell me what you recall about the incident, please.

**A.**    We were training. [Mr. Fulkerson] was training me on Excel. He got a call from Kay. I don't know what she said from her end. I heard [Mr. Fulkerson] say, "Kay, I would just like you to have a little faith in me to do what I am supposed to do."

That is as close as I can remember. Then after that they hung up. I forget how that went. It was not a long conversation. When he got off, he was frustrated. He took a deep breath and just went forward with the training he was giving me.

Exhibit ___31___
Page 3 of 10

concern was that he was trying to get her to give names. I remember her talking to me about it. She was not going to give names, I think.

Q.    Did this concern you at all?

A.    What concerned me was that I did not know he was talking to as many people as he did. I did not realize it was investigatory until people starting saying the word. It did concern me at that time. I am thinking he may have been OIC that day because our manager was not there. At that time I was still learning this environment. I had just got up here in May as a manager. *Supervisor (PB)*

Q.    Was the fact that some employees were not using the Live Meeting process a serious problem which needed to be addressed?

A.    I would not consider it a serious problem.  They just were supposed to be using it according to the workflow and the process.  I think that this came about when we were in a meeting and I think Patti mentioned they were using [Live Meeting] incorrectly and she was getting a lot of requests. I remember Bill saying they were using it incorrectly and that it was supposed to be used according to workflow. I don't know if he was focused on trying to get them to use it according to the workflow. *I'm not sure what the purpose was behind his investigative interviews (PB)*

Q.    Do you recall if Mr. Fulkerson asked you for the names of employees who were using the system incorrectly?

A.    I don't think he asked me that.

Q.    Complainant has also alleged that on unspecified dates supervisors disrespected him by directing employees not to get advice or guidance from him. Did you ever direct employees not to go to Complainant for advice or guidance?

A.    No, I am not aware of that.

Q.    Complainant has alleged that on August 19, 2011 at an off-net meeting you discussed Track 2 issues even though Complainant is the Track 2 coordinator for the section. Do you recall discussing Track 2 at this meeting?

A.    The only thing I went over was the Individual Development Plan, the IDP. I don't remember what day it was. I did discuss IDP which is Track 2, I guess. That is the only thing I would have talked about which is close to Track 2. *After researching Track 2 assignments (after the phone interview), I discovered that the IDP is not a Track 2 assignment. (PB)*

Exhibit __31__
Page __5__ of __10__

Q.    Were you in a position where you could hear Ms. Rhoads' voice?

A.    Yes.


Q.    Was her voice loud?

A.    Yes, it was loud.  It sounded quite aggressive.


Q.    Do you recall anything else about that phone call?

A.    No.


Q.    Complainant alleged that on August 9, 2011, he had a conversation with Ms. Rhoads regarding Complainant's investigative interview with other employees. Do you recall anything about Complainant meeting with employees for an "investigative interview" around the period of August 2011?

A.    He did do an investigative interview. I did not realize it was investigative interview at that time until someone used the term. I can't remember what it was about.


Q.    Did he interview you?

A.    I think he did but I don't recall what it was about. Maybe if you could remind me.


Q.    As I understand, it involved the Live Meeting process.

A.    Yes, I remember. I want to say it was about the way we were using it or not using it appropriately.  I think they were using Live Meetings with specific TEs and they are supposed to do the group.


Q.    Do you recall what Mr. Fulkerson asked you during his meeting with you?

A.    I sure don't but I do remember now what it was about. I am sure he talked to me. He talked to almost everybody.  *Everybody meaning all SupEs and TEs. (PLG)*


Q.    Did any of the employees whom you supervise talk to you or complain about Mr. Fulkerson's meeting with them?

A.    Yes. I think my TE Patti Gravlee did. I know she talked to me about it and I think her

Exhibit  31
Page  4  of  60

Q.    Do you recall who asked you to go over this issue in the meeting?

A.    I volunteered to do it. When we have our section meetings, the Section Manager will say, "Can I get a volunteer to discuss this?"

Q.    Who is your Section Manager?

A.    Sue Kloeppel. I am assuming [Mr. Fulkerson] was not in the section meeting when I was tasked with ~~Track 2~~, otherwise he would have been the one. *discussing the IDP*

Q.    Based on your knowledge and observations have any supervisors or management officials subjected Complainant to harassment and a hostile work environment?

A.    No, ~~I have not.~~ *not that I'm aware of*

Q.    Do you have anything else to add, which was not covered above, concerning the claims which were accepted for investigation in this EEO Complaint which I have discussed with you?

A.    No.

I have reviewed this statement, which consists of <u>six (6)</u> pages, including the signature page, and hereby solemnly ____ swear ✓ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____          9/12/12
Patricia L. Brown                                          Date

The information in this affidavit was sworn/affirmed to me during a telephone interview on September 7, 2012.

*Susan C. Holmes*
_____
Investigator

Devider

## WITNESS' AFFIDAVIT

I, <u>Elizabeth Irene Carey</u>, am an __x__ employee of:

Agency              <u>Social Security Administration</u>

County of Agency:   _____

Office:             <u>Albuquerque Teleservice Center, Claims Section</u>

Division:           <u>Operations Branch, Dallas Region</u>

Located in:         <u>Albuquerque, New Mexico</u>

In the capacity of (show both your organization title and the classification of your job, if different, <u>Claims Representative</u>, Grade <u>GS-11</u> between _____ and the present.

My telephone number during working hours is: _____

### I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and the Social Security Administration policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Social Security Administration. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My responses to the following questions are provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and the Social Security Administration policy. In addition, the Complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file.

Having been advised of the above information about my role as a witness in the investigative process; I solemnly swear _____ affirm _____ my responses to the questions which follow are true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised in those questions by the investigator.

Q.    What is your full name?

A.    Elizabeth Irene Carey.


Q.    In what division, office, or section of Social Security Administration do you work?

A.    I work for Claims in the Albuquerque Teleservice Center.

Page 1 of 5

Initials:

_EC_

Exhibit E

Plaintiff #4

Exhibit ___

Page 1 of 5

Q.    What is your position title and the grade of your position?

A.    I am a Claims Representative, a GS-11.

Q.    How long have you held that position in the Albuquerque Teleservice Center?

A.    About six years.

Q.    On or about September 23, 2011 who were your first and second line supervisors?

A.    It was Patricia Brown, she was my first line supervisor and the second line was Sue Kloeppel.

Q.    This EEO Complaint was accepted on the basis of reprisal for prior EEO activity.  Prior to participating in an interview for the investigation of this EEO Complaint, have you ever participated in any other EEO activity?

A.    Maybe 20 years ago I was asked to write a letter about the job an individual was doing. I was not interviewed or asked questions.

Q.    How long have you known Mr. William Fulkerson?

A.    I'd have to say about four or five years.

Q.    Did you have any direct work or organizational relationship with Mr. Fulkerson on or about September 22, 2011?

A.    Yes, he handed out the work, certain things to us, yes, ma'am.

Q.    Did he supervise you or your work?

A.    No, ma'am.

Q.    Do you have any knowledge about any prior EEO activity of Mr. Fulkerson?

A.    No.

**CLAIMS**

Page 2 of 5                              Initials:                    Exhibit __B__
                                          EC                           Page _2_ of _5_

Q.    Complainant has alleged in this Complaint that he was discriminated against when he was subjected to non-sexual harassment and a hostile work environment. He alleges, in part, that Ms. Kay Rhoads, Chief of Operations Support, subjected him to the harassment and a hostile work environment because of her misconduct and inappropriate behavior towards Complainant.

Did you observe any actions by Ms. Rhoads towards Mr. Fulkerson during the period of September 23, 2011 through November 23, 2011 which you would characterize or describe as "misconduct and inappropriate behavior?"

A.    No, not by her, no.

Q.    Did you witness or observe any actions by any individual towards Complainant during the period of September 23, 2011 through November 23, 2011 which you would characterize or describe as harassment or which, in your opinion, created a hostile work environment for Complainant?

A.    Terry Clemmons, he was the manager of the Albuquerque Teleservice Center before Mike Rowley.

Q.    When did you witness these actions, or when did they occur?

A.    It has been a while, maybe five or six years ago. It was in a very large meeting with all of Claims there. There was a motivational speaker there at the Agency and she was doing something to help the people with their job. Mr. Fulkerson had gotten up and done something very impressive.

The lady running the thing asked Terry Clemmons, "Are you his supervisor?"

[Mr. Clemmons] said, "No, not me." I know Bill was very embarrassed. It was very embarrassing for everyone. She was giving him a compliment meaning, this is a good employee, he is enthusiastic. The whole thing turned into a disaster for me. It was awful.

Q.    What about the end of last year? Did you observe any actions against Mr. Fulkerson which you would characterize as harassment?

A.    The hard part is that I am on the other part of the Claims Section. Mr. Fulkerson's office is across from where I used to sit.

There was one time. I heard loud voices. I could hear yelling. They shut the door. Sue Kloeppel was yelling at Bill. My desk is, I don't know how many feet across from the door, but I could hear yelling and then the door was shut.

Initials:

EC

Exhibit   13
Page 3 of 5

Q.      Whose office was this, where the incident occurred?

A.      Ms. Kloeppel and Mr. Fulkerson were in his office.


Q.      Did you hear Mr. Fulkerson's voice raised at all during that conversation?

A.      No.


Q.      Did this occur during the end period of last year?

A.      That would be about the time, yes.


Q.      Did Mr. Fulkerson ever tell you about any problem he was experiencing with his supervisors or management?

A.      I brought it up in a meeting. It was about leave at the Christmas holiday.  Sue Kloeppel was explaining why we could not have leave on certain days.

        I said, "Thank you, now if you all would have said that days earlier, everyone, at least I for one would have been understanding."

        [Ms. Kloeppel] said, "So when Bill comes around and says you can't go, don't be mad at Bill."  Bill wasn't here that day. This had nothing to do with Bill.

        I talked to Bill later about this.  I said, "Why did they bring you up?"

        He said, "Everything I try to go and do or try to help, they take away from me."  He used to do the leave.  They took away from him. Everything he did, they took away his duties. Things he used to do, they took away. He always used to do leave. All of a sudden, a new supervisor was doing it.


Q.      Based on your observations and experiences, how would you describe the work environment in the Claims Unit at the Albuquerque Teleservice Center?

A.      From my experience of almost 25 years, and I was a supervisor, I was an Analyst, the work environment is oppressive. You are afraid to say anything.  You are terrified that they will bring it up 10 days later if you bring something up, make a suggestion, or if you bring something up and disagree with them they will bring it up. It is a very low morale from what it used to be.


Q.      Who do you think is responsible for the problems you describe?

Page 4 of 5                          Initials:                        Exhibit _13_
                                                                      Page 4 of 5

A.    Management. It was just awful. Kay would say that we don't take as many calls even though there aren't as many calls coming in. I was so glad she retired. She would come up the back stairs. It was just, "You better watch your 'Ps and Qs,'" even if you were not doing anything wrong. I would hope I did not do anything to offend her. It was not a happy place

I remember Bill when he first started. He would go through the unit and tell everyone, "Good morning." He would make sure everyone was okay. He just doesn't seem like the same person he used to be. It seems like [management] is used to no one saying anything and [Mr. Fulkerson] said something and they are going to put the pressure on him. Any little thing you say, they hold it against you, and they are unhappy with you forever.

Q.    Do you have anything else to add, which was not covered above, concerning the matters I have discussed with you?

A.    No, I don't think so.


I have reviewed this statement, which consists of _five_ pages, and hereby solemnly _____ swear _____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_Elizabeth I. Carey_                                    5-14-12
Elizabeth I. Carey                                      Date

The information in this affidavit was sworn/affirmed to me during a telephone interview on April 26, 2012.

_Susan C Holmes_
Investigator


Page 5 of 5                        Initials:                    Exhibit ___B___
                                   _EC_                         Page _5_ of _5_



## WITNESS' AFFIDAVIT

I, <u>Pattie R. Gravlee</u>, am an __x__ employee of:

Agency                  <u>Social Security Administration</u>

County of Agency:       <u>Bernalillo</u>

Office:                 <u>Albuquerque Teleservice Center, Claims Section</u>

Division:               <u>Operations Branch, Dallas Region</u>

Located in:             <u>Albuquerque, New Mexico</u>

In the capacity of (show both your organization title and the classification of your job, if different, Technical Expert, Grade <u>GS-0105-12</u> between <u>7/2003</u> and the present.

My telephone number during working hours is: <u>505-314-5441 x 34058</u>

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and the Social Security Administration policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Social Security Administration. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My responses to the following questions are provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and the Social Security Administration policy. In addition, the Complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear _____ affirm ✓_____ my responses to the questions which follow are true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised in these questions by the investigator.

Q.      What is your full name?

A.      Pattie R. Gravlee.


Q.      In what division, office, or section of Social Security Administration do you work?

A.      In the Claims Section, the ICT in Albuquerque.

Page 1 of 6                          Initials: _BG_                Plaintiff #5

                                                                  Exhibit 5F

                                                                  Page 1 of 6

**Exhibit F**

Q.    That is Albuquerque, New Mexico, of course?

A.    Correct.

Q.    What is your position title and the grade and series of your position?

A.    Technical Expert, GS-0105-12.

Q.    How long have you held that position in the Albuquerque Office?

A.    Since July 2003.

Q.    On or about September 23, 2011 who were your first and second line supervisors?

A.    My first line supervisor was Patricia Brown, Operations Supervisor; second line is Susan Kloeppel.

Q.    This EEO Complaint was accepted on the basis of reprisal for prior EEO activity. Prior to participating in an interview for the investigation of this EEO Complaint, have you ever participated in any other EEO activity?

A.    No. I was an EEO Counselor for seven years; it was informal EEO Counseling.

Q.    How long have you known Mr. William Fulkerson?

A.    Since he has been up here in the Claims Section, maybe 7 years, I am guessing.

Q.    What was your work or organizational relationship with Mr. Fulkerson on or about September 23, 2011?

A.    They call him the Staff Assistant in the Claims Section. *He is Called*

Q.    Is he in a supervisory role over you?

A.    No, but he is a 13. He was someone who, as a member of management, if he asked for any work or any assistance, I always helped him, *in addition, the other we did also help him.*

Q.    What is your knowledge about any prior EEO activity of Mr. Fulkerson?

Initials: _Dh_

Exhibit  14
Page _2_ of _6_

A.    Just what he apprised me of. He just let me know of it. He came and told me.

Q.    When and how did you become aware of Mr. Fulkerson's EEO Complaint which we are discussing today?

A.    He informed me of it.

## CLAIMS

Q.    Complainant has alleged in this Complaint that he was discriminated against when he was subjected to non-sexual harassment and a hostile work environment. He alleges, in part, that Chief of Operations Support, Ms. Kay Rhoads, subjected him to the non-sexual harassment and a hostile work environment because of her misconduct and inappropriate behavior towards Complainant.

Please describe any actions by Ms. Rhoads towards Complainant during the period of September 23, 2011 through November 23, 2011 which you would characterize as or describe as "misconduct and inappropriate behavior."

A.    I was not aware of it. [Mr. Fulkerson] was the one who told me about it. I was not involved in it.

Q.    Do you mean that you did not observe any harassment by Ms. Rhoads of Mr. Fulkerson personally?

A.    Right, I did let Bill know that I wasn't involved and that I did not observe anything. He said that is alright and I said I would be willing to be a witness. *he asked it I would be willing to hear witness* I am in a cubicle. The Section Manager has her own office in front of us and he is in the back area behind a closed door so he is separate from all of us although we are all on the same floor.

Q.    Did you observe any actions by any individual towards Complainant during the period of September 23, 2011 through November 23, 2011 which you would characterize or describe as harassment or which, in your opinion, created a hostile work environment for Complainant?

A.    I needed to get a file. [Mr. Fulkerson] was having a conversation. He was in Sue Kloeppel's office. The office door was open. The file [cabinet] I needed was right outside her office door. When I was there I overheard Bill say, "Just stop it; just stop the harassment."

Initials: _____

I did not know what happened before that. When that happened I had already gotten my things. I did hear [Ms. Kloeppel] say, "Calm down, Bill, just calm down."

I heard him say, "No, I am not going to calm down. I have had enough." By then, I was walking back toward my desk.

Q.    Do you remember approximately when that incident occurred?

A.    I really can't recall.

Q.    Do you think it was in the middle or the end of the year?

A.    I can't remember if it was before or after I took leave around the holiday. Right now, I can only say it occurred in 2011.

Q.    Based on your knowledge, belief and observation, was Complainant subjected to harassment or a hostile work environment during the period of September 23, 2011 through November 23, 2011?

A.    Yes.

Q.    Why do you believe that?

A.    Because, one day, I was walking by and Bill was in his office. I said, "Bill, aren't you going to the Operations meeting?

He said, "No. I was banned from the meeting."

I said, "Aren't you management?" That is when he told me that he was no longer welcome in any of the Operations meetings.

Q.    Do you know why he was not attending Management meetings?

A.    Just from things he informed me had been said. There were a few clues.

Q.    What do you mean by "a few clues?" What were the clues?

A.    Some of the things he said — one thing he told me was that in a meeting — he said they had done a presentation and that he was on a committee with some of the other

Page 4 of 6                              Initials: _____

Exhibit ____

Page 4 of 6

supervisors. I am not sure who all was involved. He said he did their presentation and ~~ask~~
Cynthia Steinberg, I forget her title right now –

Q. It is my understanding she is the Teleservice Center Deputy Director.

A. Right. She approached [Mr. Fulkerson] and said, "Wow, Bill, you did a very good job."
I guess she praised him for the work he did.

The next thing that happened was that Kay Rhoads told him ~~to come up to her office.~~
She said to him, "I will teach you for not being a team player."

Q. What does that mean?

A. I guess she was upset. There was not a very good relationship between Cynthia Steinberg
and Kay Rhoads. Bill said after that, he was banned from meetings. It had just become
very ugly. They would tell him things, say things to him. He said he went to talk to Mike
and Cynthia. They said they would get back to him and brushed him off and never did
[get back to him].

I said, "I hope things work out for you." This was during my lunch hour and I couldn't
talk long so I had to leave.

Q. What is your observation of the relationship between Mr. Fulkerson and his supervisors?
Have you seen how they treat him?

A. We have Technical Expert meetings, with all of the supervisors, Section Managers and
all of the TEs. He was always included in those meetings. I know in the meetings
sometimes when he would talk, or have a suggestion Sue would just say, "We'll try it my
way first."

Q. Was Ms. Kloeppel rude to Mr. Fulkerson?

A. No, I don't think she was rude. It was just, "We are not going to do that right now." I
never did observe anyone being rude to anyone here. I know after a while even Sue cut
him off from meetings. I was going by his office and I saw him sitting there and I said,
"Bill are you going to the meetings for the Section Managers" *with the Supervisors*
And, he said, "No, they cut me off from there too."

Q. Do you have any knowledge of why he was not allowed to attend Section Manager
meetings?

A.    The only thing I know is what he told me.  I guess he was filling out his claim forms for his EEO complaint.  Sue Kloeppel came in his office and she looked down and saw her name on the forms.  She freaked out and that was it.

Q.    Have you found Mr. Fulkerson to be generally truthful in the past?

A.    Yes, I think he is very up front and honest.

Q.    Do you have anything else to add, which was not covered above, concerning the matters we have discussed?

A.    Not right now.

I have reviewed this statement, which consists of six pages, and hereby solemnly ____ swear ____ affirm that it is true and complete to the best of my knowledge and belief.  I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____        5-20-12
Pattie R. Gravlee                                Date

The information in this affidavit was sworn/affirmed to me during a telephone interview on April 23, 2012.

_____
Investigator

Initials: _____



**Ward, Sharon K.**

From:            Mathews, Vicki A.  RO Dallas
Sent:            Wednesday, June 13, 2012 9:49 AM
To:              Ward, Sharon K.
Cc:              Lewis, Janice
Subject:         FW: Follow-up on FOIA

Sharon,

CHR did not do a position review.  How do we let Mr. Fulkerson know that?

Vicki

---

From: Lewis, Janice
Sent: Wednesday, June 13, 2012 6:45 AM
To: Ward, Sharon K.
Subject: RE: Follow-up on FOIA

Sharon,
As I explained when you sent me the FOIA request, I only have a copy of the investigative review report.  If you are asking if the investigator received a copy of this same review report, the answer is "yes."  However, did the investigator receive other information? I have no doubt they did; however, I have no idea what information the EEO investigator requested.  You will need to contact other people for whatever else was sent to the investigator.

Jan

---

From: Ward, Sharon K.
Sent: Tuesday, June 12, 2012 8:17 AM
To: Lewis, Janice
Subject: FW: Follow-up on FOIA

Jan,
Please see question below from OPD, did we send them everything that we previously sent the EEO investigator?  Thank you

From: Green, Phyllis E. HQ OGC
Sent: Tuesday, June 12, 2012 8:12 AM
To: Ward, Sharon K.
Subject: RE: Follow-up on FOIA

O.K. Thanks.

*Phyllis E. Green*
410-965-8500
Office of
Privacy and Disclosure
Office of General Counsel

Plaintiff #6
Exhibit
Page 14 of 17

From: Ward, Sharon K.
Sent: Tuesday, June 12, 2012 8:50 AM
To: Green, Phyllis E. HQ OGC
Subject: RE: Follow-up on FOIA

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) FULKERSON, WILLIAM M | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date 04/08/2012 |
|---|---|---|---|---|---|

| FIRST ACTION | | | SECOND ACTION | |
|---|---|---|---|---|
| 5-A. Code 721 | 5-B. Nature of Action REASSIGNMENT | 6-A. Code | 6-B. Nature of Action | |
| 5-C. Code N7M | 5-D. Legal Authority REG 335.102 RECLASS | 6-C. Code | 6-D. Legal Authority | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority | |

| 7. FROM: Position Title and Number MANAGEMENT & PROGRAM ANALYST STAFF ASSISTANT 52D63   050L690 | | | | 15. TO: Position Title and Number MANAGEMENT AND PROGRAM ANALYST STF ASST 52D63   05D1710 | | |
|---|---|---|---|---|---|---|

| 8. Pay Plan GS | 9. Occ. Code 0343 | 10. Grade or Level 13 | 11. Step or Rate 06 | 12. Total Salary 95459 | 13. Pay Basis PA | 16. Pay Plan GS | 17. Occ. Code 0343 | 18. Grade or Level 13 | 19. Step or Rate 06 | 20. Total Salary/Award 95459 | 21. Pay Basis PA |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 12A. Basic Pay 83619 | 12B. Locality Adj. 11840 | 12C. Adj. Basic Pay 95459 | 12D. Other Pay 0 | 20A. Basic Pay 83619 | 20B. Locality Adj. 11840 | 20C. Adj. Basic Pay 95459 | 20D. Other Pay 0 |
|---|---|---|---|---|---|---|---|

| 14. Name and Location of Position's Organization SOCIAL SECURITY ADMINISTRATION OPERANS OFC REGIONAL COMMISSIONER OFC REGNL COMM DALLAS ALBUQUERQUE, NM TSC | 22. Name and Location of Position's Organization SOCIAL SECURITY ADMINISTRATION OPERANS OFC REGIONAL COMMISSIONER OFC REGNL COMM DALLAS ALBUQUERQUE, NM TSC |
|---|---|

| 23. Veterans Preference 1   1 – None   2 – 5-Point   3 – 10-Point/Disability   4 – 10-Point/Compensable   5 – 10-Point/Other   6 – 10-Point/Compensable/30% | | 24. Tenure 1   0 – None   1 – Permanent   2 – Conditional   3 – Indefinite | 25. Agency Use | 26. Veterans Preference for RIF   YES   NO |
|---|---|---|---|---|

| 27. FEGLI Z2   BASIC + OPTIONAL(5X) + STANDARD + FAMILY(1X) | | 28. Annuitant Indicator 9   NOT APPLICABLE | 29. Pay Rate Determinant 0 |
|---|---|---|---|

| 30. Retirement Plan K   FERS & FICA | 31. Service Comp. Date (Leave) 11/03/1980 | 32. Work Schedule F   FULL-TIME | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

| 34. Position Occupied 1   1 – Competitive Service   2 – Excepted Service   3 – SES General   4 – SES Career Reserved | 35. FLSA Category N   E – Exempt   N – Nonexempt | 36. Appropriation Code 4897105 | 37. Bargaining Unit Status 8888 |
|---|---|---|---|

| 38. Duty Station Code 35-0020-001 | 39. Duty Station (City – County – State or Overseas Location) ALBUQUERQUE, BERNALILLO, NEW MEXICO |
|---|---|

| 40. Agency Data FUNC CLS 80 | 41. VET STAT X | 42. EDUC LVL 13 | 43. SUPV STAT 8 | 44. POSITION SENSITIVITY NONSENSITIVE/LOW RI |
|---|---|---|---|---|

45. Remarks
RESULT OF POSITION REVIEW.

| 46. Employing Department or Agency SZ – SOCIAL SECURITY ADMIN | | | 50. Signature/Authentication and Title of Approving Official 120400506 / ELECTRONICALLY SIGNED BY: VICKI A. MATHEWS DIRECTOR, HUMAN RESOURCES |
|---|---|---|---|
| 47. Agency Code SZ00 | 48. Personnel Office ID 1166 | 49. Approval Date 04/06/2012 | |

5-Part SF-50

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238



**William E. Foote, Ph.D., ABPP**
*Forensic and Clinical Psychology*
**Board Certified Forensic Psychologist, A.B.P.P.**

215 Gold Avenue SW, Suite 202
Albuquerque, NM 87102-3364
Email: forNpsych@aol.com
Phone: 505-243-2777

April 7, 2017

Donald G. Gilpin
Gilpin Law Firm, LLC
6100 Indian School Road, NE
Suite 201
Albuquerque, NM  87110

Re:    William Fulkerson v. Carolyn W. Colvin,
       Secretary Department of Social Security Administration

Dear Mr. Gilpin:

As you requested, I have conducted a psychological evaluation of your client,
Mr. William L. Fulkerson.  I met with him initially on October 17, 2016, when I
conducted a 3.5-hour clinical interview with him.  On that same date, I administered to
him the Minnesota Multiphasic Personality Inventory-2 and the Personality Assessment
Inventory.

He returned to my office on October 24, 2016.  At that time, he met with my testing
assistant, Nikki Rowell.  She administered to him the Wechsler Adult Intelligence Scale -
IV, the Wechsler Memory Scale - IV, the Wide Range Achievement Test - 4, the TOMM,
and Trails A and B.

In addition, I had a telephone interview with him on November 17, 2016 for one hour and
fifteen minutes.  I've also reviewed a number of documents he provided for me in this
case.  These include Mr. Fulkerson's records from the following medical and mental
health providers:

- Christian Counseling of New Mexico;
- Neuropsychology Associates;
- Sage Neuroscience Center;
- Southwest Medical Associates;
- William X-Ray Associates; and,
- Social Security Administration.

I have also had the opportunity to conduct brief telephone interviews with the following
people:

- Phillip Fulkerson;
- Tammy Novak; and,
- Stuart Faulkner.

*Plaintiff #7*

The purpose of this evaluation is to assist in decision making about Mr. Fulkerson's claim against the Social Security Administration. Mr. Fulkerson contends that he was discriminated against on the basis of his disability in the context of the *Americans with Disabilities Act*.

I will begin by reviewing Mr. Fulkerson's personal history. Next, I will discuss the information gathered from his medical records. I will then turn to the data from his psychological testing and will conclude with a summary section.

## Personal History

William Fulkerson was born on September 13, 1958, in Corpus Christi, Texas. His father, Carl Fulkerson, had worked at many jobs during his life, but in later life was self-employed delivering newspapers. Mr. Fulkerson believes that his father never had any mental health problems, nor any drug or alcohol issues. His father died in 2000.

His mother, Joanne Fulkerson, is 83 years old and has worked as a housewife most of her life. As far as Mr. Fulkerson knows, his mother has no history of mental problems, nor problems with substance abuse.

William Fulkerson is the third in his sibline. His oldest brother, Phillip, is 62 years old and is disabled and retired. He worked for an electric company in Missouri and was hurt in an explosion. The second brother, Jim, is 60 years old and is self-employed working on recreational vehicles. His younger sister, Cindy, is 55 years old and just moved to Arkansas. His younger brother, Scott, is 54 years old and has worked as a warehouse man. His youngest brother, Carl David, was killed in an auto accident at age 14 in 1983. Among his siblings, several have had substance abuse issues.

Mr. Fulkerson reports that most of his relationships with his family are strained. "They walk on eggshells around me. I'm hypervigilant maybe. They're scared to make me angry." Within his family, he is probably closest to Phillip, which is ironic because Mr. Fulkerson recalls that Phillip was "a tyrant" when they were growing up, and he physically abused William. He says, "I have scars on my body from him ... He would beat the crap out of me, but would justify that to Dad. He did not want me around. He was a bully big brother." He recalls that his next oldest brother ran hot and cold and would often end up fighting him when he got mad at other people. In later life, his brother Jim had an affair with William's first wife and married his second ex-wife, as well as causing difficulties with William's last wife, which Mr. Fulkerson believes contributed to the disintegration of that marriage.

Mr. Fulkerson recalls that his family moved around quite a bit when he was a child, but he spent most of his young childhood in southern New Mexico near Hobbs. He spent his

William Fulkerson
Psychological Evaluation
William E. Foote, Ph.D., ABPP
April 7, 2017

Page 2 of 13

middle and high school years in Illinois near St. Louis. He recalls that his elementary and middle school years were marred by his involvement in many fights. He recalls, "I had 80 fights in my fifth-grade year." Through much of this time, Mr. Fulkerson justified his fights because he defended other people. His father encouraged him in his fighting, so he never got in trouble for it.

He attended Raccoon Middle School in Centralia Illinois and was on the track, softball, and basketball teams. He played Little League in the summers. In high school, he attended Salem Community High School in Salem, Illinois. He recalls that during that time he got into drugs. His grades in high school were mediocre, and he recalls, "My main thing was to party. I did quite a bunch of it in high school." He experimented with marijuana and other drugs, including prescription medications, beer, and wine. As he got older, he recalls, "I experimented with other drugs, LSD, mushrooms, heroin. I tried them, but did not like them." He recalls that the first time he was arrested was after he turned age 18. He was arrested on three separate occasions for possession of small amounts of marijuana.

Mr. Fulkerson recalls that he did not graduate from high school, because he quit in his senior year and went to work out in the oil fields near Hobbs when he was 16 years old. He was upset with the Hobbs school system because they would not accept his credits from Salem, Illinois, where he had started high school. He realized he would be hard pressed to get his credits, so he walked out. He started working in the oil fields and started driving a propane truck in 1979. He earned his license to install propane systems in vehicles, learned how to deal with all aspects of the propane industry, and eventually was able to deliver gas to homes and commercial businesses.

In March 1981, Mr. Fulkerson's propane truck ran into a moving train and was totally destroyed. He sustained a number of injuries in the course of that accident, including low back injuries that required back surgery in October of 1981. He recalls, "Then it took me three years to get back. I could not return to work as a driver. I would not let them touch my neck. I had more pain after the back surgery than before, so I was not going to let them cut on my neck."

Mr. Fulkerson got his GED in the summer of 1982 and went to the New Mexico Division of Vocational Rehabilitation, which helped him get started in junior college as a way of helping him rebuild his life. He got into a management program and worked part-time in a lawn mowing and landscaping business. In contrast to his experience in public school, he learned that he liked going to school and enjoyed learning. He was an older student as compared to his classmates, and he enjoyed college very much. He got his associate's degree in management, and because he found that working as a landscaper was very difficult and hard labor, he decided to get his bachelor's degree and went to Eastern New Mexico University from 1986 through 1989. He graduated magna *cum laude* in 1988,

but could not get a teaching job, so he started working on his master's degree and now lacks only 13 hours from finishing his master's degree in education.

Mr. Fulkerson moved to Albuquerque in August 1989. Because he was still considered to be disabled, Careers for the Handicapped, a state agency, assisted him in getting a job with the Social Security Administration in November, 1989. The issues that arose in this case occurred in the context of his employment with the Social Security Administration.

Mr. Fulkerson indicates that he has been married four times. His first marriage was to a woman named Debbie Young at age 18 for six months. Their son, Eric, was born in 1979. Debbie Young was the woman who had an affair with his older brother, Jim. Mr. Fulkerson married Tina Thompson in May of 1980. This marriage lasted about two and a half years. This marriage disintegrated in part because of his emotional reactions to the injuries sustained in the above-described accident.

Mr. Fulkerson married Teresa Layton, and this marriage lasted about 13 years. He recalls, "She was toxic, although I loved her madly. It was the worst thing for me you could ever imagine. She was very abusive physically, mentally, and emotionally. When I did not suit her fancy, she would kick me out. She would wear me down, and I would come back. The third time was it, and I was done. I asked for a divorce in 1995." They had two children, Josh born in 1986, and Nikki born in 1988. Josh died in 2009 from an accidental drug overdose.

Mr. Fulkerson's fourth and last marriage was to Ashley Harris. They were married in August, 2002 and divorced in March 2014. He met at work at the Social Security Administration and regards her as a wonderful woman. He recalls, "We did well until 2011 when they (his bosses at Social Security) came after me the second time. She told me she did not want to talk to me about what was going on at work. We soon stopped talking about everything." Since his breakup with Ashley Harris, he has had four girlfriends, the longest for about "1½ years off and on."

## Medical History

Mr. Fulkerson indicates that his first hospitalization was for a tonsillectomy at age 15 in 1974. He had a back surgery in 1981 after the train accident. He acquired a hepatitis C infection, which required 11 months of chemotherapy in 2003.

Medical records indicate that Mr. Fulkerson began treatment at Christian Counseling of New Mexico in September 2006. At that time, he was prescribed: Lithium, a medication for Bipolar disorder; Trazodone, an antidepressant; Abilify, a mood stabilizer; and Ambien, a sleep medication. He reported mild symptoms of depression and anxiety, and "logical mild racing thoughts." At the time of that visit, because he was having side-effects from the lithium, it was being gradually decreased, as the Abilify was increased to

deal with the affective symptoms.

When he was seen by Dr. Sievert in December, 2006, he was depressed, which he attributed to losing a court action related to his divorce. At that time Dr. Sievert reported this history: "He has been depressed for the past three weeks. He has had three major depressions in the past 20 years. He says that these are usually triggered by some event. He feels sad, hopeless, helpless at times, and has some anhedonia. The depression is staying the same." At the time of this evaluation, he was still experiencing a sleep disorder characterized by early wakening, poor appetite, and impairment of concentration, all cardinal symptoms of major depression. In response to the physician's inquiries concerning ongoing symptoms, Mr. Fulkerson reported: "No hallucinations. He says that he has a work situation where he has been demoted and may have some paranoia about this...He feels anxious a lot, and he has had panic attacks...He states that he has mood swings from feeling good to worrying about what will happen next...He is irritable a lot...and... When he wakes at night, he has racing thoughts about work." Dr. Sievert's assessment was: "48-year old male with diagnosis of bipolar who has been on medications, but has had side effects. Currently he describes akathisia (agitation commonly seen as side effect of psychotropic medication) which started with Abilify and worsened with propranolol." The physician discontinued the Abilify and propranolol and prescribed Zyprexa and Lorazepam.

In the course of subsequent visits in early 2007, a number of medication changes were made, and Mr. Fulkerson told Dr. Mendola in March 2007 that he was "letting a lot of legal pressures go. The benefits of the legal case was (sic) not worth the stress. Changed outlook. Court thing is over. Determined to take life back, this has been sapping energy for 4 years." Mr. Fulkerson reported feeling "more alert, less fidgety. "

Through the balance of 2007, he was seen multiple times to manage his medications. In his last appointment of that year, Dr. Baca noted: "Patient reports having increased problems with depression recently, also notes increased problems with lack of libido, sexual problems. This may not be related to prescriptions as increased with symptoms. Review history, long history of mood problems, with diagnosis of bipolar depression. Tried multiple medications in the past, has been relatively stable with current prescriptions, but notes increased symptoms, ongoing social stressors."

Mr. Fulkerson was seen a number of times during 2008 for medication management, with little change in his symptom picture. He was seen in April 2009, and through the balance of that year, Mr. Fulkerson's medications were changed several times to produce more salubrious outcomes and fewer side effects.

When he was seen in late December 2009, he was understandably upset about his son's death in October of that year from an accidental overdose of vodka and Valium.

Mr. Fulkerson believes that he went through a normal grieving process, but still misses his son a great deal. The last record dates to April 8, 2010, when medications and side effects were still the primary concern.

Mr. Fulkerson also had additional physical problems. In September 2012, he had a colon resection to treat diverticulitis. Then in December 2012, Mr. Fulkerson fell off a ladder and hit his head. This resulted in two subdural hematomas, which required surgery in February, 2013. He had significant residual problems that appeared after this fall. His short-term memory broke down, and he felt that his thinking processes slowed down significantly. He had difficulty learning new things, and even now it takes him a long time to figure things out. Of his current condition, he says, "I feel like the last several months, I got back mentally from where I was at the time of the accident. It's been diminishing over time since the surgery. I'm doing pretty good overall."

Mr. Fulkerson was seen at Sage Neuroscience Center on January 14, 2013, and was diagnosed with PTSD at that time.. The medical notes states: "Tension headache for about one month. 23-year-old son 2009—accidental overdose. Not working since August 2012. First med. For depression 1984. PTSD—he refused to do bidding of management—was asked to fire another employer (sic) on his first day of work—has been threatened—is dealing with EEOC—he feels disrespected. No work since 12/27/12. Will return 2/4/13. Sleep is interrupted—wakes up thinking about work. Gets easily angered and upset. Feels like agency has private eye watching him." Medications listed: Nortriptyline, Depakote, Zoloft, Trazodone. The physician's assessment was: "54 year old married for 10 years; employed but on leave since 12/27/12. Scheduled to return to work 2/4/13. Presents voluntarily requesting medication management and therapy. Reports he believes he has been mistreated at work—causing him to be hypervigilant, fearful—feels stressed & overwhelmed with his work. He presents angry, upset, scattered in his TP; depressed and anxious." Diagnoses: DSM-IV 296.52 Bipolar Disorder, most recent episode depressed. Not long after this visit, he had the brain surgery discussed earlier.

Mr. Fulkerson had a neuropsychological evaluation from Dr. Stephen Chinlli in May 2013 upon a referral from his general practitioner, Thomas Gross. At that time, Mr. Fulkerson was complaining about forgetting time and day, appointments, and having general difficulty with memory. He also reported having difficulty thinking clearly and experienced difficult in concentrating. He also had difficulty in word finding, which impaired his speech and his writing. He reported a series of emotional symptoms, including sadness, depression, and stress-related anxiety. He had difficulty with his temper and lost interest in much of his daily activities. The evaluation indicated that speed of processing was somewhat lower than would be expected, particularly in tasks which required rapid visual scanning. From Dr. Chinlli's perspective, "This may help to explain the fact that memory for verbal materials is impaired at times following a single

presentation (e.g., a list of words), but is adequate when dealing with well-organized material (e.g., stories). The patient may have difficulty getting his attention focused in its presentation, but subsequently shows normal learning over repeated trials."

At that time Dr. Chiulli observed the presence of emotional symptoms that impacted Mr. Fulkerson's cognitive functioning: "Personality assessment is consistent with the presence of very significant emotional distress, with anxiety, depressive symptoms, and PTSD symptoms being present and sufficient to impact on the patient's self-assessment as well as his overall cognitive functioning." Despite this assessment, Dr. Chiulli did not recommend psychotherapy, noting "the main gains are likely to be achieved by work related to his level of anxiety and emotional distress."

## Work-Related Problems

Mr. Fulkerson indicates that he began working for the Social Security Administration in November 1989. He was hired initially as a telephone service representative at the telephone service center in Albuquerque. He held that position for some seven months, and he recalls that he did very well on that job and his performance evaluations reflected a level in which he exceeded expectations on a consistent basis. He was promoted to the position of claims representative in Roswell, New Mexico, because the agency was recruiting honor graduates from ENMU. This was a promotion, and he went to Roswell in July, 1990, and things went well. He was transferred to Hobbs in 1992 and stayed there until January 1994. Then he took a lateral transfer to Ardmore, Oklahoma, in an attempt to save his marriage by getting his wife away from people they considered bad influences. The marriage failed, and in August 1996 moved to Abilene, Texas in August, 1996 in another lateral transfer following his divorce. He stayed there until he was promoted to supervisor in the district office of Albuquerque in November, 2000.

Mr. Fulkerson recalls that when he came to Albuquerque at first things went well. He and two other employees were brought in to help clean up the office after a long-term manager had failed to perform. He recalls, "... We were successful in turning that office around, and that led to me being promoted to the manager of the telephone service center in June, 2003."

## Day Before Analysis

Before he started having job-related problems that form the basis for the ongoing lawsuit, Mr. Fulkerson's prior traumatic experiences had produced some emotional reactions. For example, he indicates that following the vehicle wreck in March of 1981, he had nightmares for a year before they faded away, and he reports that he has had no Posttraumatic Stress Disorder symptoms related to that experience since that time.

Mr. Fulkerson indicates that he had a long history with the Social Security

Administration before he ever went to work for the agency. He had filed for Social Security disability benefits following his experience with the train wreck. He went through a series of hearings and adjudications, and finally an appeals council twice reversed earlier positive decisions made by an administrative law judge. He says, "When I got the job with the agency, I thought it was poetic justice." He had a 10% disability based upon his back problems at the time he was hired.

Mr. Fulkerson indicates that he has an ongoing Bipolar Disorder. He gets manic episodes during the winter of every year. He says, "I also go through periods about every month when I have a manic experience." When he is in these experiences, he says, "I'm like a crazy person. I go, go, go. I don't think. I nap more than usual." He engages himself in projects during these manic periods. For example, most recently, he remodeled his shower stall, and during these periods he sometimes does more harm to the house than he does good, by his account. During these manic episodes, he occasionally goes on buying binges. All of these issues were ongoing when Mr. Fulkerson was promoted in 2003.

However, family members report that in spite of these problems, before the job problems, Mr. Fulkerson was generally stable emotionally and happy in his relationships. His brother Phillip said, "Before he was working for Social Security he was easy to talk to. In my house (when they were children), the first three of us were always together. Fighting like siblings do. When we got older, we talked to each other like young adolescents. There were no problems. No fighting among us. Bill was easy to talk to and to get along with." His brother in law, Stuart Faulkner, said, "I felt like he and his wife had the American Dream. They had a good home, jobs, credit, money in the bank. They cooked together, did everything together. A really happy couple."

**On the Job Issues and His Reactions**
In 2003, he was a GSA 13 and a section manager. Mr. Fulkerson indicates that the function of the Telephone Service Center is to provide telephone service to the American public concerning Social Security Administration programs. This was a nationwide program, and he was the manager of Section B, one of six section managers, had 90 people working under him. He supervised three other supervisors and various other administrative personnel as part of this highly desired promotion. Still, he recalls that things went badly from the first moment. On his very first day on the job, the Mega TSC Director, Terry Clemmons, instructed him to fire an employee who had worked for the agency for some 30 years. Mr. Fulkerson asked for paperwork to justify the firing, and receiving none, he refused to fire the employee on that morning. This set the tone for his relationship with his director.

Unfortunately, starting in this new job occurred about the same time Mr. Fulkerson was being treated with chemotherapy for his hepatitis C infection. He lost 85 pounds, lost his hair, and had trouble doing almost everything on the job. He requested *reasonable*

*accommodation* as required by the ADA and asked for a position with less responsibility. He was denied *reasonable accommodation*. After his return to work, he was placed in a secretarial position in the furthest reaches of the building. He felt as though his superiors were making life tough on him. He left work in August of 2004 for nine months for unpaid medical leave and came back in June of 2005 on a half-time basis with a note from Dr. Gross. He returned to working fulltime in early 2006. He continued working full-time, but took off for his colon surgery in July, 2012, returning to work in November, 2012. Then he suffered his head injury from the ladder accident in December, 2012. He was forced back to work because he was told that if he did not get back on the job, he would be fired. However, his health did not improve and he needed surgery. Thus, his last day of work was February 8, 2013.

In retrospect, Mr. Fulkerson believes that he had a series of supervisors who he believed treated him unfairly by not giving him credit for the things that he did well, and failing to give him opportunities to advance his career. His brother in law, Stuart Faulkner had frequent conversations with Mr. Fulkerson during this time. He recalls, "…he started calling me—did it twice week. He started in about how they were not allowing him to do his job. He took it to his supervisor, and they would not let him work. How he was sitting in his office twiddling his thumbs because they would not give him anything to do. The situation was getting worse, he told me that they were starting to harass him, trying to make him feel very uncomfortable, and he was getting bullied. This kept going on and on. I watched his health and attitude, and marriage go right down the tubes. His wife would call me and tell me, 'I don't know what is going on or what to do.' How to help him. He was starting to get angry. They were not getting along. She did not know what to do. He was getting overwhelmed with the job. He was so angry with it. It was getting worse and worse and I went up there several times to see if I could get him talked off the ledge, but at that point, it was the job, he and his wife, and financial issues…. By that time, his relationship with his wife went down the tubes. By that time, everything would cause him to lose it. The entire family had been talking in confidence about him. Now, when we get together as a family, everyone walks on eggshells. Like we could be sitting in the yard and a motorcycle comes by and he goes off the wall."

From these conflicts and from other on the job situations, Mr. Fulkerson claims that he has suffered emotional problems. The plaintiff has a number of symptoms that he describes as Posttraumatic Stress Disorder. In this case, however, the symptoms appear to be more related to obsessive thinking processes, rather than symptoms which would be definable as a PTSD syndrome. He finds himself thinking a lot about what happened on the job. Sometimes he feels as though it is on his mind 24 hours a day, especially with the ongoing lawsuit. He feels that he is very difficult to get along with. He correctly recognizes that his family walks around him on eggshells, because they do not know what will set him off. He is angry at himself for not walking out of the job earlier, and he feels that he may have damaged himself. He feels bad about what happened in his

marriage, as well.

Mr. Fulkerson indicates he is getting Social Security disability income. The agency determined that he was totally disabled as of November, 2012. A review of the documentation related to that disability determination indicates that Mr. Fulkerson alleges that he suffers from Posttraumatic Stress Disorder, two subdural hematomas, diverticulosis and diverticulitis, liver fibrosis, arthritis, post-surgery lumbar back pain, and depression. He claimed an inability to function in his job as of the end of August, 2012. However, upon review of the documentation, the Social Security Administration determined his impairment began as of November 1, 2012.

In the period leading up to his retirement in 2013, Mr. Fulkerson had had a sleep disorder for several years and had been taking a sleep medication to prevent him from waking up many times during the night. He did not feel like his work was going well because of his negative interactions with his supervisors. He also took antidepressant medication, which did not do very much good for him. Even through much of the time when things were going badly on the job, he felt that his relationship with his last wife was good.

Mr. Fulkerson reports that because of the things that happened on the job, he stopped socializing and stopped attending all company events and outings. He made up excuses not to attend. Once he started making an issue of his disability and his disability claim, he lost all of his friends in the agency. He says, "All of my friends were agency people, and once I stood up, they all went by the wayside. They knew the reality, but they wanted to protect their careers." He reports that he is much more irritable and hypervigilant than he used to be.

Friends and family members reports echo Mr. Fulkerson's description of his job-related reactions. His neighbor Tammy Novak notes that he sometimes becomes overly upset and angry over little things, and the tone of his voice changes to reflect those feelings. She says, "...when he has bad days, it is hard on people. When he has those exacerbations (of his PTSD)—his voice increases, he cannot deal with it."

His brother Phillip observes that, "Before he went to work for Social Security he was easy to talk to and to get along with. There were no problems. No fighting among us (his siblings). Since the thing with Social Security, when he started fighting with them, his personality changed. He became argumentative.... He is very unpredictable. When I do call him about every two weeks, I wonder who I am going to get today. Is it going to be a conversation between two normal people, or am I going to get a raving lunatic and eventually have to hang up on him?.... We have to walk on eggshells around him to keep him from exploding."

Stuart Faulkner has been worried about Mr. Fulkerson. "I was the only one in the family

to talk to him. No one else knew what to do. I tried to walk him through this—it has been very difficult and very scary. I am worried about him hurting himself. I have watched his weight go down to almost nothing. Skin and bones. I would try to get him to eat—he had no appetite, and no drive. And that is not the man who came to our wedding when I married his sister. (ten years ago)"

When I asked Mr. Fulkerson what he wants from the current litigation, he said, "I want justice; I want truth of what went down. These people are lying through their teeth. I have not gotten any justice in the last decade. I just want my day in court. I ultimately want vindication. They have put forth a false image of me, and it is unacceptable on many levels."

**Psychological Test Data**
Mr. Fulkerson was administered a battery of cognitive tests as part of the overall evaluation. These tests included measures of effort to determine whether he was attempting to malinger or to feign a mental disorder. On these scales, his scores came out well in the normal range, showing no evidence of any attempt on his part to do poorly on the testing.

Mr. Fulkerson achieved a *Full Scale IQ* of 98, with a *Verbal Comprehension Scale Score* of 98, at the 45th Percentile; a *Perceptual Reasoning Scale Score* of 92, at the 30th Percentile; a *Working Memory Scale Score* of 100, at the 50th Percentile; and a *Processing Speed Scale Score* of 105, at the 63rd Percentile. These scores are all very much in the average range and do not differ much statistically from each other.

On the Wechsler Memory Scale, his scores were more variable, with the lowest score occurring in the *Auditory Memory Scale*, which was at the *Scale Score* of 91 and at the 27th Percentile. His highest score was on the *Visual Memory Scale* at a *Scale Score* of 117 at the 87th Percentile, indicating that he has a very good capacity for remembering things that he sees on a printed page. The balance of his scores were pretty much in the average range. All of his Wide Range Achievement Test - 4 scores were at the high school level, very much in the average range. On the basis of Dr. Chinlli's evaluation report, these scores appear to be very much as they were when he was evaluated in 2013.

Mr. Fulkerson was administered two tests of ongoing emotional functioning. The first of these was the Minnesota Multiphasic Personality Inventory-2. On this measure, he had an elevated profile, reflecting elevations on the *Paranoia* and *Depression Scales*. People with this profile report a moderate level of emotional distress characterized by brooding, dysphoric mood, anger, and a general lack of pleasure. These people are worriers and believe that they are more nervous than other people. They tend to become impatient with other people and often are irritable and grouchy, feeling angry with themselves and other people. These people feel as though their concentration, memory, and attention are

impaired and lack self-confidence. They are also sensitive to any form of criticism. They assume that other people are against them, and they anticipate being rejected by others. Disappointments are taken very hard, and they often feel as though other people have it in for them.

A review of subscale scores indicates elevations on scales reflecting paranoid thinking and somatoform disorders. He has an elevation on the *Paranoia Scale*, reflecting persecutory ideas. On the *Depression Scale*, he shows a broad range of different kinds of depressive experiences, including a sense of subjective depression and a sense of mental illness; that is, a sense that his thinking is not as strong as and sharp as it has been in the past. This has resulted in an overall sense that he is not able to function as well as he has been able to.

The Personality Assessment Inventory produced an unelevated profile. However, on the basis of that profile, the computer-generated interpretive program suggested that Posttraumatic Stress Disorder may be considered as an Axis I disorder for Mr. Fulkerson.

## Summary and Conclusions

William Fulkerson has a long history of emotional disorders stemming from serious accidents (a truck/train collision and a head injury following a fall from a ladder), which have resulted in both orthopedic and brain injuries. These experiences have also resulted in their own emotional components, with which he has grappled since these occurred.

In addition, he has a long history of Bipolar II Disorder, characterized by periods of high activity, little sleep and increased irritability. These hypomanic periods alternate with periods of moderate depression, with predictable seasonal changes. The impact of this disorder is to cause him to become more active, but also more irritable during his hypomanic phases, and more withdrawn and sad during his depressed intervals.

In addition, Mr. Fulkerson has encountered difficulty in his job at the Social Security Administration. He is especially sensitive to people putting him down or derogating his intelligence or skills and reacted to many changes he experienced on the job as being that sort of disrespect. This caused him to have special difficulty with particular supervisors, who he did not feel were properly supportive of him or respectful of his skills and capacities. It appears that this resulted in impaired relationships in the work context, which eventually led to him feeling very stressed and overwhelmed on the job. On that basis, he eventually left the Social Security Administration and was later awarded disability because of a combination of physical and emotional disorders.

By his account, supported by friends and family members, the way he was treated by his Social Security supervisors, particularly when they did not respect his work or his capabilities, caused him to become increasingly angry and isolated. This anger was

evident to everyone around him, and became such a problem that many who knew him avoided him in fear of triggering his excessive anger. In contexts in which they did spend time with him, they "walked on eggshells" to avoid an explosive and long lasting angry reaction. He was observed to deteriorate both emotionally and physically, losing weight, and showing low drive. His best friend and brother in law has even been worried about Mr. Fulkerson becoming suicidal. Although the plaintiff has benefitted from treatment for these reactions, he is still seen as emotionally brittle by many in his family.

On the basis of the current testing, Mr. Fulkerson still shows evidence of depression and a significant degree of suspiciousness and obsessive thinking concerning things that occurred on the job four years ago. For him, it is as though these things happened just yesterday, as he is unable to let go of the resentment and anger associated with those events.

It is my recommendation that Mr. Fulkerson receive individual psychotherapy to assist him in managing these feelings and resolving them, no matter how his ongoing litigation is resolved. He may also benefit from medication designed to dampen his emotional swings, including perhaps mood stabilizing medication.

I hope that this has been of assistance in your evaluation of this case. If I may provide further information, please feel free to call or write.

Sincerely yours,

William E. Foote, Ph.D., ABPP
Board Certified Forensic Psychologist
License Psychologist No. 193, State of New Mexico

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

**Case Number** _____

# EXHIBIT NUMBER:

# # 1

4/28/23 NM OAG
Complaint -
4 pages .

# STATE OF NEW MEXICO
## OFFICE OF THE ATTORNEY GENERAL

### RAÚL TORREZ
### ATTORNEY GENERAL

## Electronic Complaint Submission

*[Handwritten: X Defedant does not follow the law when a felony is reported - 18 U.S.C. subsection 4 violation.]*

### Submission Detail

**ECS Reference Number**          NMOAG-ECS-20230428-a9da
**Final Submit Date**             4/28/2023 12:03:16 PM

Disclosure of your complaint: A copy of this complaint may be sent to the business/entity/agency against whom I am filing the complaint. This complaint is a public report, thus available under provisions of the NM Inspection of Public Records Act.

Disclosure to other entities: This complaint, its content, and other information may be disclosed to other law enforcement and regulatory agencies.

☑ I understand disclosure statements.

**DECLARATION:** By submitting this form, I attest that the information in this complaint is true and accurate to the best of my knowledge. I further understand that by submitting this form I may be called to testify as a witness in this matter.

☑ **I understand declaration statement.**

The Office of the Attorney General cannot give legal advice regarding this complaint and will not act as your personal attorney. If you have questions regarding your rights consult a private attorney.

*[Handwritten: Plaintiff's Exhibit #1]*

Complaint Detail

**Complaint Type**  Criminal Complaint
**Retained Attorney**  ☐
**Description of Complaint**



This criminal complaint concerns the violation of 18 U.S.C. Section 3771 - Crime Victims Rights Act. I previously reported the violation of 18 U.S.C. Sections 241 and 242 by U.S. Federal Judges to your Office in July 2022. I submitted a copy of the filed Judicial Misconduct complaint and evidence of that violation. This was a criminal violation of my Constitutional Due Process protections as well as a civil violation. This is a Obstruction of Justice Issue under 18 U.S.C. 1505. It is also called "perverting the course of Justice." Your Office's failure to take appropriate legal action on the criminal matters is a violation of 18 U.S.C. Section 4. I filed a criminal complaint on this issue in November 2022 with your Office. I made two "status requests" voice messages thereafter with no response from your Office. Ignoring your duties is unacceptable. NONFEASANCE is my take on your Office's handling of the original criminal complaint and this one. Your Office has violated the following Victim rights concerning myself: 1) - the right to be treated with dignity, fairness or respect; 2) - the right to timely disposition of the case; 3) - the right to confer with prosecution on this matter; 4) - the right to be heard in the Criminal Justice process; 5) - the right to informed on all aspects of that process; and 6) - the right to enforcement of these rights mentioned above and access to any remedies available to Victims. I intend to hold all wrongdoers accountable. I gave a Notice of Intent to your Office on March 23, 2023 using your complaint system. Your Office continues to violate my rights by its inaction on these matters. Let me be clear, Attorney General Torres, I don't appreciate your Office's failures to prosecute criminal Judges - their criminal intent can be demonstrated easily - if you have open eyes !!! And that is your staff's problem - they ignore their duties and responsibilities under the law, regulations, policies and procedures for your Office. I conducted numerous federal investigations over the course of my career with SSA. I helped put criminals in prison for their crimes against the programs administered by the Agency. I also worked with a number of U.S. Attorneys on various cases. I was the Agency's representative in Court Hearings. I also understand "personal capacity" liabilty very well. DO YOU? I will be glad to show you in a Court of Law if I am forced to file that lawsuit mentioned in March Notice of Intent submission to your Office. I want someone from your Office to contact me on these matters or I will see you ALL in Court in the near future. If your Office continues its inaction, I will be contacting the F.B.I. to file criminal complaints on the violation of ten federal felonies that I have detected as being violated to date - and I am not a lawyer. That is a promise !!!

Parties

*Plaintiff's Exhibit #1*

## Complainant

Mr. William M. Fulkerson

Person

**Address**
3809 General Bradley St NE
Albuquerque, New Mexico 87111

**Contact information**
billygoat3809@gmail.com
(505) 234-0254

## Complaint against

Attorney General Raul Torres

Person

**Address**
Po box 1508
Santa Fe, New Mexico 87504

**Contact information**
(505) 490-4060

Mr. Hector Ballard's is also responsible for this mess and he will be held accountable for his actions as well.

## Complaint Specifics

| | |
|---|---|
| Date of Incident | July 2022 |
| Describe where the crime took place. (Street address, city, county, landmark, etc.) | Albuquerque, NM |
| What evidence do you have in your possession? (Text messages, emails, phone records, bank records, video or audio tapes, clothing, etc.) | NMOAG-ECS-20220719-F8A9 and the evidence submitted: NMOAG-ECS-20221112-2d4c; NMOAG-ECS-2023-0945. |

Plaintiff's Exhibit #1

**Have you reported this matter to** Yes
**any law enforcement agencies**
**(FBI, NMSP, City Police, etc.)?**

**If yes, provide agency name, date** In July 2022, I made a report to the F.B.I. on the violation of 18 U.S.C. Sections 241 and 242.
**of report, and other details. Also,**
**indicate whether you have**
**received a response from the**
**agency and the disposition of the**
**report.**

Transaction

Documents

*** END OF COMPLAINT ***

*Plaintiff's Exhibit #1*

FULKERSON v. New Mexico DEPARTMENT OF JUSTICE

Case Number _____

# EXHIBIT NUMBER:

# #2

10th Judicial Miscon-
duct Complaint
+ Statement of Facts
- 7 pages

10th Response to Show
Cause Order - 4
pages.

USDC   Plaintiff's
Amended Comply
- 5 pages. }
● 10th Complaint
Acceptance letter

*These Judges ignored all of the crap in the 2018 case file!*



**Judicial Council of the Tenth Circuit**

## COMPLAINT OF JUDICIAL MISCONDUCT OR DISABILITY

To begin the complaint process, complete this form and prepare the brief statement of facts described in item 4 (below). The Rules for Judicial-Conduct and Judicial-Disability Proceedings, adopted by the Judicial Conference of the United States, contain information on what to include in a complaint (Rule 6), where to file a complaint (Rule 7), and other important matters. The Rules are available in federal court clerks' offices, on individual federal courts' websites, and on www.uscourts.gov.

Your complaint (this form and the statement of facts) should be typewritten and must be legible. For the number of copies to file, consult the local rules or clerk's office of the court in which your complaint is required to be filed. Enclose each copy of the complaint in an envelope marked "COMPLAINT OF MISCONDUCT" or "COMPLAINT OF DISABILITY" and submit it to the circuit executive. Do not put the name of any judge on the envelope. Please mail your complaint to:

> **Office of the Circuit Executive**
> **United States Courts for the Tenth Circuit**
> **Byron White United States Courthouse**
> **1823 Stout Street**
> **Denver, Colorado 80257**

1. **Name of Complainant:** William N. Fulkerson
   **Contact Address:** 3809 General Bradley St. NE
   Albuquerque NM 87111
   **Daytime telephone:** (505) 234-0254

2. **Name(s) of Judge(s):** William Johnson, all "th" Circuit Jud
   **Court:** U.S. District Court; Tenth Circuit Court of Appeal

3. **Does this complaint concern the behavior of the judge(s) in a case?**
   [X] Yes        [ ] No
   If "yes," give the following information about each case:
   **Court:** U.S. District Court; Tenth Circuit Court of Appeals
   **Case Number:** 1:20-cv-01145 and 21-2001, Fulkerson v. Commission
   **Docket number of any appeal to the _____ Circuit: _____**

Page 1 of 2

*Plaintiff's Exhibit 42A page 1 of 7.*

Are (were) you a party or lawyer in the case?

[ X ] Party          [   ] Lawyer          [   ] Neither

If you are (were) a party and have (had) a lawyer, give the lawyer's name, address, and telephone number:

_____

_____

_____

4. **Brief Statement of Facts.** Attach a brief statement (no more than 5 pages) of the specific facts on which the claim of judicial misconduct or disability is based. Include what happened, when and where it happened, and any information that would help an investigator check the facts. If the complaint alleges judicial disability, also include any additional facts that form the basis of that allegation.

5. **Declaration and signature:**

I declare under penalty of perjury that the statements made in this complaint are true and correct to the best of my knowledge.

(Signature) *William N. Falkenon*          (Date) *12/12/21*

Exhibit #2
page 2

## STATEMENT OF FACTS

The actions taken by the District Court (DC) Judge and the Tenth Circuit Court Judges have been those of an attorney for the Defendant – not the actions of fair and impartial trier(s) of facts which are contained in the Plaintiff's Response to Show Cause Order or in the Amended Complaint. In effect, these Judges are attempting to be Defense Counsel, Judge and Jury on a legitimate, timely filed legal Constitutional Rights violation complaint. There is nothing in the Code of Conduct for Judges that allow these kinds of actions to have occurred legally. A second area of Judicial Misconduct concerns an Abuse of Discretion by these same Judges. They have ignored the (proven or provable at a hearing) facts of the case and case law that was put forth in the Plaintiff's Response and in the Amended Complaint – which was a brand new complaint case - where a legally entitled federal employee is able to file a Section 1983 complaint for the denial of Constitution Due Process. Secondly, a worsen of the case issues due to a continuing violation of law did occur. These two exceptions distinguish the instant case regarding the issuance of a Res Judicata decision as the final Judgement in both the DC and the tenth Circuit Court of Appeals.

A legal definition of abuse of discretion – an error of judgment by a trial Court in making a ruling that is clearly unreasonable, erroneous, or arbitrary and not justified by the facts or law applicable to the case. Such is the case as discussed and demonstrated in the filed documents submitted to the DC and to the Tenth Circuit Court of Appeals. The Judges intentionally ignored the pleadings and Case Law put forth by the Plaintiff/Appellant in those documents. This is an abuse of discretion by those Judges.

An improper exercise of Discretion includes such things as "taking irrelevant considerations into account", "acting for improper purposes", "asking the wrong questions", "acting in bad faith", "neglecting to take into consideration relevant factors" or "acting unreasonably." These apply to the actions of the Judges involved in the instant case. They have intentionally and deliberately ignored the facts of the case and Case Law on the issues presented to them.

The Plaintiff/Appellant put forth the Supreme Court case - *National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002)* and the *Doctrine of Continuing Violation* in the Plaintiff's Response to the Show Cause Order and the Amended Complaint to support his allegations that defeat the Judge's possible reasoning and rulings on the issue of Res Judicata. This was the first instance of Abuse of Discretion on the Judges' part. I recently found *Lawlor v. National Screen Service Corp., 349 U.S. (1955)* which substantiates that a Res Judicata decision should NOT be issued where it would defeat the ends of Justice. The Judges intentionally and deliberately failed to recognize the application of the Doctrine of a Continuing violation and the "new" claim of a Constitutional Due Process Violation that are exceptions discussed in the Lawlor case that should have been recognized by those Judges. The Judges should have researched the pleadings and the case law presented by the Plaintiff/Appellant to determine if a Res Judicata decision was even possible before issuing one. This is the second abuse of Discretion issue being raised.

Exhibit #2A
page 3

This specific information was presented to the Judges in the Plaintiff's Response to the Show Cause Order and the Amended Complaint to the DC and in the Petition for Rehearing to the Tenth Circuit Court of Appeals. The Judges failed to give appropriate and proper consideration to the contents of those documents and the applicability to the instant case. The Plaintiff/Appellant is attaching the Plaintiff's Response to Show Cause Order, the Amended Complaint and the Petition for Rehearing documents so that any reader can determine if the Plaintiff/Appellant supplied the sufficient facts and Case law concerning the instant case to move his complaints forward to a hearing. This is the third Abuse of Discretion issue being raised.

According to the Tenth Circuit Court Clerk's Office statement - ALL of the "eligible" Judges of the Tenth Circuit Court of Appeals chose not to take appropriate action to give the Plaintiff/Appellant the hearing he is entitled to. This was intentional, deliberate and willful disregard for the Plaintiff/Appellant's case and a denial of his Constitutional right to Due Process. If the Tenth Circuit's Chief Judge was "eligible" to take action based upon the Petition for Rehearing, the Plaintiff/Appellant requests that he and all other "eligible" Judges be disqualified from participation on this Abuse of Discretion issue under Rule 25.

The Judges took actions on their own volition to prevent the case from moving forward to a hearing on the issues presented in the complaints - even though the Plaintiff/Appellant has a property right that legally entitles him to receive a hearing on the instant case. This is objectionably unfair and shows a complete lack of impartiality on the Judges' part. This is an abuse of discretion by the Judges involved.

## DISCUSSION OF SPECIFIC CASE LAW APPLICABLE TO CASE

In the *Lawlor v. National Screen Service Corp.*, 349 U.S. 1955, the Supreme Court ruled that if a "new" claim raises new facts that did not arise out of the same transaction or occurrence of the first complaint, the issuance of a Res Judicata decision is precluded. Also, this "new" claim was not ripe at the time the first complaints were filed in 2016, therefore, the exception applies. The 2020 "new" claim of a Section 1983 case – namely the Due Process Violation claim could not be filed prior to the issuance of the Summary Judgement decision in April 2018. A second case law issue involves the case of *Lynch v. Household Financial Corp.*, 405 U.S. 538,553 (1972) which ruled on the validity of the Section 1983 claim issue being appropriate when a Federal employee who has a property interest in their federal career is denied Constitutional Due Process. It should be noted that the Judges do not discuss the facts nor case law put forth by the Plaintiff/Appellant in their decision letters. They intentionally, deliberately and willfully ignored the facts of the case, and supportive Case Law that has ultimately deprived the Plaintiff/Appellant of his right to be heard on his complaints. This is an abuse of Discretion by the Judges involved.

A second Res Judicata exception issue that has been ignored by the Judges concerns the worsening of the case issues discussed in the Lawlor case – the *Doctrine of Continuing Violation* that were presented to the Judges in the filed documents to both the DC and the Tenth Circuit Judges. It should be noted that the Tenth Circuit's own decision issued in *Watson V. University of Utah Medical Center*, 94- 4209 (10th Cir. 1996) which discussed the issue of property rights and entitlement to a hearing was intentionally

*Exhibit 2A page 4*

ignored and avoided by the Judges. The Judges have not given the Plaintiff/Appellant the appropriate "Opportunity to be heard" which includes cross-examining the Defendant's Witnesses to determine their intent and motivations concerning the Retaliation complaint. This is the fourth Abuse of Discretion issue being raised.

The Appellant discussed the evidence (Exhibits) documents submitted along with his initial complaints filed in November 2020. Any person (lay or professional) who reads those documents AND then, reads the Judge's decisions in the 2020 case will conclude that a hearing should have happened based upon what is put forth by the Plaintiff/Appellant and third party witnesses. The Judges misconstrued what was presented by the Plaintiff/Appellant and it cannot be ignored.

Below are two examples of misconstrued statements and the wrong "inferences" presented in the Ten Circuit Court's decision. The first is on page 3, last paragraph, first half of sentence two:

> (In an attempt to justify the Res Judicata decision), the Writing Judge states that the the Appellant states "...it [2020 case filing] is intended to rectify his attorneys failures in *Fulkerson 1* "to present appropriate arguments and evidence". R at 4. The Appellant was promised by his former lawyer that he would get the Appellant a hearing. The Appellant's statement was meant to convey the achievement of actually getting that hearing - not in reverbing the 2018 complaint again. Had a hearing or Discovery taken place, the misconstrued "inferences" by the Judges would have been resolved in favor of the Plaintiff/Appellant. There are many examples in the 2021 decision letter that are distorted to fit the Judge's intent to misconstrue the Appellant's statements to support their incorrect" inferences".

> A second example of wrong" inferences" by the Tenth Circuit Judges concerns the MSPB judge's rationale for issuing his Dismissal. That dismissal occurred due to the submission of the 2018 Judge's incorrect "inference" about the Plaintiff's alleged lack of creditability (on page seven) in the 2018 decision - even though the Defendant had received a copy of Exhibit One previously. Exhibit One clearly shows that the Plaintiff/Appellant was formally diagnosed with PTSD in January 2012 as he claimed. This incorrect "inference" swayed the MSPB Judge's opinion concerning the Plaintiff/Appellant and it was discussed in the MSPB Judge's own decision. The MSPB Judge's decision to dismiss the case is incorrect and it was subject to a De novo Review (by the DC) based upon the appeal language in the MSPB Judge's decision letter -- which did not happen. The Tenth Circuit's own Decision in *Timmons V. White*, 314 F. 3d, 1229 (2003) was also ignored by the Judges. A fourth abuse of Discretion action should be noted.

The issue of decisions based upon "inferences" is discussed in the Tenth Circuit's own decision in *Romero v. Union Pacific Railroad*, 615 F. 3d, 1303 (1980). This case decision concerns the applicability of issuing Summary Judgement decisions based upon the "inferences" - especially cases involving creditability issues, and in Retaliation claims. The 2018 Deciding Judge ignored this case's particular applicability to the Plaintiff's case that was before him. The Tenth Circuit likewise has ignored the applicability of the *Romero* case to the instant case. This is another abuse of Discretion issue that is

Exhibit 2A
page 5

being raised now.  (A review of the September 2021 Tenth Circuit's decision letter states the word "Retaliation" complaint numerous times – yet ignored the Romero case decree and it's applicability to the instant case.)

Preventing a hearing from occurring benefited only the Defendant when they should not have received any kind of benefit without an actual full and fair hearing occurring and receiving a jury determination on the PROVEN facts of the case before the Jury – not a Judge's incorrect "inferences" concerning the instant case.

The Plaintiff/Appellant filed a Petition for Rehearing with the Tenth Circuit Court in October 2021. In that document, he put forth applicable specific case law from the Supreme Court, the Tenth Circuit and other Circuits that show that a Section 1983 Due Process Violation case is timely, legal and valid. The Judges have ignored the facts of the case and case law that should have guided them in moving the instant case forward to a hearing – not to a Res Judicata decision. This is an abuse of discretion by those particular Judges! I see nothing in the Code of Conduct for Judges that allows them to do so. In all, the Judges have ignored nine cases that support the Plaintiff/Appellant's allegations concerning the instant case. This is an abuse of discretion by the Judges involved. Pure and simple!

Res judicata cannot apply to the Due Process Violation claim.  As discussed in Lawlor v. National Screen Service Corp, 349 U.S. (1955), the Due Process Violation complaint issue in the instant case was not ripe at the time the 2018 case was initially filed and/or plead. The Due Process Violation occurred AFTER the issuance of the April 2018 Summary Judgement decision. Therefore, it could not be legally raised previously. Violating the Appellant's Constitutional right to Due Process has both a worsening effect – a continuing violation and it also raised new facts related to the new complaint – independent of the 2018 issues.

As discussed in the filed documents in both the DC and Tenth Circuit, the 2018 case was not decided on the actual merits of that case that was before the deciding Judge at that time due to the issues discussed in the Romero case. It is understood that the erroneous decision stands as the final ruling on the particular complaint issues raised in Fulkerson 1. The exhibits submitted by the Plaintiff/Appellant in the instant case demonstrate that the actual merits were ignored by that Judge in 2018. That Judge is a senior member of the Tenth Circuit panel of Judges and he has possibly participated in the instant case and his potential influence on the instant case cannot be ignored. He should have recused himself – and the Plaintiff/Appellant also believes that the Tenth Circuit itself should have done the same based upon that particular issue as well. This did not occur as best he can determine. The Judges cannot show their actions are/were legal or in line with the Code of Conduct for Judges.

Again, the main thrust of the timely filed Amended Complaint is a Constitutional Due Process Violation case – not a rehearing of the 2018 case. As the Lawlor Court decision applies to the instant case – the elements of preclusion that are necessary for preclusion to be applied were not met, and therefore, they cannot and should not have applied to the instant case.  Yet the DC and Tenth Circuit Court Judges issued Res Judicata decisions. Ignoring that distinction, the facts of the case, case law and ultimately the

*Exhibit 2A.*
*page 6*

Rule of Law, the Judges chose to deprive the Plaintiff/Appellant of his right to get Justice on his legal complaints against the Defendant. These intentional, deliberate and willful actions do not reflect that these Judges carried out the legitimate and legal duties and responsibilities of the position they occupy.

In Summary, the intentional, deliberate and willful actions taken by the Judge involved are an abuse of discretion, and as such, they are misconduct issues which prevented the processing of legitimate valid legal complaints in a proper forum. These actions are not superficial or "harmless error" kind of actions – they are misconduct issues and they deprived the Plaintiff/Appellant of his legal entitlement right to Constitutional Due Process which includes the opportunity to be heard on the instant case. They knowingly trampled on the Civil rights of a legally entitled federal employee AGAIN! The Plaintiff/Appellant is/was entitled to a full and fair Hearing concerning the instant case minimally. The Judges actions have deprived him of that Right.

For over eight years, the Plaintiff/Appellant has done everything he could legally do to get a full and fair hearing, he wants these matters put before a Jury and let them decide who is truthful and who is not. Justice demands it!!! The following quote sums it up -

"Failure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights and thus requires reversal." *Fletcher v. Superior Court (Oakland Police Dept.),* (2002) 100 Cal. App. 4th 386,392. This same applies to the instant case as well.

If the Plaintiff/Appellant may respectfully do so, he requests that if a committee is formed, the committee members assigned an inquiry on these matters comes from outside of the DCs within the Tenth Circuit Court of Appeals jurisdiction including from the Tenth Circuit Court itself. He requests that the Chief Judge from the Court of Appeals for the Federal Circuit be asked to serve as chairman of the Committee. He also requests that Judge Mark E. Walker, Chief District Judge for the N.D. Florida, Tallahassee Division serve on the committee as well. Other committee members can be selected by the Chairman of the Committee, please.

If the plaintiff/Appellant needs to supply any additional information or evidence that is not in file, please notify him and he will comply promptly.

Respectfully submitted,

William M. Fulkerson

William M. Fulkerson

Attachments: Plaintiff's Response to Order to Show Cause; Plaintiff's Amended Complaint; and the Petition for Rehearing.

Exhibit 2A
page 7 of 7.



Case 1:20-cv-01145-SCY   Document 6   Filed 11/19/2020   Page 1 of 5

**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

NOV 1 9 2020

MITCHELL R. ELFERS
CLERK /mn

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILLIAM M. FULKERSON

    Plaintiff,

v.                                              No. 1:20-cv-01145-SCY

ANDREW SAUL, Commissioner of the
Social Security Administration.

    Defendant.

## PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE

In the Court's Order to Show Cause document, the Court's opinion is that the Plaintiff's current claims of
Constructive Discharge, Retaliation, Civil Rights Violation and Whistleblower Act Violations are time
barred by either "Res judicata" and/or "the Statutes of Limitations." The Plaintiff appreciates the
opportunity to address the Court's concerns.

*Supreme Court's*

*Lawlor*

*Case*

*Exception*

*#1*

→

1.  The Plaintiff disagrees because the Doctrine of Continuing Violation applies to the Plaintiff's
    case at hand. Therefore, all time bars are waived due to the fact that this case is —and has
    always has been a ██████████████████████████ case. The Continuing Violation Doctrine
    understands that illegal discriminatory "discrete" actions taken by the employer can occur
    over a substantial amount of time that can ultimately add up to a violation of the
    complainant's Civil Rights - which is at the heart of the Doctrine's purpose and its intentions
    to address the totality of wrongdoings by the employer. The application of the Continuing
    Violation Doctrine to the Plaintiff's case is appropriate and proper.

2.  In the MSPB Judge's Initial Decision letter, the MSPB Judge addresses the "resjudicata/time
    bar" issues raised by the Defendant (MSPB, pg. 4-6, Procedural Rulings) in the context of the
    Constructive Discharge complaint raised by the Plaintiff that was before the MSPB. The
    Judge cites the following case – Elgin v. Department of Treasury, 567 U.S. 1, 11-13 (2012).
    The Plaintiff believes that the MSPB Judge understood the Continuing Violation Issue raised
    by the Plaintiff in his filings made in the MSPB appeals.

3.  Further down on page 5 of the document, the MSPB Judge goes on to say that "Timeliness in
    such [constructive discharge] cases is determined by when an appellant/ Plaintiff learns of
    the right to appeal an alleged CONSTRUCTIVE ADVERSE ACTION and whether he or she acts

*Plaintiff's
Exhibit 2B
page 1 of 4.*

Reasonably promptly thereafter." The Judge cites the following cases – Fields v. U.S. Postal Service, 117 M.S.P.R. 475, 479 (2012); Popham v. U.S. Postal Service, 50 M.S.P.R. 193, 198-200. In the instant case, once the Plaintiff learned of this possibility, he took timely and appropriate action on the matter as the MSPB Judge writes to in his decision letter.

4.  The MSPB Judge ruled that they Plaintiff's Constructive Discharge case is valid and timely under the existing M.S.P.B. regulations and case law. This ruling is favorable to the Plaintiff on the issue of res judicata and time bars, and he reiterates, they do not apply to the Plaintiff's case. The Court should recognize this fact.

5.  In the Court's Order to Show cause letter on page two, the Court states in the paragraph on the issue of "res judicata" – and specifically what is stated in the last sentence of that paragraph – "In addition, even if these three elements are satisfied, there is an EXCEPTION to the application of claim preclusion [res judicata] where the party resisting it DID NOT HAVE A FULL AND FAIR OPPORTUNITY TO LITIGATE THE CLAIM IN THE PRIOR ACTION.

6.  This is exactly the case where the Plaintiff is concerned. No full Hearing was held where the Plaintiff had the opportunity to present his case in its entirety nor was he given the opportunity to cross-examine the Defendant's witnesses. Credibility issues have been ignored repeatedly! The Court should recognize this fact.

7.  No actual FULL hearing has been held to date. The Plaintiff did not have "a full and fair opportunity to litigate the claim in prior action" as discussed in the Lenox Maclaren Case cited in the Court's Order to Show Cause document. The Plaintiff has written to this very issue in his original complaint that is before the Court. This fact should be recognized by the Court.

8.  The Defendant's "Decision without a Hearing" document was submitted in regards to the EEOC complaint in 2014, the Defendant's U.S. District Court Motion for Summary Judgement document was submitted in 2017, and the Defendant's multiple Motions for Dismissal on the four MSPB appeals were submitted in 2018, 2019 and 2020. These Constructive Adverse Actions led to the issuance of unwarranted adverse rulings in favor of the Defendant at the expense of the Plaintiff's Constitutional Rights. These individual actions are well within the three year limitation period concerning the Civil Rights Violations complaint that is before the Court.

9.  The Continuing Violation Doctrine also applies to the Constructive Adverse Actions taken in reference to the Plaintiff's Civil Rights Violations listed above. The Defendant's motivations and actions are intentional, deliberate and willful.

Exhibit 2B
page 2

10. All of these CONSTRUCTIVE AVERSE ACTIONS occurred after the termination of the Plaintiff's employment in 2013. Each one of them individually led to the Plaintiff being denied his Constitutional right to due process. The Court should recognize this fact.

11. The current complaint before the Court was filed on November 5, 2020, and the Plaintiff has been diligently pursuing legal action against the Defendant for its wrongdoings since 2013.

12. It is a fact that the Plaintiff has an ongoing "Protected Property Interest" in his federal career. Based upon the Federal Judge's decision in Snipes v. Scott, 4:18-cv-580-mw/cas (January 9, 2019), the Plaintiff is/was entitled to a Hearing.  As the Judge writes — "Due Process does not mean no process. When it comes to key rights, government officials do not have the luxury of doing whatever they want." The failure of the Defendant to let the legal issues raised by the Plaintiff go to a hearing are Retaliatory — pure and simple. The Court should recognize this fact.

13. The Federal Judge goes on to say "The fundamental requirement of Due Process is the opportunity to be heard at a meaningful time and in a meaningful manner, Matthews v. Eldridge, 424 US 319, 333 (1976). In the instant case, the Defendant through its filings has deprived the Plaintiff of that opportunity - time and time again. This is illegal!!! The Court should recognize this fact.

14. " Summary Judgement" decisions do not meet the standard set forth in the Federal Judge's decision in meeting the Due Process required by the Rule of Law. Such decisions do not meet the appropriate "level" of process as discussed in the Federal Judge's decision. The Court should recognize this fact.

15. The illegal actions of the Defendant have been to prevent the Plaintiff from having a hearing, and thus, the Defendant deliberately, intentionally and willfully continues to violate the Plaintiff's Constitutional right to Due Process. The Defendant has been an employer for over ninety years and it knows it is failing in its DUTY OF CARE legal responsibilities owed to the Plaintiff. The Court should recognize this as well.

16. All Summary Judgement decisions that are based upon ERRONEOUS FINDINGS OF FACTS SHOULD NOT BE ACCEPTABLE TO ANY COURT IN OUR NATION. Ignoring it is equally unacceptable to the Plaintiff and he will continue to raise legal challenges on this matter. With all due respect - the U.S. District Court Judge screwed up in his 2018 Summary Judgment document PERIOD!!! Evidence submitted (in support of the Plaintiff's complaint) by the Plaintiff demonstrates this fact!!! The Court should recognize this as well.

17. The Constructive Discharge issue and the Civil Rights violations occurred after the termination of the Plaintiff's employment in 2013. In order to raise the Constructive Discharge complaint in District Court, the Plaintiff had to raise the issue to the MSPB first.

*Exhibit 2B*
*page 3*

before being able to raise it in District Court according to what the MSPB Judge writes in his decision. See Elgin v. Dept. of Treasury. The Court should recognize this fact. The plaintiff's current complaints are validly and timely raised before the Court.

18. The Constructive Discharge claim, the Whistleblower Act violation claims, nor the Civil Rights violations claim have not been formally adjudicated previously by any Judge. The Court should recognize this fact. Res Judicata cannot apply as no judicial decision has been rendered on the specific complaints raised by the Plaintiff. Even the Retaliation complaint issues have shifted to including new and different retaliatory actions than those raised in previous filings.

The Plaintiff seeks to amend his Complaints that the Plaintiff has spoken to regarding these legal issues and the evidence in his original complaint and the above discussion. The Plaintiff is willing to comply with what the Court wants him to do in order to move his case forward - without fail.

The Plaintiff requests that the Court allow his complaints to move forward to a Hearing so that the Plaintiff receives Due Process on his complaints against the Defendant.

Respectfully submitted,

William M. Fulkerson

William M. Fulkerson
3809 General Bradley St. NE
Albuquerque NM 87111
(505) 234-0254

Plaintiff's
Exhibit 2B
Page 4 of 4.



UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NOV 3 0 2020

MITCHELL R. ELFERS
CLERK /mm

WILLIAM M. FULKERSON

Plaintiff,

V.                                          No. 1:20-cv-01145-SCY

ANDREW SAUL, Commissioner of the
Social Security Administration.

*The Supreme Court's Law for*
*case Exception # 2 - a*
*NEW claim.*

Defendant.

PLAINTIFF'S AMENDED COMPLAINT

The Plaintiff appreciates the Court's allowance for the Plaintiff to amend his Complaint. It must be
stated that the Plaintiff is concerned that his previous arguments put forth in his Response to the
Court's Show Cause Order are being ignored in respect to the issue of Statutes of Limitation and Res
Judicata. Specifically, that the MSPB Judge's decision which addresses these two very issues directly
relating to the Constructive Discharge complaint filed by the Plaintiff in this cause of action. It should be
noted by this Court that the Defendant had previously put forth a number of Motions for Dismissal -- the
latest in September 2020 concerning these VERY same issues which the MSPB Judge addresses in that
ruling. (These issues will be further discussed in the contents of this document below.)

Is it this Court's intention to overrule the MSPB Judge's finalized decision on the issue of Procedural
Rulings related on this matter? The Plaintiff objects if this is correct! The Plaintiff would also expect the
Court to apply same standard to be ERRONEOUS Rulings issued in the 2018 U.S. District Court Summary
Judgement Decision.

*Formal*

The plaintiff also takes issue on the Court's statement concerning the "Facts" relied upon by the Plaintiff
in his current Complaints of Constructive Discharge, Retaliation and the Deprivation/Violation of his
Constitutional Right to Due Process. The impression gathered by the Plaintiff is that those same facts
cannot be used to support other new complaints/claims than it usage in the previously denied or
dismissed complaints/claims and that is incorrect and objectionable.

*Objection*

This amendment concerns the inclusion of a Hostile Work Environment claim in addition to the standing
Constructive Discharge, Retaliation and Civil Rights Violation complaints discussed in the Plaintiff's
original Complaint. The following dialog begins:

*Ignored*

*Plaintiff's*
*Exhibit 2C*
*page 1 of 5.*

1. It is apparent that the Court does not fully grasp what a Hostile Work Environment claim means in relationship to the Doctrine of Continuing Violation and its proper application to the Plaintiff's complaints. In a Hostile Work Environment claim (the Plaintiff's allegation from the start of his formal complaints/claims to the Defendant first, and the EEOC thereafter), "discrete" actions take on a different meaning as discussed in the Supreme Court's decision in National Railroad Passenger Corporation v. Morgan, which was decided in 2002. The Court held that Hostile Work Environment cases are PURE CONTINUING VIOLATIONS and that the entirety of a Hostile Work Environment represents a single discriminatory "Practice". This cannot be denied by any party.

2. The Supreme Court states that "A Hostile Work Environment claim is composed of a series of separate acts that collectively constitute "one unlawful employment practice." 42 U.S.C. Sect. 2000-5(e)(1). The submission of six "Motion documents" by the Defendant in the instant case meets this established standard. In addition, there are many other legal points contained within the Morgan case that apply to the Plaintiff's case. Those can and will be discussed at a hearing.

3. Furthermore, the Morgan Court states that - and the Plaintiff quotes - "We [the Supreme Court] also hold that consideration of the entire scope of a Hostile Work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that Hostile environment takes place within the statutory period."

4. In the instant case, that one act that necessarily occurred within the statutory time limit is the Defendant's September 2020 "Motion to Dismiss document" concerning the Constructive Discharge complaint. That was latest one of the six similar "Motion documents" that have been filed by the Defendant to prevent the Plaintiff from having a hearing on his various EEO complaints to date. If the Defendant files another one concerning the current complaints before this Court – it will be number seven.

5. This is an "ongoing pattern or practice" of "discrete" actions that the Defendant should have FORSEEN as causing the Plaintiff direct harm – the deprivation of his Constitutional Right to Due Process – and more specifically, an actual formal hearing contained within that Civil right. This is a breach of the Defendant's known DUTY OF CARE responsibilities where the Plaintiff is concerned.

6. These "CARE" breaches by the Defendant have ultimately led to the Plaintiff's PTSD disability and the condition could have been prevented - had the Defendant exercised reasonable care concerning that DUTY correctly and legally. The Plaintiff would not have PTSD -but for – the illegal actions taken or a failure to take by the Defendant over the entire period of the Hostile Work Environment.

7. As stated in the Plaintiff's original Complaint document and in his Response to the Court's Show cause Order, the Defendant filed a Motion for a "Decision without a Hearing" Document in

*Exhibit 2C*
*page 2*

2014. The EEOC Judge ruled in favor of the Defendant based upon this Motion. The Plaintiff would have been given a hearing – but for- the "Motion document" filed by the Defendant. The Defendant was not legally required to file its Motion. It should also be noted that the Defendant failed to properly advise the Judge of the likelihood that the Plaintiff's Constitutional Rights could be violated by the Judge ruling in favor of the Defendant. Of course, that would likely lead to the Judge denying the Defendant's Motion. Intentional, deliberate and willful "discrete" actions taken by the Defendant. This is blatant DECEPTION on the part of the Defendant!

8.  In the decided 2018 U.S. District Court case, the Defendant filed a Motion for Summary Judgement and the Judge ruled in favor of the Defendant on the basis of that Motion. But for this submission of the "Motion document", the Plaintiff would likely have gotten a hearing. The same issue concerning the failure of the Defendant to properly advise the Judge concerning the Plaintiff's Constitutional Rights issue.

9.  The Defendant filed multiple Motions for Dismissal with the MSPB on the Plaintiff's four appeals made to the MSPB in 2018, 2019, and as mentioned above, in 2020. And again, the" but for" issue applies to each "Motion document" submitted. And again, the Defendant failed to notify the judge of potential harm to the Plaintiff's Constitutional Right to Due Process. The Defendant's actions were deliberate, intentional and willful.

10. The Defendant understood the negative effects that such disclosures would have upon each of their various Motions before the Judge AND the effect of the previous Judges decisions made before and potentially influencing the current Judge's thinking on the issue. Ultimately, the Judge ruled in favor of the Defendant's Motions at the expense of the Plaintiff's Civil right to Due Process.

11. The six Hostile Work Environment "discrete" individually filed "Motions" to deny or dismiss the claims/complaints of the Plaintiff's that have been filed by the Defendant – IN THEIR TOTALITY - constitute ONE UNLAWFUL EMPLOYMENT PRACTICE. That harms the Plaintiff and deprives him of his entitled Civil Rights as a U.S. citizen and the "CORE PROTECTION" rights as a federal employee.

12. The defendant is well aware of the Plaintiff's ongoing "Protected Property Interest" in his federal career and it knowingly filed numerous "Motion documents"' that ultimately deprived the Plaintiff from receiving a hearing time after time over the period of the Hostile Work Environment.

13. This mockery of Justice cannot be allowed to stand in the face of the Rule of Law. The negative implications this has on all federal employees – currently and in the future, who bring forth legitimate complaints of any kind against their own Federal Agency/employer cannot be overstated!!! This not just about the Plaintiff's case!!!

Exhibit 2C
page 3

14. The Plaintiff will be seeking the application of equitable doctrines like Equitable tolling, waiver, estoppel or limiting the time period involved if necessary. The Supreme Court cites Zipes v. World Airlines, Inc., 455 U.S. 385, 393, in its decision on these specific issues. These are mentioned in the Morgan decision and are applicable so that the Plaintiff might receive the hearing he wants and is entitled to by law.

15. With establishment of the one unlawful employment practice concerning the deprivation of the Plaintiff's Constitutional Right to Due Process described above in the instant case, all OTHER actions taken by the Defendant during the entire Hostile Work Environment time period may be scrutinized and considered for the purpose of determining liability for its illegal actions taken over the entire course of the Hostile environment period. All illegal actions are subject to legal liability by the Defendant. So says the Morgan Court.

16. All Complaint/claim issues raised and put forth by the Plaintiff in his original Complaint filed with this Court and in his Response to this Court's Show Cause Order are applicable in demonstrating the TOTALITY OF CIRCUMSTANCES that the Morgan Court states are the task for a Trier of Facts, and they should be focused upon this totality in deciding the legal issues in a Hostile Work Environment claim.

17. The "totality of circumstance" also applies to the adjudication of the Constructive Discharge complaint as well. The Plaintiff has previously addressed the issue of "involuntariness" in his other filed documents mentioned above. This complaint is filed timely and no court has ruled on it previously. This complaint needs to be heard!!!

18. However, it must also be noted that the Plaintiff has not previously been given the opportunity to address or to discuss the issue of "PRETEXUALITY" nature of the Defendant's statements and actions on the complaints/claims put forth by the Plaintiff. This violated the legally accepted three step process/ procedures used in the development of the legal issues at hand.

19. Prior to the discussion with MSPB Judge Kasic, the Plaintiff did not possess the knowledge about filing a Constructive Discharge complaint with the MSPB. Once the Plaintiff was made aware of that right, he filed a complaint within a couple of weeks. Without knowledge, it is not acceptable that the Plaintiff be held accountable for not filing timely by the Court. This is considered the application of the legal "Discovery Rule" by the Plaintiff.

20. The Plaintiff submitted Exhibit #1 to demonstrate that the U.S. District Judge incorrectly assumed that the Plaintiff put forth that his primary doctor had FORMALLY diagnosed the Plaintiff's PTSD condition. It is a fact that the Plaintiff NEVER VERBALLY OR STATED IN WRITING that he was formally diagnosed by anyone else other than the Nurse Practitioner who actually diagnosed his condition.

*Exhibit 2C*
*page 4*

21. The Judge's words and actions, directly and/or indirectly, concerning the creditability of the Defendant's witnesses demonstrate that he did not scrutinized them as closely as he did concerning the words and actions of the Plaintiff. An example of this concerns the quoted statements put forth regarding a specific threat made to the Plaintiff by his immediate Supervisor. The Supervisor stated the following (verbatim) to the Plaintiff —"I will make you look like non-team player."

22. The Judge words do reflect that he was excusing the Supervisor's direct threat as little more than a normal exchange between a Supervisor and subordinate employee. This is not the true context of the situation, NOR is it acceptable conduct based upon the Code of Conduct of Federal Employees of the Defendant Agency. Secondly, he was not there to draw such distinction based solely upon the Supervisors' denial statement. Body Language, tone of speech, is not discernible based upon the written words put forth.

23. The Plaintiff contends that creditability determinations are best left to a Jury that can see all witnesses and hear the testimony and cross examination of all witnesses before it, and thus; enabling it to make the most accurate determination as to the truthfulness of each witness involved.

24. The Plaintiff did not get a full and fair opportunity to litigate his valid complaints that were before the Judge. The Plaintiff has many issues concerning the lack of due process and processing issues by this judge.

25. The negative impact of this Judge's incorrect assumptions/assertions on the Plaintiff's creditability cannot be overstated. This heavily influenced the MSPB Judge's decision!!! The Judge concluded that the Plaintiff was less than truthful concerning his complaints and wrote about this in his decision. That decision is worthless and does not express any truth as to the provable demonstrable legal facts of the Plaintiff's case.

The Plaintiff reiterates his request that the Court allow his Complaints to move forward to a Hearing so that the Plaintiff receives Due Process on those Complaints.

Respectfully submitted,

William M Fulkerson

William M. Fulkerson
3809 General Bradley St. NE
Albuquerque NM 87111
(505) 234-0254

Plaintiff
Exhibit 2c
page 5 of 5.



**United States Courts for the Tenth Circuit**
**Office of the Circuit Executive**
**1823 Stout Street**
**Denver, Colorado 80257**
**(303) 844-2067**

**David Tighe**
**Circuit Executive**

**Leslee Fathallah**
**Deputy Circuit Executive**

March 15, 2022

Mr. William M. Fulkerson
3809 General Bradley St. NE
Albuquerque, NM 87111

Re:   <u>William M. Fulkerson v. Chief District Judge William P. Johnson</u>
Judicial Complaint No. **10-22-90008**

Dear Mr. Fulkerson:

Your complaint against Chief District Judge William P. Johnson under the Judicial Conduct and Disability Act was received in this office and assigned the case number referenced above. Please note, we cannot accept complaints against <u>unnamed judges</u> for filing.

*[handwritten: ✗ Clerk's Office refused to disclose the names of the Judges involved (emails)]*

Insofar as you are seeking a transfer of your complaint to another circuit, that request is denied. *See* JCD Rule 26.

Any future correspondence in this misconduct matter should be directed to my office. I will notify you of any actions taken on the complaint. In accordance with Tenth Circuit Misconduct Rule 8.2, I am providing a copy to Chief Circuit Judge Timothy M. Tymkovich, District Judge James O. Browning, and to the subject of the complaint, Chief District Judge William P. Johnson.

Sincerely,

*[signature]*

Leslee Fathallah
Deputy Circuit Executive

*[handwritten: ✗ This is nothing short of the fox guarding the hen house!]*

cc:   Chief Circuit Judge Timothy M. Tymkovich
Chief District Judge William P. Johnson
District Judge James O. Browning

*[handwritten: Plaintiff's Exhibit #2]*

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

**Case Number**_____

# EXHIBIT NUMBER:

# #3

NM OAG
11/22/22
Complaint -
4 pages.

**STATE OF NEW MEXICO**
**OFFICE OF THE ATTORNEY GENERAL**



**HECTOR H. BALDERAS**
**ATTORNEY GENERAL**

## Electronic Complaint Submission

*✗ What has happened on this complaint?*

**Submission Detail**

**ECS Reference Number**    NMOAG-ECS-20221112-2d4c
**Final Submit Date**    11/12/2022 4:26:15 PM

Disclosure of your complaint: A copy of this complaint may be sent to the business/entity/agency against whom I am filing this complaint. This complaint is a public record, thus available under provisions of the NM Inspection of Public Records Act.

Disclosure to other entities: This complaint, its contents, and other information may be disclosed to other law enforcement and regulatory agencies.

☑ I understand disclosure statements

**DECLARATION:** By submitting this form, I attest that the information in this complaint is true and accurate to the best of my knowledge. I further understand that by submitting this form I may be called to testify as a witness in this matter.

☑ I understand declaration statement.

The Your Attorney Office of the Attorney General cannot give legal advice regarding this complaint and will not act as your personal attorney. If you have questions regarding your rights please contact a private attorney.

Submission of this complaint is not confirmation that an investigation will be initiated.

*Plaintiff's Exhibit #3*

## Complaint Detail

**Complaint Type**            Criminal Complaint

**Retained Attorney**         

**Description of Complaint**  Novella Salazar, who is the director of the Adovocacy and Intervention Division has violated 18 U.S.C Subsection 4 by her actions related to NMOAG-ECS-20220719-f6a9. I request that Attorney General Hector H. Banderas investigate my allegations before his term as Attorney General is over. Director Salazar received the evidence submitted with the afore mentioned case that shows that: 1) the Principals, Executive Director Mr. David Tighe and the Tenth Circuit Court of Appeals Judges violated my Constitutional right to Due process under N.M. state law; 2) based upon the submission of the Online complaint form to the N.M.A.G. office, and evidence in the form of Court filings made to the Tenth Circuit Court of Appeals: she has full knowledge that my Constitutional right to Due Process has been violated by the Principals under New Mexico state law; 3) Director Salazar failed to take legal action to notify the appropriate authorities- that is filing criminal charges with the State District Court against the Principals; and 4) Director Salazar took affirmative steps to conceal the crime of the principal by her failure to file criminal charges against the Principals in New Mexico State District Court. I want to call attention to the recent criminal Court case prosecuted by the N.M.A.G. office concerning the dog being shot by a man with the pellet gun. This case should have been handled by the District Attorney Raul Torres. but for unknown reasons it was handled by the Associate Attorney General staff. The failure to take appropriate action on my Civil Rights being violated is unacceptable !!! Based upon the New Mexico Civil Rights law; N.M.A.G. Balderas office staff has violated my civil rights. Again. this is unacceptable !! I note that the first online complaint SOMEHOW allegedly ginot received by the A.G. office and I printed out a copy from my files and submitted it thereafter. If it happens this time with this complaint. I will be taken additional action again.

## Parties

**Complainant**

Mr. William Mckinley Fulkerson

Person

**Address**
3809 General Bradley St NE
Albuquerque. New Mexico 87111

**Contact information**
billygoat3809@gmail.com
(505) 234-0254

*Plaintiff Exhibit #3*

**Complaint against**

Director Novela Salazar

Person

**Address**
P.O. Drawer 1508
Santa Fe, New Mexico 87504

**Contact information**
(505) 490-4060

Complaint Specifics

| | |
|---|---|
| **Date of Incident** | September 22, 2022 |
| **Describe where the crime took place. (Street address, city, county, landmark, etc.)** | Within the N.M A.G. office |
| **What evidence do you have in your possession? (Text messages, emails, phone records, bank records, video or audio tapes, clothing, etc.)** | NMOAG-ECS-20220719-f8a9 online complaint and Court filings submitted. |
| **Have you reported this matter to any law enforcement agencies (FBI, NMSP, City Police, etc.)?** | No |

Transaction

Documents

\*\*\* END OF COMPLAINT \*\*\*

*Plaintiff's Exhibit #3*

Plaintiff's Exhibit #3

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

**Case Number** _____

# EXHIBIT NUMBER:

# #4

Tenth Circuit
Appellant's Opening
Statement — 14 pgs.

Tenth Circuit Decision
— 9 pages.

32 pages total.

Tenth Circuit Request
for Rehearing — 8
pages.

Tenth Circuit Denial letter

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

**FILED**
United States Court of Appeals
Tenth Circuit

**MAR 17 2020**

WILLIAM M. FULKERSON,

    Plaintiff/Petitioner-Appellant,

**CHRISTOPHER M. WOLPERT**
Clerk

v.

Case No. 21-2001, Fulkerson v. Commissioner, SSA

Dist/Ag docket: 1:20-CV-01145-WJ-SCY

Appellant/Petitioner's Opening Brief

Andrew Saul, Commissioner, SSA,

    Defendant/Respondent – Appellee.

*X End of Justice Issue Passed*

APPELLANT/PETITIONER'S OPENING BRIEF

1. **Statement of the Case** – The Appellant received a Final Decision (action) from the Merit System Protection Board (MSPB) on the Constructive Discharge complaint on November 4, 2020. The Appellant (plaintiff) filed his initial complaint with the District Court on November 5, 2020. The case that was put forth to District Court (DC) was an appeal of the MSPB's Final Action on the Appellant's case that had been before it. While specific case law was not specifically cited in the Appellant's three documents submitted to the DC, the subject matter concerning case law discussed below was discussed within those three documents. Based upon Tiemens V. White, 314 F.3d 1229 (10th Cir., 2003), the Appellant expected a Trial De Novo on the Constructive Discharge complaint (involuntary retirement – which is a Removal Issue, and it is an "adverse action" that the DC Judge spoke about being necessary in his dismissal letter), a termination complaint associated with that removal action, a Whistle blower Protection violation, and a Constitutional rights violation as discussed in the documents filed with the MSPB. In the instant case, his documents were written in that mind set. The Appellant did not expect to be appealing his case to the Tenth Circuit Court of Appeals to get a hearing.

Due to the jurisdictional limitations of the MSPB, it focused upon the Constructive Discharge (Removal) complaint. The MSPB is an administrative Federal Agency to which the Appellant could legally and legitimately submit his administrative Constructive Discharge complaint to — as to exhaust his potential administrative remedies aspects so to speak. Had the MSPB given the Appellant a full and fair hearing, the other complaints raised in his documents before the MSPB would have been dealt with in that formal hearing as well. It should be noted that the Defendant has "actively interfered" by its specific actions that prevented the Appellant from

*Plaintiff's Exhibit*
*Page 1 of 14.*

receiving a full and fair hearing on his multiple EEO complaints against the Defendant. The Defendant intentionally interfered with the judicial process, and thus, they violated the Appellant's Constitutional right to procedural due process.

It is also noteworthy that two MSPB judges ruled on the procedural validity of the Constructive Discharge complaint (MSPB Exhibit, pgs. 4-6). It should also be noted that the Defendant's Motions for Dismissal on the grounds of Res Judicata and Statutes of Limitations were denied by the second MSPB judge. The Res Judicata and the Statutes of Limitation issues are in the Appellant's favor (MSPB, Pgs. 4-6) and the DC judge erred and failed to recognize the significance of the facts that are stated in the Appellant's three documents, and their implications on the legal issues that were before the DC. The Defendant did not appeal the MSPB judge's procedural rulings on those issues, therefore they carry over to the instant case that was submitted to the DC for a hearing—a Trial De Novo on all of his formal complaints including the original EEO issues he previously raised while employed, and to which the Tenth Circuit's decision spoke to the in the Thura  case on the issue of what a Trial DE Novo is all about.

The actual "Trial De Novo" review statute is stated in Statute is 42 U.S.C. 2000e-16(c) concerns Federal employees entitlement to such hearings, and it is stated well in the Tenth Circuit's decision in the Thuraus case that "the Court requires a trial of all the issues in a particular case". The Court should make a "fresh, independent look at the questions at bar." Furthermore, the Court also put forth have Black's Law Dictionary defines such a trial as "a new trial on the entire case—that is on both questions of fact and issues of law—as if there been no trial in the first instance." Black's Law Dictionary, (7th Ed. West 1999). For the record, the Appellant has never received a full and fair trial or hearing of any kind from the EEOC, the U.S. District Court in 2018 or 2020, and not from the MSPB—even though he has a protected property interest in his federal career, and his employment can only be terminated for "just cause".

As such, he was/is entitled to a full and fair hearing as discussed in Watson v. University of Utah Medical Center, 75 F.3d 569 (10th Cir., 1996). Had the DC moved the Appellant's case to a formal hearing, the Discovery process would have clarified the legal grounds for all issues raised by the Appellant that not spoken to in detail in the Appellant's three filed documents that were submitted to the DC. The DC's use of the terms like "particularities" which are ambiguous and vague terms that confused the Pro-se Appellant (in the moment) and he spoke mainly to the Constitutional rights violation with more specificity in his amended application document. The Appellant felt he had addressed the other aspects of his complaints in enough detail to move the case to a hearing stage.

The Appellant believes Decisions without hearing, Summary Judgement or Dismissal decisions do not meet the legal standard necessary to meet the Appellant's Constitutional right to due process namely in this case, a full and fair hearing which should have occurred "at a meaningful time and in a meaningful manner" as discussed in the Supreme Court decision in Matthews v.

*Exhibit #4*

*Page 2*

Elddge, 424 U.S. 319, 333 (1976). The Appellant has not been able to obtain a full and fair hearing for over eight years due to the Defendant's filing of "a series of related motions" that effectively became an "Unlawful employment practice" that deprived the Appellant of his Constitutional right to due process over the course of eight years. This repeated active interference with the judicial process by the Defendant's Representatives should be noted and ruled upon by this Court.

In the instant case, the DC Judge's Dismissal decision which is based upon the grounds of Res Judicata and Statues of Limitations ignores the procedural findings of the MSPB Judges. The DC Judge also fails to recognize the application of "De Novo" review. This is incorrect for the stated reasons above and the DC's decision should be set aside. The Appellant's case demands a full and fair hearing, which includes the opportunity to present his case with supporting evidence and witness testimony. And for him to be able to cross examine and challenge the Defendant's witnesses credibility and the evidence the Defendant puts forth before a jury who can then decide on the truth of the matters and issue its determination on the case. The Appellant did not get the opportunity to formally challenge any of the Defendant's witnesses' statements on the issues at hand at any point previously in over eight years. The denial of a full and fair hearing is at the heart of the Appellant's current case as it has evolved over the course of those eight years. The responsibility for the deprivation of the Appellant's Constitutional right to Due Process belongs to the Defendant and its actions which actively interfered with that right being obtained.

In the instant case, the Appellant received a Show Cause Order from the District Court (DC) and the Appellant provided his full responses to all of the issues raised by the DC Judge in that document. The DC also offered the Appellant the opportunity to amend his complaint. The Appellant amended his complaint to include the Hostile Work Environment claim that had previously been raised in prior complaints and was specifically raised initially with the EEOC. The inclusion of the Hostile Work Environment on the record allowed the Appellant to raise the Constitutional Right violation complaint based upon the Supreme Court's decision in National Passenger Railroad Corp. v. Morgan case (2002) that was discussed in the Amended Complaint document sent to the DC. The DC Judge erred in his failure to not give the Appellant's stated rationale and discussion regarding that violation of the Appellant's Constitutional right to a fair hearing (on his various complaints) the necessary consideration it deserves — nor did he give appropriate consideration to the fact that the Appellant was entitled to a Trial De Novo based upon the Timmons case.

The Appellant believes the Judge erred by failing to address the legitimate and valid complaint issues put forth by the Appellant, and again, he ignored the favorable aspects of the MSPB Judge's Procedural rulings that denied the Defendant's Motions for Res Judicata and Statutes of Limitation issues concerning the Constructive Discharge complaint. In the Timmons case, the Tenth Circuit also ruled that "...a plaintiff seeking relief under the 42 U.S.C. 2000e-16(c) is not entitled to litigate those portions of an EEOC decision believed to be wrong, while at the same

Exhibit #4
Page 3

time **FINDING** the government on issues resolved in his or her favor." The DC Judge erred in ruling as he did in the instant case. The Appellant's case that he put forth in his initial Complaint document and presented to the DC should have gone to a full and fair hearing.

The application of the Continuing Violation Doctrine to the Appellant's case is warranted and valid, but the DC Judge fails to understand its application to the Appellant's case that was before the DC. It should be noted that in his decision, the DC Judge spoke to the issue about that some of the Defendant's actions took place while the Appellant was employed and that some other actions occurring after the forced retirement of the Appellant. The Appellant does not agree with the DC judge's assessment that because some actions were not taken while employed by the Defendant, he is not entitled to bring the complaints before the DC. The responsibility for the actions that happened before and after the Appellant's forced retirement belong to the Defendant – not the Appellant. They are linked together by the Continuing Violation Doctrine. The Appellant also raised the failure to receive timely processing of his formal complaints "at a meaningful time and in a meaningful manner" as discussed in Matthews v. Eldridge, 424 U.S. 319, 333 (1976). Eight years to date in March 2021 without a full and fair hearing. Being able to submit a "Reply brief" in response to the Defendant's 2018 Motion for a Summary Judgment document does not equate to a full and fair hearing being received as the DC Judge suggests in his decision in the instant case! In fact, a reading of that Reply brief shows that the Judge failed to address much of the evidence and discussion of that evidence from the brief in his decision.

Unacceptable!

2. Statement of Facts Relevant to the Issues Presented for Review— The Appellant states that the Judge erred by failing to consider the main complaint issue— "Constructive Discharge" and the related "Retaliation" complaint specifically related to that Constructive Discharge complaint that the Appellant spoke to in the Appellant's three filed documents to the District Court. As stated above, the Timmons case (a case decided by the Tenth Circuit Court of Appeals in 2003) shows that the Appellant is legally entitled to a Trial De Novo —which means a full and fair hearing on all of the complaint issues and the DC Judge erred by failing to give him one. The Appellant formally requests a Trial De Novo if the Appellant needs to do so. The Res Judicata and Statutes of Limitation basis for the Judge denying the Appellant's instant case are a carryover from different complaints and they should not be used to determine the case that was before this Court.

The Appellant states that it should be noted that Timmons did receive "an actual Hearing" from the employer at some early point in the judicial proceedings. In the Watson case, the plaintiff also not receive a hearing previously and this Court ruled in favor of Watson on the violation of Watson's Constitutional right to procedural due process. The Appellant has not received a full and fair hearing to date. The 2018 Summary Judgment decision referred to as "Fullerson I" should not have been issued and that case should have proceeded to a full and fair hearing as the Appellant was entitled to own. That 2018 Summary Judgment decision deprived the

Exhibit #4

Page 4

Appellant of his Constitutional right to a full and fair hearing on the issues presented in that DC. In that Witness case, this Court stated that "we examine the whole record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." The Judge did not do so in 2008. The Appellant believes Summary Judgments do not meet the level of process necessary to uphold a Federal employee's Constitutional rights, an employee who has a protected property interest, and thus, is entitled to a full and fair hearing that is guaranteed under the Due Process clause of the Fifth Amendment to the U.S. Constitution.

In *Willner v. Committee on Character*, 373 U.S. DC (1963) Pp. 373 U.S. 103-104, the Supreme Court held that procedural Due Process also requires confrontation and cross-examination of those whose word deprives a person of his liberty. ... that the requirements of procedural Due Process must be met *before* exclusion, P 373 U.S. at 102. That did not happen in the case that was before the Judge in 2008. It should be noted that the deciding Judge solely relied upon the written statements supplied by the Defendant's witnesses – without any opportunity to cross examination to challenge their written words on record by the Appellant.

And we all know, they would tell on themselves for their court illegal wrongdoings – RIGHT?

Credibility issues have been raised by both the Appellant and the Defendant previously in numerous documents that have been filed in the previous tribunals. The Appellant has never had the opportunity to cross examine nor challenge this Agency's witnesses to demonstrate their lack of credibility in a formal setting in those tribunals. On the other hand, the Appellant's credibility was trashed by the Judge in his TWENTY-NINE page Summary Judgment decision in April 2008. The Appellant believes that the Judge erred and failed to consider all of the supporting third party evidence (which were in the file) that supports the Appellant's formal allegations that was before the Judge at that time.

In the instant case before the DC in 2009, the exhibits submitted by the Appellant, specifically Exhibit number 2 through Exhibit 6 were submitted along with the Appellant's Initial Complaint document to the DC on November 5, 2009, and they were also available as "evidence in file" to the Judge who issued the 2008 Summary Judgment decision. These exhibits provide a host of third party support to the Appellant's original complaints that the Judge failed to recognize – nor addressed – in his summary judgment decision. More unsigned Affidavits that are in file also give credence to the allegations put forth by the Appellant.

When the Court of Appeals reviews the file sent from the DC, it should be noted that the file contains the following exhibits:

Exhibit # 1 is discussed in the Appellant's three documents submitted to the DC in the instant case. This particular exhibit shows that in the 2008 Judge's decision, he incorrectly assumed who provided the formal diagnosis of PTSD in 2002. The Judge stated that he believed the diagnosis

Exhibit #4
Page 5

did not occur until 2013. Incorrect! The Appellant has never stated, in any form or manner, that anyone other than the actual person who made that diagnosis. It was the Appellant's attorney who failed to present the letter from the Nurse Practitioner as evidence of that formal diagnosis. The Judge took EXTREME exception to this alleged non-truth as a sign that the Appellant was less than credible and wrote to it in his decision.

As the Appellant wrote in his three filed documents to the BC in the instant case – the 2018 Summary Judgment decision denied the Appellant's right to a full and fair hearing to which he was entitled, and that it is based upon numerous provable erroneous findings of facts in that 2018 decision." Clearly erroneous determinations should not be allowed to stand when evidence shows that determination is erroneous – past or present. The Federal Rules of Civic Procedures, 52(a) states that they should not stand.

Exhibit #2 is the conclusions of the Defendant's internal investigation which was conducted by a person whose spouse is directly involved in the EEO complaint issues up to her neck. This was an inter-Regional Office conducted investigation, no personnel from any the other Regions – or any outside third-party investigator were involved in the internal investigation. Even as watered down as the investigator attempted to paint the situation in his conclusions, these conclusions fully support the Appellants' original allegations/complaints in several major ways on a number of the issues involved in the hostile work environment. This is why the Defendant chose to bury the investigation and not address those conclusions.  Both Agency investigations were shoddy in numerous ways as discussed in the Appellant's three documents.

Exhibit #3 is an affidavit from a Unit Supervisor who heard the Appellant's first-line Supervisor taking "key approved/Purchasing/supplies" over the phone. This was an attempt to harass the Appellant. The first-line Supervisor's explanation for conducting the call was pretextual and false. The Appellant was a trained and state licensed Secondary Social Studies teacher before going to work for the Defendant and he did not need any help from his first-line Supervisor in putting forth quality training on any Agency subject matter.

Exhibit #4 is an affidavit of a co-worker who sat close to the Appellant. She states she was likewise threatened by the Appellant's first-line superior (Ronald) on another occasion without provocation. She also spoke to the hostile work environment being wide spread within that facility. (that employees within that facility have their own horror stories concerning the hostile work environment. Some of them will be testifying if the Appellant has a hearing) She also witnessed the Appellant being yelled at by another first-line superior of the Appellant. She also witnessed him being made fun of and embarrassed at a management meeting in 2005 or 2006. The Appellant stop attending all Agency social gatherings thereafter.

Exhibit #5 is an affidavit from another co-worker who personally witnessed and stated that the Appellant was being subjected to the Hostile Work Environment that he complained of. She also spoke to the Appellant's honesty. This was the only person the EEO Complaint Investigator

Exhibit #4

Page 6

asked about the Appellant's credibility. Continuity of questions asked of witnesses is vital to conducting a proper and legitimate investigation. That did not happen in either investigation.

Exhibit # 6 is a series of emails and an SF-50 form that show the actual deception of the Defendant's witnesses on several of the legitimate EEO issues raised by the Appellant, and, specifically, that deception shows the lack of credibility of the particular persons involved in those issues. The inability to challenge the Defendant's witness credibility issues is beyond the control of the Appellant without a full and fair hearing.

Exhibit # 7 is a summary report from the Appellant's medical Expert witness that discusses the Appellant's disabling PTSD condition. He interviewed family members that state the Appellant's ability to interact with them grew more contentious as he became disabled. The expert's testimony will show that the Appellant did not have that condition prior to being subjected to the hostile work environment at that particular Defendant's facility. The Appellant did not cause this condition himself; the actions of the Defendant's management team operating and in control of that environment are responsible for causing the condition, and ultimately, disabling the Appellant. While the Appellant is uncertain if the Judge who issued the 2018 Summary Judgement decision was aware of this particular exhibit or not, the Defendant themselves are quite aware of it.

The Federal Rules of Civil Procedures # 56(c) cannot apply to the 2018 Summary Judgement case because the exhibits and other evidence discussed above do not allow for a summary judgement to be issued in this case. And there are other substantial affidavits and other evidence in file that can be brought forward to an actual hearing that further provides support and collaborates the Appellant's own complaint issues beyond those already identified and spoken to.

It should be noted that the Appellant has been repeatedly denied the opportunity to DEFEND his reputation, his integrity, nor his credibility at an actual full and fair hearing. Nor has he been given the opportunity to challenge the Defendant's case or the credibility of its witnesses. The Appellant knows that these substantial credibility issues should have precluded the issuance of a Summary Judgement at any point on his legitimately filed formal complaints. That did not happen. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and opportunity to be heard are essential", *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). The fact that the Appellant's 2018 Summary Judgement Decision is available on the internet shows that it has public accessibility to the stated erroneous findings of facts that could cause the questionability of his integrity and honesty, and that would potentially limit his future employability if he attempted to gain employment.

In the Due Process case of *Snipes V. Sojet*, No. 4:18-CV-580-MW/CAS (Jan.9, 2020), the Judge determined that the Plaintiff was entitled to an actual hearing to defend her name and

Exhibit #4

Page 7

reputation and that she ultimately had been denied the "opportunity to be heard" by the Defendant. The Appellant is entitled to the same treatment as Snipes received by the DC in the instant case. The Appellant has not been given the opportunity to be heard in the right forum previously. The Complaint issues the Appellant brought forth are far more substantial in nature and should have been sent to a full and fair hearing where the Appellant had the opportunity to be heard on his various complaints and to challenge the Defendant's case.

The fundamental requirement of Due Process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976). This did not and has not happened in the Appellant's case – nor can the Appellant be held responsible for the previous six adverse judicial rulings on this specific issue. The Appellant filed his first request for a hearing with the EEOC in 2013 and he has not received a full and fair hearing to date from any judicial tribunal. His actions did not cause the case to be denied previously at any point. It is a fact that the Appellant has not received any post-deprivation full and fair hearing within a meaningful time, nor has it been done in a meaningful manner. The Appellant believes that any "reasonable person" would see it as being true as well.

In response to each of the Appellant's first six Requests for a Hearing on his complaints that he filed with each of the previous judicial tribunals:

1. EEOC case numbers – 540-2103-00129X and 540-2013-330X (2016),
2. U.S. D.C. case number – CV 16-00089 SS/KBM, 2088 WL 1726245 (D.N.M., Apr. 6, 2088)
3. M.S.P.B. case numbers – DE-1221-18-0410-W-1, DE-3443-18-0411-I-1, DE-1221-19-0042-W-1, DE-0752-20-0323-I-1, and now
4. U.S.D.C. case number-1:20-cv-01145-WJ-SCY

The Defendant, in turn, has filed six "Motions" with the various tribunals to have a "decision without a hearing" in 2014, a Summary Judgement Motion in 2017, and four dismissal Motions filed with the MSPB since 2018. The Constructive Discharge complaint (DE-0752-20-0323-I-1) being the last Dismissal from the MSPB. This series of Motions influenced the deciding Judge's decisions against the Appellant's particular case at issue. Based upon the Watson case decision, the actions (filing motions) of the Defendant actively interfered with the Appellant receiving due process each and every time it filed one of these motions – which ultimately kept the Appellant from receiving a full and fair hearing.

These "Motions" were not required to be put forth by the Defendant in any shape, form or fashion. They were intentionally filed by the Defendant. This "series" of Motions are related actions that constitute "one unlawful employment practice" which was identified and spoken to in the Supreme Court's decision in National Passenger Railroad Corp. v. Morgan (2003). The Morgan Court did not specify what issues or actions would necessarily constitute a "series" in its ruling, leaving that to be determined by future court action. In the instant case that was before

Exhibit #4

Page 8

the DC, the Judge does not speak to the Constructive Discharge complaint in his decision in any manner.

3.  **Statement of Issues –**

a.  One of the Constitutional Questions that the Appellant asks this Court to understand and rule on is – is a federal employee with an ongoing protected "property interest" entitled to an actual full and fair hearing that allows the Appellant to challenge the Defendant's defenses it puts forth?  If so, are Decisions without a hearing, Summary Judgements, or Dismissals sufficient to meet and satisfy the appropriate "level of Process" requirements of the Due Process clause section of the Fifth Amendment?

Arguments and Authorities –The Appellant believes that anything less than a full and fair hearing violates the federal employee's constitutional right to Due Process as guaranteed under the Due Process clause of the Fifth Amendment. The Supreme Court case of Arnett v. Kennedy, 416 U.S. 134 held that claim to permanent civil service employment absent to "good cause" for discharge shows the Appellant's status as a federal employee. The Appellant is entitled to that status in the instant case.

The Appellant does not believe that Fifth Amendment or the Supreme' level of process' requirement is satisfied otherwise. The decision in Watson v. University of Utah Medical Center [at 580-581] speaks to the level of Process here.  In that case, the Tenth Circuit ruled that "active interference" Applied information it on have that Courts need to consider in its determination on the case at hand. "The question then becomes whether defendant's alleged actions violated a clearly established right of which they should have been aware. " and further down, "…and then [the Defendant] activity interfered with that process, they violated plaintiff's right to procedural due process, a right clearly established at the time." In the instant case, the Defendant is well-aware of its employee's legal rights or should be. They have been an employer for almost ninety years. And, the Defendant should know its legal responsibility to not harm, injure or deprive its employees of these rights by its actions.

The Appellant found no authorities or case law that state that Decisions without a Hearing, Summary Judgements, nor Dismissals satisfy the level of Process issue. The Appellant seeks this Court's guidance on this issue. The absence of case law suggests to the Appellant that they do not exist. The Appellant's case –is its' entirety – cannot be limited to anything less than a full and fair hearing – a trial on them. However, if the issue of failing to provide an actual full and fair hearing in a timely and meaningful manner allows this Court to rule that the Appellant has already been deprived of his Constitutional right to due process by the Defendant's previous actions, the Appellant request that this Court does so.

And, as such, a formal hearing on the other EEO complaint issues becomes secondary to rectifying the due process violation issue in the favor of the Appellant. It should be noted

*Exhibit #4*

that the Defendant has to give SSI Recipients a formal hearing so that the Recipient's Liberty interests are protected based upon the Supreme Court case of Goldberg V. Kelley, 397 U.S. 254, 269-271 (1970). The Constitutional rights of the Defendant's own employees are no less valuable than those of the SSI recipients those employees serve and the Defendant failed to honor or respect them in the instant case where the Appellant is concerned.

## NONVIOLATION OF CONSTITUTIONAL RIGHT TO DUE PROCESS

In February 2019, the Appellant notified the Defendant's Representative of the Appellant's Constitutional right to an actual full and fair hearing. But because the Appellant was not the Attorney of Record at that time, the Defendant's Representative did not act upon that information. This was two months before the DC Judge ruled favorable on the Agency's Motion for Summary Judgement in April 2019. The Defendant's Representative could have withdrawn the Motion for Summary Judgement and let the case go to a hearing, but he chose not to do so.

After the Judge's decision in April 2019, the Appellant then filed a grievance with the Defendant Agency. See Exhibit Number One. This email confirms that the Appellant filed a grievance concerning the violation of his right to due process. In July 2019, the Defendant issued its "final action" on this matter. See Exhibit Number two. This email states that the Defendant would not be taking any other actions concerning the Appellant's Constitutional rights violation. In August 2019, the Appellant filed his first appeal with the MSPB. In every instance thereafter, the Appellant informed the Trier of Facts of this specific violation — expecting to formally deal with it at an actual full and fair hearing thereafter.

It should be noted that the Appellant made the formal legal issue with the Defendant that is less than three years ago. In the DC Judge's decision in the instant case, he stated that according to N.M.S.A. Sec. 37-1-8 "Actions must be brought ...for an injury to the person ... within three years". (D.C. Judge's 2021 decision letter, pg 2). The Appellant has filed timely on the Constitutional rights violation complaint concerning Due Process with the District Court in November 2020. Three years has not yet elapsed. Neither Res Judicata nor the Statutes of Limitation should apply to this particular Complaint because it had not been raised legally previously before the instant case. The case can and should stand on its own merit — independent of the EEO complaint case.

b.  The second Constitutional Question concerns the "series of minor actions" issue put forth by the Appellant in his documents submitted to the SC. The Appellant discusses the applicability of the Morgan case to his own (instant) case — that is the filing of multiple related Motions by the Defendant counsel to the "series" issue that the Supreme Court spoke to in its decision in the Morgan case. These Motions influenced the deciding Judge, and ultimately, they were granted by three deciding Judges in same time. These Motions

Exhibit #4
Page 10

should be considered as active interference actions that actually deprived the Appellant from getting a full and fair hearing that is called for by Law.

The Morgan Court focused on this issue in non-specific terms as to what possible actions could be shown and filed upon in regards to the "series" question. In the instant case, does the Defendant's various filed "Motions" constitute a "series" and does the denial of a full and fair hearing constitute the "one unlawful employment practice"? The Appellant believes they do and he believes that this Court should as well. A second issue concerns whether these Motions are to be considered as "active interference" actions taken by the Defendant to deprive the Appellant of his Constitutional right to due process.

Arguments and Authorities -- The Supreme Court case - National Passenger Railroad Corp. v. Morgan (2002). The Supreme Court left it up to the Trier of Facts and to the Jury to rule on this issue based upon the "totality of the situation" concerning the particular facts of a given case brought forth.. The Doctrine of Continuing Violation applies the Appellant's case based upon the Morgan Court's decision -- which negates all Statutes of Limitation Issues and provides linkage of those particular actions that have occurred over time.

The Appellant's complaint issues, in their totality, are very complex, complicated, compounded and interlocked. They required that a timely full and fair hearing should have been given to the Appellant and deciding these issues should not be subject to anything less when it comes to a judicial ruling on them. The disputed issues of material facts in the Appellant's case cannot and should not have been resolved on Summary Judgment.

c. The third Constitutional Question concerns the "Duty of Care" issue raised in the Appellant's documents regarding the violation of a federal employees' Constitutional Right to Due Process. The Defendant bears a legal responsibility or duty to ensure its actions' do not violate the legal protected rights of its employees. This also includes the physical and mental health of its employees -- neither to violate them illegally nor to impair or disable an employee. The Defendant does not deny that the Appellant has a disabling PTSD condition, but it has not acknowledged its' illegal actions led to the progression of that condition to the point of disabling the Appellant. The defendant has not been held accountable for the permanent damage its' illegal actions has brought to the Appellant.

Arguments and Authorities -- No employer can legally ignore or violate the Constitutional Rights of its employees even if it is unintentional -- let alone knowingly doing so. The Defendant was informed of this fact repeatedly over the course of the Appellant's formal Complaints. The Appellant believes there is a Supreme Court case -- Pa. Hickman (or possibly Glickman, unable to find full citation) that deals with the Duty of Care issue. Again, the Defendant has a legal obligation to protect its' employee's rights -- not violate them. The damages associated with the Appellant's disabling PTSD condition have not been addressed

Exhibit #4

Page 11

in any manner to date. Evidence will show that the Defendant is legally responsible for those damages.

d. The issue concerning the Appellant's entitlement to a Trial De Novo needs to be acted upon in the instant case. This is/was an appeal of a federal Agency decision, the MSPB's final action on the legitimate Constructive Discharge complaint—a Dismissal that should have prompted the DC to move the Appellant's case forward to a full and fair hearing, not a dismissal.

Arguments and Authorities - The MSPB Judge's Procedural Rulings contained in his decision letter are favorable to the Appellant's position that Res Judicata and Statutes of Limitation do not apply to the Constructive Discharge complaint. The Tenth Circuit's own decision in Timmons v. White case, which has been discussed above in detail support the Appellant's position on the issue. The Appellant has been entitled to a Trial De Novo and he should have been given one previously on his various complaints. Also, the Watson v. University of Utah Medical Center case regarding the level of Process and active interference issues are applicable.

4. Do you think that the District Court applied the wrong Law? If so, what law do you want applied? Yes, I believe the District Court applied the wrong law. The District Court should have followed what Timmons v. White spoke to – providing a Trial De Novo on all issues to the Appellant. The Appellant is not certain of what law specifically applies to the deprivation of a federal employees' Constitutional right to Due Process when that employee has a protected property interest in his career. Also, the Mathews v. Eldridge case regarding the "at a meaningful time and in a meaningful manner" issue needs to be addressed and ruled upon by this Court. Eight years without a full and fair hearing! There have been numerous actions taken by the Defendant that has prevented the Appellant from getting a full and fair hearing. The Tenth Circuit's ruling in the Watson v. University of Utah Medical Center should be considered as well concerning the level of process issue.

The Supreme Court's Morgan case is applicable to the Appellant's case concerning the "series" of related actions that constitute "one unlawful employment practice" addressed in the Morgan case, and that failure has continued to deprive the Appellant of his Constitutional right to due process. The Defendant has prevented him from receiving a full and fair hearing for years by violating his Constitutional rights.

5. Did the District Court incorrectly decide the facts? If so, what facts? Yes, the District Court decision is incorrect because the Appellant is entitled to a trial De Novo based upon the Timmons case as well as the pertinent provable facts of the Appellant's case. The favorable procedural rulings from the MSPB decision should have been considered and ruled upon favorably in the Appellant's case presented to the DC. The Constitutional issue involving the

Exhibit #4

Page 12

level of process issue involving a federal employee with a protected property interest in his career was not addressed by the DC. The creditability issues were ignored and minimized regarding the statements of the Defendant's witnesses versus those of the Appellant – even though recordings were given to the Defendant previously that show the lack of creditability of several of its' witnesses. The Appellant submitted Exhibit#1 which clearly shows that the Appellant did receive a formal diagnosis of PTSD in January 2002 – not 2003. The negative fallout of that particular "erroneous finding" was the MSPB Judge incorrectly determined that the Appellant was not creditable on the complaints raised and his decision shows that! Again, there are more erroneous findings of facts that could be addressed at a full and fair hearing if needed.

Per Federal Rules of Civil Procedures (FRCP) – specifically Rule 52(a), it states that a "clearly erroneous findings of facts" are not acceptable to the Court. The District Court Judge ignored this fact and failed to rule on the erroneous findings contained in the 2018 decision. The Summary Judgement decision issued in April 2018 is full of similar erroneous finding of facts and failed to consider third party evidence in file. It should be "set aside" from further consideration by this Court.

The issue of Trial De Novo is appropriate and proper and the issuance of the Summary Judgement decision was not. The fact is that the Defendant has filed multiple Motions that have actively interfered with the judicial process, and ultimately, deprived the Appellant of his timely Constitutional right to Due Process has to be considered by this Court. The Defendant was first notified by the Appellant on this very issue in February 2008. The Defendant chooses to ignore that reality of the effect of its actions that precipitated and caused substantial and permanent harm and damage to the Appellant. The Defendant has not been held accountable for the forced ending of the Appellant's career.

6.  Did the District Court fail to consider important grounds for relief? If so, what grounds? Yes, it did. The Appeals Court case of Thomas v. White is applicable to the complaints raised by the Appellant and submitted to the District Court. The favorable ruling on the Procedural findings made by the MSPB Judge determining that neither Res Judicata nor the Statutes of Limitation applies to the Defendant's Motion for Dismissal filed on those very grounds/issues with the MSPB. The Morgan case is ignored completely as well. FRCP Rule 52(a) likewise is ignored.

"At a meaningful time and in a meaningful way" did not occur due to the intentional filing of various Motions by the Defendant. This entire interference influenced the deciding Judge's consideration of the Appellant's case before him. The Appellant's Constitutional rights have been violated repeatedly!

7.  Do you feel that there are any other reasons why the District Court's Judgement was wrong? If so, what? Yes, in the instant case, the DC Judge fails to acknowledge that the U.S. District Court's 2008 Summary Judgement contains a number of erroneous findings of facts – even though the Appellant made applicable arguments and he also provided evidence in support of

Exhibit #4

: Page 13

those arguments in his initial complaint document. The 2018 Summary Judgement Judge credited the Appellants' character and credibility in his 2018 decision, and yet he failed to scrutinize the Defendant's witnesses with the same critical eyes. Third party affidavits and other evidence contained in file should have precluded a Summary Judgement decision. The MSPB Judge relied upon that incorrect 2018 credibility determination as a basis for dismissing, at least in part, the Appellant's Constructive Discharge case that was pending before the MSPB.

The Constitutional Rights Violation case should be a separate case from the EEO complaint case. Each has its own legal merits that deserve to be heard at a full and fair hearing.

8.  **What actions do you want this Court to take in your case?** The Appellant wants a full and fair hearing on all of the issues he is able to raise, if necessary at this late date, concerning the original EEO complaints he filed previously, as well as those that are contained in the Appellant complaints in the instant case submitted to the District Court. In lieu of the necessity of a full and fair hearing on all complaint issues, the Appellant asks this Court to make all adjudicative rulings that are applicable to the legal situation because the Defendant has ultimately deprived the Appellant of a timely opportunity to be heard by actively interfering in the judicial process in place by the filing of Motions that prevented the Appellant from receiving a full and fair hearing which would have protected his Constitutional rights. This Constitutional deprivation has occurred over the period of eight years and is directly attributable to the Defendant's actions.

However, this latter action if taken by the Court of Appeals would still require the Court to remand the Appellant's case back to DC for some type of a formal hearing to determine appropriate damages due the Appellant for the Defendant's illegal actions as he discussed in the relief sought in his initial Complaint document to the DC. The DC Judge's Dismissal decision in the instant case concerning Res Judicata and the Statutes of Limitation shows that the Appellant is not able to pursue his legal complaints to getting a full and fair hearing otherwise.

9.  **Do you think this Court should hear oral arguments in this case? If so, why? No,** The Appellant feels he has put forth the pertinent information on the issues at hand before this Court. He has included the understanding he has in writing about the issues contained in the three documents he filed with the DC concerning a Constructive Discharge complaint and other complaints.

_____3/12/21_____          _William A. Fulton_
**Date**                          **Signature**

Exhibit #4
Page 14 of 14

## CERTIFICATE OF SERVICE

I hereby certify that on ___March 1, 2021___ I sent a copy of
(date)

the Appellant/Petitioner's Opening Brief to ___N/A per conversation

with Office of the Clerk_____

(Opposing Party or Attorney)

_____, the last known address/email

address, by _____.

(state method of service)

_____            _____

**Date**                        **Signature**

---

## CERTIFICATE OF COMPLIANCE

I certify that the total number of pages I am submitting as my
Appellant/Petitioner's Opening Brief is 30 pages or less or alternatively, if the total
number of pages exceeds 30, I certify that I have counted the number of words and
the total is _____, which is less than 13,000. I understand that if my
Appellant/Petitioner's Opening Brief exceeds 13,000 words, my brief may be
stricken and the appeal dismissed.

___3/12/21___                  _William M. Falkner_

**Date**                       **Signature**



FILED
United States Court of Appeals
Tenth Circuit

September 27, 2021

Christopher M. Wolpert
Clerk of Court

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

WILLIAM M. FULKERSON,

Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

Defendant - Appellee.

No. 21-2001
(D.C. No. 1:20-CV-01145-WJ-SCY)
(D. N.M.)

## ORDER AND JUDGMENT[*]

Before HARTZ, PHILLIPS, and EID, Circuit Judges.

William M. Fulkerson appeals pro se from a district-court order that dismissed his

employment-discrimination case as untimely and barred by res judicata. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm the district court's dismissal of

Mr. Fulkerson's Title VII, Rehabilitation Act, and due-process claims on the ground of

res judicata, but we reverse and remand on Mr. Fulkerson's whistleblowing claim so that

it can be dismissed for lack of jurisdiction.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

Plaintiff's Exhibit #E
page 1 of 9.

**Background**

Mr. Fulkerson worked in a variety of positions at the Social Security Administration (SSA) from 1989 to 2013. In 2002 he began working as a Section Manager "in the SSA Mega Teleservice Center (TSC) located in Albuquerque, New Mexico." *Fulkerson v. Colvin*, No. 16-CV-989-DRB-KBM, 2018 WL 1726245, at *1 (D.N.M. Apr. 6, 2018) (*Fulkerson I*).

While on a leave of absence after being diagnosed with Hepatitis C and depression in 2004, Mr. Fulkerson filed an EEO complaint against the TSC Director, claiming disability discrimination. He returned to work in 2005 and was reassigned to a Staff Assistant position. He then filed another EEO complaint, this time for retaliation.

In 2012, Mr. Fulkerson filed two more EEO complaints. He alleged disability discrimination and the creation of "a hostile work environment in retaliation for his prior EEO activity," which caused him to suffer posttraumatic stress disorder (PTSD). *Id.* at *2. He accepted a disability retirement in October 2013.

In 2016, through counsel, Mr. Fulkerson sued the SSA for (1) disability discrimination in violation of the Americans with Disabilities Act (ADA), and (2) retaliation by subjecting him to a hostile work environment in violation of Title VII. He sought damages for the SSA's alleged discriminatory practices and for being forced to retire. The SSA moved for summary judgment. The district court dismissed the ADA claim, explaining that "[t]he Rehabilitation Act of 1973 . . . is the exclusive remedy for federal employees alleging disability discrimination against the United States or its agencies." *Fulkerson I*, 2018 WL 1726245, at *4. As for the Title VII claim, the district

2

*Exhibit 48*
*page 2*

court addressed ten adverse actions the SSA allegedly committed against Mr. Fulkerson, including "subjecting [him] to a hostile work environment in retaliation for [his] 2004 and 2005 EEO complaints," *id.* at *5, and concluded that none survived summary judgment. Mr. Fulkerson did not appeal the district court's decision to this court.

Instead, Mr. Fulkerson turned to the Merit Systems Protection Board (MSPB), filing two Individual Right of Action (IRA) appeals under the Whistleblower Protection Act (WPA) from decisions issued by the Office of Special Counsel on his administrative complaints. *See Fulkerson v. Soc. Sec. Admin.*, No. DE-1221-19-0042-W-1, 2020 WL 3498783 (M.S.P.B. June 24, 2020); *Fulkerson v. Soc. Sec. Admin.*, No. DE-1221-18-0410-W-1, 2018 WL 5115962 (M.S.P.B. Oct. 16, 2018). He complained, among other things, that the SSA retaliated against him for whistleblowing. The MSPB dismissed both IRA appeals as untimely, except that it docketed separately his claim in one appeal that his retirement was an unlawful constructive discharge. It proceeded to dismiss that claim on the ground that the circumstances prompting Mr. Fulkerson's retirement did not rise to the level of constructive discharge. *See Fulkerson v. Soc. Sec. Admin.*, No. DE-0752-20-0323-I-1, 2020 WL 5879676 (M.S.P.B. Sept. 30, 2020).

Mr. Fulkerson then filed the instant litigation. In his pro se complaint he states it is intended to rectify his attorneys' failures in *Fulkerson I* "to present appropriate arguments and evidence," R. at 4, and the district court's findings regarding his credibility and PTSD diagnosis date, *id.* at 7. He alleges that his 2005 reassignment was in retaliation for filing EEO complaints and being a witness "in other EEO issues against the [SSA]," and was the start of a "campaign to get rid of [him]" by exposing him to a

3

*Exhibit #4 B*
*page 3*

hostile work environment. *Id.* at 5. He also alleges that when he engaged in "whistleblowing on the hostile work environment," the SSA retaliated against him. *Id.* at 14. Finally, he alleges that the SSA caused his PTSD and forced his retirement. Based on these allegations, he brought four claims for relief: (1) disability discrimination in violation of the Rehabilitation Act; (2) retaliation in violation of Title VII; (3) violation of the WPA and the Whistleblower Protection Enhancement Act (WPEA); and (4) violation of due process.

The district court sua sponte reviewed the complaint and noted that it appeared barred by res judicata, because it arises from the facts in *Fulkerson I*, and untimely, because the events at issue occurred no later than 2013. The district court ordered Mr. Fulkerson to show cause why the case should not be dismissed.

Mr. Fulkerson responded that he did not have a full and fair opportunity to litigate his claims in *Fulkerson I* because that case was decided at the summary-judgment stage. He contended his lawsuit was timely based on the continuing-violation doctrine because the SSA's legal filings after his retirement resulted in "unwarranted adverse rulings." *Id.* at 92. Further, he noted that an MSPB judge had rejected the SSA's attempt to dismiss his MSPB constructive-discharge appeal on the grounds of res judicata and the statute of limitations. Mr. Fulkerson concluded by asserting that the decision in *Fulkerson I* was erroneous and had to be challenged.

The district court ordered Mr. Fulkerson to file an "amended complaint to show that this case is not barred by the statute of limitations or *res judicata*." *Id.* at 97. Mr. Fulkerson responded by filing a document labelled "Plaintiff's Amended

4

*[handwritten: NO cross-examination of witnesses or evidence]*

*[handwritten: Exhibit B page 4]*

Complaint," which included only legal arguments against dismissal and more attacks on *Fulkerson I.*

The district court dismissed Mr. Fulkerson's case with prejudice, stating he had not shown his case was timely and not barred by res judicata. We need address only the res judicata ground of the district court's decision.

### Discussion

We review de novo a district court's application of res judicata to the facts. *See City of Eudora v. Rural Water Dist. No. 4*, 875 F.3d 1030, 1035 (10th Cir. 2017). Because Mr. Fulkerson is pro se, we liberally construe his pleadings. *See Andrews v. Heaton*, 483 F.3d 1070, 1076 (10th Cir. 2007).

*The Supreme Court's Lawlor case — 2 Exception ignored by Judges!*

"The doctrine of res judicata, or claim preclusion, will prevent a party from litigating a legal claim that was or could have been the subject of a previously issued final judgment." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017) (internal quotation marks omitted). Three elements are required for claim preclusion to apply: "(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *Id.* (brackets and internal quotation marks omitted). "[A] cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence. All claims arising out of the transaction must therefore be presented in one suit or be barred from subsequent litigation." *Wilkes v. Wyo. Dep't of Emp. Div. of Lab. Standards*, 314 F.3d 501, 504 (10th Cir. 2002) (internal quotation marks omitted).

5

*Exhibit BB page 5*

These three elements were satisfied here. *Fulkerson I* ended in a final judgment and involved the same parties as this case. And the Title VII, Rehabilitation Act, and due-process claims all arise from the core operative allegations in *Fulkerson I*. In particular, both cases include the same ~~"Retaliation in Violation of Title VII"~~ claim alleging that Mr. Fulkerson's "complaints about the discriminatory practices in the work place w[ere] the motivating factor for continuing the hostile work environment and ultimately forcing Plaintiff to retire." R. at 17; Complaint at 5, *Fulkerson v. Colvin*, No. 16-CV-889-BRB-KBM (D.N.M. Aug. 4, 2016). Thus, this claim is barred.

Mr. Fulkerson asserts that this court is bound by the MSPB judge's conclusion that res judicata did not bar his constructive-discharge appeal. But he provides no authority or even an explanation for why this is so. Despite Mr. Fulkerson's pro se status, this "court cannot take on the responsibility of serving as [his] attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). At a minimum, Mr. Fulkerson must provide "more than a generalized assertion of error." *Id.* at 841 (internal quotation marks omitted). Moreover, if we are bound by a decision of the MSPB, why are we not bound by its ultimate conclusion that there is no merit to Mr. Fulkerson's constructive-discharge claim?

The Rehabilitation Act claim in the instant litigation is simply the ADA claim from *Fulkerson I* with a different label. *Compare* R. at 16 ("Defendant discriminated against Plaintiff in the terms and conditions of his employment on the basis of his disabilities, in violation of the Rehabilitation Act of 1973."), *with* Complaint at 4, *Fulkerson v. Colvin*, No. 16-CV-889-BRB-KBM (D.N.M. Aug. 4, 2016) ("Defendant

6

*Exhibit 4.B*
*page 6*

discriminated against Plaintiff in the terms and conditions of his employment on the basis of his disabilities, in violation of the ADA."). It too is barred. *See* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4411 (3d ed. 2021) ("[O]rdinarily[,] theories growing out of different federal statutes constitute a single claim or cause of action whenever that result is suggested by a transactional approach."); Restatement (Second) of Judgments § 24 cmt. c (1982) ("That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims.").

The due-process claim alleges that the SSA filed motions that prevented him from obtaining a "full hearing" on his employment claims. R. at 18. This claim is barred, as any errors underlying the judgment in *Fulkerson I* should have "be[en] corrected on appeal or other available proceedings to modify the judgment or to set it aside, and not made the basis for a second action on the same claim." Restatement (Second) of Judgments § 19 cmt. a (1982).

On a related point, Mr. Fulkerson invokes the "exception to the application of claim preclusion where the party resisting it did not have a full and fair opportunity to litigate the claim in the prior action," *Lenox MacLaren Surgical Corp.*, 847 F.3d at 1239 (internal quotation marks omitted). He argues this exception applies because *Fulkerson I* was resolved through summary judgment, which, he says, "do[es] not meet the level of process necessary to uphold a Federal employee's Constitutional rights." Aplt. Opening Br. at 5. But "the Supreme Court has made it abundantly clear that summary judgment has a proper role to play in civil cases, and thus granting summary judgment does not

7

Exhibit 45B
page 7

violate a plaintiff's right to due process." *Banks v. Wis. Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006) (brackets and internal quotation marks omitted); *see also Shannon v. Graves*, 257 F.3d 1164, 1167 (10th Cir. 2001) ("The Seventh Amendment is not violated by proper entry of summary judgment, because such a ruling means that no triable issue exists to be submitted to a jury.").

Finally, as for Mr. Fulkerson's WPA/WPEA claim, its precise contours are unclear. To the extent the claim is a freestanding federal whistleblower retaliation claim, it is preempted by the Civil Service Reform Act. *See Steele v. United States*, 19 F.3d 531, 533 (10th Cir. 1994). To the extent the claim seeks review of the MSPB's IRA decisions, the district court lacked jurisdiction. *See* 5 U.S.C. § 7703(b)(1)(B) (providing that a final MSPB order in a whistleblower retaliation case is reviewable by "the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction"); *Young v. Merit Sys. Prot. Bd.*, 961 F.3d 1323, 1327-28 (Fed. Cir. 2020) (agreeing with the MSPB that IRA appeals to the MSPB "are never 'mixed cases'" and cannot provide a whistleblowing claim for district court review); *cf., e.g., Baca v. Dep't of the Army*, 983 F.3d 1131, 1137 (10th Cir. 2020) (observing that a federal court of appeals has jurisdiction to review a "whistleblower retaliation claim[ ] aris[ing] before the MSPB" as an IRA appeal). Thus, Mr. Fulkerson's WPA/WPEA claim is jurisdictionally barred.


Exhibit B
page 8

## Conclusion

We affirm to the extent the district court applied res judicata and dismissed Mr. Fulkerson's Title VII, Rehabilitation Act, and due-process claims. We reverse insofar as the district court applied res judicata and dismissed Mr. Fulkerson's WPA/WPEA claim. We remand the case with instructions to dismiss that claim without prejudice for lack of jurisdiction.

Entered for the Court

Harris L Hartz
Circuit Judge

9



Exhibit
page 9 of 9.



William M. Fulkerson
3809 General Bradley St. NE
Albuquerque NM 87111



F I L E D
United States Court of Appeals
Tenth Circuit

OCT 27 2021

CHRISTOPHER M. WOLPERT
Clerk

October 25 , 2021                    Case No. 21-2001, Fulkerson v. Commissioner, SSA,
                                     Dist/Ag docket: 1:20-CV-01145-WJ-SCY

                              Request for Rehearing En Blanc

United States Court of Appeals
For the Tenth Circuit
Office of the Clerk
Byron White U.S. Courthouse
1823 Stout St.
Denver CO 80257

To Whom it Concerns:

I am filing the Petition for Rehearing En Blanc for the referenced case above. I have included a second
copy of the document that I would like you to stamp date and return it in the envelope provided.

If you have any questions on this matter, please call me at (505) 234-0254.

Thank you,

William M. Fulkerson
William M. Fulkerson

Plaintiff's
Exhibit 4C
page 1 of 8.

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT


WILLIAM M. FULKERSON,

    Plaintiff/Petitioner -Appellant,


    V.

                              Case No.  21-2001, Fulkerson v. Commissioner, SSA
                              Dist/Ag docket:  1:20-CV-01145-WJ-SCY

                              Appellant/Petitioner's Request for En Banc

Andrew Saul, Commissioner, SSA;


    Defendant/Respondent - Appellee.


## APPELLANT/PETITIONER'S PETITION FOR REHEARING WITH EN BANC CONSIDERATION

The Panel's decision conflicts with the following Supreme Court and the 10th Circuit's Decisions:

Arnett V. Kennedy, 416 U. S. 134 (1974) concerning the issue of a non-probationary federal Employee having a property interest in continuing employment. The Appellant is one of them. He was forced into retirement by the Defendant's actions. This has been intentionally ignored by the Defendant.

Gilbert V. Homar, 520 U. S. 924 (1997) concerning the protections afforded by the Due Process Clause apply to deprivations of a "property" interest in governmental employment. This was not understood in either the 2018 not 2020 cases filed in District Court. The Appellant should have been given a full and fair hearing in both instances, but was not. The failure to do so violates the Appellant/ Petitioners' right to due process which included the opportunity to be heard.

Lynch v. Household Financial Corp., 405 U. S. 538,553 (1972) concerning the issue on a deprivation of property without due process gives rise to a claim under 42 U.S.C. SS 1983. The Appellant right to due process has been violated twice thus far, and these particular cases should have moved forward to a hearing -- but each was denied which gives rise to a legitimate 1983 claim thereafter - subject to the Statutes of Limitations. This responsibility for this deprivation belongs to the actions of the Defendant.

The Defendant ignored its responsibility and duty to give the Appellant a hearing, but it has to give claimants, beneficiaries and recipients hearing concerning benefits they want or have. The Appellant/Petitioner is entitled to the equal treatment under the law. The cumulative effect of those

*Exhibit 4C*
*page 2*

actions has prevented the Appellant/Petitioner from receiving a hearing on his complaints in 2018 and 2020.

Willner v. Committee on Character and Fitness, 373 U.S. 96 (1963) concerning the requirement that procedural due process must be met before exclusion happens. Also, procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood. This did not happen in either the 2018 or 2020 cases. The Appellant/Petitioner's right to due process — namely the opportunity to be heard did not happened prior to the issuance of either decision.

Goldberg v. Kelley, 397 U. S. 254 (1974) concerning the failure of the Social Security Administration (SSA) to give the SSI population due process hearings before depriving them of their eligibility and/or the payment of benefits they might be due. This was a denial of their right to be heard before any changes were made in receiving their benefits. The Agency likewise has been sued successfully for it's' failure to give numerous claimants due process hearings when claimants are attempting to secure benefits for the Agency. The Agency refuses to accept and act responsibly for how it treats others' rights in the course of its business time and time again.

The Appellant/Petitioner is entitled to the same EQUAL protections as claimants and recipients are afforded under law concerning his legal complaints against the Agency. The Agency has willingly, deliberately, and intentionally filed documents that prevented the Appellant/Petitioner from receiving a hearing REPEATEDLY!

It should be noted that the Appellant/Petitioner filed a grievance with the Agency in April 2018 concerning the failure to give the Appellant/Petitioner a hearing on the property interest issue and preventing him the opportunity to be heard on his complaints. They refused to take appropriate action in July 2018.

Romero v. Union Pacific Railroad, 615 F. 3d, 1303 (10ᵗʰ Cir. 1980) concerning claims that should not be settled by Summary Judgement. Summary Judgement should not be granted in cases where there are conflicting affidavits and depositions — especially where credibility issues are apparent, and when the question of Retaliation is involved. These issues are part of the Appellant/Petitioner's case and they should have prevented a Summary Judgement from occurring. The case should have proceeded to a full and fair hearing, but the actions taken by the Agency prevented the Appellant/Petitioner from receiving a hearing.

Watson v. University of Utah Medical Center, Et Al, 75 F. 3d  (10th Cir., 1996) concerning the issue of property interests and the Level of process necessary to ensure the Appellants right to due process are achieved through a hearing. In the instant case, the Appellant/Petitioner has a property interest and he did not receive a hearing to date. The Appellant did not receive the appropriate level of process on his complaints.

*Exhibit 4C*
*page 3*

Timmons v. White, 314 F. 3d 1229 (10th Cir. 2003) concerning the issue of "Trial De Novo" on cases appealing the decision by a federal agency. The language of the appeal rights discussed in the MSPB Judge's letter calls for a trial de novo on all legitimately raised complaints involved in the instant case. This case should have prevented the Res Judicata issue from controlling the outcome in the instant case that was before the DC.

Another point, each of these particular cases have been cited in hundreds and hundreds of other cases which give rise to the Rule of Law issue on these matters. The Appellant/Petitioner right to due process has been taken away by the actions of the Defendant and this need to be rectified to give justice a chance to happen through a full and fair hearing. Please.

## DISCUSSION OF RES JUDICATA

The Hearing panel's decision that Res Judicata applies to instant case is incorrect because it ignores the Rule of Law concerning federal employees who have entitlement to a property interest. The DC and this Court's hearing panel has misconstrued the instant case and ignore the 1983 claim in regards to the 2018 case. Furthermore, that case which is known as "Fulkerson 1" has many legally fatal flaws -some of which were discussed above and other issues are discussed below. WITHOUT conducting an actual hearing prior to the issuance of that 2018 decision, the property interest entitlement of the Appellant/Petitioner and the "opportunity to be heard" was violated in both 2018 and 2020. By ignoring the Appellant/Petitioners right to due process, the Defendant has violated his Constitutional right to due process under the 5th Amendment. Those denials should not withstand the scrutiny of this Court En Banc and they should be overturned or vacated as deemed necessary by this Court.

The 2018 decision violated the Appellant/Petitioner's opportunity to be heard attached to the Due Process Clause and it ignores the Appellant's property interest in continued employment with the Defendant agency, the Social Security Administration. In Lynch v. Household Finance Corporation, 405 U.S. 538,563,(1972) the Supreme Court held that property rights are basic civil rights and a deprivation of property without due process gives rise to a claim under section 1983. The statutes of Limitation on the 2018 Decision is three years in the state where the Appellant/Petitioner lives. The November 2020 Complaints were timely filed in DC and a 42 U.S.C. Subsection 1983 claim was applicable to the Fulkerson 1 case. The Complaints were valid and legitimate claims that should have proceeded to a hearing due to the property interest entitlement issue.

The Appellant's entitlement to property rights are spelled out in the Supreme Court decision in Arnett v. Kennedy, 416 U. S. 134 (1974) and I quote:

"MR. Justice Powell, joined by MR. Justice Blackmun, while agreeing that 5 U.S.C. SS 7501 is not unconstitutionally vague or overbroad, concluded with respect to the due process issue that the appellee, as a nonprobationary federal employee who could be discharged only for "cause," had a legitimate claim of entitlement to a property interest under the 5th Amendment, and his employment could not be terminated without notice and a full evidentiary hearing."

Exhibit 4C
Page 4

documents presented to DC. According to the ruling by the Supreme Court in Daniels v. Williams, 474 U.S. 327,339 (1986), a Plaintiff must demonstrate that the Defendant deprived him of a property right or liberty right. These demonstrated issues were discussed in the various documents filed in DC in both the 2018 case and the instant case.

It should also be noted that a positive outcome need not to happen in order for the property interest entitlement to apply in this case. The federal employee property interest entitlement ensures that a full and fair hearing will happen and where the Appellant/Petitioner has the opportunity to be heard – which includes the cross-examination of witnesses. The Jury is best to make determinations as to the creditability of the witness's individual truthfulness.  A case decided by written documents only should not be allowed to stand. In American Surety Company v. Baldwin, 287 U.S. 156 (1932), the Supreme Court stated that due process requires that a plaintiff "shall have opportunity to present every available defense." In both the 2018 case and in the instant case, that has not happened as no full and fair hearing has been held on the Appellant/Petitioner complaints in any of the jurisdictions that he filed in.

In Romero v. Union Pacific Railroad, 615 F.2d 1303(10th Cir., 1980), the Tenth Circuit stated that "Summary Judgement should not be granted where different inferences can be drawn from conflicting affidavits and depositions according to Madison v. Deseret Livestock Co., 574 F.2d, 1027,(10th Cir., 1978). This is especially so where an issue turns creditability", National Aviation Underwriters, Inc., v. Altus Flying Service, Inc., 555 F. 2d 778, (10th Cir. 1977). The decision also stated that the question of Retaliation is particularly inappropriate for Summary Judgement disposition since the primary issue is one of intent and motive. The decision in 2018 ignored this standing decision, and thus, the ruling violated the Appellant/Petitioners right to due process by failing to give him the opportunity to be heard. The same can be said of the instant case that presented to DC in November 2020. Entitlement issues have to be addressed BEFORE a final decision can be rendered by Judge and/or a jury.

Without an actual full and fair hearing, it is a fallacy to think that the true finding of facts have been ascertained at all. The deciding Judge's inferences in his 2018 Summary Judgement decision as to what Ms. Patricia Brown said in her affidavit is a perfect example of a different inference in comparison to that of the Appellant/Petitioners' who was there in person at the time of this particular incident which was discussed in her affidavit. Cross-examination would have shown that the Judge's inferences were incorrect. The Appellant/ Petitioner had no input as to what questions were asked of this witness - nor any of the other Defendant's witnesses for that matter. It should be noted that TWENTY-TWO other issues put forth by the Appellant/Petitioner in his Opposition Response to the Defendant's Motion for Summary Judgement in 2018 and they were not addressed in any manner. The exhibits included in the filing of the 2020 instant case came from the 2018 case. These documents were/are supportive of the Appellant/Petitioner's complaint issues in key ways.

The Appellant/Petitioner is entitled to his reasonable expectation in continued employment, and that he was entitled to a full and fair hearing including the opportunity to be heard concerning his various complaints. One where creditability issues can be resolved through direct questioning and cross-

*Exhibit 4C*
*page 5*

examination of ALL witnesses testimony which can be tested and observed by a jury. The Appellant looks forward to having the opportunity of testifying and being cross-examined!

The Tenth Circuit's decision in Watson V. University of Utah Medical Center, et al, 75 F. 3d 569 (10th Cir. 1996) states that a person with a property interest is entitled to the appropriate level of process. The Appellant/Petitioner has never has received a Hearing at any point. A Summary Judgement decision, a Denial decision, a Dismissal decision and a Res Judicata decision do not meet that standard in any way and they should be overturned or vacated.

The Appellant requested legitimate hearings in three different Jurisdictions – the Equal Employment opportunity Commission (EEOC), U.S. District Court (twice now), and the Merit System Protection Board (MSPB). He is/was entitled to a full and fair hearing based upon his property interest entitlement in each of these Jurisdictions. The deprivation of the Appellant/Petitioner's right to Due process within each Jurisdiction is a separate violation - independent of the other ones and each violation is/was actionable independently. For the record, that did not happen because of the Defendant's intentional and deliberate actions as discussed in the various documents submitted by the Appellant to District Court in November 2020 and thereafter.

SSA has been an employer for about ninety years and it is well aware (OR should be) of its' employees right to due process because of property interest entitlement. The Defendant has faced the issue of providing due process to claimants seeking and receiving benefits in many lawsuits and for its' continuing failure to provide due process related to its processing of claims. Many Courts across the nation have continuously and routinely ruled that SSA must give appropriate notice AND the opportunity to be heard to all of its claimants seeking and receiving benefits. In the Supreme Court's decision in the case of Richardson V. Perales, 402 U.S. 389, 401-402 (1971), the Court states Social Security hearings are subject to procedural due process considerations which this Court cited in its' own decision in the case of Allison v. Heckler, 711 f.3d 145, 147 (10th Cir., 1983). As a matter of Equal protection under the Law, this same principle applies to its' employees with property interests as well. Other District Courts that are in other Circuits have ruled accordingly on the cases before them. Eve v. Gonzales, 478 F.3d 46, 47 (1st Cir. 2007); Passmore v. Astrue, 533 F.3d 46, 47 (8th Cir. 2008) are such examples of this happening.

The grievance to the Agency filed by the Appellant /Petitioner in 2018 on the issue of property interest entitlement and due process gave the Agency the opportunity to rectify the issue of the Appellant/Petitioner being entitled to an actual hearing due to his property interest as a federal employee with regards to continued employment. The Agency refused to take corrective action. This was discussed in the documents submitted to the MSPB, the DC and this Court. The Agency does not have the legal authority to ignore the employee's Constitutional rights associated with the employee's property entitlement to a hearing on the matters at hand. The Agency has a legal duty and obligation to ensure its' employees legitimate rights are protected – NOT violated or ignored in any capacity as his employer. It did not do so repeatedly where the Appellant/Petitioner is concerned in three different jurisdictions because it is attempting to keep its' wrongdoing from being exposed. The Agency has filed

*Exhibit 4C*
*page 6*

The Appellant/Petitioner was a non-probationary employee for decades, and thus, entitled to a full and fair hearing on his complaints in 2018 and 2020 before a final decision was rendered in both cases. The failure to do so means that his right to due process is being violated. He planned on returning to work (reinstatement) at the Agency after a full and fair hearing occurred and he won by a decision from a jury. He will be found creditable by that jury – not by inferences based on interpretations of written documents.

It should be noted that these specific court case issues were put forth by the Appellant/Petitioner in the documents submitted to DC and this Court previously. No hearings of any kind have been held to date on any of the complaints filed by the Appellant/Petitioner in the various jurisdictions. By the actions taken by the Defendant who routinely has failed to recognize the applicability of the Appellant/Petitioners property interest entitlement and thus are violating his right to due process on purpose. A full and fair hearing is required to satisfy that entitlement – because neither a Summary Judgement, nor a Res Judicata decision meet or satisfy the required level of process the Appellant/Petitioner is entitled to under law. In Gilbert v. Homar, 520 U.S. 924,929 (1997), the Supreme Court decision states the it is well settled that the protections afforded by the Due Process Clause apply to deprivations of a "property" interest in government employment. This is the Rule of Law on the matter. The Defendant cannot claim ignorance on these matters.

The Clerk's office told the Appellant/Petitioner that he the Appellant/Petitioner could not present oral arguments to this Court. So he said "no" on the form he completed. He had no choice in the matter according to the Clerk's office. The Hearing panel's statement on this issue is incorrect.

The issuance of the decision in April 2018 is direct violation of the Appellant's right to due process as it gives rise to a 1983 claim in the 2020 instant case, and as such, it can't be legally sound for its' use concerning the current Complaint issues presented by the Appellant/Petitioner to District Court in November 2020. The District Court's Res Judicata decision is a direct violation of the Appellant/Petitioner right to due process and should have been overturned by the Hearing panel and remanded back to DC for a full and fair Hearing. This Court's Res Judicata decision is no better than a Summary Judgement decision in that it deprives the Appellant/Petitioner of his right to a full and fair hearing and the opportunity to be heard on his legitimate complaints, and thus, violates his property entitlement right to due process.

Conversely, the Constructive Discharge that is an involuntary Retirement (Forced Retirement that prematurely ended his career) complaint is a legitimate Complaint and it would have been provable at an actual hearing before the MSPB had one occurred. But for the motions filed by the Defendant on this case, an actual hearing would have occurred as the MSPB judge denied the Defendant's Motion to Dismiss on the grounds of Res Judicata and/or Statutes of Limitations issues. For the record, four different complaints were before the MSPB in the past three years, the same "related actions" were taken by the Defendant, which ultimately led to the Appellant/ Petitioner's right to due process being violated each and every time. The intentional actions taken by the Defendant are discussed in the filed

*Exhibit 4C*
*page 7*

the various and numerous motions in an attempt to hide its' true intent and motives which can be shown at an actual hearing. Justice demands that the Appellant /Petitioner be heard and the truth revealed, please.

In the MSPB Judge's Dismissal decision letter concerning the Involuntary Retirement (forced retirement) Complaint, the appeal rights for the Plaintiff to appeal the Agency's Dismissal are spelled out in detail. There is no discussion of Res Judicata being a possibility in that document. The appeal rights can be summed up to say that a Trial De Novo is proper. As discussed in his filed documents to the DC in the instant case, Tinytsois v. White, 314 F.3d 1229(10th Cir. 2003) is discussed and its' application to the Appellant/Petitioner's case. The decision calls for a Trial De Novo on all complaint issues. This did not happen, but should have.

Also, it should be noted that if the Appellant/Petitioner had not included and addressed all legitimate complaint issues in his pleadings to the DC in November 2020 (in the event a trial De Novo actually happened), he would not have any appeal rights to any complaint issues left out thereafter.

In Summary, the Res Judicata decision (which is based upon a legally defective Summary Judgement decision as discussed above) deprives the Appellant/Petitioner, who has a legitimate property interest, from receiving a full and fair hearing on his complaints, and thus, violates his right to due process by failing to give him the opportunity to be heard. He has put forth case law from the Tenth Circuit, other Circuits and the Supreme Court that show his entitlement to receiving a full and fair hearing concerning the instant case. He asks this Court to vacate the Res Judicata decision it issued and to remand the instant case back to DC with instructions that a full and fair hearing be given to the Appellant/Petitioner to ensure his legal rights are protected.

The Appellant has attempted to put forth the case as he sees it. And, as his knowledge is expanded from researching other cases, he understanding concerning the facts of the instant case grows and he speaks to them. Discovery has not happened yet in the instant case. Once that occurs, a clearer picture of the wrongdoing will emerge regarding the Defendant's actions. He understands he is not good at being a lawyer and he apologizes for not being better, but this case needs justice to be served to a federal Agency that continues to ignore its obligations to others' legal rights.

Respectfully submitted,

William Fulkerson

William Fulkerson

Plaintiff's
Exhibit 4C
page 8 of 8.



FILED
United States Court of Appeals
Tenth Circuit

November 18, 2021

Christopher M. Wolpert
Clerk of Court

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

WILLIAM M. FULKERSON,

　　Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

　　Defendant - Appellee.

No. 21-2001
(D.C. No. 1:20-CV-01145-WJ-SCY)
(D. N.M.)

## ORDER

Before **HARTZ, PHILLIPS,** and **EID,** Circuit Judges.

Appellant's petition for rehearing is denied.

The petition for rehearing en banc was transmitted to all of the judges of the court

who are in regular active service.  As no member of the panel and no judge in regular

active service on the court requested that the court be polled, that petition is also denied.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk

Plaintiff's
Exhibit 4D
page 1 of 1.

FULKERSON v. New Mexico DEPARTMENT OF JUSTICE

Case Number _____

# EXHIBIT NUMBER:

# #15

A. MSPB Complaint.
18 pages.

A1. MSPB Decision.
21 pages.

39 pages total

*✗ The Plaintiff went to
various federal agenc
asking
Help. on
his
Issues.*

## Merit System Protection Board Appeal Request on OSC PPP Case Number MA-18-3279

My name is William McKinley Fulkerson. I am the Appellant. My address is 3809 General Bradley St. NE, Albuquerque, New Mexico, 87111. My phone number is (505) 234-0254. The Agency is the Social Security Administration (SSA). The Address is 1301 Young St., Dallas, Texas, 75202. The Phone number is (214) 767-4664.

Based upon Judge James Kasic's second paragraph on page four of his dismissal decision letter, and I quote "Further, I note that the above cited email shows that OSC only considers the Appellant to have asked it to reopen Case Number MA-18-3279, not Case Number MA-12-2097 which is the subject of this appeal (DE-1221-18-0410-W-1). IF the Appellant desires to file an IRA appeal related to Case Number MA-18-3279, he may do so. If filed, the Board will consider whether such an appeal is also untimely filed." It is not untimely!

### OSC FAILURE TO TAKEN APPROPRIATE LEGAL PROCESSING ACTION ON MA-18-3279

I have actively written repeatedly to the OSC regarding the actual agency processing of my Prohibited Personnel Practices (PPP) complaint since I filed it originally in April 2018. Most of those emails were not responded to by the OSC. Other Responses are vague and immaterial to what was asked in my emails. Over one hundred and twenty days elapsed months ago! They have set on my request for Reconsideration without taking any appropriate legal action to complete the necessary processing of that specific complaint since April. This is a violation of OSC's Regulations, Policies, and Procedures. I have informed OSC that I intend to bring a lawsuit against the OSC for violating my Due Process rights in the near future.

Concerning OSC Case Number MA-18-3279, I am raising the fact that OSC never interviewed me after I originally filed this particular complaint in April 2018 before issuing its denial letter on that particular complaint. The OSC MA-18-3279 denial Letter is Marked as Appellant's Exhibit A. The reason for the denial in that document is erroneous because I did file a timely complaint in 2012. There were no other reasons given for the denial. It should be noted that the Denial letter does not contain the necessary close out language to make it a legal document. I filed my request for Reconsideration the same day I received the erroneous denial on April 18, 2018. I sent a follow-up email dated May 9, 2018 to ensure OSC acknowledged my Reconsideration request on this complaint. I have marked that email as the Appellant's Exhibit B.

The OSC has intentionally set on that request for Reconsideration for in excess of one hundred and eighty days and counting without any real movement on that reconsideration issue whatsoever. Apparently, OSC has no ability to move forward on that complaint for unknown reasons. The fact that they have never interviewed me to date may explain it all! I sent an email in late July 2018 and requested a final agency decision from the OSC. It is marked as the Appellant's Exhibit C. I have recently sent OSC another email in late September that put the issue into perspective from my position. It is

*✗ O.S.C. letter attached pg. 15-16)*

*Plaintiff's Exhibit #15A
Page 1 of 18 wmf*

marked as the Appellant's Exhibit D. OSC's response was less than adequate on the issues at hand! To date, I have not received a FORMAL decision from the OSC on Case Number MA-18-3279.

Based upon Mastrullo v. Dept. of Labor, 2015 MSPB 67, I have exhausted my efforts to get administrative relief from the OSC. I cannot force them to move forward and do their duties under their own agency's regulations, policies, or procedures!

## SSA'S FAILURE TO PROVIDE DUE PROCESS AND INVOLUNTARY RETIREMENT ISSUES

Regarding the PPP's, I am assert that at the beginning of this discussion that all PERSONNEL ACTIONS begin with the Agency protecting all of the employee's rights - all of them from the get go. Lying in any shape, form, or fashion is not LEGAL NOR ACCEPTABLE – whether it is a little white lie OR by lying by omission. SSA has gone to great links to hide its illegal PPP actions through Deception to get the current end results regarding my complaints against SSA. Through Deception, it has successfully FOOLED two Judges that issued the defective Summary Judgement decisions – pure and simple!

I am raising the issue that the Social Security Administration forced me to retire or I would have been fired by the Agency after the Brain surgery in early 2013. The Agency had previously sent me a "Return to Work or Be Fired" letter after the accident in late December 2012. The Agency refused to give me Reasonable accommodation previously and also failed to submit paperwork for a timely request for leave under the SSA Voluntary Leave Transfer Program. This led me to conclude that if I got fired; my complaints against Agency could be negatively impacted as well as having no income. It turns out that I was correct!!! Based upon Mastrullo v. Dept. of Labor, 2015 MSPB 67, this is a viable issue to establish MSPB jurisdiction.

Once established, the Appellant will seek to expand the scope of the appeal to include other adverse actions under the Prohibited Personnel Practices complaint that have been taken by the Social Security Administration (SSA) available under law. Deception has been an ongoing issue for SSA on these matters. I now have most of the Agency's witnesses written depositions (in my possession) to show the deception of SSA's witnesses. I can submit them immediately to support my allegations as needed for this appeal. The outstanding deposition will be requested during the Discovery period.

Therefore, I am requesting that the Board to ignore all references to any Whistleblowing aspects in this document and concentrate on the other issues or matters related to OSC case Number MA-18-3279.

A recent example of the ongoing Deception can be shown by the fact that Opposing Counsel wrote that the Appellant is raising the Involuntary Retirement issue for the first time on the MSPB appeal. Judge Kasic noted in his decision that the Appellant had raised that issue in his District court case. It is only a little lie! RIGHT? How many little lies does it take to amount to being considered? There way too many to ignore when they ALL are brought to the light of day. Secondly, Opposing Counsel is an OFFICER OF

*Exhibit #15A*

*Page 2*

THE COURT and putting forth DECEPTIVE statements IS NOT LEGAL OR ACCECPTABLE to me or the Court!

CREDITIBILITY ISSUES have been ignored repeatedly by the Agency and Opposing Counsel – past and present – deliberately, willfully, and intentionally PERIOD!!! I will raise them in this appeal again! The Agency cannot LEGALLY build a defense based upon the false statements of the Agency's witnesses PERIOD!!! Each Agency witness has substantial creditability issues and those issues will be exposed as the case moves forward.

As a U.S. citizen, and as a federal employee, I have a legal right to Due Process. The Agency failed to give me proper notice, meaningful input to the decision-maker, or an actual fair hearing on all of my formal complaints. This is a Continuing Violation of my right to Due Process from the start of my initial request for the Agency to conduct an internal investigation to the present date. On July 18, 2018, the Agency sent me an e-mail stating that in reference to my grievance – SSA 18501077, the Agency (refused to admit it has failed to provide me with an actual fair hearing on any of my complaints) stated that the Summary Judgement decision was correct, and that the Agency would not take any other actions on my complaints. The Agency is relying on the Summary Judgement decisions as being acceptable legal actions in lieu of their obligation to provide me with an actual fair hearing on my formal complaints. I am appealing the decision made by the Agency regarding this matter. The Agency's actions violate the Merit System Principles in several ways.

Ms. Nancy Berryhill is the Agency Head and as the Agency Head, she has a duty and obligation to investigate complaints of constitutional violations of the Agency's employees' rights as did Mr. Astrue and Ms. Colvin back in the day PERIOD! I began emailing her EARLIER than May 2018 on these issues – which makes the statement about May being the first time the Appellant wrote Ms. Berryhill about this situation yet another example of DECEPTION. I sent numerous emails to her outlining the wrongdoings IN AN ATTEMPT to get the Agency to dismiss its Motion for Summary Judgement before the judge ruled on the case AND LET THE CASE GO TO HEARING!!!

I am requesting a hearing on this matter from the Merit Service Protection Board, please. I wish to appear at that hearing.

**Historical Background:**

On June 24, 2011, I disclosed to Mr. Mikel Rowley, SSA Albuquerque TSC Director, that my first-line Supervisor – Ms. Kay Rhoads had made a direct threat and was taking other illegal actions concerning myself on June 22, 2011. Ms. Rhoads is a direct report employee to Mr. Rowley. I told him that she stated that she would make me "look like a non-team member." That threat would negatively affect my ability to promote in the future regardless of the position being applied for.  Furthermore, I expressed my strong apprehension concerning the supervisor's likelihood of harassing and retaliating against me for making this protected disclosure. She had done so previously on other matters. I expected that she

Exhibit 15A
Page 3

would do so again. I was right as I have sent e-mail after e-mail to Mr. Rowley as incidents occurred concerning Ms. Rhoads' actions thereafter. Ms. Rhoads carried out that threat, and unfortunately she succeeded in accomplishing that threat!!!

Both Mr. Rowley and Ms. Steinberg promised to conduct an investigation and in each of their individual depositions - each stated that they did not conduct any investigation thereafter although they deceived the Appellant into believing that they were doing so. The Appellant did learn that truth until September 23, 2011. Those depositions will be provided when appropriate.

Under Agency policy and procedures concerning this type of protected disclosure/ protected activity and the allegations made, an investigation should have been initiated the following day – June 25, 2011. This did not happen. I complained about this failure thereafter in a number of e-mails which are contained in the Agency's Report of Investigation (ROI). From that point on, I have been treated differently – like I was the enemy. Any information about my complaints was treated as top secret and I wasn't entitled to receive it - let alone to discuss it. There a variety of e-mails that confirms this reality in the ROI. The Agency routinely refused to communicate with me in any real manner over the course of the Agency's investigations. The lack of Response e-mails from the Agency in the ROI confirms this fact as well.

I believe that the protected disclosures made in all of my e-mails are directly responsible for the Agency's initial and ongoing actions to deprive me of my right to Due Process on these matters. I truly believe that those protected disclosure/ protected activity e-mails addressed a number of violations of Federal law and regulations, as well as Agency Regulations, Policies, and Procedures. Various e-mails documenting these illegal actions are located in the ROI. The Agency's actions demonstrate the deliberate intent to deprive me of a fair hearing on all of my complaints.

On November 15, 2011, I sent the Regional Commissioner, Martha Lambie, an e-mail demanding that she investigate my allegations as Mr. Rowley had failed to investigate my allegations previously. Based upon testimony in the depositions, she was officially informed of my complaints no later than August 31, 2011. Her EXCUSE for not initiating an Investigation the next day was the Dallas Region didn't have trained investigators. There are nine other Regions that could have sent an investigative team in order to get it started. Ms. Lambie acknowledged getting this email in her Deposition. This e-mail is included in the ROI. The Investigative team finally showed up on January 17, 2012. I had already filed formal EEO complaints in November 2011, and again in February 2012. I have actively pursued getting an actual fair hearing on my all of my complaint issues from that point on.

The record of events clearly supports my allegations that I have put forth and that I expected to be able to raise the issues concerning the internal investigation at an actual fair hearing. I do not believe that the Agency can deny me the Constitutional right to having an actual fair hearing legally when the Agency can't do so concerning the American public the Agency serves. The Supreme Court has ruled as such in the Goldberg-Kelly decision where the Agency was found to be depriving recipients of their right to Due Process. The agency should know better based upon past court cases it lost on the subject of Due Process.

Exhibit 15A
page 4

The Agency has been able to secure a Summary Judgement decision from the EEOC in March 2016 and another one from the U. S. District Court in April 2018. Case law has routinely shown that Summary Judgement decisions are error prone for obvious reasons. I consider the Agency's actions to constitute a Continuing Violation of my Due Process rights. In fact, because I alleged a hostile work environment in my EEO complaints, I believe that the Doctrine of a Continuing Violation applies to my case. It should be noted that I had submitted a number of e-mails to the current Commissioner of the Social Security Administration outlining the illegal actions taken by the Agency (in detail) supporting my contentions concerning the deprivation of my right to have a fair hearing or Due Process discussed in this document. I will be requesting the Agency provide the Board and me with copies of those emails and any actual responses to those same emails during the Discovery process.

I believe the Agency has intentionally and illegally failed to provide me with an actual fair hearing on all of the formal complaints that I have raised because the Agency knows that the Agency's actions concerning the irregularities of that Internal investigation would be impossible to overcome if those actions were brought to light of day in an actual fair hearing. I further believe that a critical reading of the evidence contained in that internal investigation file would be viewed somewhat favorably to my original contentions on the formal EEO complaints and deciding my complaints in my favor was unacceptable to the Agency.

The Summary Judgement decisions are based upon the presentation of sworn statements of the Agency's witnesses and I wasn't given the opportunity to cross-examine any of those witnesses! Without an actual fair hearing, it is literally - "He said, the Agency says" situation at the best. Summary Judgement decisions do not equate to having an actual fair hearing where I am given the opportunity to present my case and to cross-examine the Agency's witnesses. This is exactly what the Agency has prevented by the Agency's own intentional and deliberate actions to deprive me of an actual fair hearing.

Based upon the Depositions of the Agency witnesses taken in August 2017, each individual witness has their own substantial creditability issues that have not been dealt with. Opposing Counsel – past and present have gone outside of their duty in order to present the defense they have/are putting forth. These issues have been INTENTIONALLY ignored by the Agency.

I do not agree with those bad Summary Judgement decisions and I do not believe they should stand. I believe that my entire case is strong on its own merits and my case would have been prevailed ON THE MERITS OF IT, if an actual fair hearing had been conducted. The Agency went far outside of the Agency's legal duties and responsibilities to achieve this end result. Those Depositions will provide a number of admissions concerning the deprivation of my Due Process rights.

I would like the Judge to order that the Agency has failed to provide me with Due Process in violation of my civil rights and the Agency should pay punitive damages to me for that violation. I also want the Judge to order the Agency to pay me compensatory damages on all of my EEO complaints against the

Exhibit 15A
page 5

Agency. Furthermore, I would like the Judge to order all remedies I am entitled to be levied against the Agency for the Agency's illegal actions so that I might be made as "whole" as possible.

As mentioned above, I did not receive any kind of notice (FAD) letter from the Agency concerning the Dallas Regional Office Internal Investigation, and without the FAD letter, I was denied ANY appeal opportunity when it was going on at that point in time.

When the Agency is informed about illegal actions taken by Agency employees, the Agency has a duty to investigate the matters adequately and correctly to seek the true nature of the any possible wrongdoing and correct any AND ALL wrongs found!

THIS IS DONE ROUTINELY UNDER SSA'S RULES OF ADMINISTRATIVE FINALITY WHEN IT IS THE EMPLOYEE'S FAULT. The Agency cannot deny this fact.

The relationship between the Employer and myself was SUPPOSE TO BE one of an Employer/Employee, not that of Adversaries. I have been in litigation on these issues for over five PLUS years waiting for an actual fair hearing to present my case and to be able to cross-examine the Agency witnesses to get to the real truth of the matters.

Signed _____    Date _____

Exhibit 15A
Page 6

## Discussion of the Historical Evidence and Arguments

I first filed a whistleblower protection complaint with the Office of Special Counsel in June 2012 in Albuquerque, New Mexico. I have the letters issued by the OSC on that complaint. I filed another Prohibited Personnel Practices complaint with the OSC in April 2018. They have not advised me that they are going to take any action against the Agency and over 180 days have elapsed.

The persons involved in this specific matter are:

Ms. Martha Lambie, SSA Dallas Regional Commissioner;
Ms. Vicki Matthews, SSA Dallas Region Director of Human Resources:
Mr. Mikel Rowley, SSA Albuquerque TSC Director;
Ms. Cynthia Steinberg, SSA Albuquerque TSC Deputy Director.

The Agency's Dallas Regional Office completed an internal investigation in 2012 concerning the allegations I brought forth against my first-line Supervisor in June 2011. That internal investigation was legally inaccurate and inadequate (SHODDY) in the following ways:

1. The Investigator had a conflict of interest. His spouse has direct involvement in the EEO complaint issues I raised. I believe he attempted to underscore my allegations and minimize them to the degree that he could concerning the issues I raised. Agency personnel (minimally) should have known this connection was there and acted accordingly.

2. The investigation was not thorough as the Investigator failed to interview the two witnesses that I identified that I believed had information they could testify to concerning the EEO issues I raised.

3. The focus of the investigation was not actually what the Agency should have investigated because the investigation was not performed timely. It took the Agency Investigators six months to show up to conduct the Internal Investigation. The damage from PTSD was beyond repair at that late date. In SSA's EEO VOD Series, there is a particular discussion about internal

Exhibit 15A
page 7

investigations titled "SSA's Obligation to Eliminate & Prevent Workplace Discrimination, Harassment, & Retaliation". In that discussion, the FOCUS of these types of investigations is distinguished from those under EEO complaints even though they appear to be the same on the surface.

4. The investigator REFUSED direct evidence that supported my allegations –namely, recorded conversations between me and Ms. Rhoads, Mr. Rowley, and other management persons involved in these matters. Copies of most of the recorded conversations have been given to the Agency twice. These recordings are legal under state law if the need to express that is necessary - given the noteworthy creditability issues concerning the Agency's witnesses. These recordings contradict their sworn testimony and written affidavits in the ROI. In the Agency's individual witnesses' own sworn statements and written affidavits in the ROI, they flip-flop their individual answers to the issues raised between their own documents. A thorough critical reading of those various documents in the ROI will confirm this fact. The Agency refuses to acknowledge this truth.

5. Based upon #4, the Investigator purposely failed to discern the creditability of the Agency's witnesses and the impact that has on the Agency's defenses and pleadings on these matters thereafter. Without cross-examination during an actual fair hearing, the Agency has the ability to manipulate the statements of the Agency's witnesses to suit the Agency's own design and purposes, and ultimately, to hide the wrongdoing of the Agency's witnesses. Each investigation conducted by the Agency concerning my complaints has its own particular legal irregularities that could have been addressed and ruled upon if an actual fair hearing had occurred.

6. The Agency continuously failed to communicate with me concerning this investigation throughout and the Agency ultimately failed to issue a Final Agency Decision (FAD) letter on the internal investigation itself. The failure to issue a FAD letter denied me appropriate appeal rights that would have been included in the FAD letter. It should be noted that the Agency denied my Freedom of Information Request to get access to the Investigation file in a timely manner.

7. I formally requested a FAD letter twice from Ms. Lambie in August 2012 by e-mail. Those e-mails are in the ROI. Ms. Lambie admitted to receiving them in her Deposition taken in August 2017. I want to add that in reviewing her testimony in that deposition, she went to great links to NOT discuss the internal investigation issues or whether it was used in the decision-making concerning the Agency's denial of my complaints. This can't be explained away PERIOD!!!

8. The Agency placed (BURIED) the internal investigation file into the EEO Case file and refused to discuss that internal investigation in any aspect thereafter. I sent several e-mails complaining to the Agency that this is illegal placement with no response ever coming back from the Agency on this issue. This refusal to address valid issues I raised in my e-mails happened routinely throughout the investigations. Those particular e-mails are included in the ROI. I was finally given a copy of the internal investigation file in September 2012 from the EEO complaint

Exhibit 15A
page 8

investigator, Susan Holmes. Without having the file, I would not have been able to discuss, let alone being able to appeal the wrongdoing associated with that investigation. Again, this is the result the Agency wanted to achieve by its own deliberate and intentional actions on the issue.

9. The Agency did conduct a "Position Review" as noted in the remarks section of the attached SF-50 in April 2012. In my formal EEO complaints, I alleged that the actual duties I was performing did not match of duties on my Position Description (PD) because the actual duties were part of the Retaliation issues I raised in my formal EEO Complaints. Based upon the Position Review – the actual duties I performed changed to reflect duties concerning Regional Workloads thereafter. There is a creditability issue associated with the SF-50 and the statements made in the Deposition (this is the missing one) of Ms. Vicki Matthews. Ms. Matthews stated that there was not actual "Position Review" completed in her Deposition. She is the person who signed off on the SF-50 Document. That document is marked as Appellant's exhibit number 1. Furthermore, she admitted that she herself failed to conduct another investigation that she should have taken of concerning the allegations raised in my formal complaints in her Deposition. Again, I will be requesting a copy during the Discovery period.

I believe that the Agency realizes that the Agency's illegal actions would be exposed in an actual fair hearing and that is what drove the Agency's need to keep a fair hearing from actually occurring. It takes someone with blind eyes to overlook, or better phrased – to intentionally ignore the overwhelming evidence in the ROI to conclude I have no real EEO or Due Process violation issues. The failures discussed above can be summed as a total deprivation of all of my due process rights concerning that Regional Office Internal Investigation and that there has been an intentional and deliberate failure to give me a hearing on my formal EEO complaints by the Agency as well. I plan on requesting the SSA EEO VOD, which discusses how the Agency is to process this type of internal investigation, as evidence of the irregularities of the Dallas Regional Office Internal Investigation conducted in 2012 on my complaints. The actions discussed in the video will show how badly the Regional Office Investigation was done.

On June 24, 2011, I met with and I complained to Mr. Rowley that my first-line Supervisor was threatening me, harassing me, and retaliating against me for speaking up to her. Mr. Rowley failed to conduct an investigation into my allegations. I complained about this failure in various e-mails I sent him directly. Those e-mails are in the ROI. He failed to follow applicable Agency regulations, policies, or procedures thereafter. I complained in emails about this failure in later emails to upper SSA management officials. Mr. Rowley has admitted this in his deposition taken in August 2017.

I complained to Ms. Lambie in November 2011 in an e-mail dated November 15, 2011, as Mr. Rowley was not taking any action to stop the continuing harassment or retaliation from my first-line Supervisor and demanded she take immediate action. In January 2012, she sent an investigation team to investigate my complaints. The investigator conducted an inferior investigation as discussed above. The Agency refused to discuss this investigation with me in any terms over the course of the investigation. Various e-mails regarding this issue are located in the ROI. In late January 2012, I was formally diagnosed with Post Traumatic Stress Disorder (PTSD) from this situation. If the Agency had taken appropriate legal

Exhibit 15A
page 9

actions and actively pursued its duties and responsibilities on my formal complaints as the laws, regulations, policies, and procedures dictate, I would not have a PTSD disability today.

As mentioned above, Ms. Vicki Matthews completed a "Position Review" in April 2012, which led to a change in the actual duties I was to perform thereafter. She admitted that she failed to conduct another investigation that she should have completed in her Deposition. There are a number of e-mails I sent to Ms. Matthews over the course of the investigations that she ignored as well. They are in the ROI.

In May 2012, I complained to Ms. Lambie about her failure to take appropriate timely action on the internal investigation and failing to issue a decision in another e-mail that is in the ROI as well.

In August 2012, I made two formal requests through emails to Ms. Lambie for her to issue the FAD on this investigation. She refused to do so even though she knew a FAD was necessary. She denied personally responsibility for issuing the FAD. She admitted to this in her deposition taken in August 2017. She also admitted to failing to give me meaningful input as she passed on all of my e-mails to subordinate employees and did not respond herself to the issues I raised in the emails I sent her. No one responded to the issues I raised! The Agency refused to discuss this investigation in any shape, form, or fashion. The lack of any response on the Agency's part gives heightened credence to my contentions on being denied Due Process on these matters.

Evidence of protected disclosures or activities are numerous e-mails from me outlining the ongoing misconduct and the failure to follow appropriate Federal Law and Regulations, as well as, the Agency's Regulations, policies, or procedures – For Example, an email I sent to Ms. Lambie, dated November 15, 2011, in the email, I was demanding that she initiate an Internal Investigation into my allegations concerning the misconduct of my supervisor. Under Agency Policy and Procedures, that investigation should have begun June 25, 2011. The Agency's stated rationale for the late investigation would not hold water if I had given the opportunity to scrutinized the alleged excuse under cross-examination at an actual fair hearing.

The ROI contains most of the e-mails mentioned in this document. The internal investigation file was placed in the ROI. Again, I sent a number of e-mails complaining that combining the files was illegal. This action was deliberate and intentional on the Agency's part - regardless of who actually did the placement. In addition, there are a number of admissions made by both Ms. Lambie and Mr. Rowley in their own Depositions taken in August 2017 concerning the e-mails I sent them on these due process matters. The contents of other Agency witnesses' affidavits obtained in August 2012 further support my allegations on my formal EEO complaints. The Agency has conveniently and intentionally ignored its legal duties and responsibilities to protect my rights as an employee.

Another example, in August 2012, I sent Ms. Lambie two e-mails formally requesting that a FAD be issued so that I could exercise my appeal rights concerning the internal investigation. In her Deposition, she admitted to receiving those particular e-mails and allegedly passed them on to someone else to take care of. Thereafter, I complained about her failure to provide that FAD in future e-mails. In her

Exhibit 15A
page 10

Deposition, she admits that a FAD was necessary, but it wasn't her responsibility to issue the FAD. I disagree. This was her investigation, it was her responsibility! Minimally, she should have ensured that someone responded to the issues I raised in the various e-mails I sent her over the course of the investigations.

Looking at the bigger picture on this matter - For these particular illegal actions to be acceptable legally and then be applied to all employees in a similar situation, in the absence of Whistleblowing, the Agency would be admitting that it intentionally deprives all employees (of their civil right to Due Process) who complain on legitimate work related issues of any legally legitimate opportunity to present that employee's case in an actual fair hearing and actually get appropriate justice given the facts of the particular case.

As time went on, I worked my way up the chain of command in the various e-mails up to and including the Commissioner of Social Security at that time, Mr. Michael Astrue, himself. Ultimately, Mr. Astrue ended up "Blocking me on e-mail" so that he didn't get my e-mails any longer. Second-in-Command, Ms. Carolyn Colvin read ALL of my e-mails, but failed to take any action. They knew the Internal Investigation was substandard! They knew that the internal investigation file was buried in the EEO Case file (illegal)! And they were aware that I was being denied Due Process and they conveniently, intentionally, and deliberately looked the other way!

Again, absent the intent to deprive any and all employees in the Agency of their individual Constitutional right to Due Process and their "core protections" as a Federal employee, how can it not be anything but Whistleblower retaliation for the disclosures I had made throughout the processing of my complaints as the basis for the Agency's ongoing failure to administer it's duties and responsibilities legally and properly.

In that meeting on June 24, 2011, I disclosed the misconduct of my supervisor which included a direct threat to my career, harassment, and Retaliation. That supervisor carried out that direct threat and I sent e-mails to Mr. Rowley documenting the continuing misconduct issues as they occurred. Mr. Rowley worked for eight years as an EEO Specialist before he came to work for the Agency. Yet, in his Deposition, he stated that he didn't realize the context of my allegations as the reason he never began an investigation into my whistleblowing concerning my supervisor's misconduct.

Regarding Mr. Rowley's creditability issues, I point to page 158 of the Regional Office Internal Investigation where Mr. Rowley states that I did state that there were "misconduct" issues discussed concerning my supervisor's direct threat and other issues in the June 24, 2011 meeting. In his other sworn affidavits, and in his Deposition, he out and out denies that I made sufficient t allegations in that initial meeting to warrant an investigation. Again, the Agency is responsible for determining the truth of the sworn statements of its witnesses and this example and the one concerning Ms. Matthews points to the fact that they don't really care about the truth. An actual Fair hearing would have brought out much of this "Tom Foolery" crap!!!

Exhibit 15A
page 11

In the Agency's Response to Plaintiff's First Set of Interrogatories, question # 18, the Agency admits that I did make multiple complaints throughout the investigation of my formal complaints concerning the actual processing of my case as evidenced by the e-mails in the ROI. They Agency cannot produce any actual responses to the issues I raised in the various e-mails. I will request a copy of these in the Discovery period.

I continued to send e-mails addressing each legal infraction that I became aware of throughout the investigations in attempt to document the facts of the case and to be able to present them at a fair hearing on my complaints.

The fact that the Agency has taken preventative, intentional, and deliberate actions, i.e., the filing of multiple Summary Judgement Motions, for example, to keep me from having an actual fair hearing., Yet knowing at the same time, the Agency has a legal duty to give me due process creates an obvious question as to the motives and actions of the Agency. The Agency would need to start telling all of the Agency's employees that their civil right to Due Process are subject to intentional violation by a member of management if a management employee chooses to do so, and that management can do it without fear of accountability, if so inclined.

### Summation

No Notice, No meaningful input, and especially, no actual fair hearing! The Agency set up the leave situation issue that forced the Appellant into retirement by not taking appropriate action. Again, looking at the big picture on this subject - this would be applicable to all Federal employees across the board as well. Millions and millions of Federal employees' right to Due Process ignored illegally. This is unacceptable.

I believe the framers of the Constitution included the right to Due Process in the Fifth Amendment to serve a vital and necessary purpose to protect the rights of the individual citizen over the overly zealous - possibly ILLEGAL actions of a less than friendly Federal Agency. That still applies today. The Agency spends significant time and resources to train the Agency's management staff to do those duties and responsibilities legally and professionally to ensure the rights of the Agency employees are protected. Based upon the evidence discussed above, Agency personnel chose to ignore their duty and responsibilities repeatedly over the course of the investigations. To say that the actions complained of are legally standard operating policies and procedures of the Agency – applicable to all of the Agency's sixty-five thousand plus employees, is outright deception! And if it is being done, it is outright illegal.

Please give this matter consideration and give me a hearing please. I need Justice and Resolution that I can live with.

Respectfully,

*Exhibit 15A*
*page 12*

William M. Fulkerson

Exhibit 15A
page 13

Devider

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33. Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| FULKERSON, WILLIAM M | ▮▮▮▮▮ | ▮▮▮▮ | 04/08/2012 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code **721** | 5-B. Nature of Action **REASSIGNMENT** | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code **N7M** | 5-D. Legal Authority **REG 335.102 RECLASS** | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| MANAGEMENT & PROGRAM ANALYST STAFF ASSISTANT S2D6J  098L090 | MANAGEMENT AND PROGRAM ANALYST STF ASST S2D6J  05D1710 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0343 | 13 | 06 | 95459 | PA | GS | 0343 | 13 | 06 | 95459 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 83619 | 11840 | 95459 | 0 | 83619 | 11840 | 95459 | 0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| SOCIAL SECURITY ADMINISTRATION OPERANS OFC REGIONAL COMMISSIONER OFC REGNL COMM DALLAS ALBUQUERQUE, NM TSC | SOCIAL SECURITY ADMINISTRATION OPERANS OFC REGIONAL COMMISSIONER OFC REGNL COMM DALLAS ALBUQUERQUE, NM TSC |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1-None  3-10-Point/Disability  5-10-Point/Other<br>2-5-Point  4-10-Point/Compensable  6-10-Point/Compensable/30% | 1 — 0-None  2-Conditional<br>1-Permanent  3-Indefinite | | YES ☐  NO ☒ |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| Z1  BASIC + OPTIONAL(5X) + STANDARD + FAMILY(1X) | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K  FERS & FICA | 11/05/1989 | F  FULL-TIME | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 — 1-Competitive Service  3-SES General<br>2-Excepted Service  4-SES Career Reserved | N  E-Exempt  N-Nonexempt | 4007106 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City — County — State or Overseas Location) |
|---|---|
| 35-0030-001 | ALBUQUERQUE, BERNALILLO, NEW MEXICO |

| 40. Agency Data FUNC CLS 00 | 41. VET STAT X | 42. EDUC LVL 13 | 43. SUPV STAT 8 | 44. POSITION SENSITIVITY NONSENSITIVE/LOW RI |
|---|---|---|---|---|

45. Remarks

RESULT OF POSITION REVIEW.



| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| SZ - SOCIAL SECURITY ADMIN | 120468036 / ELECTRONICALLY SIGNED BY: |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | VICKI A. MATHEWS |
|---|---|---|---|
| SZ00 | 1164 | 04/06/2012 | DIRECTOR, HUMAN RESOURCES |

5-Part 50-316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238



Exhibit 15A
page 14



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-804-7000

April 18, 2018

Mr. William Fulkerson
3809 General Bradley St. NE
Albuquerque, NM 87111

*Via email at:* billygoat3809@gmail.com

    Re: <u>OSC File No. MA-18-3279</u>

Dear Mr. Fulkerson:

    This letter responds to the complaint you recently filed with the U.S. Office of Special Counsel (OSC) against the U.S. Social Security Administration (SSA or agency). Based on our evaluation of the facts and law applicable to your circumstances, we have made a determination to close our inquiry into your complaint.

    In your complaint, you stated that in June 2011 you reported that your supervisor made a threat. You filed a complaint and requested an investigation by the Regional Office. You asserted that the investigation was not conducted according to federal law or agency policies and procedures. For example, you stated the agency failed to issue you a Final Agency Decision (FAD), which violated your due process rights. You also stated the case file for this matter, which was not an Equal Employment Opportunity (EEO) complaint, was wrongfully placed into an EEO case file.

    Unfortunately, it becomes increasingly difficult to obtain evidence regarding a claim the longer an employee waits prior to filing. We note that all other types of employment law claims must be filed within a reasonable amount of time, some as short as 45 days. *See* 29 C.F.R. § 1614.105 ("an aggrieved person must initiate contact with a counselor within 45 days of the date of the matter alleged to be discriminatory" for EEO related complaints). Congress determined that OSC need not investigate an alleged prohibited personnel practice filed three years after the individual knew or should have known of the violation. 5 U.S.C. § 1214(a)(6)(A)(iii). Because your allegations concern events that occurred more than three years before your filing, we are closing our file in this matter.

    Sincerely,

Malvina Winston
Attorney
Complaints Examining Unit

*Exhibit 15A*
*page 15*

---------- Forwarded message ----------
From: **Winston, Malvina** < mhryniewicz@osc.gov>
Date: Wed, May 9, 2018, 8:11 AM
Subject: RE: Response from the Social Security Administration - Grievance - Reference 18501077
To: billygoat3809 <billygoat3809@gmail.com>, Young, Molly <myoung@osc.gov>
Cc: Wheeler, Barbara <BWheeler@osc.gov>


Mr. Fulkerson,

As I stated in my email on April 25, 2018, I forwarded your request for reconsideration and subsequent emails to Ms. Barbara Wheeler, Chief of OSC's Complaints Examining Unit. I copied Ms. Wheeler on that email as well, which provided you with Ms. Wheeler's email address. My April 25th email is attached. I am copying Ms. Wheeler again on this email.

Malvina Winston
Attorney
Complaints Examining Unit
U.S. Office of Special Counsel
1730 M Street, N.W.
Suite 218
Washington, DC 20036
Phone: (202) 804-7138 (please note the new number)
Fax: (202) 653-0015
Email: mwinston@osc.gov

NOTICE: This message and any attachments may contain information that is sensitive, confidential, or legally privileged. If you are not the intended recipient, please immediately notify the sender and delete this email from your system; you should not copy, use, or disclose its contents. Thank you for your cooperation.

*Exhibit 15A*
*page 16*

---------- Forwarded message ----------
From: **billygoat3809** < billygoat3809@gmail.com>
Date: Mon, Jul 23, 2018, 12:47 PM
Subject: Request for a Final Agency Decision (FAD)
To: <bwheeler@osc.gov>
Cc: Young, Molly <myoung@osc.gov>, Winston, Malvina <mhryniewicz@osc.gov>


Good afternoon, All.

First, my apology to Ms. Winston for having to include her in the audience of this email. It is my hope
that you question why Mr. FULKERSON has to go to this extent to get some one to communicate
with him on the RECONSIDERATION issue.  His time to file his IRA has started. Thank you, Ms.
Winston. To a degree Ms. YOUNG, this applies to you.

Ms. Wheeler, you have failed to communicate with me for no good LEGAL reason for in excess of
120 days, Ma'am! I do not accept your actions as being appropriate given the facts I laid out to the
COMMISSIONER OF the SOCIAL SECURITY ADMINISTRATION in numerous emails since
April.

This is my FORMAL REQUEST for the OSC to issue it's FAD upon my Reconsideration request
immediately. Failure to do so, IMPEDES my ability to file TIMELY with MSPB.

FUTHERMORE, SPECIAL COUNSEL Mr. KERNER - YOU ARE ON NOTICE EFFECTIVE
IMMEDIATELY!!!

Resolved.

William Fulkerson


Sent via my Samsung Galaxy, an AT&T 4G LTE smartphone

Exhibt 15A
Page 17
10/1/2018

From: billygoat5005 <billygoat5005@gmail.com>
Sent: Sunday, September 23, 2018 1:57 PM
To: Giaccio, Gregory <ggiaccio@osc.gov>
Subject: The DENIAL of Due Process by OSC Personnel

Good morning,

As you are aware of my pending appeal before the MSPB, and I have been questioned by Judge Kasic regarding my pending Reconsideration with you. Judge Kasic is receiving a copy of previous emails from Ms. Wheeler naming you as the person responsible for the reconsideration, my recent e-mail to you requesting a decision on the Reconsideration, and this one regarding the denial of Due Process by OSC personnel. These issues have nothing to do with OSC's proscecutional options, but rather the processing of my complaint filed in April concerning prohibited personnel practices by SSA.

First infraction by OSC personnel was a failure to conduct an interview with the complainant. Had that OSC personnel actually interviewed the complainant, she would have known that the complainant had timely filed two complaints in 2012. The basis of her denial is erroneous. The OSC issued a legally defective "closure" letter that does not contained required language nor addressed the issues necessary to be considered legal.

The second infraction concerns the failure to issue of a "Preliminary Decision" letter and allow the ten day period for me to object to that decision. This did not happen!

I filed the Reconsideration on April 18th, 2018, and to date, I have not received any decision on that request. I have asked for multiple final agency decisions on my reconsideration request. OSC has failed to provide the required Agency status reports on my request at the 90 day mark nor at the 60 follow-up status report due the complaintant. I can't force you to give me due process and make that decision, but I can hold you accountable for failing to do your duties correctly and legally.

If Judge Kadic dismisses my Appeal because of OSC's failures to take appropriate actions under OSC regulations policies, and Procedures, I will bring a lawsuit against the OSC for it's violations of my Due Process rights immediately.

Please issue a FINAL AGENCY DECISION PLEASE!!!

RESPECTFULLY,

William Fulkerson

Sent via my Samsung Galaxy, an AT&T 4G LTE smartphone

*Exhibit #15A*
*page 18 of 18*

devider

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### DENVER FIELD OFFICE

WILLIAM M. FULKERSON,

      Appellant,

      v.

SOCIAL SECURITY
ADMINISTRATION,

      Agency.

DOCKET NUMBER
DE-0752-20-0323-I-1

DATE: September 30, 2020

William M. Fulkerson, Albuquerque, New Mexico, pro se.[1]

Lisa K. Paquette, Esquire, Dallas, Texas, for the agency.

**BEFORE**
Stephen C. Mish
Chief Administrative Judge

## INITIAL DECISION

On June 24, 2020, the appellant filed this appeal alleging the agency unlawfully forced him into retirement in 2013.[2] (Initial Appeal File (IAF), Tab 1.) The Board's jurisdiction over the appeal, and its timeliness, are at issue.

---

[1] The appellant was represented by counsel at the start of this appeal. However, counsel formally noticed his disappearance on August 26, 2020. (IAF, Tab 14.)

[2] The appellant has litigated various other aspects of his employment with the agency in the years preceding this case. See, e.g., Fulkerson v. Social Security Administration, DE-1221-18-0410-W-1 (M.S.P.B. In'tl Dec. Oct. 16, 2018); Fulkerson v. Colvin, 16-CV-389-BRB-KBM, 2018 WL 1726245 (D.N.M. Apr. 6, 2018). This non-Individual Right of Action (IRA) appeal was docketed after the appellant raised the constructive discharge claim in an IRA where the claim could not be heard. Fulkerson v. Social Security Administration, DE-1221-19-0042-W-1 (M.S.P.B. In'tl Dec. Jun. 24, 2020).

*Cases cited are Summary Judgment dismissals.
Constitutional Rights never been litigated.
Core Protection Rights never been litigated either.*

*Plaintiff's Exhibit #15A
page 1 of 21.*

*Doctrine of Continuing Violation applies*
*action preventing a Hearing.*

For the reasons set forth below, the ~~appeal~~ is **DISMISSED** for lack of jurisdiction.

## ANALYSIS AND FINDINGS

When they are taken as true for purposes of a decision, the appellant's allegations establish the following.[3] In 1989, the agency first employed the appellant. From 2002 through 2005, the appellant was employed as a Section Manager at the agency's Albuquerque facility. (IAF, Tab 9, pp. 23-26.) In late 2003 into 2004, the appellant underwent a course of medical treatment which involved chemotherapy. (*Id.*) He requested an unspecified accommodation which the agency denied. (*Id.*) From August 2004 to June of 2005, the appellant was on an extended leave of absence. (*Id.*) When he returned, he was only working part-time at the time, and the agency reassigned him to a Staff Assistant position. (*Id.*) While paid at the same GS-13 rate, the Staff Assistant position did not involve supervising other people. (*Id.*) The appellant eventually returned to a fulltime schedule, now in the Staff Assistant position. (*Id.*) At or around that time, he requested unspecified accommodations which the agency denied. (*Id.*)

*Retaliton*
*2012*
*Internal*
*Investigation*
*Conclusions*
*show*
*pretextual*
*grounds*

In the following years, 2006 and 2007, the appellant asked his supervisor at the time to non-competitively reassign him to a Section Manager position when vacancies in such jobs became available. (*Id.*) However, his then-supervisor advised the appellant that the vacancies would be advertised for applicants, and that he could apply along with other candidates if he chose. (*Id.*)

In or around September 2009, the appellant's son died. (*Id.*) He asked make use of leave at the time, and when he did so, he found his immediate

---

[3] In addition, the factual background is drawn from findings made in the decisions in the appellant's prior cases against the agency. Facts taken from those decisions are noted as such.

*Exhibit 15A*
*page 2*

supervisor to be insensitive to the situation. (*Id.*) She insinuated he was trying to avoid a scheduled performance meeting. (*Id.*)

While the starting point is not specified in the record, the appellant had been taking a regimen of depression medication, but he discontinued it in or around April of 2010.[4] (IAF, Tab 9, p. 24.) Beginning in later 2010 and continuing into 2011, some of the appellant's coworkers reported to agency managers that the appellant had been less than pleasant when he interacted with them. (*Fulkerson v. Colvin, supra*)

In June of 2011, the appellant's immediate supervisor told him that she "would make [him] 'look like a non-team member.'" (IAF, Tab 1, p. 4.) The appellant reported this to his second level supervisor believing his career prospects would be stymied if she did that. (*Id.*) Under agency policy, the agency should have commenced an investigation the very next day because of his report, but it did not. (*Id.*) For the next few months, the appellant reported a series of conflicts with his immediate supervisor over matters like whether local staff should be involved in training others or not or whether and when they should be making use of an electronic messaging program. (IAF, Tab 9, p. 24.)

In September 2011, the appellant's immediate supervisor alerted her superiors that she was concerned for her safety, reporting the appellant's behavior had become "erratic." (*Id.*) The next month, October, the agency informed the appellant he would have a new supervisor. (IAF, Tab 9, pp. 23-24.) It further informed him he would no longer be attending management meetings. (*Id.*)

In November 2011, the appellant wrote to the agency's Regional Commissioner complaining that his second level supervisor had not timely initiated the investigation he requested. The appellant resumed taking unspecified medications for depression that month, as well. (IAF, Tab 9, p. 23.)

---

[4] The appellant's proffered exhibit states that this discontinuation of medication was in April 2011. However, there is a handwritten notation on it stating that is "wrong" and that it was April 2010.

Exhibit 15A1
page 3

However, the appellant's new supervisor also reported he had made inappropriate comments to her at or around this time. (*Id.*)

The investigation the appellant requested commenced in January 2012. The agency would not openly and freely communicate with the appellant about the investigation while it was ongoing. The investigator did not interview two people the appellant recommended be interviewed and would not accept recordings the appellant had surreptitiously of his coworkers. He also refused to make credibility determinations about the people he did interview. The agency also did not issue a report about the investigation directly to the appellant when it concluded. He did, however, obtain a copy from the agency's investigator assigned to one of his Equal Employment Opportunity complaints.

In December 2012, the appellant suffered a traumatic brain injury (TBI). (IAF, Tab 9, pp.16-17.) He had two subdural hematomas, and he underwent brain surgery in February 2013. The appellant suffered a cognitive decline as a result of this situation. (*Id.*) He was on an extended leave of absence from his position and eventually used all paid leave he had available. He sought to make use of the agency's leave transfer program, whereby other agency employees could donate their leave to him for his use if they chose to do so. While the agency did put out a notice via its email system that the appellant was seeking leave under the transfer program, it could have done so more quickly and to a wider audience within the agency than it did.

For approximately the last month of his employment, while the appellant was on the agency's rolls, he was in a leave-without-pay status. He could not afford to go without income for very long. He applied for and accepted a disability retirement effective October 4, 2013. (IAF, Tab 9, p. 21, Ex. A.)

## Procedural Rulings

The agency argues that the appellant is barred by res judicata from pressing a constructive discharge claim, and it further contends that any such appeal is untimely. I cannot agree on either score. With regard to res judicata, it bars

*Exhibit 15A1*
*page 4*

claims that were or could have been raised in prior litigation between the same parties and which is based on the same nucleus of facts as the prior case. *See, e.g., Johnson v. Department of Veterans Affairs*, 121 M.S.P.R. 695, 700 (2014). In this case, however, the appellant could not properly press a constructive discharge claim in his prior civil action because, in order to do so, he would need to exhaust administrative remedies first. As the sole administrative adjudicator with original, as opposed to appellate, jurisdiction over adverse actions against Federal Government employees, the appellant would have had to press such a claim at this Board before presenting it to a district court. *See Elgin v. Department of Treasury*, 567 U.S. 1, 11–13 (2012) (describing the exclusive nature of Civil Service Reform Act review of the statutory adverse actions before MSPB); *Harms v. I.R.S.*, 321 F.3d 1001, 1010 (10th Cir. 2003) (dismissing discrimination claims tied to an adverse action where the appellant did not exhaust proceedings before MSPB). And, as will be explained below with regard to timeliness, the appellant did not have specific obligation to press his constructive discharge claim at this Board until he was informed of the right to do so by Judge Kasic in a prior Whistleblower Protection Act based case.[5]

With timeliness, pursuant to both statute and regulation, an employee subject to an actual adverse action has 30 days from the receipt of the required, written agency notice imposing it, at the latest, and agencies must apprise the affected employee of the right of appeal and the time limit for it. *See* 5 U.S.C. §§ 7513, 7701; 5 C.F.R. §§ 752.404, 1201.22-23. With resignations and retirements, however, the agency is not directly imposing an adverse action and does not generate a written notice of its decision. Timeliness in such cases is determined by when an appellant learns of the right to appeal an alleged constructive adverse action and whether he or she acts reasonably promptly

---

[5] The agency identifies no earlier point at which it, or any other entity, expressly advised the appellant he could challenge his retirement before this Board as a constructive discharge, let alone that there may be a deadline to do so.

Exhibit #15A
page 5

thereafter.   *See Fields v. U.S. Postal Service*, 117 M.S.P.R. 475, 479 (2012); *Popham v. U.S. Postal Service*, 50 M.S.P.R. 193, 198–200 (1991) (the agency had no obligation to inform employee who resigned of the his right to appeal to the Board prior to the time it had reason to know that the employee considered his resignation to be involuntary).   *Cf. also Parker v. U.S. Postal Service*, 59 M.S.P.R. 603, 610 (1993) (whether the agency was required to advise the appellant of his appeal rights depended on whether the agency actually took an appealable action; whether the agency is deemed under law to have taken an appealable adverse action depends on whether the employee can show he or she was constructively removed; administrative judge should not have dismissed as untimely without deciding the jurisdictional constructive discharge issue; the jurisdictional and timeliness issues were "inextricably intertwined").

In the instant case, the appellant filed an appeal with this Board specifically alleging a forced retirement within two weeks of Judge Kasic's decision advising he could do so, and accordingly, I conclude the appeal is not untimely.

Applicable Law

The Board's jurisdiction, i.e., its power to hear and decide a case, is limited to the specific matters and classes of persons granted to it by law or regulation. *See Lee v. Merit Systems Protection Board*, 857 F.3d 874, 875 (Fed. Cir. 2017); *Morse v. Merit Systems Protection Board*, 621 F.3d 1346, 1351 (Fed. Cir. 2010). To state it differently, the Board does not have general jurisdiction over all employment matters involving a Federal worker that are allegedly unfair or incorrect. *See Burroughs v. Department of Army*, 116 M.S.P.R. 292, 297 (2011). It is an appellant's burden to establish jurisdiction. 5 C.F.R. § 1201.56(b)(2)(i)(A); *Lal v. Merit Systems Protection Board*, 821 F.3d 1376, 1378 (Fed. Cir. 2016). Where an appellant makes non-frivolous allegations of jurisdiction, namely, facially plausible, material, factual claims supported by oath or other evidence which, if ultimately proven, could establish the Board's

*Exhibit 15A.*
*page 6*

jurisdiction, then he or she has a right to a hearing at which jurisdiction must be proved by preponderant evidence. *See* 5 C.F.R. § 1201.4(s); *Garcia v. Department of Homeland Security*, 437 F.3d 1322, 1344 (Fed. Cir. 2006) (en banc). Absent non-frivolous jurisdictional allegations, there is no right to a hearing on the threshold issue of jurisdiction. *Id.* at 1334-35.

"[S]eemingly voluntary actions in some circumstances may be considered adverse actions." *Garcia*, 437 F.3d at 1328. A resignation or retirement is presumed voluntary, and is therefore not an adverse action within the Board's jurisdiction, unless the retiree proves by preponderant evidence that he or she was, inter alia, improperly coerced in to resigning from employment. *See Neice v. Department of Homeland Security*, 105 M.S.P.R. 211, 216 (2007). To press such a claim, the former employee must non-frivolously allege, then ultimately prove: "(1) the agency effectively imposed the terms of the employee's resignation or retirement; (2) the employee had no realistic alternative but to resign or retire; and (3) the employee's resignation or retirement was the result of improper acts by the agency." *Garcia*, 437 F.3d at 1329. *See also Bean v. U.S. Postal Service*, 120 M.S.P.R. 397, 401 (2013) ("[A]ll constructive adverse action claims whatsoever, have two things in common: (1) the employee lacked a meaningful choice in the matter; and (2) it was the agency's wrongful actions that deprived the employee of that choice"). This is an objective inquiry based on the totality of the circumstances. *See Middleton v. Department of Defense*, 185 F.3d 1374, 1379 (Fed. Cir. 1999) ("an employee's subjective feelings are irrelevant"); *Garcia*, 437 F.3d at 1329. "[T]he doctrine of coercive involuntariness is a narrow one requiring that the employee satisfy a demanding legal standard." *Id.* Most resignations and retirements do not meet it, and the unpleasant, difficult or stressful nature of actions an agency may otherwise lawfully take will not support a forced resignation case. *Id. See also Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (to support a constructive discharge claim, the working environment must be "extraordinary and egregious"); *Terban v. Department of*

*Exhibit 15A*
*page 7*

8

*Energy*, 216 F.3d 1021, 1026 (Fed. Cir. 2000) ("where an employee is faced with the unpleasant alternative of resigning or being subjected to an adverse action, the resulting resignation cannot be considered an involuntary retirement unless the employee shows that the agency lacked reasonable grounds for threatening to take the adverse action").

<u>The appellant has not made non-frivolous allegations which could support a constructive discharge claim.</u>

The appellant advances several theories in support of his constructive discharge claim.  The first is that he was provided misinformation by an agency Human Resources employee, Leanne Maldonado, as he was contemplating retiring.  According to the appellant, "[h]e specifically asked her if his retirement would have any effect on his case against the Agency about the hostile work environment, workplace harassment and related issues regarding his employment." (IAF, Tab 9, p. 8.)  He further avers she, "informed him that his retirement would not have any effect on his case. In reliance on her assurances to this specific inquiry, he processed his retirement paperwork." (*Id.*)

Assuming the truth of the appellant's factual contention, he has not made a non-frivolous allegation that Maldanado's answer to his question actually constituted misinformation.  The appellant's "case against the Agency" at that time involved a claim of a hostile environment stemming from unlawful disability discrimination and/or retaliation.  (*Fulkerson v. Colvin, supra*)  Whether the agency's actions were sufficient to constitute a hostile environment within the meaning of the law would be, and was, judged based on events which preceded the appellant's retirement.  (*Fulkerson v. Colvin, supra*) The appellant retiring would not affect the determination of whether or not events which preceded his retirement constituted a hostile environment.  *See Winspear v. Community Development, Inc.*, 574 F.3d 604, 607 (8th Cir. 2009) (while a proven hostile environment can support a constructive discharge claim, they are distinct causes

of action with separate elements): *Garcia v. Department of Homeland Security*, 437 F.3d 1322, 1341 (Fed. Cir. 2006) (en banc) (while constructive action claims may be informed by discrimination claims, one is not necessarily dependent on the other); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1107 (9th Cir. 1998) (noting a hostile environment claim and a constructive discharge claim were "distinct legal theories"). Accordingly, this allegation is not a non-frivolous allegation to support jurisdiction.

The appellant's second theory in support of a constructive removal claim is that "under all of the circumstances the agency made his working conditions so difficult that a reasonable person in his position would have felt compelled to retire or resign." (IAF, Tab 9, p. 9.) In support of this theory, the appellant avers that from approximately 2011 through his retirement in 2013, he was subject to a series of harassing actions by agency employees as outlined above. Taking the appellant's allegations about what occurred and when at face value, they are insufficient to support a constructive removal claim.

As noted, for a viable constructive discharge appeal, the working environment must be "egregious." *Poland*, 494 F.3d at 1184. And that egregious environment must be the result of actions the employing agency is not authorized to take. *Garcia*, 437 F.3d at 1329; *Bean*, 120 M.S.P.R. at 401. Here, however, the appellant has not alleged any agency activity which would meet that standard. The appellant contends he was unfairly criticized as not being a team player, that multiple supervisors spoke to him in loud, aggressive tones beyond that of normal conversation, that his work assignments were not appropriate given his position description, that the agency would not act promptly on his complaints, that he had been banned from management meetings, and that the agency would not take actions which would put him in a better position for career advancement. Simply put, even if all these things were not actions they agency could lawfully take, under case law, they do not amount to an egregious work environment sufficient to meet the narrow and demanding standard applicable to constructive discharge

Exhibit 15A.
page 9

cases. *See, e.g., Levy v. Department of Treasury*, 232 F.3d 912, 2000 WL 369755, at *1-2 (Fed. Cir. 2000) (Table) (allegations of an inaccurate performance appraisal, a letter of reprimand, agency disclosure of employee's personal information, agency requests for personal information and inaccurate workload review were insufficient); *Miller v. Department of Defense*, 85 M.S.P.R. 310, 322 (2000) (dissatisfaction with work assignments, feelings of being unfairly criticized or difficult or unpleasant working conditions are generally not so intolerable as to compel a reasonable person to retire); *Jones v. Department of Navy*, 66 M.S.P.R. 421, 424-25 (1995) (allegations that supervisor made numerous threatening calls to employee's home in the middle of the night, which prompted severe stress reactions such as sudden unconsciousness, were sufficient); *Bates v. Department of Justice*, 70 M.S.P.R. 659, 667-72 (1996) (where law enforcement employee's coworkers placed her in a potentially deadly situation by repeatedly cutting off her ability to call for backup or help when needed, constructive discharge proven).

The appellant also contends that the agency also created circumstances which negatively affected his health to the point that he could not continue working and disability retirement was his only option. As he says, "Mr. Fulkerson did not have PTSD (Posttraumatic Stress Disorder) when he began working at the agency. But he was diagnosed with PTSD beginning in January 2012. He was completely disabled by November 2012. Between January 2012 and November 2012, agency personnel at the TSC exploited the fact of his PTSD, making his work environment intolerable, exacerbating his PTSD, and in effect forcing him out." (IAF, Tab 9, p. 14.)

First, this argument repeats a fallacy noticed and called out by the District Court in the appellant's prior civil action. The appellant was not diagnosed with PTSD in January of 2012. At that point, a coworker, presumably a layman, had told the appellant he thought the appellant might have PTSD. The physician the appellant consulted with in January 2012 about that told him he should contact

Exhibit 15A1
page 10

mental health specialists in that regard to receive a genuine, proper diagnosis and provided him with some options to do so. The appellant does not allege he availed himself of those.

Furthermore, the appellant did not rely solely on PTSD in applying for disability retirement. He also relied on his TBI and resultant problems, and the appellant makes no allegation, supported or otherwise, that the agency caused his physical brain injury. To the extent the appellant contends that the timing and scope of the leave donation notice the agency sent out after the appellant suffered his TBI was a wrongful action, which forced him into retirement because it kept him in a Leave Without Pay status when he might otherwise have had income through use of donated leave, he has made no allegation about any official requirements for the agency in that regard, in either timing or scope. When reviewing constructive claims, it is objective measures and standards, not an appellant's subjective views about what should or should not occur, which must be applied. *See Middleton*, 185 F.3d at 1379; *Garcia*, 437 F.3d at 1329. In the absence of even allegations about objective requirements for the leave donation program, one cannot determine if the agency's actions were permissible or not. Accordingly, the appellant has not made a non-frivolous allegation in support of jurisdiction.

Finally, the appellant avers that he was incompetent at the time of his retirement, and as such, it was invalid. At the first line, this presents a logical conundrum. If the appellant's mental health was in such a poor state that he was indeed not mentally competent and could not actually choose to retire under the law, bad jokes about Federal employees notwithstanding, he would not have been able to work. In such a case, the agency would have been obligated to either try to get a family member to file a retirement application on his behalf, or to actually undertake that action itself and file for a disability retirement on his behalf. *See* 5 CFR § 844.202 (setting forth requirements for when an employing agency should file a disability retirement application on behalf of an

incapacitated employee).   Second, the appellant makes no specific averments about these circumstances, only broad and general averments.  For example, he has not alleged that he was declared *non compos mentis* by a state court after a competency proceeding or that any mental health professional had reached that conclusion outside of legal proceedings.  He just declares his own incompetence at the time.  Accordingly, it is not a non-frivolous allegation.  *See* 5 C.F.R. § 1201.4(s) (non-frivolous allegations are allegations of facts supported, at least preliminarily, by sworn statements or other evidence.)

## CONCLUSION

The appellant experienced circumstances while working at the agency which he found stressful and unpleasant, at a minimum.  However, even if they were proven as alleged, they do not rise to the level of constructive discharge.  He also suffered from external circumstances not attributable to the agency, his TBI, but the unfortunate effects of that do not render his retirement involuntary.  Accordingly, he has not pled a viable constructive discharge claim and further proceedings are not warranted.

## DECISION

The appeal is DISMISSED.

FOR THE BOARD:

Stephen C. Mish
Chief Administrative Judge.

## NOTICE TO APPELLANT

This initial decision will become final on **November 4, 2020**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after

*[handwritten: X Appeal Rights violated by Judge Johnson]*

*[handwritten: Exhibit 15A1]*

*[handwritten: page 12]*

the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, see 5 C.F.R. § 1200.3(a),

*Exhibit 15A 1*
*page 13*

(e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

## Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

*Exhibit 15A1*
*Page 14*

earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully

Exhibit 18A:
page 15

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the

Exhibit 15.
page 16

follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

(1) **Judicial review in general.** As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within 60 calendar days of <u>the date this decision becomes final</u>. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Exhibit 151
page 17

**(2) Judicial or EEOC review of cases involving a claim of discrimination.** This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (not the U.S. Court of Appeals for the Federal Circuit), within 30 calendar days after this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); see *Perry v. Merit Systems Protection Board*, 582 U.S. ____, 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within 30 calendar days after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Exhibit #151
page 18

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

(3) **Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012.** This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within 60 days of the date this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation

Exhibit 151
page 19

for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

Exhibit 15A?
page 20

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

### Appellant

U.S. Mail

William M. Fulkerson
3809 General Bradley St NE
Albuquerque, NM 87111

### Agency Representative

Electronic Mail

Lisa K. Paquette, Esq.
Social Security Administration
Office of General Counsel, - Suite 340
1301 Young Street, Mailroom 104
Dallas, TX 75202

| | |
|---|---|
| **September 30, 2020** | *Stacy Abbott* |
| **(Date)** | Stacy Abbott |
| | **Paralegal Specialist** |

Exhibit 1SA1
page 21 of 21.

FULKERSON v. New Mexico DEPARTMENT OF JUSTICE

Case Number _____

# EXHIBIT NUMBER:

#15 B. U.S.D.C.

11/2020

Complaint - 18 pages.

22 pages total.

B1. U.S.D.C.

Decision - 4 pages

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

NOV 0 5 2020

MITCHELL R. ELFERS
CLERK

WILLIAM M. FULKERSON,           )
                                )
    Plaintiff,                  )
                                )
Vs.                             )
                                )            No. 20cv1145-JFR
Andrew Saul, Commissioner of the )
                                )            JURY DEMANDED
SOCIAL SECURITY ADMINISTRATION, )
                                )
    Defendant.                  )

---

**COMPLAINT FOR CONSTRUCTIVE DISCHARGE, RETALIATION AND CIVIL RIGHTS VIOLATIONS**

    Plaintiff alleges and states:

**JURISDICTION AND VENUE**

*[handwritten: ✱ The Plaintiff's Federal Appeal rights were violated as well by Judge Johnson.]*

1.  This action is brought by Plaintiff to remedy an illegal Constructive Discharge complaint, a Retaliation complaint (through a hostile work environment that led to employment discrimination), a Civil Rights Violation(s) complaint concerning his Constitutional Right to Due Process, and for the denial of Whistleblower protections. These complaints are based on disability in the terms, conditions and privileges of employment, in violation of 42 U.S.C. Section 2000e et. seq., (Title VII), and the Rehabilitation Act of 1973, 29 U.S.C. Section 701 et. seq., the Fifth Amendment of the United States Constitution, the Whistleblower Protection Act of 1989 (WPA) and the Whistleblower Protection Enhancement Act of 2012 (WPEA), U.S.C. Section 2302 of Title 5.

2.  Plaintiff William Fulkerson is a resident of Bernalillo County, State of New Mexico.

3.  Defendant, Andrew Saul, is the Commissioner of the Social Security Administration, which is a Federal governmental entity.

4.  This Court has subject matter and personal jurisdiction. Defendant is an employer

*[handwritten: Plaintiff's Exhibit 15B page 1 of 18.]*

within the meaning of Title VII, the Rehabilitation Act of 1973, and the WPA of 1989 and WPEA of 2012.

5.  Venue is proper because all unlawful practices complained of herein occurred within the District of New Mexico.

6.  Plaintiff received a Dismissal Final decision from the Merit System Protection Board on Summary Judgement decision issued in U.S. District Court Case No. 16-CV-889-BRB-KBM. This is a "mixed" case and the appeal notice section of the Judge's decision letter states that the U.S. District Court has jurisdiction on these matters.

## PLAINTIFF'S ALLEGATIONS

7.  Former attorneys representing the Plaintiff failed to present appropriate arguments and evidence that was available to them and the Plaintiff had requested them to present such in prior complaints and proceedings in previous jurisdictions. Arguments regarding the Defendant's Dallas Regional office Internal Investigation Conclusions, which is Exhibit number 2, was never put forth, are one example of this occurring. Witness statements contained in the Affidavits in the Defendant's Report of Investigation (ROI) on the issues at hand is another, which are Plaintiff's Exhibits numbered 3, 4, and 5.

8.  The failure by both of the Plaintiff's former attorneys to present the letter from the Nurse Practitioner, which is Plaintiff's Exhibit number 1, concerning the formal diagnosis of the Plaintiff's PTSD condition in early 2012 is a third example. Unfortunately, the numerous failures ultimately robbed the Plaintiff from receiving a formal hearing on the illegal actions of the Defendant, and thus, denied the Plaintiff from receiving any kind of justice on the matter.

9.  The Plaintiff does refer to some of the evidence put forth previously and other Judges having discussed that evidence in previous judgement documents. This case is built on existing evidence and other previously excluded, overlooked or ignored evidence that is in the Defendant's Report of Investigation (ROI) file. The Plaintiff will put forth strong "new" arguments associated with this mixture of evidence in this case to provide the

*Exhibit 15B page 2*

Court with truth based upon the "totality of the circumstances" called for by the Rule of Law.

10. Plaintiff began working for Defendant on November 5, 1989. Plaintiff started as a Tele-Service Representative. Because the Plaintiff was an "Honor Graduate" in college, the Plaintiff was selected for a promotion under the Defendant's "Honor Grad" program and he was promoted to the Claims Representative position in June 1990. Plaintiff was a successful Supplemental Security Income (SSI) Claims Representative, a successful Field Representative, successful Operations Supervisor, and a successful Tele-service Center (TSC) Section Manager.

11. Plaintiff's last position was as a GS-13 Staff Assistant to the Mega TSC Director. The Plaintiff states that the TSC Director's reassignment to this position in 2005 was retaliatory because the Plaintiff had filed multiple Formal EEO complaints and participated as a witness in other EEO issues against the Defendant Agency in the recent past. It should be noted that some of the allegations also have been part of legal issues raised and ruled upon before, but those same allegations have direct applicability to the current legal issues being brought forth. They should not be ignored in considering the overriding "totality" issue.

12. This particular Constructive Adverse Action (CAA) started the Defendant's (through TSC management in a Cat's Paw scenario) campaign to get rid of the Plaintiff by any means necessary – specifically by maintaining a hostile work environment towards the Plaintiff throughout the remainder of his career at that Tele-service Center (TSC) facility.

13. It is also worth noting that each of the Defendant Agency positions requires that the individual is in overall good standing in all aspects in order to be promoted upwardly – especially with respect to his creditability as demonstrated by his obeying the laws, regulations and policies as an employee of the Defendant in these various positions with no conduct issues ever being raised. The Defendant does not promote persons lacking the ability to model and demonstrate appropriate

3

Exhibit 15,
page 3

behaviors, or for not displaying appropriate conduct or having creditability issues.

14.  A witness for the Plaintiff (and familiar with the Plaintiff's EEO issues
     when asked as to the Plaintiff's truthfulness as part of the EEO investigation, she
     stated in her Affidavit (Exhibit number 5) that the Plaintiff was "very upfront and
     honest."  This same witness stated that the Plaintiff was subjected to a hostile work
     environment based upon her own observations, knowledge and experience as well
     as her being trained and have been an EEO Counselor for seven years previously.

15.  The EEO Investigator should have asked this important question to the other
     witnesses, but she did not do so. Based upon the answers given by the witnesses,
     other important and appropriate questions that should have been asked - were not.
     Both of the Investigations that the Defendant conducted have legal fatal flaws that
     the Plaintiff has made the Defendant aware of previously. No action was taken to
     address this issue by the Defendant. The Plaintiff had conducted many
     investigations on behalf of the Defendant over his career with the Agency and the
     Plaintiff is a knowledgeable expert on investigations in his own right.

16.  The EEO Investigator failed to include or even recognize the Defendant's
     Internal Investigation Conclusions as they related to the EEO issues she was
     investigating in the moment. It should also be noted that the placement of the
     Defendant's administrative Agency file – the "confidential" Regional Office
     Internal Investigation file into the EEO Case file should not have happened. The
     first EEOC ALJ told the Agency representative at that time, Mr. Kingsolver, about
     that very issue in a very loud and anger voice in the October 2013 Conference call.
     The Defendant's actions deliberately, intentionally and willfully ignored the
     regulations in doing so!

17.  While the Defendant's witnesses may sound and look good on paper - they are
     not creditable and this will be demonstrated at a hearing. The testimony of the
     Plaintiff's witnesses will collaborate and expand upon the Plaintiff's testimony on
     this very issue as well as stating their own perceptions of the hostile work

4

Exhibit 15.
page 4

environment that each of them experienced or witnessed.

18. In 2004, Plaintiff was diagnosed with Hepatitis C. The failure of the Defendant to give the Plaintiff any form of Reasonable Accommodation concerning the treatment of his condition is what led to the filing of the Plaintiff's first EEO Disability Discrimination complaint in 2004. He also filed an EEO Retaliation Complaint against the TSC Director in 2005.

19. The TSC Director did not like being named as the defendant in the EEO complaints filed by the Plaintiff and he set out to get rid of the Plaintiff and the TSC management personnel went along with him thereafter.

20. In January 2012, after seven years of surviving the retaliatory hostile work environment, the Plaintiff was formally diagnosed with Post-Traumatic Stress Disorder (PTSD) by a Nurse Practitioner named Pamela Conry. She provided a letter in February 2012 to that affect. It is Exhibit 1 attached to this complaint. One major issue concerning that formal diagnosis is that it is one of the stated erroneous finding of facts made by the U.S. District Judge in 2018. In the Judge's decision, the Judge stated that the Plaintiff was not diagnosed in January 2012. In reality, he was.

21. A second major – and more troubling issue concerns the erroneous finding of fact concerns the Judge's incorrect assumption that the Plaintiff has no credibility largely based upon the formal diagnosis issue. The Plaintiff is credible – which can be demonstrated through other witnesses' testimony at a hearing. Those same witnesses can also speak to the Defendant's witnesses' credibility or lack of credibility as well.

22. This Plaintiff did not have the PTSD condition prior to his promotion to the TSC in 2003 as documented by his medical history. In December 2012, the Plaintiff also suffered a Traumatic Brain Injury (TBI) which required brain surgery. Having PTSD, TBI recovery time, and the likelihood of the Defendant's ongoing CAAs made it impossible for the Plaintiff to believe he could continue to withstand the onslaught of the Defendant's retaliatory motives, intentions or CAAs to get rid of the Plaintiff.

23. The Defendant failed to timely process the Plaintiff's paperwork on the Leave Program

Exhibit 15B
page 5

which prevented the Plaintiff from receiving donated leave to help the Plaintiff meet his financial obligations. This was another CAA retaliatory action.

24. The Defendant failed to provide Reasonable Accommodations to the Plaintiff other than Leave without Pay. Their illegal retaliatory actions were responsible for giving the PTSD to the Plaintiff. This was another CAA retaliatory action.

25. Knowing that the Defendant's CAAs were not going to stop AND that those actions would further disable him if he stayed on duty, he had no choice but to remove himself from the equation. To retire, win his case at a hearing, and then return – physically and mentally strong and able to work – hopefully in a better non-hostile working environment.

26. Secondly, the Plaintiff had to remove himself from the continuing "known harm" in order to protect his "victim" status under EEOC regulations. Failure to do so would have negatively impacted his pending EEO complaints at that point in time. The plaintiff had no choice about retiring and he was waiting for a formal hearing before returning to that hostile work environment because the Defendant was not going to stop trying to get rid of the Plaintiff through CAAs.

27. The Plaintiff also contends that the Continuing Violation Doctrine is applicable to this case based upon the provable facts that demonstrate this is an ongoing hostile work environment case. There should be no sustainable time bar arguments that can be raised by the defendant related to the issues of this case.

28. The Plaintiff had made the Defendant aware of his medical issues as they occurred over the years of his employment. Again, prior to the formal diagnoses concerning the PTSD condition, the Plaintiff's medical history does not show any signs of PTSD prior to 2012. The Defendant's numerous illegal CAAs are responsible for disabling the Plaintiff over time.

29. Plaintiff is still limited in his daily activities of sleeping, lifting, sitting or standing for long periods of time. Managing his ongoing PTSD issues is HARD every day, but, he knows that there is no choice if he wants a decent life!

30. The Defendant's agent (TSC Director) failed to reassign the Plaintiff, who requested such,

6

*Exhibit 15L*

*page 6*

to his former position of Section Manager in 2006 and again, in 2007.

31. These were retaliatory Constructive Adverse Actions that were not warranted based upon the successful performance in that position by the Plaintiff previously. In fact, the Agency Investigator of the Defendant's Internal Investigation wrote in his Conclusions that a "reasonable person" would question these denials of reassigning the Plaintiff back to his former position that he successfully competed for. The Plaintiff should not have to do so again.

32. The Agency Investigator also addressed the Defendant's failure to follow the Plaintiff's Position Description (PD) in the Conclusions and stated that "the position was never used as it was designed." The Defendant was/is legally responsible for - and had a duty to properly administer the Plaintiff's PD and the duties associated to that position. The Defendant had a "Duty of Care" towards the Plaintiff and it purposely failed to do so in provable illegal retaliatory ways.

33. The Plaintiff routinely questioned his each of his immediate supervisor's understanding of the issue and they would not address it – but chose to become obstinate with the Plaintiff for bringing it up. This is another Constructive Adverse Action taken by the Defendant to keep the retaliation masked and hidden. It should be noted that this particular action was a deliberate, intentional and willful failure that lasted almost seven years. The Defendant ignored its legal responsibility deliberately, intentionally and willfully.

34. There is also conflicting evidence concerning whether a "position review" was conducted or not. Exhibit number 6 contains an email and the SF-50 that demonstrate this issue. This is an outright deception issue concerning whether to tell the Plaintiff that a Position Review was not actually conducted. The Plaintiff was unaware of this until reading the particular email involved.

35. The Defendant Agency SF-50 form regarding the official PD change states that the change in the PD was "Based upon Position Review" in the Remarks field of that particular form. Deception is a common tactic that the Defendant used to mask its' illegal retaliatory actions under the guise of being above reproach for those actions. It is noteworthy to recognize the

7

Exhibit 151
page 8

fact that a "position review" was deemed ultimately unnecessary by the Defendant.

36. It is obvious that it was readily known by the Defendant's agents that the PD and actual duties being performed necessitated formal action on the part of the Defendant to continue to mask and hide what was going on concerning the ongoing retaliation toward the Plaintiff.

37. It is a common practice for the Defendant to be reassigned a person back into the position once they are able to perform the duties of that position and also recognizing that the person had been successful in performing the duties of that position previously. This is the case where the Plaintiff is concerned. The Investigator speaks to it in his Conclusions of the internal investigation as well.

38. In 2008, Plaintiff was assigned a new supervisor, Rhodes.

39. Ms. Rhodes and Plaintiff's management team was aware of Plaintiff's previous EEO activity – both as a complainant and as a witness for the Union. Ms. Rhodes and Plaintiff's management team continued to retaliate against the Plaintiff and to subject the Plaintiff to Hostile work environment in an ongoing effort to force the Plaintiff to retire.

40. Some examples (but by no means all that occurred over the years) of the hostile work environment consisted of being subjected to rude and derogatory comments such as, "I mean you are really, really slow!" and, "You have a bad reputation. Do you want to know what it is?" Another major one was when Rhodes threatened the plaintiff by stating she "would make him look like a non-team player." She threatened his potential future career.

41. This would likely stop him from being promoted in the future if she did so. Based upon the Regional Commissioner Laubie's and Jan Lewis's Affidavits, she did so. The day in, day out ongoing illegal CAAs of the Defendant eventually led to his PTSD becoming totally disabling.

42. Several witnesses speak to Rhodes' fear and intimidation actions in their own affidavits that are part of the Defendant's ROI. Rhodes is heard by one management witness who stated in her Affidavit the she found Rhodes' tone and loudness note-worthy and that

8

*Exhibit 13*
*page 8*

Rhoads sounded "quite aggressive" towards the Plaintiff in the phone conversation in Exhibit number 3.

43. Another witness states that Rhoads had threatened her one time by saying "You better watch your P's and Q's, even if you were not doing anything wrong". The Witness goes on to say "I would hope I did not do anything to offend her. It was not a happy place" in Exhibit number 4. It is a hostile work environment to more people than just the Plaintiff as the testimony of others will show at a hearing.

44. Plaintiff was also denied to attend management meetings he had previously attended. It should be noted that in order to fulfill his Position Description (PD) duties of his job, he needed to attend those management meeting so that he could properly advise the TSC Director about the Agency's regional and facility issues concerning all three of the region's TSCs under the Director's authority and responsibility. This was a retaliatory CAA for complaining about Rhoads to her supervisors.

45. Plaintiff's job duties were taken away, leaving Plaintiff with mostly clerical work to perform. The Defendant Agency's Investigator stated in his Conclusions that the actual duties that the Plaintiff had been doing for years were not likely to be sufficient for his grade level if no changes were made. The Defendant is legally responsible for assigning appropriate grade level duties to the Plaintiff over the course of his employment, not the other way around!

46. Even after the PD was officially changed, the actual duties the Plaintiff was performing virtually remained the same. The Plaintiff then requested a reconsideration concerning the actual duties he was still performing – which was ultimately denied by the Defendant thereafter.

47. The Defendant kept the Plaintiff in a position with no growth potential whatsoever – and deliberately, intentionally and willfully left the Plaintiff to professionally Rot for the remainder of his career! This is another retaliatory CAA.

48. Plaintiff was denied training to advance in his career while other employees readily received such help with their own careers. An example of this concerns TSC

Exhibit 15.
page 9

Management personnel receiving details to the District office, while the Defendant refusal to give a detail to the Plaintiff was another retaliatory CAA. The Plaintiff has routinely demonstrated his ability to lead employees and he was worthy of receiving the same opportunities as other Agency employees.

49. His many requests, including the ones made in his Individual Development Plan (IDP) for Supervisory duties, assignments, or details were ignored by the Defendant each and every time since 2005 – deliberately, intentionally and willfully. There is no legitimate reason other than the ongoing retaliation towards the Plaintiff to force him to retire.

50. Plaintiff was denied ongoing opportunities to be the Officer in Charge when the Claims Section Manager was on leave. This had been an ongoing practice for a period of time before the Defendant started appointing lower level employees to be the OIC. It stopped when the Plaintiff started making issues concerning his supervisor.

51. It should be noted that the individuals put in charge did not have any real knowledge or experience with the Claims Section or its operations for the most part. This CAA occurred after the Plaintiff started complaining about his supervisor to her supervisors.

52. Plaintiff was evaluated annually by the Defendant on supervisory performance elements outside of his job description that he never actually performed for the five or six year period. This is a deliberate, intentional and willful outright falsification of official Agency legal documents. The Defendant was attempting to hide or mask the illegal retaliatory Constructive Adverse Actions of the Defendant by doing so.

53. The Defendant's use of the numerous CAAs should render any and all "Chevron Deference" defense arguments null and void! These illegal actions do not allow for a misunderstanding as to the illegal motivation or intentions of the TSC management officials actions – nor the Defendants' as a whole.

54. Plaintiff was ostracized and physically isolated by the Defendant from the TSC management team and other TSC employees. Bargaining unit employees also made numerous negative comments to the Plaintiff because they knew that the Plaintiff could not do anything to them for their comments. The Plaintiff stopped reporting

Exhibit 15B
page 10

these events because no action was taken on his complaints against the particular

employees involved and that made him sad and depressed.

55. The Plaintiff was only allowed to report to the Claim Section Manager for years, and

furthermore, that some manager ordered the Plaintiff not to talk to any of the

employees other than that manager himself. The Plaintiff begrudgingly complied.

56. Plaintiff was threatened with reassignment on several occasions.

57. To fulfill his Position Description (PD) duties of his job, the Plaintiff needed to attend

those management meeting so that he could properly advise the TSC Director about the

Agency's regional and multiple facility issues. The duties the Plaintiff actually

performed for years only involved the Claims Section at the Albuquerque TSC – nothing

on or at the regional level concerning the three TSCs in the region that were under the

Director's authority.

58. Plaintiff was belittled and yelled at in meetings, in front of his peers, and various

management officials. This is spoken to in the affidavits of the Plaintiff's witnesses -

not just the Plaintiffs' statements to that effect. Their testimony will bring out more

CAAs they witnessed themselves concerning the hostile work environment.

59. Plaintiff was also sent threatening and Harassing emails that demonstrate the ongoing

retaliatory actions of the Defendant.

60. Plaintiff continually complained about the hostile work environment to his supervisors

and other management officials over the years. However, no action was ever taken to

remedy the situation by the Defendant.

61. The Plaintiff filed an informal EEO complaint in September 2011. He has diligently

pursued resolution of his legal issues concerning the ongoing Constructive Adverse

Actions the Defendant has used – and continues to use to prevent the Plaintiff from

obtaining a formal hearing on those matters. If a hearing ever happens, the Defendant

knows that all of the illegal actions it has taken against the Plaintiff will be shown to the

world and it will be judged accordingly.

62. The Plaintiff contends that each of the Defendant's Motions for Summary Judgement

Exhibit 15R
page 11

documents and its Motions for Dismissal documents are CAAs that have robbed the Plaintiff from getting a formal hearing – and that violates his Constitutional Due Process rights. The Plaintiff still has a "Protected Property Interest" in his Federal career and he should have been given a formal Hearing with the ability to cross-examine the Defendant's witnesses minimally.

63. The submission of these Motions was not required to be filed by the Defendant. The Defendant has purposely and intentionally chosen that course of action it has and is continuing to take. Had those Motions not been submitted, the Plaintiff would have gotten an actual formal hearing on the matters in question and been able to cross-examine the Defendant's witnesses and prove that they have manufactured a defense to mask and cover-up their retaliatory actions.

64. The failure to give the Plaintiff the opportunity to present his case in its entirety **AND** not to be able to cross examine the Defendant's witnesses to show their wrongdoing regarding these illegal allegations is a violation of his Constitutional Due Process rights.

65. The Defendant has a legal obligation as a Federal Agency, and as an employer, to protect the rights of its employees and it did not do so –deliberately, intentionally and willfully. The Defendant failed to provide the Plaintiff with a safe environment for the Plaintiff to work in and retaliated against him for internally whistleblowing on the hostile work environment. This violates the legal "Core Protection" rights that are afforded Federal Employees. The Defendant did not care – even though the Defendant has a "duty of care" responsibility to the Plaintiff.

66. Credibility issues concerning the Defendant's witnesses emerged early which led to the Plaintiff to record discussions between himself and TSC management officials. When the TSC management officials started lying, the Plaintiff started to record their lies. Two copies of the recordings have been provided to the Defendant previously – with no change in the defendant's discussion of the facts that the Defendant's witnesses were making false statements. They refuse to address the issue in any manner deliberately, intentionally and willfully.

12

Exhibit 15,
page 12

67. The Defendant failed to fully act upon the conclusions of the Internal Investigation it conducted which had occurred based upon the request/demands of the Plaintiff. While some of the issues brought out by the Conclusions were addressed, others were not. The Plaintiff blew the whistle on TSC management and the Defendant deliberately, intentionally and willfully ignored its responsibility to address and remedy all illegal issues raised in the Conclusions. It took the Defendant six months before it began the investigation. Its' stated reasons for the delay are pre-textual and they should be questioned hard. By the time they actually showed up, the Plaintiff had PTSD as noted by the Defendant Agency Investigator in his Conclusions. A Retaliation complaint was filed in 2012 and named the Regional Commissioner as a defendant in that complaint.

68. It should be noted that the Defendant's has nine other Regions which could have sent investigators (from one of those regions) to conduct the investigation in a more timely manner as required by Agency Regulations, Policy and Procedures. It was conducted by Dallas Regional Office personnel because the Regional Commissioner/ Decision-maker did not want any outside involvement in the matter that might unmask and uncover the truth of the retaliatory hostile work environment situation.

69. In fact, the TSC Director suggested that an outside Investigator be brought in to conduct the investigation, but that did not happen. It was the Regional Commissioner's decision. Outside Investigators would possibly uncover the truth and the Regional Commissioner knew she would be in trouble big time. Still the Conclusions of the Internal Investigation do support the Plaintiff's allegations against the Defendant in his formal EEO complaints and the hostile work environment issue.

70. The Defendant failed to protect the Plaintiff as required under WPA or WPEA.

71. The Regional Commissioner is the Decision-maker for both the Agency's Internal Investigation and the EEO complaint investigation. It can be shown that she is "biased" for discriminatory reasons that she speaks to in her Affidavits and Deposition. She failed to take into consideration the conclusions of the Internal Investigation to those same issues that were investigated under the EEO complaints that the Plaintiff had raised.

13

Exhibit 15
page 13

72. She has also made several provable false statements on the issues in an attempt to hide her own retaliatory actions. The Plaintiff made her aware of her responsibilities and the difference in the handling of the internal investigation as opposed to the EEO complaint investigation in several emails in late 2011. She intentionally ignored the evidence provided her on this issue.

73. The Texas state Agency determined that the Plaintiff became disabled due to PTSD as of November 1, 2012. From January 2012 until November 2012, the Constructive Adverse Actions taken by the Defendant led to the Plaintiff's total disability. The Plaintiff did not have a diagnosis - or any history of PTSD related issues before his employment with the Defendant.

## COUNT 1 – DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE REHABILITATION ACT O 1973

74. Plaintiff restates and re-alleges all other paragraphs of this complaint with the same force and effect, as though set forth fully herein.

75. Defendant discriminated against Plaintiff in the terms and conditions of his employment on the basis of his disabilities, in violation of the Rehabilitation Act of 1973. The Defendant's ongoing hostile work environment laced with many CAAs that violated the "Case Protections" afforded all federal employees which includes the right to have a "safe" environment in which to work -- one that is free of illegal retaliatory actions (the second right afforded Federal employees) based upon bringing legitimate wrongdoing to the attention of the TSC management personnel. Whistleblowing was the right thing to do! Otherwise, thing would have never changed for the remainder of the Plaintiff's career.

76. Plaintiff notified Defendant of his disabilities repeatedly over the years. Defendant unequivocally acknowledged that Plaintiff suffered from a disability.

77. Plaintiff was discriminated against on the basis of his EEO activities and  by him being subjected to a hostile work environment that led to his disabling PTSD condition.

14

Exhibit 15?

page 14

78. No action was taken by Defendant to alleviate the discrimination or retaliation.

79. Plaintiff's emerging disability was the motivating factor in Defendant's creating a hostile work environment and forcing Plaintiff to retire. The Plaintiff's Medical expert that examined the Plaintiff will provide testimony as to what caused the Plaintiff's disability. Exhibit Number 7 is the Summary Report of the expert's findings.

80. Plaintiff has suffered, and will continue to suffer, irreparable injury and monetary damages as a result of Defendant's discriminatory practices, unless and until this Court grants relief.

## COUNT II-RETALIATION IN VIOLATION OF TITLE VII

81. Plaintiff restates and re-alleges all other paragraphs of this complaint with the same force and effect as though set forth fully herein.

82. Defendant retaliated against Plaintiff in the terms and conditions of his employment, in violation of the Title VII.

83. Plaintiff had previously filed an EEO cases in 2004 and 2005 and was a witness for the Union in another EEO matter against TSC management in 2004. In addition, Plaintiff continually complained to his management team that he was being subjected to a hostile work environment.

84. No action was taken by Defendant to relieve the discrimination or retaliation.

85. Plaintiffs complaints about the discriminatory practices in the work place was the motivating factor for continuing the hostile work environment and ultimately forcing Plaintiff to retire.

86. Plaintiff has suffered damages as a result of the retaliation for his reporting of illegal actions being taken against him by the Defendant and ultimately being forced to retire from his position by those illegal actions.

## COUNT III-VIOLATION OF WPA OF 1989 AND THE WPEA OF 2012

87. Plaintiff has suffered damages as a result of the Defendant's failure to provide the necessary protections called for in both of the Whistle-Blower acts. That failure was delicate, intentional and willful on the part of the Defendant and they should be

Exhibit 15

page 15

penalized for knowingly violating these acts.

## COUNT IV-VIOLATION OF CONSTITUTIONAL RIGHTS

88. Plaintiff has suffered damages as a result of the Defendant's failure to provide the Plaintiff with the required Constitutional protections called for in regards to his right to Due Process as a citizen of the United States. The Plaintiff had a Protected Property Interest in his Federal career, and therefore, he was entitled to a full hearing on the matters at hand. That failure was deliberate, intentional and willful on the part of the Defendant and they should be penalized for knowingly violating the Plaintiff's Constitutional rights.

### JURY DEMAND

Plaintiff requests a trial by jury.

WHEREFORE, Plaintiff respectfully requests this Court enter a judgment Against the Defendant to make Plaintiff whole for his lost wages, lost benefits, emotional stress, consequential damages and special damages suffered because of Defendant's wrongful conduct. The Plaintiff also asks for punitive damages for the violations concerning the Constructive discharge complaint, the Retaliation complaint, the violation of his Civil Rights and Core Protection Rights, and for subjecting the Plaintiff to the hostile work environment.  The Plaintiff requests immediate re-instatement to his former position and compensatory damages for the violations concerning the various EEO complaints the Plaintiff has filed while he was at the TSC. Plaintiff also seeks double damages for his wages, costs, and attorney fees related to this current case and for the attorney fees associated with the prior representation on the same issues raised in other Jurisdictions and any and all other just and equitable relief.

### DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the Plaintiff in the above action, that he has read the above complaint and that the information contained therein is true and correct. 28 U.S.C. Sec. 1746.,  18 U.S.C. U.S.C.  Sec. 1621.

Respectfully submitted,

16

page 16

*William M. Fulkerson*

William M. Fulkerson

3809 General Bradley St. NE

Albuquerque NM 87111

(505) 234-0254

Attorney Pro-Se

Exhibit 15B
page 17

# CERTIFICATE OF SERVICE

I hereby certify that the attached Document – the Plaintiff's complaint with Exhibit and a Summons was sent this day to each of the following:

**Agency Representative:**

Certified
U.S. Mail

    Social Security Administration
    1301 Young St. Suite A-702
    Dallas, TX 75202

Certified
U.S. Mail

    Civil Process Clerk
    U.S. Attorneys Office for the State of New Mexico
    P. O. Box 607
    Albuquerque NM 87 108

_11/5/20_
(Date)

_William M. Fulkerson_
William M. Fulkerson

Plaint Iffs
Exhibit #15B
page 18 of 1

Devider

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WILLIAM M. FULKERSON,

      Plaintiff,

                                               No. 1:20-cv-01145-WJ-SCY

v.

ANDREW SAUL, Commissioner of the
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

**THIS MATTER** comes before the Court on *pro se* Plaintiff's Amended Complaint, Doc. 8, filed November 30, 2020.

Plaintiff, who was employed by the Social Security Administration from 1989-2013, filed this action asserting claims of disability discrimination, retaliation, violation of the "Whistle-Blower Acts, and violation of due process. *See* Complaint, Doc. 1, filed November 5, 2020. Plaintiff previously filed an action against the Commissioner of the Social Security Administration asserting claims of disability discrimination and retaliation arising during his employment with the Social Security Administration. *See Fulkerson v. Social Security Administration*, No. 1:16-cv-00689-BRB-KBM ("*Fulkerson I*"). The Court in *Fulkerson I* granted Defendant Social Security Administration's motion for summary judgment and dismissed the case on April 6, 2018.

After noting that this case appears to arise from the same facts in *Fulkerson I* and explaining that it appears the claims in this case are barred by the doctrine of *res judicata* and/or the statute of limitations, United States Magistrate Judge Steven C. Yarbrough ordered Plaintiff to show cause why this case should not be dismissed. *See* Order to Show Cause, Doc. 5, filed November 10, 2020.

Plaintiff's
Exhibit 15B.1
page 1 of 4.

In his Response to the Order to Show Cause, Plaintiff asserted that this case is not barred by the statute of limitations because the "Doctrine of Continuing Violation" applies to this case because some of Defendant's "CONSTRUCTIVE AVERSE [sic] ACTIONS OCCURRED AFTER THE TERMINATION OF THE Plaintiff's employment in 2013." Response ¶ 1 at 1, ¶ 10 at 3, Doc. 6, filed November 19, 2020. Plaintiff did not, however, describe those actions with particularity. Plaintiff also asserted that *res judicata* does not bar this case because Plaintiff did not have a full and fair opportunity to litigate his claim in *Fulkerson I. See* Response ¶¶ 5-6 at 2. Plaintiff requested an opportunity "to amend his Complaints that the Plaintiff has spoken to regarding these legal issues and the evidence in his original complaint and the above discussion." Response at 4.

Judge Yarbrough granted Plaintiff an opportunity to file an amended complaint in this case and stated: "Failure to include sufficient allegations in the amended complaint to show that this case is not barred by the statute of limitations or *res judicata* may result in dismissal of this case." Doc. 7, filed November 23, 2020.

Plaintiff's Amended Complaint is not so much a complaint as it is an argument why the case should proceed. The Amended Complaint contains very few nonconclusory factual allegations.

Plaintiff has not shown, either in his Response to the Order to Show Cause or in his Amended Complaint, that this case is not barred by the statute of limitations. *See e.g. Rhodes v. Langston University*, 462 Fed.Appx. 773 n.6 (10th Cir. 2011) ("Since neither the Rehabilitation Act nor the ADA set forth a statute of limitations, the [state] statute of limitations applies"); N.M.S.A. § 37-1-8 ("Actions must be brought ... for an injury to the person ... within three years"). Plaintiff's employment with Defendant terminated in 2013. The only factual allegations

Exhibit 15B:
page 2

regarding Defendant's adverse actions after the termination of Plaintiff's employment and the dismissal of *Fulkerson I* assert that Defendant filed, in 2018-2020, motions to dismiss Plaintiff's appeals in his case before the Merit Systems Protection Board. *See* Amended Complaint ¶ 9 at 3. Defendant was no longer Plaintiff's employer and, consequently, Defendant's actions before the Merit Systems Protection Board were not adverse employment actions. *See* 42 U.S.C. § 2000e(f) ("The term 'employee' means an individual employed by an employer"); *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 206 (1997) (Test for whether employer "has" employee, for purposes of statutory definition of "employer" subject to Title VII, is whether employer has employment relationship with employee on day in question; such test is generally called "payroll method," since employment relationship is most readily demonstrated by individual's appearance on employer's payroll); *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1268 (10th Cir. 2005) ("An adverse employment action includes acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

Plaintiff has not shown, either in his Response to the Order to Show Cause or in his Amended Complaint, that this case is not barred by res judicata.

> "The doctrine of res judicata, or claim preclusion, will prevent a party from litigating a legal claim that was or could have been the subject of a previously issued final judgment." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005). "The principle underlying the rule of claim preclusion is that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not have another chance to do so." *Stone v. Dep't of Aviation*, 453 F.3d 1271, 1275 (10th Cir. 2006) (citation omitted). To apply claim preclusion, "three elements must exist: (1) a [final] judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir. 1997). In addition, even if these three elements are satisfied, there is an exception to the application of claim preclusion where the party resisting it did not have a "full and fair opportunity to litigate" the claim in the prior action. *MACTEC*, 427 F.3d at 831 & n.6.

3

*Exhibit 15B:*
*page 3*

*Lenox Maclaren Surgical Corporation v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017).

Plaintiff argues that he did not get a hearing in *Fulkerson I* because Circuit Judge Baldock granted

Defendant's motion for summary judgment. *See* Amended Complaint ¶ 8 at 3. While he may not

have been afforded a hearing in person, Plaintiff has not shown that he did not have a "full and fair

opportunity to litigate" his claims in *Fulkerson I*. Plaintiff, who was represented by counsel in

*Fulkerson I*, filed a response to defendant's motion for summary judgment in *Fulkerson I*. *See*

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Doc. 55, filed

November 27, 2017, in *Fulkerson v. Social Security Administration*, No. 1:16-cv-00889-BRB-

KBM.

IT IS ORDERED that this case is DISMISSED with prejudice.

WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE

Plaintiff's
Exhibit 15B1
page 4 of 9.

FULKERSON v. New Mexico DEPARTMENT OF JUSTICE

Case Number_____

# EXHIBIT NUMBER:

# 30

DOJ
Complaints

— 8 pages.



## U.S. Department of Justice
## Civil Rights Division

*Washington, DC 20530*

July 11, 2023

William Fulkerson
3809 General Bradley St. NE
Albuquerque, NM 87111

Dear William Fulkerson,

You contacted the Department of Justice on October 13, 2022. After careful review of what you submitted, we have decided not to take any further action on your complaint.

# What we did:
—

Team members from the Civil Rights Division reviewed the information you submitted. Based on this information, our team determined that the federal civil rights laws we enforce do not cover the situation you described. Therefore, we cannot take further action.

Your report number is 230199-NKZ.

# What you can do:
—

Your issue may be covered by other federal, state, or local laws that we do not have the authority to enforce. We are not determining that your report lacks merit.

Your state bar association or local legal aid office may be able to help with your issue even though the Department of Justice cannot.

*Plaintiff's*
*Exhibit # 30A*
*Page 1 o 2.*

# To find a local office:

**American Bar Association**
https://www.americanbar.org/groups/legal_services/flh-home
(https://www.americanbar.org/groups/legal_services/flh-home)
(800) 285-2221

**Legal Services Corporation (or Legal Aid Offices)**
https://www.lsc.gov/find-legal-aid (https://www.lsc.gov/find-legal-aid)

Thank you for taking the time to contact the Department of Justice about your concerns. We regret that we are not able to provide more help on this matter.

Sincerely,

U.S. Department of Justice
Civil Rights Division

Plaintiff
Exhibit 30A
Page 2 of 2.

William M. Fulkerson
3809 General Bradley St. NE
Albuquerque NM 87111

February 22, 2023

U. S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave. N.W.
Washington D.C. 20530

To whom it Concerns:

In reference to record number 253149-TQR: On February 10, 2023, a representative from your Agency called me and reported that my complete Court case file has been misplaced or lost. I am disappointed to say the least. The tracking number is 9510 8123 9341 2277 1013 27. It was delivered to your mail room on October 7, 2022. It was in a new, bright red 2 inch binder containing everything I filed since November 2020 – several hundred pages plus. I request that you continue to attempt to locate it.

My name is William M. Fulkerson and I am wishing to file a formal complaint with your department.  I am providing the following information concerning the violation of my Constitutional right to Due Process.  I am a former federal employee with a property interest in my federal career. In *Lynch v. Household Finance Corp*, 405 U.S. 538, 553(1972), the Supreme Court ruled that most federal employees do have a property interest right AND that if they do, they have a right to a hearing concerning a violation of that right. I put forth the history of case law that discusses the federal employee's property interest right in the Petition for Rehearing document filed in the Tenth Circuit Court of Appeals case.

I was also forced into retirement (Constructive Discharge) by the Social Security Administration while I had pending EEO complaints on a number of employment violations by the Agency against me. I have been legally entitled to some form of fair hearing since I filed (through my former attorney) my first complaints in 2013 with the EEOC. To date, I have not received any such hearing on any of the legitimate complaints I have filed to date. It should be noted that I am totally disabled from Post-Traumatic Stress Disorder (PTSD) and suffered a Traumatic Brain Injury (TBI) that has impacted my cognitive abilities for years including my ability to do legal research.

### FORMAL COMPLAINT ON VIOLATION OF CIVIL RIGHTS

First, I wish to provide the Case Numbers and the Jurisdiction of the eight Requests for hearings made to those entities:

1. EEOC case numbers – 540-2103-00129X and 540-2013-130X (2016).

Plaintiff's
Exhibit 30B
page 1 of 6.

2. U.S. D.C. case number – CV 16-00889 BB/KBM, 2018 WL 1726245 (D.N.M., Apr. 6, 2018).
3. M.S.P.B. case numbers – DE-1221-18-0410-W-1, DE-3443-18-0411-I-1, DE-1221-19-0042-W-1, DE-0752-20-0323-I-1.
4. U.S.D.C. case number-1:20-cv-01145-WJ-SCY – This is a due process case. Fulkerson v. SSA.
5. Tenth Circuit Court of Appeals case number:  21-2001, Fulkerson v. Commissioner, SSA.
6. Judicial Complaint Number – 10-22-90008; William M. Fulkerson v. Chief Dist. Judge William P. Johnson. The Misconduct complaint included the Tenth Circuit Court panel of Judges but was not accepted by the Executive Director of the Tenth Circuit.

- **Number 4, Number 5 and Number 6 are the focus of this formal complaint.**

Both of the last two court cases were denied "Res Judicata", which means that I have been legally denied my Constitutional right to Due Process forever.  More specifically, I have been denied the "the opportunity to be heard" as decided in the Florida case of *Snipes v. Scott*, No. 4:18-CV-580 MW/CAS. As in the *Snipes* case, I was legally entitled to a full and fair hearing on each and every one of my various complaints because I have a property interest in my federal career. "When protected interest are implicated, the right to some kind of <u>prior</u> hearing is paramount." *Bd. Of State College of Regents v. Roth*, 408 U.S.  569-70 (1972).

*It is a legal principle/requirement that <u>before</u> the Judges issued their final decisions on my case, they needed to address my "protected" property interest issue – which I believe means that I should have gotten a fair hearing from them*. That did not happen! The failure by the Judges to do so was minimally an abuse of discretion, OR more likely - a direct violation of my civil rights as I see it. Let me be clear – *the Judges' actions demonstrate their criminal intentions to violate their duty and responsibilities in addition to violating my civil rights*!  What is important on this issue is the DOJ has to agree with me that the Judges' failure <u>should not have happened</u>. And that the **reversal** of those procedurally deficient decisions **is legally appropriate, necessary and just.**

In reading the Circuit Court Judge's Summary Judgement decision on the 2018 U.S.D.C. case, my reputation and good name has been permanently impugned and I was never afforded the opportunity to contest and clear my name. <u>**This crap is shown on the Internet forever**</u>! I want to point out that the Judge's statements are based upon what was written about me by the Defendant's witnesses <u>without</u> me having the opportunity to confront or cross-examine any of the Defendant's witnesses at a hearing. The Judge himself had no prior personal knowledge of me.  Another point to be made is I was represented by an attorney for five years and his legal career would be been  seriously jeopardized - if not disbarred thereafter for knowingly putting forth a frivolous or bogus complaint - or one based upon lies and deception from his client. He would not do so and he would be the first to say that.

The violation of my federal and State Constitutional civil rights happened through no fault of my own.

Exhibit 30B
page 2.

I wanted and would have welcomed a fair hearing on each and every one of my legitimately filed complaints. The violation of my civil rights was either done by the Defendant and/or the various Judges that made the negative rulings – there is <u>no one else</u> to hold accountable for the violation of my civil rights.

That same Judge ignored the Tenth Circuit's own decision in *Romero v. Union Pacific Railroad*, 615 F. 3d. 1303(1980) concerning the issue of when a Summary Judgement decision is not appropriate - as well as Denials and Dismissals.  I received only Summary Judgements, Denials or Dismissals - without having a full and fair hearing to which I was legally entitled to <u>**before**</u> those final decisions were issued.  In the *Romero* decision, the Judges specifically stated that cases involving Retaliation complaints/claims should not be decided without a hearing due to Intent and Motivational issues concerning the defendants. For the Record, Retaliation complaints/claims were put forth in both the 2018 case and in the 2020 case. In addition to ignoring the Rule of Law, the Judge also ignored favorable evidence that was in case file –like the exhibits that are included with the initial Complaint I filed in U.S.D.C. in November 2020. You won't read about them in the Judge's 2018 decision, but should have. Minimally, these actions are an abuse of discretion - if not outright criminal!!!

I believe there is much wrong with how that Judge conducted himself in the 2018 case. To a degree, his actions are part of the Judicial Misconduct issues I raised in my complaints to the Tenth Circuit Chief Judge and concerning the Tenth Circuit Court itself.  The issues raised in the misconduct complaint focus on the abuse of Discretion by the District Court Judge and the Tenth Circuit Court of Appeals Judges relating to the November 2020 lawsuit.  I have strong reservations concerning the Chief Head Judge reviewing the Misconduct complaint issues (he may have a personal conflict of interest issue) as I may have named him as a participant in violating my civil rights within that document.

Concerning the Judicial Misconduct complaint Number 10-22-90008, I put forth six plus instances where the Judges abused their individual discretion in taking the actions that they did that ultimately deprived me of my civil right to due process in a number ways. It is my hope that the DOJ is able to access all documents that I filed in the November 2020 lawsuit. By reviewing what I put forth in my documents, it is easy to understand what the abuse issues are. When I was preparing the Misconduct complaint a year plus ago, I happened to read an article concerning how the Chief head Judge for the Circuit Court of Appeals for the Federal Sector handles Judicial Misconduct complaints concerning abuse of discretion . She stated that the first thing she looks at is the judge's (in question) written decision to see what is addressed within the decision or not. The Judge's decision statements should speak to the specific legal issues and case law put forth in the documents presented to the Court. That did not happen.

In respect to the decision letter from Judge Johnson – he does not address most of the legal issues or Case law issues I put forth in his decision letter. Only by reading my filed documents can this fact be known, but it's all there.

Exhibit 30B
page 3

Much of the same can be said for the Tenth Circuit's own decision – specifically when it comes to the Petition for Rehearing document I filed with the Tenth Circuit Court of Appeals. When an Appellant's civil rights have been violated and that fact is demonstrated through testimony and other evidence before the particular Judge(s), I believe the judge(s) have violated their own oath as a Judge and they deserve to be disrobed and indicted for their crimes!

If I could state how badly I feel about this mess, I would use the following Poker playing analogy – one where I am sitting at the table with a crooked house-dealer who is control of the game with a stacked deck of cards. And even though I know how to play Poker very well – DO you really think I really have a chance to win? No, but I refuse to stop protecting my civil rights until I am dead and it no longer matters!!!

Failure to exercise appropriate discretion can be summed up as stated in *Fletcher v. Superior Court (Oakland Police Dept.)* 100 Cal. App. 4th 386,392:

> *"Failure to exercise a discretion conferred and compelled by law constitutes*
> *a denial of a fair hearing and a deprivation of fundamental procedural rights,*
> *and thus, requires reversal."*

In *Lawlor v. National Screen Services Corp.*, 349 U.S. (1955), the Supreme Court ruled that a *Res Judicata* decision should not be issued where it would defeat the ends of Justice. I believe that Justice would demand that I should have been given a timely fair hearing that I was legally entitled to. That did not happen. Therefore, my civil rights have been violated. Both Judge Johnson and the Tenth Circuit Judges have intentionally ignored the Rule of Law (an abuse of discretion minimally) in issuing their decisions regarding the 2020 case. They were informed about the violation of my civil rights by the statements and evidence contained in the filed documents before them. I also put forth arguments about two of the exceptions to *Res Judicata* discussed in the Lawlor case to District Court Judge Johnson in the Plaintiff's Response to Show Cause Order - the Doctrine of Continuing Violation, and the Plaintiff's Amended Complaint – (a new Due Process violation claim) based upon *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) documents contained in the November 2020 Case file. I repeated them to the Tenth Circuit Judges as well. I believe that the Judges were determined to go all in – violating my rights regardless of the facts of the case and case law including using proper judicial procedures.

Based upon the case decision in *Goldberg v. Kelley*, 397 U.S. 254 (1970), the Supreme Court has stated to the Social Security Administration that individuals do have the right to confront and to cross-examine adverse witnesses as well as being entitled to a fair hearing. The Agency had been violating the SSI recipients' due process rights previously. I find it hard to believe that SSA beneficiaries and SSI recipients legally get hearings - while the Agency's employees sitting on the other side of the desk don't!

Exhibit 3D
page 4

The Rule of Law concerning the federal employee's property interest/ legal entitlement to a hearing issue that I am raising to the DOJ now does not only affects me - but also every federal employee - current and retired. I personally believe others are being negatively impacted like me. And let's not forget all other persons who have some other type of property interest who could be negatively impacted by whether they get a hearing or not!

Two million plus federal employee rights being stomped on! (Are you a federal employee?) The Rule of Law concerning anyone who has a property interest right being ignored <u>routinely</u>! Civil Rights being violated! What is going on? This needs to change now! I have done everything I could humanly legally possible do to get a fair hearing for almost TEN YEARS now and I remain resolved to get Justice if it kills me. But I do fear it is beyond my ability to achieve. You are the Department of Justice – PLEASE take action to protect our civil rights as well as all others who have property and Liberty interest rights that could be adversely affected like mine.

Based upon 18 U.S.C. Section 4 – Misprision of Felony, it is a provable fact that numerous persons (have intentionally ignored and violated my civil rights over an extended period of time) that could and should have taken appropriate actions to remedy the matters at hand did not do so!

For the record, every document I have filed has been so over the penalty of Perjury clause and I fully understand what perjury is. Cross-examination would have shown who was lying and who was truthful **ON both sides**.  I have no qualms about testifying!!! Based upon 79(?) U.S.C. Section 1623, the Defendant's witnesses have made numerous false declarations before a Court.

Based upon 18 U.S.C. Sections 241 and 242, Federal Felonies have been committed and that led to me to filing the Judicial Misconduct complaint against the Judges involved. I am hoping that the DOJ can access the individual documents filed with each court case so that it can be shown that I carried the Due Process violation issue forward in each initial complaint document filed since April 2018.
Is there a <u>deep state conspiracy against me</u> - I can't help but wonder after all that I have done to get Justice! Perhaps I should contact Rep. Jim Jordan's office about this matter.

In my documents, I presented case law that fully supported the facts of my case that I filed in each of cases for the particular Jurisdiction involved. I have been a Pro-Se litigant for five years now. While I am confident on my legal understanding of this case, I continue to seek representation. But I do not even receive any call backs concerning the representation requests I have made. I have kept notes and my phone records are evidence of my efforts to find representation.

I filed a report with the FBI on July 13, 2022 and I also filed a formal complaint with the State of New Mexico Attorney General's office on July 17, 2022 because on the violation of my state Constitutional right to Due Process under state law.

*Exhibit 30B*
*page 5*

I will conclude this formal complaint with a quote from the *Snipes* case, Chief Judge Mark Walker wrote:

> "*It is true that [the state has separate and significant interest in the proper administration of its public office under the Constitution and Laws in conformity with the needs and interests of the Public," ECF No. 20, at 17] but an individual's procedural due process rights outweigh the State's interest.*"

The same applies to me in both the federal realm and the State realm.

I am requesting that your Agency provide me help to bring an end to the violation of my Civil Rights, to prosecute the wrongdoers and ensure that I obtain JUSTICE and the payment for damages caused me, please!

Respectfully submitted,

*William M. Fulkerson*

William M. Fulkerson

Plaintiff's
Exhibit 30B
page 6 of 6.

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

## Case Number _____

# EXHIBIT NUMBER:

# #39 NMOAG
# Denial of
# Service letter.

#t-34  RE:

Denial of

Service letter.

# STATE OF NEW MEXICO
## OFFICE OF THE ATTORNEY GENERAL



### HECTOR H. BALDERAS
### ATTORNEY GENERAL

September 22, 2022

*[Handwritten: The failure to "uphold and defend" the rights of citizens was violated!]*

Mr. William Mckinley Fulkerson
3809 General Bradley St. NE
Albuquerque, NM 87111

RE: NMOAG-ECS-20220719-f8a9

Dear Mr. Fulkerson,

The New Mexico Office of the Attorney General (NMOAG) is in receipt of your online complaint. It is the policy of this office not to investigate or attempt to mediate any matters that have been taken to court. This policy applies to matters that have already been adjudicated as well as those currently pending.

In addition, per New Mexico Law, the NMOAG is only authorized by statute to provide legal advice and representation to the State of New Mexico, state agencies, and state officials acting in their official capacity. While we would like to be responsive to requests from others, given this office's limited statutory authorization, it would not be appropriate for this office to provide legal advice to you.

As such, you may consider contacting New Mexico Legal Aid at 1-833-LGL-HELP, (1-833-545-4357) or the New Mexico State Bar's Free Legal Helpline for Seniors at 1-800-876-6657. This program is a free, statewide helpline for New Mexico residents age 55 and older. The Program does not have any income restrictions. LREP is a joint project of the New Mexico State Bar Foundation and the New Mexico Aging and Long-Term Services Department.

We regret that we cannot provide you with any further assistance with matter. Thank you for utilizing the NMOAG's online complaint system.

TOLL FREE 1-844-255-9210 TELEPHONE: (505)490-4060 FAX: (505)490-4883 www.nmag.gov
MAILING ADDRESS: P.O. DRAWER 1508 - SANTA FE, NEW MEXICO 87504-1508
STREET ADDRESS: 408 GALISTEO STREET - SANTA FE, NEW MEXICO 87501

*[Handwritten: Plaintiff's Exhibit #39 page 1 of 2.]*

Mr. William Mckinley Fulkerson
September 22, 2022
Page -2-

Sincerely,

Novela Salazar
Director
Advocacy and Intervention Division

cc:  File# NMOAG-ECS-20220719-f8a9

Plaintiff's
Exhibit #39
page 2of 2.

**FULKERSON v. New Mexico DEPARTMENT OF JUSTICE**

Case Number_____

# EXHIBIT NUMBER:

# #37     7/19/22

NMOAG

Complaint &

Cover letter -

6 pages.

William M. Fulkerson
3809 General Bradley St. NE
Albuquerque NM 87111


August 17, 2022


New Mexico Attorney General Office
201 3rd St. NW Ste. 300
Albuquerque NM 87102


To whom it Concerns:

My name is William M. Fulkerson and I am wishing to file a formal complaint with your office. I had previously completed your online complaint form and I thought it had been submitted online. I was informed that it was not there. I saved a copy of it and it is attached. I wish to provide some additional information in this letter that was not included on the complaint form.

First, I wish to provide the case Numbers and the Jurisdiction of the six Requests for hearings made to those entities:

1. EEOC case numbers – 540-2103-00129X and 540-2013-130X (2016),
2. U.S. D.C. case number – CV 16-00889 BB/KBM, 2018 WL 1726245 (D.N.M., Apr. 6, 2018)
3. M.S.P.B. case numbers – DE-1221-18-0410-W-1, DE-3443-18-0411-I-1,DE-1221-19-0042-W-1, DE-0752-20-0323-I-1, and now
4. U.S.D.C. case number-1:20-cv-01145-WJ-SCY

In addition to these Requests, I filed a Request for Appeal to the Tenth Circuit Court of Appeals. That case number is 21-2001, Fulkerson v. Commissioner, SSA, Fulkerson v. Commissioner, SSA. Both of the last cases were denied Res Judicata, which means that I have been denied my Constitutional right to Due Process. More specifically, I have been denied the "the opportunity to be heard" as cited in the Florida case of Snipes v. Scott, No. 4:18-CV-580 MW/CAS. Like Snipes, I am/was legally entitled to a full and fair hearing on each and every one of my various complaints because I have a property interest in my federal career. The violation of my rights was not my own. It was either done by either the Defendant or the Judges that made the rulings.

In addition, I am submitting a copy of the Judicial Misconduct complaint and supporting documents that I have filed concerning the last two cases with the U.S. District Court and the Tenth Circuit Court of Appeals. That complaint number is 10-22-90008 and I filed that complaint on December 27, 2021. I have yet to receive a decision from the Tenth Circuit Chief Judge on the complaint to date.

I have presented case law that supports the facts of my case in each brief that I have filed in each of the Jurisdictions involved. It should be noted that I did have attorney representation twice and the results

*Plaintiff's Exhibit #37 page 1 of 6*

were two Summary Judgement decisions and one Dismissal decision. I have been a Pro-Se litigant otherwise. I continue to seek representation, but I do not even receive any call backs concerning the requests I have made to them.

While the Defendant's written documents sound good on paper, I have never given the opportunity to cross-examine the witnesses involved on the legal issues at hand. Cross examination would show that their testimony is fabricated. And if that never happens, I will never have my "legally entitled day in Court."

I am requesting any help your office can provide me to bring an end to the violation of my Civil Rights and to give me the Hearing to present and fulfill my opportunity to be heard.

Respectfully submitted,

William M. Fulkerson

Exhibit # 37
page 2

### STATE OF NEW MEXICO
### OFFICE OF THE ATTORNEY GENERAL



### HECTOR H. BALDERAS
### ATTORNEY GENERAL

# Electronic Complaint Submission

Submission Detail

**ECS Reference Number**          NMOAG-ECS-20220719-f8a9

**Final Submit Date**             7/19/2022 12:55.23 PM

**Disclosure of your complaint:** A copy of this complaint may be sent to the business/entity/agency against whom I am filing this complaint. This complaint is a public record, thus available under provisions of the NM Inspection of Public Records Act.

**Disclosure to other entities:** This complaint, its content, and other information may be disclosed to other law enforcement and regulatory agencies.

☑ I understand disclosure statements.

**DECLARATION:** By submitting this form, I attest that the information in this complaint is true and accurate to the best of my knowledge. I further understand that by submitting this form I may be called to testify as a witness in this matter.

☑ I understand declaration statement.

The New Mexico Office of the Attorney General is prohibited from acting regarding this complaint and will not act as your personal attorney. If you have questions regarding your rights you should contact a private attorney.

Submission of this complaint and confirmation that an investigation will be initiated.

Exhibit #3,
page 3

## Complaint Detail

| | |
|---|---|
| **Complaint Type** | Criminal Complaint |
| **Retained Attorney** | ☐ |
| **Description of Complaint** | |

I have a property interest in my federal career and I was legally entitled to a full and fair hearing on my EEO complaints initially. Based upon 18 U.S.C. Subsections 241 and 242, my Constitutional Right to Due Process has beenk violated by my employer - SSA and/or by five Judges within three seperate Jurisdictions. I have made six Formal Requests for a hearing over a period of nine years. I have received two Summary Judgement decisions, four denial/dismissal decisions, and two Res judicata decisions most recently. Based upon the Supreme Court case if " Lawlor v. National Screen Service Corp , 349 U.S. 1955" , the Res Judicata decisions are incorrect decisions. Both conditions discussed in that case have been met in my own case. I filed a Judicial Misconduct complaint against the Tenth Circuit Court panel of Judges and the U.S. District Court Judge. That Judicial Misconduct case number is 10-22-90008. The Executive Director for the Tenth Circuit only accepted the complaint against the District Court Judge because I did not individually name the specific Tenth Circuit Court Judges on the complaint form. However, I addressed their wrongdoing in the Document submitted discussing the facts of the Civil Rights violation in my case. I filed the complaint on December 27, 2021. I request a change in Venue which was denied. I should have been given a full and fair hearing each time I filed a formal request. The case Number in Tenth Circuit Court of Appeals iis No.21-2001. The U.S. District Court case No. is 1:20-CV-01145-WJ-SCY (D. N.M.) All document filings were timely. I have the filed Documents and evidence to support my allegations put forth for both cases and the Misconduct complaint in hand. I would like to fax or hand deliver the 20 pages I submitted concerning the Misconduct complaint if appropriate to do so. There are a number of important Supreme court cases that are on point with the facts of my case. One concerning the property interest issue and rights to a hearing is "Lynch v. Household Finacial Corp , 405 U.S. 538.553 (1972)". A Tenth Circuit case case discussed is " Watson v. University of Utah Medical Center, 94-4209 (10th Cir. 1996) Another important Tenth Circuit Court case is "Romero v. Union Pacific Railroad, 615 F. 3d. 1303 (1980). This case discusses the issuance of when Summary Judgement, Denials or Dismissal decisions are inappropriate for cases involving Retaliation - which is part of my original EEO issues filed upon.87 The 2018 U.S. District Court case No. 1:16-CV-00889-BRB-KBM Summary Judgement decision should not have been issued based upon the Retaliation issue. The EEOC Judge likewise should not have issued her Summary Judgement decision in 2013, but did. The same for all of the filed complaints with the M.S.P.B. I filed a grievance with the Agency on the property interest issue after receiving the 2018 Summary Judgement decision. TheyAgency declined giving me a hearing on this matter. Numerous Agency Personnel and authorized Representatives have been informed of my right to Due Process and ignored and failed their "PERSONAL CAPACITY" duties/responsibilities to give me the legally entitled Hearing I should have received. The reason they have not given me that hearing us because I can prove all of the allegations presented in each filed document with each jurisdictional body. It is important to note that NOT having a winning case is immaterial to the application of the property interest issue on the allegations put forth each and every time. I want to know if I have any other course(s) of legal action at the state level on the violation of my Civil rights, please. I have resided in the state of New Mexico for over the past twenty plus years and illegal actions occurred here in the state of New Mexico I was forced into retirement by the actions of Agency personnel that led to total disability for PTSD. I never received any compensation for my injuries

Parties

Exhibit #37
page 4

Complaint

## Mr. William Mckinley Fulkerson

Person

**Address**
3809 General Bradley St NE
Albuquerque, New Mexico 87111

**Contact information**
billygoat3809@gmail.com
(505) 234-0254

Complaint against

## Social Security Administration

Public Body (Government Entity)

**Address**
500 Lead Ave
Albuquerque, New Mexico 87102

**Contact information**

## Complaint Specifics

| | |
|---|---|
| **Date of Incident** | APRIL 2013 to the present |
| **Describe where the crime took place. (Street address, city, county, landmark, etc.)** | I was stationed at the Albuquerque Teleservice Center located at 500 Lead Ave SW in Albuquerque, N.M. when's all illegal action took place. |
| **What evidence do you have in your possession? (Text messages, emails, phone records, bank records, video or audio tapes, clothing, etc.)** | I have Text messages and emails to the employer and filed documents/evidence sent to the Courts. I have recorded conversations of employer personnel discussing issues in the moment. |
| **Have you reported this matter to** | Yes |

Exhibit 37
page 5

any law enforcement agencies
(FBI, NMSP, City Police, etc.)?

If yes, provide agency name, date I filed a report with with Albuquerque FBI on July 13, 2022. I have not received any response to
of report, and other details. Also, date
indicate whether you have
received a response from the
agency and the disposition of the
report.


Transaction


Documents


*** END OF COMPLAINT ***

Plaintiff's
Exhibit #37
page 6 of 6.

FULKERSON v. New Mexico DEPARTMENT OF JUSTICE

Case Number _____

# EXHIBIT NUMBER:

# 31    A.G. Torrez

Letter to the

N.M. Governor.

- 4 pages.

#13.

A.G. Torrez
Letter to the
N.M. Governor.

— 4 pages.

## STATE OF NEW MEXICO
### OFFICE OF THE ATTORNEY GENERAL



### RAÚL TORREZ
### ATTORNEY GENERAL

September 12, 2023

The Honorable Michelle Lujan Grisham
Governor of New Mexico
State Capitol
490 Old Santa Fe Trail, Room 400
Santa Fe, NM 87501

     In Re: Nat'l Ass'n for Gun Rights v. Grisham, No. 1:23-CV-00771; Blas v.
     Grisham, No. 1:23-CV-00774; Donk v. Grisham, No. 1:23-CV-00772; We the
     Patriots USA, Inc. et al v. Grisham et al, No. 1:23-CV-00773

Dear Governor Lujan Grisham:

I am writing to inform you that my office will not defend your administration in the
above referenced cases challenging the Public Health Emergency Order Imposing
Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures (the
Emergency Order) issued by the Secretary of Health on September 8, 2023. Though I
recognize my statutory obligation as New Mexico's chief legal officer to defend state
officials when they are sued in their official capacity, my duty to uphold and defend the
constitutional rights of every citizen takes precedence. Simply put, I do not believe that
the Emergency Order will have any meaningful impact on public safety but, more
importantly, I do not believe it passes constitutional muster.

As a career prosecutor I have grieved with too many victims of gun violence in New
Mexico not to share your anger and frustration at the unacceptable toll that gun violence
has exacted, especially among the youngest members of our community. The tragic
deaths of 5-year-old Galilea Samaniego in a recent drive-by shooting and 11-year-old
Froylan Villegas in a road rage incident should serve as a wakeup call to everyone.
However, I encourage you to engage in a more thoughtful and deliberative process with
members of the New Mexico Legislature rather than taking unilateral action that infringes
on the constitutional rights of law-abiding citizens while having little if any discernible
impact on the underlying dynamics driving gun violence in our community.

The Emergency Order prohibits the possession of a firearm for anyone other than law
enforcement and security officers except on private property owned by the person or with

*The Defendant is derelict in the performance of his duties as A.G.*

*Plaintiff's Exhibit #31*

*POOR 1 of 10*

express consent of the owner, on the premises of a firearms dealer or gunsmith for lawful transfer or repair, at a licensed firing range or sport shooting venue, or while traveling to those locations with the firearm kept in a locked container or locked with a firearm safety device. In short, the Order prevents individuals from carrying firearms in public for the purpose of self-defense. The attempted reach of this Order, despite currently being limited to Bernalillo County, is highly problematic because it purports to alter lawful firearm possession in ways that are inconsistent with the Federal and State Constitutions.

I agree with the need to "start a debate" about the devastating impact that gun violence is having on our citizens, especially our children, but the issuance of an executive order in violation of core constitutional principles is not the appropriate method for bringing about such a debate, and its flawed legal foundation is likely to obscure, rather than highlight, meaningful solutions. First, the Order's reliance on the Public Health Emergency Response Act (PHERA) distorts that law's meaning beyond its intended purpose of protecting the public from the "imminent threat of exposure to an extremely dangerous condition or a highly infectious or toxic agent, including a threatening communicable disease." NMSA 1978, § 12-10A-3(G). Second, simply rebranding gun violence as a "public health emergency" will not satisfy the heightened judicial standard for justifying the blanket prohibition against any citizen, regardless of criminal conduct or intent, from carrying a firearm for personal protection.

While no one doubts the devastating impact that gun violence has had on our community over the last several years, it is not clear that that problem is properly defined as a "public health emergency" as that term is used within the PHERA. Moreover, even if the problem is properly categorized as a "public health emergency," the data do not support the conclusion that gun violence in our community is attributable to otherwise law-abiding citizens exercising their constitutional right to carry firearms for protection outside the home. As the former Bernalillo County District Attorney, I agree with your assessment that "responsible gun owners are certainly not our problem (and) have never been our problem." Given that only responsible gun owners are likely to abide, much less recognize your ban, it is unclear how this action will lead to a measurable decline in gun violence in our community.

Moreover, considering the extraordinary resistance that many citizens had to certain public health restrictions during the recent COVID pandemic, I believe it is unwise to stretch the definition of a "public health emergency" to encompass something that is fundamentally a public safety issue. However, even if the courts agree with that classification and accept the premise that the ban on any person carrying weapons outside the home is deemed to be sufficiently tailored to address that concern, it is a near certainty that the Emergency Order will still be found to violate both the Second Amendment of the United States Constitution and Article II, Section 6 of the New Mexico Constitution.

The Second Amendment secures "the right of the people to keep and bear arms" and the United States Supreme Court has clarified that "individual self-defense is 'the central component' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S.

742, 767 (2010) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)). The Court, relying on the textual use of the word "bear," has further held that this right "naturally encompasses public carry." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2134 (2022). Moreover, "the Second Amendment right is fully applicable to the States." *McDonald*, 561 U.S. at 750.

Although the Second Amendment "right [i]s not unlimited," *Heller*, 554 U.S. at 595, it is "among those fundamental rights necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778. Laws may appropriately regulate the right but may not infringe upon "the right of an ordinary, law-abiding citizen to . . . carry handguns publicly for their self-defense." *Bruen*, 142 S. Ct. at 2122 (emphases added). The New Mexico Constitution likewise secures the right to keep and bear arms. New Mexico's provision specifically applies to "security and defense," as well as to "lawful hunting," "recreational use," and "other lawful purposes." N.M. Const. art. II, § 6.

The *Bruen* Court emphasized that the importance of a governmental objective is irrelevant to the constitutionality of a state's regulation of firearms. If the regulation interferes with an individual's right to armed self-defense, it is presumptively unconstitutional and can only be upheld if the government is able to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. As indicated above, the novel reclassification of gun violence as a "public health emergency" appears to have been adopted as a pretext to apply the extraordinary but narrowly proscribed powers of the PHERA to prohibit all citizens, regardless of their criminal intent or conduct, to possess firearms in public. Unfortunately, it is the very novelty of this approach that places it outside the "historical tradition" of gun regulation in this country and thus unlikely to survive judicial scrutiny.

For these reasons, my office cannot undertake a defense of the Emergency Order and though we will provide a limited commission for your administration to defend these actions in the above referenced cases, I strongly encourage you to consider whether the time and energy dedicated to its defense might be better utilized in the development of a comprehensive legislative response to the problem of gun violence for the New Mexico Legislature to consider during the upcoming session.

New Mexicans recognize that there is no single solution to our public safety challenges. Instead, there is a common understanding that we must address multiple issues simultaneously and comprehensively to make a meaningful impact. We need, among other things, more and better trained police officers; stricter gun laws and tougher guidelines for pretrial detention; robust mental health and drug treatment; rehabilitation programs to reduce recidivism; real-time data on gun crimes and gun trafficking; and a protective services framework that keeps today's child victims from maturing into the next generation's repeat offenders.

Our collective efforts should thus be engaged in a robust dialogue around each of these issues, building consensus that challenges the status quo and harnessing our once-in-a-

*Plaintiff's Exhibit #3*

*page 3 of 4*

generation budget surplus to bring about transformative change. This can only occur through the legislative process and will only occur through your committed and energetic leadership. While I understand that frustration may have led you to undertake a unilateral approach to addressing the heart-wrenching challenge of gun violence in our community, I urge you to reconsider this course of action and redouble your efforts to bring about lasting change through the democratic process. I can and will commit the resources of the Attorney General's Office to such an endeavor and stand ready to assist you in building a safer community without sacrificing the constitutional rights which we have sworn an oath to preserve, protect and defend.

Sincerely,

Raúl Torrez
Attorney General

Plaintiff's Exhibit
#3
page 4 of 4.

FULKERSON v. New Mexico DEPARTMENT OF JUSTICE

Case Number _____

# EXHIBIT NUMBER:

N.M. Civil Rights
Act - 8 pages.

1          AN ACT

2  RELATING TO CIVIL RIGHTS; ENACTING THE NEW MEXICO CIVIL

3  RIGHTS ACT; PERMITTING AN INDIVIDUAL TO BRING A CLAIM AGAINST

4  A PUBLIC BODY OR PERSON ACTING ON BEHALF OF OR UNDER THE

5  AUTHORITY OF A PUBLIC BODY FOR A VIOLATION OF THE

6  INDIVIDUAL'S RIGHTS, PRIVILEGES OR IMMUNITIES ARISING

7  PURSUANT TO THE BILL OF RIGHTS OF THE CONSTITUTION OF NEW

8  MEXICO; PROHIBITING THE USE OF THE DEFENSE OF QUALIFIED

9  IMMUNITY; PERMITTING ATTORNEY FEES; LIMITING RECOVERY;

10  PROVIDING A THREE-YEAR STATUTE OF LIMITATIONS.

11

12  BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF NEW MEXICO:

13         SECTION 1.   SHORT TITLE.--This act may be cited as the

14  "New Mexico Civil Rights Act".

15         SECTION 2.   DEFINITION.--As used in the New Mexico Civil

16  Rights Act, "public body" means a state or local government,

17  an advisory board, a commission, an agency or an entity

18  created by the constitution of New Mexico or any branch of

19  government that receives public funding, including political

20  subdivisions, special tax districts, school districts and

21  institutions of higher education, but not including an

22  acequia or community ditch, a soil and water conservation

23  district, a land grant-merced, a mutual domestic water

24  consumers association or other association organized pursuant

25  to the Sanitary Projects Act or a water users' association.

HJC/HB 4/a
Page 1

SECTION 3.  CLAIM FOR VIOLATION OF RIGHTS ESTABLISHED
PURSUANT TO THE BILL OF RIGHTS OF THE CONSTITUTION OF NEW
MEXICO.--

A.  A public body or person acting on behalf of,
under color of or within the course and scope of the
authority of a public body shall not subject or cause to be
subjected any resident of New Mexico or person within the
state to deprivation of any rights, privileges or immunities
secured pursuant to the bill of rights of the constitution of
New Mexico.

B.  A person who claims to have suffered a
deprivation of any rights, privileges or immunities pursuant
to the bill of rights of the constitution of New Mexico due
to acts or omissions of a public body or person acting on
behalf of, under color of or within the course and scope of
the authority of a public body may maintain an action to
establish liability and recover actual damages and equitable
or injunctive relief in any New Mexico district court.

C.  Claims brought pursuant to the New Mexico Civil
Rights Act shall be brought exclusively against a public
body.  Any public body named in an action filed pursuant to
the New Mexico Civil Rights Act shall be held liable for
conduct of individuals acting on behalf of, under color of or
within the course and scope of the authority of the public
body.

HJC/HB 4/a
Page 2

D.  Individuals employed by a public body shall be prohibited from using the New Mexico Civil Rights Act to pursue a claim arising from the individual's employment by the public body.

E.  The remedies ~~provided~~ for in the New Mexico Civil Rights Act are not exclusive and shall be in addition to any other remedies prescribed by law or available pursuant to common law.

SECTION 4.  PROHIBITING THE USE OF THE DEFENSE OF QUALIFIED IMMUNITY.--In any claim for damages or relief under the New Mexico Civil Rights Act, no public body or person acting on behalf of, under color of or within the course and scope of the authority of a public body shall enjoy the defense of qualified immunity for causing the deprivation of any rights, privileges or immunities secured by the bill of rights of the constitution of New Mexico.

SECTION 5.  ATTORNEY FEES.--In any action brought under the New Mexico Civil Rights Act, the court may, in its discretion, allow a prevailing plaintiff or plaintiffs reasonable attorney fees and costs to be paid by the defendant.

SECTION 6.  LIMITATION ON RECOVERY.--

A.  In any action for damages against a public body pursuant to the New Mexico Civil Rights Act, the liability per occurrence shall not exceed the sum of two million

HJC/HB 4/a
Page 3

1  dollars ($2,000,000) per claimant, inclusive of the

2  claimant's costs of action and reasonable attorney fees.  In

3  jury cases, the jury shall not be given any instructions

4  dealing with this limitation.  Interest shall be allowed on

5  judgments against a public body at a rate equal to two

6  percentage points above the bank prime loan rate published by

7  the board of governors of the federal reserve system on the

8  last business day of the month preceding entry of the

9  judgment.  Interest shall be computed daily from the date of

10  the entry of the judgment until the date of payment.

11        B.  As of July 1, 2022 and on July 1 of each

12  successive year, the maximum recovery limit shall be

13  increased for the cost of living as provided in Subsection C

14  of this section.

15        C.  On July 1, 2022 and on July 1 of each

16  successive year, the maximum recovery limit shall be

17  increased by the increase in the cost of living.  The

18  increase in the cost of living shall be measured by the

19  percentage increase as of August of the immediately preceding

20  year over the level as of August of the previous year of the

21  consumer price index for all urban consumers, United States

22  city average for all items, or its successor index, as

23  published by the United States department of labor or its

24  successor agency, with the amount of the increase rounded to

25  the nearest multiple of ten thousand dollars ($10,000);

HJC/HB 4/a
Page 4

1   however, the maximum recovery limit shall not be adjusted

2   downward as a result of a decrease in the cost of living.

3   The risk management division of the general services

4   department shall publish by May 1 of each year the adjusted

5   maximum recovery limit that shall take effect the following

6   July 1.

7       SECTION 7.  STATUTE OF LIMITATIONS AND ABATEMENT.--A

8   claim made pursuant to the New Mexico Civil Rights Act shall

9   be commenced no later than three years from the date a claim

10  can be brought for the deprivation of a right, privilege or

11  immunity pursuant to the bill of rights of the constitution

12  of New Mexico unless a longer statute of limitations is

13  otherwise provided by state law.

14      SECTION 8.  INDEMNIFICATION BY PUBLIC BODY.--A judgment

15  awarded pursuant to the New Mexico Civil Rights Act against a

16  person acting on behalf of, under color of or within the

17  course and scope of the authority of the public body shall be

18  paid by the public body.  The public body shall also pay for

19  all litigation costs for the public body and for any person

20  acting on behalf of, under color of or within the course and

21  scope of the authority of the public body, including attorney

22  fees.

23      SECTION 9.  WAIVER OF SOVEREIGN IMMUNITY.--The state

24  shall not have sovereign immunity for itself or any public

25  body within the state for claims brought pursuant to the New

HJC/HB 4/a
Page 5

1    Mexico Civil Rights Act, and the public body or person acting

2    on behalf of, under color of or within the course and scope

3    of the authority of the public body provided pursuant to the

4    New Mexico Civil Rights Act shall not assert sovereign

5    immunity as a defense or bar to an action.

6        SECTION 10.    COMMON LAW JUDICIAL, LEGISLATIVE OR OTHER

7    ESTABLISHED IMMUNITY.--The prohibition on the use of the

8    defense of qualified immunity pursuant to Section 4 of the

9    New Mexico Civil Rights Act and the waiver of sovereign

10    immunity pursuant to Section 9 of that act shall not abrogate

11    judicial immunity, legislative immunity or any other

12    constitutional, statutory or common law immunity.

13        SECTION 11.    RECORDS OF CLAIMS.--Each public body shall

14    maintain a record of all final judgments and settlements paid

15    by the public body for claims made pursuant to the New Mexico

16    Civil Rights Act and attach a copy of the complaint to each

17    record.    All judgments, settlements and complaints are

18    subject to disclosure pursuant to the Inspection of Public

19    Records Act.

20        SECTION 12.    PROSPECTIVE APPLICATION.--Claims arising

21    solely from acts or omissions that occurred prior to July 1,

22    2021 may not be brought pursuant to the New Mexico Civil

23    Rights Act.

24        SECTION 13.    NOTICE OF CLAIMS.--

25        A.    Every person who claims damages from an act or    HJC/HB 4/a
                                                                    Page 6

1   omission of a certified law enforcement officer under the New

2   Mexico Civil Rights Act shall cause to be presented to the

3   certified law enforcement officer's agency or department,

4   within one year after an occurrence giving rise to a claim

5   under the New Mexico Civil Rights Act, a written notice

6   stating the time, place and circumstances of the loss or

7   injury.

8          B.  No suit or action for which immunity has been

9   waived under the New Mexico Civil Rights Act shall be

10   maintained, and no court shall have jurisdiction to consider

11   any suit or action against the state or any local public

12   body, unless notice has been given as required by this

13   section or unless the governmental entity had actual notice

14   of the occurrence.  The time for giving notice does not

15   include the time, not exceeding one year, during which the

16   injured person is incapacitated from giving the notice by

17   reason of injury.

18          C.  When a claim for which immunity has been waived

19   under the New Mexico Civil Rights Act is one for wrongful

20   death, the required notice may be presented by, or on behalf

21   of, the personal representative of the deceased person or any

22   person claiming benefits of the proceeds of a wrongful death

23   action, or the consular officer of a foreign country of which

24   the deceased was a citizen, within one year and six months

25   after the date of the occurrence of the injury that resulted

HJC/HB 4/a
Page 7